## IN THE UNITED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RONDA A. PLEDGER, SANDRA BRITT, JENNIFER L. PRIMM, AND ALEX BROOKS, JR., individually and as representatives of a class of similarly situated persons of the Insperity 401(k) Plan, | CIVIL ACTION NO. COMPLAINT—CLASS ACTION JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| RELIANCE TRUST COMPANY, INSPERITY, INC., INSPERITY HOLDINGS, INC., INSPERITY RETIREMENT SERVICES, L.P., INSPERITY RETIREMENT PLAN COMMITTEE, AND JOHN DOES 1–20, | |
| *Defendants.* | |

1.     Plaintiffs Ronda A. Pledger, Sandra Britt, Jennifer L. Primm, and Alex Brooks, Jr., individually and as representatives of a class of participants and beneficiaries in the Insperity 401(k) Plan ("Plan") bring this action under 29 U.S.C. §§1132(a)(2) and (3) on behalf of the Plan against Defendants Reliance Trust Company, Insperity, Inc., Insperity Holdings, Inc., Insperity Retirement Services, L.P., Insperity Retirement Plan Committee, and John Does 1–20 for breach of fiduciary duties.

2.     Today, 401(k) defined contribution plans, in which the employee's retirement assets are at risk of high fees and underperformance, have become America's primary retirement system, departing from traditional defined benefit (pension) plans in which the employer assumes the risk.[1] With over $2 billion in assets, the Plan is in the top *0.08%*—less than 1%—of over 621,000 401(k) plans offered to participants based on plan assets.[2] The marketplace for 401(k) retirement plan services is established and competitive and multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to demand low-cost services. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that plan expenses are reasonable. These duties have been defined as the "highest known to the law", which must be done with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Reliance Trust selected and retained high-cost and poorly

---

[1] Nancy Trejos, *Retirement Wreck,* WASHINGTON POST (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

[2] *The BrightScope / ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* at 11 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

performing investments, including its own proprietary investments, compared to available institutional alternatives to benefit itself and the other defendants, and Defendants allowed Insperity's proprietary recordkeeping subsidiary to receive excessive recordkeeping compensation for providing recordkeeping services to drive revenues and profits to themselves at the expense of Plan participants.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District and Division is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district

and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found. In addition, Named Plaintiffs Pledger and Britt reside in this District, participated in the Plan from this District, and received Plan information from Defendants from this District. Defendant Reliance Trust, who is the discretionary trustee for the Plan, resides in this District where it held and controlled Plan assets and made investment selection, deselection and other decisions deciding Plan makeup.

## PARTIES

### The Insperity 401(k) Plan

6.     The Insperity 401(k) Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a), which was last amended and restated effective January 1, 2014.

8.     Generally, Insperity offers the Plan to employees of small- and medium-sized businesses whose employer has contracted with Insperity to serve as its off-site human resources department. These employees are referred to as "eligible worksite employees".

4

9.     Specifically, the client company enters into an election agreement with a subsidiary of Insperity, Inc., Insperity Holdings, Inc., to permit its employees to participate in the Plan. The election agreement becomes effective when the client company enters into a client service agreement with another subsidiary of Insperity, Inc., Insperity PEO Services, L.P. (formerly named Administaff Companies II, L.P.), to provide off-site, full service human resource services to the client company. Under this client service agreement, the employees of the client company are designated as co-employees of Insperity PEO Services, L.P.

10.     The Plan provides for retirement income for the eligible worksite employees of Insperity Holdings, Inc. and its affiliates. This retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and from the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

11.     As of December 31, 2014, the Plan is one of the country's largest 401(k) plans and is what is known as a jumbo plan with over $2 billion in total assets and over 50,000 participants with account balances.

**Plaintiffs**

12.     Ronda A. Pledger resides in Roswell, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

13.     Sandra Britt resides in Ackworth, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

14.     Jennifer L. Primm resides in Pinehurst, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

15.     Alex Brooks, Jr. resides in Houston, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

**Defendants**

16.     Reliance Trust Company ("Reliance Trust") is a domestic bank organized under Georgia law with its principal place of business in Atlanta, Georgia. Under the Trust Agreement between Insperity Holdings, Inc. and Reliance Trust Company, Reliance Trust functions as the Plan's discretionary trustee to "hold, manage and control the assets of the Plan", including the selection, retention and monitoring of investment options made available to

6

participants for the investment of their contributions and provision of their retirement income.

17.     Insperity, Inc. (formerly named Administaff, Inc.) is a for-profit domestic corporation organized under Delaware law with its principal place of business in Kingwood, Texas. Insperity, Inc. serves as a professional employer organization providing human resources and business solutions to small- and medium-sized businesses (5 to 5,000 employees) throughout the United States.

18.     Insperity, Inc. acts through its officers, including those acting as Plan fiduciary committee members, and administers the Plan through its subsidiaries.

19.     Insperity Holdings, Inc. (formerly named Administaff of Texas, Inc.) is a for-profit domestic corporation organized under Delaware law with its principal place of business in Kingwood, Texas. Insperity Holdings, Inc. is a wholly owned subsidiary of Insperity, Inc.

20.     Section 10.2 of the Plan names Insperity Holdings, Inc. as the fiduciary responsible for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a), with all powers necessary to enable it properly to carry out such responsibilities, which includes the selection and compensation of the providers of administrative services to the

Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. Insperity Holdings, Inc. is the Plan sponsor under 29 U.S.C. §1002(16)(B) and Plan administrator under 29 U.S.C. §1002(16)(A)(i). Insperity Holdings, Inc. is a fiduciary to the Plan because it exercised discretionary authority or control respecting the management of the Plan or disposition of its assets, and exercised discretionary authority or responsibility in the administration of the Plan.

21. Under Section 10.3 of the Plan, Insperity Holdings, Inc. may delegate, by written instrument, all or any part of its responsibilities under the Plan to such person or persons and may revoke such delegation. Insperity Holdings, Inc. delegated its fiduciary responsibility to hold, manage and control the assets of the Plan to Reliance Trust, which includes the selection, retention and monitoring of Plan investment options.

22. Insperity Holdings, Inc. is advised by a committee that consists of certain officers and members of management of Insperity, Inc. For the purpose of this complaint, the committee is referred to as the "Insperity Retirement Plan Committee". Plaintiffs are currently unaware of the identities of the individual members of the committee or the formal name of the committee. Those individuals are collectively named as John Does 1–20.

Plaintiffs will substitute the real names of the John Does and the formal name of the committee when Plaintiffs know them.

23.     Insperity Retirement Services, L.P. (formerly Administaff Retirement Services, L.P.) is a domestic limited partnership organized under Delaware law with its principal place of business in Kingwood, Texas. Insperity Retirement Services is a wholly-owned subsidiary of Insperity, Inc. Since October 1, 2003, Insperity Retirement Services has served as the Plan recordkeeper providing in-house administrative and recordkeeping services.

24.     Because all of the Insperity individual entities have acted as alleged herein as the agents of Insperity, Inc., they are collectively referred to hereafter as Insperity unless otherwise indicated.

## FACTS APPLICABLE TO ALL COUNTS

### Insperity's Principal Business as a Provider of HR Outsourcing Services

25.     As a professional employer organization ("PEO"), Insperity's core business is providing human resources and business solutions to small- and medium-sized businesses, which range from payroll processing to employee performance management and training.

26.     Under a PEO arrangement, Insperity assumes an employer/employee relationship with the employees of the client company.

9

> In a PEO arrangement, the PEO assumes certain aspects of the employer/employee relationship as defined in the contract between the PEO and its client. Because PEOs provide employer-related services to a large number of employees, they can achieve economies of scale that allow them to perform employment-related functions more efficiently, provide a greater variety of employee benefits, and devote more attention to human resources management than a client can individually.[3]

27.   Under the Insperity's PEO outsourcing service, all client companies execute a client service agreement whereby Insperity is contracted to provide off-site, full service human resource services. This agreement also provides for an ongoing relationship between Insperity and the client company.

28.   The client service agreement divides responsibility between Insperity and the client company. Through this division, Insperity is responsible for providing employee benefits through Insperity-sponsored plans in compliance with ERISA and other federal laws.

29.   As previously noted, employees  of clients who enter into this client service agreement with Insperity (referred to as "Workforce Optimization® clients") are eligible to participate in the Plan upon the client's

---

[3] Insperity, Inc. Form 10-K at 3 (Dec. 31, 2014), available at http://www.sec.gov/Archives/edgar/data/1000753/000100075315000008/document-12312014x10k.htm.

execution of an election agreement designating the Plan as the retirement savings plan for their employees, who become co-employees of Insperity.

30.   Insperity promotes the Plan to client companies, emphasizing the fiduciary role it assumes on behalf of clients when administering and managing the Plan for their employees.

> For Insperity® Workforce Optimization® clients, the Insperity 401(k) Plan removes burdens of plan sponsorship[.]
> …
> **Relief from plan sponsorship and fiduciary responsibility.**
> As plan sponsor, Insperity assumes all of the responsibilities inherent in plan sponsorship, including fiduciary obligations.
> …
> **Elimination of your day-to-day 401(k) tasks**
> We take care of everything. We already have your data because you're a Workforce Optimization® client. You won't be bothered with sending payrolls, tracking eligibility or approving QDROs and loans. Insperity deposits all contributions; distributes all participant communications; and prepares and submits IRS Form 5500.[4]

31.   Consequently, assuming complete fiduciary authority over the Plan and its assets by Insperity is a central selling point of the Plan offered to small- and medium-sized businesses.

32.   Insperity also promotes the investment services provided by Reliance Trust with respect to the Plan. In participant communications, Insperity refers to Reliance Trust as the "investment manager and trustee"

---

[4] See http://www.insperity.com/services/retirement/401k-plans/insperity-401k-plan (emphasis in original).

for the Plan who "selects and continually monitors the investment options available to participants in the Plan."

33.     In promotional materials for its retirement services business, Insperity markets Reliance Trust as a provider of investment products who "carefully manage[s]" available investment options by its "experts" at the company to ensure participants are provided "the best possible choice".[5]

## The Plan Seeded and Continues to Sustain Insperity's Proprietary 401(k) Recordkeeping Business

34.     After performing human resource services to businesses since the company was founded in 1986, Insperity saw an opportunity to enter the 401(k) recordkeeping marketplace to further enhance its revenue generated from PEO arrangements.

35.     In February 2003, Insperity announced its plans to provide recordkeeping services to the Plan and other defined contribution plans. During the year, Insperity established Insperity Retirement Services to perform such services.

36.     By October 1, 2003, rather than obtaining bids, Insperity hired itself and began providing recordkeeping services to the Plan. In doing so, Insperity became its own first recordkeeping client.

---

[5] See http://www.insperity.com/services/retirement/investment-choices.

37.     On December 31, 2003, Insperity began providing recordkeeping services to the separate Insperity Corporate 401(k) Plan (formerly Administaff Corporate 401(k) Plan) and other defined contribution plans.[6]

38.     Expanding its business beyond human resource outsourcing services occurred at a time when the company was recovering from financial shortfalls that included a net loss in 2002.[7] In 2003, the company reflected on these past challenges:

> [Insperity] experienced an extraordinary recovery and return to profitability in 2003. While emerging from one of the most challenging periods in our 17-year history, we overcame significant obstacles, accomplished major objectives and posted some of our best-ever financial results.[8]

39.     Providing recordkeeping services to Insperity-sponsored retirement plans was a departure from Insperity's prior business. Previously, Insperity retained a third-party service provider to perform the majority of the recordkeeping functions associated with the Plan.[9]

---

[6] Insperity, Inc. Form 10-K at 2, 41 (Dec. 31, 2003), available at http://www.sec.gov/Archives/edgar/data/1000753/000095012904000788/h12965e10vk.htm.

[7] Insperity, Inc. Form 10-K at 29 (Dec. 31, 2002), available at http://www.sec.gov/Archives/edgar/data/1000753/000095013403004206/h03347e10vk.htm#011.

[8] See 2003 Insperity Annual Report, available at http://library.corporate-ir.net/library/10/105/105568/Items/103119/C31BB24A-A60E-4BB8-BD69-6CCB511056B1_ASF_2003AR.pdf.

[9] See 2003 Insperity Annual Report at 41.

13

40.     Since the Plan's inception, Insperity has used the retirement assets of the Plan to seed its new and untested 401(k) recordkeeping business. The Plan has been and continues to notably be Insperity's largest, but also its most profitable recordkeeping client. In 2013, Insperity boasted that the 401(k) plan assets it recordkept and administered exceeded $2 billion.[10] At that time, the Plan represented over $1.9 billion in assets, or <u>95%</u> of Insperity's 401(k) recordkeeping assets.[11] As a result, the Plan's assets, and the revenues derived from proprietary services provided to the Plan, have built and sustained Insperity's retirement business.

**Insperity's Compensation for Proprietary Recordkeeping Services**

41.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are capable of providing a high level of service to jumbo 401(k) plans, like the Plan, and will readily respond to a request for proposal. These vendors primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

---

[10] Press Release, *Insperity Retirement Services Tops $2 Billion in 401(k) Plan Assets*, BUSINESSWIRE (Apr. 9, 2013), available at http://www.businesswire.com/news/home/20130409005098/en/Insperity-Retirement-Services-Tops-2-Billion-401.

[11] See 2013 Insperity 401(k) Plan Form 5500.

42.    The cost of providing recordkeeping services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 50,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

43.    Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services.

44.    Mutual funds have thousands of shareholders and the expense ratio for those funds includes within it a portion for recordkeeping those thousands of shareholders' accounts. However, since a mutual fund in a 401(k) plan has only one aggregate amount in the plan to track, the recordkeeping must be done by the plan for each participant. In these

15

circumstances, some mutual funds engage in a practice in 401(k) plans known as revenue sharing.

45.   In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing recordkeeping and administrative services for the investment vehicle. Because revenue sharing arrangements provide asset-based fees, and recordkeeping costs have nothing to do with the size of 401(k) participants' assets, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, flat per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Because revenue sharing payments are asset-based, they can bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or be used as kickbacks by mutual fund companies to induce recordkeepers to have those mutual funds included as plan investment options.

46.   To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large 401(k) plans, such as the Plan, put plan

16

recordkeeping and administrative services out for competitive bidding at regular intervals of around three years.

47.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services, the payments can effectively be "kickbacks" for including the fund in a plan's investment lineup. There are vendors readily available that do recordkeeping only and do not sell investment products. These vendors can offer pricing on a pure per-participant basis, without any revenue sharing component.

48.    In order to make an informed assessment as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider.

49.    When providing recordkeeping services, Insperity is compensated based on a combination of hard dollar fees and revenue sharing payments from the Plan's investments.

50.    A hard dollar fee refers to a direct payment from the participant's account rather than an indirect or revenue sharing payment from the Plan investment. All participants in the Plan paid the same hard dollar fee.

51.    With the exception of the Plan's passively managed BNY Mellon S&P 500 Index Fund II, with an expense ratio of 5 bps, all of the other funds in the Plan paid or continue to pay revenue sharing to Insperity Retirement Services, and in turn, Insperity, Inc. These participants in those funds paid Insperity's recordkeeping arm both asset-based and revenue sharing payments for recordkeeping.

52.    As described in further detail below, the amount paid by Plan participants for recordkeeping services was and is excessive for the services provided, and Defendants failed to rebate to Plan participants excessive payments that exceeded a reasonable, flat per participant recordkeeping fee. In doing so, Defendants acted for their benefit to drive revenue and profits to themselves, and Insperity's own recordkeeping business, at the expense of Plan participants.

### Reliance Trust's Comprehensive Role in the Plan

53.    By end-of-year 2003, Insperity retained Reliance Trust as discretionary trustee to hold, manage and control the assets of the Plan and to be responsible for selecting, retaining and monitoring of investment options available to participants for the investment of their retirement assets.

54.    As the delegated fiduciary responsible for Plan investment selections, Reliance Trust selected mutual fund and collective trust investments for the Plan. These investments were not limited to non-proprietary funds offered by third-party investment management firms. Rather, Reliance Trust, who must act for the exclusive benefit of Plan participants, selected and retained its own high-cost and poorly performing Reliance Trust investments to benefit itself at the expense of Plan participants. In return for offering its own products, Reliance Trust selected investments that paid asset-based, revenue sharing to Insperity's subsidiary, Insperity Retirement Services, and consequently, Insperity, Inc., for providing recordkeeping services.

55.    For the target date fund options, Reliance Trust selected its untested, newly-established target-date funds with no performance history, called the Insperity Horizon Risk-Managed Funds.[12] These proprietary target date funds were established on November 13, 2012 and were added to the Plan just days later.

56.    Selecting investment options for plan participants that have no performance history is wholly contrary to the most basic prudent fiduciary

---

[12] See, e.g., Insperity Horizon Risk-Managed 2020 Fund Fact Sheet, available at https://retirementdocs.insperity.com/fundfact/NSP2020.pdf.

practices. When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate superior long-term investment results compared to the fund's benchmark or peer group of managers with similar mandates. At a minimum, prudent fiduciaries require a three-year performance history for an investment option prior to its inclusion in a 401(k) plan. As set forth in further detail below, there was no prudent or loyal reason to select the Reliance Trust target date funds in the Plan without a performance history and to retain these funds when they served to only benefit Defendants at the expense of Plan participants.

57.    For providing investment services as set forth in the Plan's Trust Agreement, Reliance Trust is compensated based on an asset-based fee in the following fee schedule.

| Annual Asset Market Value | Fee |
|---|---|
| First $30,000,000 | 18 basis points (0.18%) |
| Next $70,000,000 | 12.5 basis points (0.125%) |
| Next $700,000,000 | 6.5 basis points (0.065%) |
| Over $800,000,000 | 4.5 basis points (0.045%) |

58.     The amount of this compensation was and remains unreasonable for the services provided to the Plan. As the discretionary trustee, Reliance Trust is responsible for the selection, retention and monitoring of investment options. However, there is no value to the Plan when an investment adviser, who has a financial incentive to favor its own products, merely selects, monitors and retains its own proprietary investments to benefit itself, or when the adviser selects investment options laden with asset-based revenue sharing payments designed to benefit other plan fiduciaries and services providers, who permit the adviser to benefit from its conflicted investment decisions.

59.     The United States Department of Labor ("DOL") explicitly requires the disclosure of direct and indirect compensation received by service providers in connection with services provided to a 401(k) plan on a publicly available form, the Form 5500. This makes it possible for plan participants to see what fees are being charged and who is receiving them.

21

Despite the fact that Reliance Trust is compensated for providing services to the Plan, the total amount of its compensation is not reported on the Plan's Form 5500s filed with the DOL.

## Plan Investments

60.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. See 29 U.S.C. §1002(34). Accordingly, poor investment performance and unreasonable fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. See, e.g., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013)(illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[13]

61.    As of December 31, 2014, Reliance Trust had selected as investment options in the Plan 14 mutual funds and 7 collective trusts among multiple asset classes. These funds included two proprietary Reliance Trust-

---

[13] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

managed investment offerings: the target dated funds, called the Insperity Horizon Risk Managed Funds, and the stable value fund, called the Reliance Trust New York Anchor Account (Series 1, Class 25).

## Excessive Recordkeeping and Administrative Fees

62.     Rather than using an arm's length bidding process to hire a recordkeeper for the Plan, since 2003, Defendants selected Insperity's own subsidiary, Insperity Retirement Services, as the Plan's recordkeeper. Defendants are responsible for monitoring the compensation received by Insperity's in-house recordkeeper, Insperity Retirement Services, including the revenue sharing payments it received from the Reliance Trust funds and other funds for recordkeeping services.

63.     Insperity Retirement Services is compensated based on hard dollar and asset-based revenue sharing payments from the Plan's investments. The Plan's recordkeeping fees became excessive in part because Defendants failed to monitor and control the amount of hard dollar and asset-based revenue sharing amounts allocated to Insperity Retirement Services.

64.     Upon information and belief, Defendants selected Insperity's own subsidiary, Insperity Retirement Services, to provide administrative and recordkeeping services without any competitive bidding process and without any negotiation over the compensation to be paid for these services, even

though other outside entities would have provided the same services at a far lower cost to the Plan. Defendants also failed to even attempt to rebate excessive fees to Plan participants. This allowed Insperity Retirement Services, and in turn Insperity, Inc., to self-deal by receiving significant revenues and profits, and unreasonable recordkeeping fees, which came at the direct expense of Plan participants. Since Defendants, which include Insperity wholly-owned subsidiaries, must monitor Insperity Retirement Services' recordkeeping fees, there is a direct conflict of interest, and the Plan's fees became excessive in part because Defendants failed to monitor and control the amount of the revenue sharing payments to Insperity Retirement Services, and in turn Insperity, Inc.

65. Based on the nature of the administrative services provided by Insperity Retirement Services, the Plan's participant level (roughly 50,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant.

66. Based on the direct compensation levels shown on the Plan's Form 5500 filed with the Department of Labor, and the estimated revenue sharing or indirect compensation, the Plan paid approximately $119 to $142 per participant per year from 2009 through 2014, as much as 473% higher

than a reasonable fee for these services, resulting in millions of dollars in excessive fees.

67.     From the beginning of 2009 to the end of 2014, the Plan's assets almost tripled, from $704 million to over $2.04 billion. Because revenue sharing payments are asset-based, the already excessive compensation paid to Insperity Retirement Services increased each year even though the administrative services provided to the Plan remained essentially the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan but failed to do so.

68.     Defendants failed to prudently monitor and control Insperity Retirement Services' recordkeeping compensation, including the amount of asset-based, uncapped revenue sharing. By allowing Insperity Retirement Services to receive an uncapped amount of revenue sharing, Defendants allowed it to receive greatly excessive compensation.

69.     Had Defendants conducted a competitive bidding process to select the Plan's recordkeeper and ensured that only reasonable fees were charged for administrative and recordkeeping services, Plan participants would not have lost over $30 million through unreasonable recordkeeping expenses.[14]

---

[14] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who

**Excessive Investment Management Fees**

70.     Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

71.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that

---

have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

72.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000).

73.     Many Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively

managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (January/February 1991).[15]

74.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

75.     Reliance Trust and Insperity engaged in blatant self-dealing when offering higher-cost investments to Plan participants. In order to drive revenue to Reliance Trust, Reliance Trust selected, and Insperity allowed, Reliance Trust proprietary investments to be offered as Plan investment options. In return, Reliance Trust selected mutual fund and collective trust investments with higher-cost share classes than identical investments with the same manager that were available to the Plan in order to drive asset-based revenue sharing payments to Insperity for recordkeeping services. This conflicted scheme ensured that excessive fee revenue from Plan investments was fully captured and sustained by these conflicted fiduciaries.

---

[15] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

76.   As demonstrated below, at all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan compared to institutional alternatives that were readily available to the Plan, including lower-cost share classes of the identical mutual fund and collective trust investments, lower-cost mutual fund options with similar investment styles, even lower cost separate accounts, and lower-cost collective trusts, which in some instances are lower cost than separate accounts. Those high fees were not justified by superior investment performance.

### A. *Excessive fees compared to the identical mutual fund and collective trust investments*

77.   It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees that can be obtained in the market. Thus, large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Jumbo multi-billion dollar plans, such as the Plan, have even greater bargaining power.

78.   Lower-cost institutional share classes of mutual funds or collective trusts compared to retail shares are available to institutional

investors, even much smaller than the Plan, that meet minimum investment amounts for these share classes.

79.    Throughout the relevant time period, the Plan offered higher-cost share classes of mutual funds and collective trusts despite lower-cost share classes for the identical investment with the same investment managers that were available to the Plan.

### 1.  Mutual Funds in the Plan as of December 31, 2014

80.    Lower-cost identical institutional mutual fund alternatives to the Plan's retail mutual funds with assets as of December 31, 2014 included the following:

| Plan Investment[16] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) (PCVAX) | 117 bps | $65,930,339 | PSVIX | 77 bps | 52% |

---

[16] Expense ratios were primarily obtained from Morningstar, a provider of independent investment research. See www.morningstar.com. For the Virtus Real Estate Securities Fund, the expense ratio was obtained from the fund's prospectus dated Nov. 12, 2014, available at http://www.sec.gov/Archives/edgar/data/1005020/000157104914006219/t1402 057_485bpos.htm.

| Plan Investment[16] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| AllianzGI High Yield Bond (Adm) (AYBVX) | 97 bps | $32,914,144 | AYBIX | 64 bps | 52% |
| American Beacon Mid Cap Value Fund (Inv) (AMPAX) | 114 bps | $103,448,427 | AACIX | 93 bps | 23% |
| American Funds EuroPacific Growth Fund (R3) (RERCX) | 114 bps | $113,188,795 | RERGX | 49 bps | 133% |
| BlackRock Equity Dividend Fund (S) (MSDVX) | 101 bps | $101,123,975 | MADVX | 70 bps | 44% |
| Eaton Vance Floating-Rate Fund (A) (EVBLX) | 99 bps | $14,008,553 | EIBLX | 74 bps | 34% |
| Mainstay Large Cap Growth Fund (R2) (MLRTX) | 109 bps | $90,134,981 | MLRSX | 62 bps | 76% |
| Munder Midcap Core Growth Fund (A) (MGOAX) | 132 bps | $86,255,539 | MGOSX | 89 bps | 48% |

| Plan Investment[16] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| PIMCO Total Return Fund (Adm) (PTRAX) | 71 bps | $86,022,139 | PTTRX | 46 bps | 54% |
| Virtus Real Estate Securities Fund (A) (PHRAX) | 138 bps | $63,058,966 | VRREX | 96 bps | 44% |
| John Hancock Income Fund (R4) (JSNFX) | 69 bps | $33,621,881 | JSNWX | 42 bps | 64% |

### 2. Mutual Funds in the Plan prior to December 31, 2014

81.    Investments that were removed before end-of-year 2014 also suffered from higher-cost share classes than those identical lower-cost share classes available to the Plan. Lower-cost identical institutional mutual fund alternatives to these retail mutual funds included:

| Prior Mutual Fund Investments[17] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund (SS) (PRSXX) | 29 bps | $120,004,672 | POIXX | 20 bps | 45% |
| American Funds Growth Fund of America (R3) (RGACX) | 97 bps | $60,060,301 | RGAGX | 34 bps | 185% |
| American Funds High Income Trust (R3) (RITCX) | 102 bps | $20,936,278 | RITGX | 37 bps | 176% |

[17] For asset amounts, the end-of-year assets for the mutual funds prior to their removal from the Plan were included, as well as their corresponding expense ratios and the expense ratios of the lower-cost mutual fund alternatives. Expense ratios were primarily obtained from Morningstar. For the American Funds Growth Fund of America, the expense ratio was obtained from the fund's annual report dated Aug. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/44201/000005193110000690/gfa_ncsr .htm. For the Davis New York Venture Fund, the expense ratio was obtained from the fund's annual report dated July 31, 2010, available at http://www.sec.gov/Archives/edgar/data/71701/000007170110000045/dnyvf_dr fncsr.htm. For the J.P. Morgan SmartRetirement Funds, the expense ratios were obtained from the funds' prospectus dated Nov. 1, 2010, available at http://www.sec.gov/Archives/edgar/data/1217286/000114544310002212/d2737 8.htm. For the Fidelity Advisor Freedom Funds, the expense ratios were obtained from the funds' prospectus dated May 30, 2009, available at http://www.sec.gov/Archives/edgar/data/880195/000088019509000089/main.h tm#fid4666.

| Prior Mutual Fund Investments[17] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Columbia Strategic Income Fund (A) (COSIX) | 103 bps | $31,328,730 | LSIZX | 78 bps | 32% |
| Davis New York Venture Fund (R) (NYVRX) | 123 bps | $60,639,007 | DNVYX | 63 bps | 95% |
| Fidelity Spartan U.S. Equity Index Fund (Inv) (FUSEX) | 10 bps | $76,572,314 | FUSVX | 7 bps | 43% |
| Goldman Sachs Mid Cap Value Fund (Svc) (GSMSX) | 124 bps | $91,459,412 | GSMCX | 74 bps | 68% |
| JPMorgan SmartRetirement 2010 Fund Select (JSWSX) | 76 bps | $46,585,514 | JSWIX | 61 bps | 25% |
| JPMorgan SmartRetirement 2020 Fund Select (JTTSX) | 84 bps | $118,464,448 | JTTIX | 69 bps | 22% |
| JPMorgan SmartRetirement 2030 Fund Select (JSMSX) | 92 bps | $109,109,831 | JSMIX | 77 bps | 19% |

| Prior Mutual Fund Investments[17] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 Fund Select (SMTSX) | 94 bps | $78,657,794 | SMTIX | 79 bps | 19% |
| JPMorgan SmartRetirement 2050 Fund Select (JTSSX) | 94 bps | $8,236,242 | JTSIX | 79 bps | 19% |
| Fidelity Advisor Freedom 2010 Fund (T) (FCFTX) | 117 bps | $40,728,638 | FCIFX | 67 bps | 75% |
| Fidelity Advisor Freedom 2020 Fund (T) (FDTFX) | 123 bps | $82,919,255 | FDIFX | 73 bps | 68% |
| Fidelity Advisor Freedom 2030 Fund (T) (FTFEX) | 127 bps | $65,792,236 | FEFIX | 77 bps | 65% |
| Fidelity Advisor Freedom 2040 Fund (T) (FTFFX) | 129 bps | $45,146,999 | FIFFX | 79 bps | 63% |

### 3. Mutual Funds Added to the Plan July 22, 2015

82.   Effective July 22, 2015, several investment options were removed from the Plan and new funds were added as their replacements. These newly added funds were also invested in higher-cost share classes of identical institutional mutual funds than were available to the Plan.

35

| Newly-Added Mutual Fund Investments[18] | Plan Fee | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund (M) (MWTRX) | 68 bps | MWTIX | 44 bps | 55% |
| T. Rowe Price Blue Chip Growth Fund (Adv) (PABGX) | 98 bps | TRBCX | 72 bps | 36% |
| Hartford SmallCap Growth HLS Fund (IB) (HBSGX) | 90 bps | HISCX | 65 bps | 38% |
| T. Rowe Price Real Estate Fund (Adv) (PAREX) | 102 bps | TRREX | 76 bps | 34% |

83.     The self-dealing between Reliance Trust and Insperity of offering higher-cost share classes to drive revenue to Reliance Trust and Insperity Retirement Services, and in turn Insperity, Inc., is even more apparent considering the list of available investment options made available to Insperity's other recordkeeping clients to whom, unlike Insperity Plan participants, it owed no fiduciary duty. From the list of available investment options, Insperity provided lower-cost share classes for the American Funds EuroPacific Growth Fund and the Virtus Real Estate Securities Fund to

---

[18] Expense ratios were obtained from Morningstar. The T. Rowe Price Blue Chip Growth Fund (Instl) (TBCIX) is also lower cost at 58 bps, see prospectus dated Dec. 15, 2015, available at http://www.sec.gov/Archives/edgar/data/902259/000090225915000017/BCGBCI485b.htm#1_2.

other defined contribution plan clients than were offered to Plan

participants.[19]

### 4. Collective Trusts in the Plan as of December 31, 2014

84.    The Plan also offered collective trust investments, which are

pooled investment vehicles provided by a trust company or bank. These

investments are commonly offered to institutional clients, including 401(k)

plans.

85.    Higher-cost share classes for the identical investment with the

same investment manager were also offered for the Plan's collective trust

investments. Lower-cost identical institutional collective trust alternatives to

the Plan's collective trusts with assets as of December 31, 2014 included the

following:

---

[19] See http://www.insperity.com/services/retirement/investments-funds.

| Plan Investment[20] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| New York Life Anchor Fund, Series I, Class 25 | 72 bps | $113,782,101 | New York Life Anchor Fund, Series I, Class 0 | 47 bps | 53% |
| Insperity Horizon Risk-Managed 2020 Fund I | 53 bps | $177,602,148 | Reliance Trust Risk-Managed 2020 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed 2030 Fund I | 53 bps | $197,592,343 | Reliance Trust Risk-Managed 2030 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed 2040 Fund I | 53 bps | $155,842,314 | Reliance Trust Risk-Managed 2040 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed 2050 Fund I | 53 bps | $49,662,836 | Reliance Trust Risk-Managed 2050 Target Date Fund I | 28 bps | 89% |

---

[20] Expense ratios were obtained from Reliance Trust, see http://www.relico.com/CIT/Pages/CITHome.aspx. Based on information presently available, the Plan also offered the BNY Mellon S&P 500 Index Fund II as a Plan investment option. Plaintiffs do not have sufficient information to determine whether a lower-cost share class for the fund existed during the relevant time period.

| Plan Investment[20] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Insperity Horizon Risk-Managed Retirement Income Fund | 53 bps | $58,300,748 | Reliance Trust Risk-Managed Retirement Income Fund I | 28 bps | 89% |

86.   Apart from the examples shown above, lower-cost share classes to the Plan's mutual funds and collective trusts were available throughout the relevant time period.

87.   Had the amounts invested in the higher-cost share classes instead been invested in the identical lower-cost share class versions of the Plan's investments, Plan participants would not have lost over $26 million in their retirement savings through excessive fees.[21]

### B. *Excessive fees compared to mutual funds from other mutual fund companies*

88.   The fees charged on the Plan's investments are far higher than reasonable investment management fees for such funds. These fees were and are significantly higher than comparable institutional mutual funds available

---

[21] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses.

to 401(k) plans, including actively-managed and passively-managed index Vanguard institutional funds with similar investment styles that were readily available as Plan investment options.

### 1.  Funds in the Plan as of December 31, 2014

89.    As of December 31, 2014, the fees for the Plan's investment options then in the Plan were up to *16 times* more expensive than available Vanguard alternatives in the same investment style.

| Plan Investment[22] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) | 117 bps | Vanguard Small-Cap Value Index (Instl) (VSIIX) | 8 bps | 1363% |
| | | Vanguard Explorer Value Fund (VEVFX) | 57 bps | 105% |

---

[22] The Plan's Form 5500 identified the "Instl" share class for the AllianzGI High Yield Bond Fund but participant communications reference the "Adm" share class (AYBVX). Similarly, the Form 5500 identified the "Instl" share class for the BlackRock Equity Dividend Fund but participant communications reference the "Serv" share class (MSDVX). Expense ratio information was obtained primarily from Morningstar. For the Vanguard Target Retirement Funds, fee information was obtained from the funds' annual report dated September 30, 2014, available at http://www.sec.gov/Archives/edgar/data/752177/000093247114006878/chester _final.htm.

| Plan Investment[22] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| AllianzGI High Yield Bond (Adm) | 97 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 13 bps | 646% |
| American Century Inflation-Adjusted Bond Fund (Instl) | 27 bps | Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX) | 7 bps | 286% |
| American Beacon Mid Cap Value Fund (Inv) | 114 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 9 bps | 1167% |
| | | Vanguard Selected Value Fund (VASVX) | 41 bps | 178% |
| American Funds EuroPacific Growth Fund (R3) | 114 bps | Vanguard Total International Stock Index Fund (Instl) (VTSNX) | 12 bps | 850% |
| | | Vanguard International Growth Fund (Adm) (VWILX) | 34 bps | 235% |
| BlackRock Equity Dividend Fund (S) | 101 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 1163% |
| | | Vanguard U.S. Value Fund (Inv) (VUVLX) | 29 bps | 248% |
| Buffalo Small Cap Fund | 100 bps | Vanguard Small-Cap Growth Index (Instl) (VSGIX) | 8 bps | 1150% |

| Plan Investment[22] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| | | Vanguard Explorer Fund (Adm) (VEXRX) | 35 bps | 186% |
| Dodge & Cox Stock Fund | 52 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 550% |
| Eaton Vance Floating-Rate Fund (A) | 99 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 6 bps | 1550% |
| BNY Mellon S&P 500 Index Fund II | 5 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2 bps | 150% |
| Insperity Horizon Risk-Managed 2020 Fund I | 53 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 16 bps | 231% |
| Insperity Horizon Risk-Managed 2030 Fund I | 53 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 17 bps | 212% |
| Insperity Horizon Risk-Managed 2040 Fund I | 53 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 18 bps | 194% |
| Insperity Horizon Risk-Managed 2050 Fund I | 53 bps | Vanguard Target Retirement 2050 Fund (VFIFX) | 18 bps | 194% |
| Insperity Horizon Risk-Managed Retirement Income Fund | 53 bps | Vanguard Target Retirement Income Fund (VTINX) | 16 bps | 231% |

| Plan Investment[22] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Mainstay Large Cap Growth Fund (R2) | 109 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 1263% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 263% |
| Munder Midcap Core Growth Fund (A) | 132 bps | Vanguard Mid-Cap Growth Index Fund (Instl) (VMCIX) | 8 bps | 1550% |
| | | Vanguard Mid-Cap Growth Fund (VMGRX) | 44 bps | 200% |
| PIMCO Total Return Fund (Adm) | 72 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIUX) | 5 bps | 1340% |
| Virtus Real Estate Securities Fund (A) | 138 bps | Vanguard REIT Index (Instl) (VGSNX) | 8 bps | 1625% |
| John Hancock Income Fund (R4) | 69 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 6 bps | 1050% |

### 2.  Funds in the Plan prior to December 31, 2014

90.    The Plan mutual fund options that were removed from the Plan prior to December 31, 2014 also suffered from excessive fees compared to comparable institutional mutual funds available to 401(k) plans.

| Prior Mutual Fund Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund (SS) | 29 bps | Vanguard Prime Money Market Fund (Adm) (VMRXX) | 10 bps | 190% |

---

[23] The asset amount and expense ratio of the Plan option, and the expense ratio of the comparator fund, are identified for the final full year the Plan option was offered to participants. Expense ratios were primarily obtained from Morningstar. For the Vanguard U.S. Growth Fund, the expense ratio was obtained from the fund's annual report dated Aug. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/52848/000093247110003304/worldfu ndsfinal.htm. For the Vanguard Growth Index, the expense ratio was obtained from the fund's annual report dated Dec. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/36405/000093247111001799/indexfun ds_final.htm. For Vanguard Institutional Index, for 2010, the expense ratio was obtained from the fund's annual report dated Dec. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/862084/000093247111001805/institut ionalindexfund_final.htm. For the Vanguard Target Retirement Funds, for 2009, the expense ratios were obtained from the funds' annual report dated Sept. 30, 2009, available at http://www.sec.gov/Archives/edgar/data/752177/000093247109001899/chester fundsfinal.htm.

| Prior Mutual Fund Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| American Funds Growth Fund of America (R3) | 97 bps | Vanguard Growth Index (Instl) (VIGIX) | 9 bps | 978% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 223% |
| American Funds High Income Trust (R3) | 102 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 13 bps | 685% |
| Columbia Strategic Income Fund (A) | 103 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 7 bps | 1371% |
| Davis New York Venture Fund (R) | 123 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2.5 bps[24] | 4820% |
| Fidelity Spartan U.S. Equity Index Fund (Inv) | 10 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2 bps | 400% |
| Goldman Sachs Mid Cap Value Fund (Svc) | 124 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 9 bps | 1278% |
| | | Vanguard Selected Value Fund (VASVX) | 43 bps | 188% |

[24] In 2011, the expense ratio was lowered to 2 bps.

| Prior Mutual Fund Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2010 Fund (Select) | 76 bps | Vanguard Target Retirement 2010 Fund (VTENX) | 17 bps | 347% |
| JPMorgan SmartRetirement 2020 Fund (Select) | 84 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 17 bps | 394% |
| JPMorgan SmartRetirement 2030 Fund (Select) | 92 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 19 bps | 384% |
| JPMorgan SmartRetirement 2040 Fund (Select) | 94 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 19 bps | 395% |
| JPMorgan SmartRetirement 2050 Fund (Select) | 94 bps | Vanguard Target Retirement 2050 Fund (VFIFX) | 19 bps | 395% |
| Fidelity Advisor Freedom 2010 Fund (T) | 117 bps | Vanguard Target Retirement 2010 Fund (VTENX) | 19 bps[25] | 516% |
| Fidelity Advisor Freedom 2020 Fund (T) | 123 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 19 bps[26] | 547% |
| Fidelity Advisor Freedom 2030 Fund (T) | 127 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 19 bps | 568% |

---

[25] In 2010, the expense ratio was lowered to 17 bps.

[26] In 2010, the expense ratio was lowered to 17 bps.

| Prior Mutual Fund Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Fidelity Advisor Freedom 2040 Fund (T) | 129 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 19 bps | 579% |

### 3. Mutual Funds Added to the Plan July 22, 2015

91.    The mutual funds that were recently added to the Plan effective July 22, 2015 also charged significantly higher fees than readily available mutual funds.

| Newly-Added Mutual Fund Investments[27] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund (M) | 68 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIUX) | 5 bps | 1260% |
| T. Rowe Price Blue Chip Growth Fund (Adv) | 98 bps | Vanguard Growth Index Fund (Instl) (VIGIX) | 8 bps | 1125% |

---

[27] Expense ratios were obtained from Morningstar.

| Newly-Added Mutual Fund Investments[27] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Hartford SmallCap Growth HLS Fund (IB) | 90 bps | Vanguard Small-Cap Growth Index (Instl) (VSGIX) | 8 bps | 1025% |
| T. Rowe Price Real Estate Fund (Adv) | 102 bps | Vanguard REIT Index (Instl) (VGSNX) | 10 bps | 920% |

92.    Had the amounts invested in the Plan's investments instead been invested in the lower-cost mutual funds from other fund companies readily available to the Plan, Plan participants would not have lost tens of millions of dollars in their retirement savings through excessive fees.

### C. *Excessive fees compared to separate accounts*

93.    Retirement plans with assets over $500 million can hire investment advisers directly to manage separate accounts tailored for the plan within plan-specific investment parameters and even using the same investment managers as mutual funds with the same investment style. Use of such accounts greatly reduces the cost of investing with the same adviser through a retail mutual fund.

94.    According to the Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, can

"commonly" reduce "[t]otal investment management expenses" by "<u>one-fourth of the expenses incurred through retail mutual funds</u>." *Id*. U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, §2.4.1.3 (Apr. 13, 1998)(emphasis added).[28]

95.    As the Plan had assets of well over $900 million at all relevant times, including over $2 billion as of December 31, 2014, separate accounts were readily available to obtain economies of scale offered in the marketplace.

96.    Separate accounts have a number of advantages over mutual funds, including the ability to negotiate fees, control by the plan sponsor over the investment guidelines, ability to avoid marketing fees built into the cost of mutual funds,[29] and ability to avoid holding significant cash for shareholder redemption.[30] In a mutual fund, all investors are charged the same fee, and investors have no ability to modify the fund's investment

---

[28] Available on the Department of Labor's website at http://www.dol.gov/ebsa/pdf/401krept.pdf.

[29] Mutual fund expense ratios include fees for marketing costs, which are wholly unnecessary in a 401(k) plan since participants cannot choose funds other than those provided by the plan's fiduciaries.

[30] Unlike mutual fund shareholders, 401(k) participants rarely make trades in their account. Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeski Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006), available at http://www.mrrc.isr.umich.edu/publications/Papers/pdf/wp115.pdf.

guidelines, which are set by the fund's investment adviser. In a separate

account, the plan sponsor can negotiate the best possible fee for the plan

using its bargaining power, and can tailor the investment guidelines to fit the

demographics of the workforce.

### 1.   Funds in the Plan as of December 31, 2014

97.   While many of the Plan's options offered identical institutional-

rate mutual funds with somewhat lower rates from retail share class funds,

the fees charged to these funds were still much higher even if Defendants had

used them rather than separate accounts with identical investments. To

demonstrate the Plan's excessive fees compared to separate accounts, had the

Plan obtained separate accounts with expenses of one-fourth the costs of the

retail shares of the mutual funds offered as of December 31, 2014, the Plan's

expenses would have been reduced dramatically.[31]

---

[31] The asset amount and expense ratio of the Plan option, and the expense
ratio of the comparator fund, are identified for the final full year the Plan
option was offered to participants. Expense ratios were primarily obtained
from Morningstar. For the American Funds Growth Fund of America, for
2010, the expense ratio was obtained from the fund's annual report dated
Aug. 31, 2010, available at
http://www.sec.gov/Archives/edgar/data/44201/000005193110000690/gfa_ncsr
.htm. For the Davis New York Venture Fund, for 2010, the expense ratio was
obtained from the fund's annual report dated July 31, 2010, available at
http://www.sec.gov/Archives/edgar/data/71701/000007170110000045/dnyvf_dr
fncsr.htm. For the J.P. Morgan SmartRetirement Funds, for 2011, the
expense ratios were obtained from the funds' prospectus dated Nov. 1, 2010,

| Mutual Fund Investment[32] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund | 117 bps | 29 bps | 117 bps | 303% |
| AllianzGI High Yield Bond | 94 bps | 24 bps | 97 bps | 304% |
| American Century Inflation-Adjusted Bond Fund | 72 bps | 18 bps | 27 bps | 50% |
| American Beacon Mid Cap Value Fund | 133 bps | 33 bps | 114 bps | 245% |
| American Funds EuroPacific Growth Fund | 84 bps | 21 bps | 114 bps | 443% |
| BlackRock Equity Dividend Fund | 95 bps | 24 bps | 101 bps | 321% |
| Buffalo Small Cap Fund Inc. | 100 bps | 25 bps | 100 bps | 300% |
| Dodge & Cox Stock Fund | 52 bps | 13 bps | 52 bps | 300% |
| Eaton Vance Floating-Rate Fund | 99 bps | 25 bps | 99 bps | 296% |

available at
http://www.sec.gov/Archives/edgar/data/1217286/000114544310002212/d2737
8.htm. For the Fidelity Advisor Freedom Funds, for 2009, the expense ratios
were obtained from the fund's prospectus dated May 30, 2009, available at
http://www.sec.gov/Archives/edgar/data/880195/000088019509000089/main.h
tm#fid4666.

[32] Expense ratios were obtained from Morningstar.

| Mutual Fund Investment[32] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Mainstay Large Cap Growth Fund | 99 bps | 25 bps | 109 bps | 336% |
| Munder Midcap Core Growth Fund | 132 bps | 33 bps | 132 bps | 300% |
| PIMCO Total Return Fund | 85 bps | 21 bps | 72 bps | 243% |
| Virtus Real Estate Securities Fund | 138 bps | 35 bps | 138 bps | 294% |
| John Hancock Income Fund | 86 bps | 22 bps | 69 bps | 214% |

## 2.  Funds in the Plan prior to December 31, 2014

98.    The Plan's mutual funds that were offered prior to December 31, 2014 also suffered from the same excess, mutual fund fees compared to readily available separate accounts.

| Prior Mutual Fund Investments | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund | 29 bps | 7 bps | 29 bps | 314% |
| American Funds Growth Fund of America | 69 bps | 17 bps | 97 bps | 471% |
| American Funds High Income Trust | 67 bps | 17 bps | 102 bps | 500% |
| Columbia Strategic Income Fund | 103 bps | 26 bps | 103 bps | 296% |
| Davis New York Venture Fund | 89 bps | 22 bps | 123 bps | 459% |
| Fidelity Spartan U.S. Equity Index Fund | 10 bps | 3 bps | 10 bps | 233% |
| Goldman Sachs Mid Cap Value Fund | 114 bps | 29 bps | 124 bps | 328% |
| JPMorgan SmartRetirement 2010 Fund | 94 bps | 24 bps | 76 bps | 217% |
| JPMorgan SmartRetirement 2020 Fund | 106 bps | 27 bps | 84 bps | 211% |
| JPMorgan SmartRetirement 2030 Fund | 114 bps | 29 bps | 92 bps | 217% |

| Prior Mutual Fund Investments | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 Fund | 117 bps | 30 bps | 94 bps | 213% |
| JPMorgan SmartRetirement 2050 Fund | 116 bps | 29 bps | 94 bps | 224% |
| Fidelity Advisor Freedom 2010 Fund | 92 bps | 23 bps | 117 bps | 409% |
| Fidelity Advisor Freedom 2020 Fund | 98 bps | 25 bps | 123 bps | 392% |
| Fidelity Advisor Freedom 2030 Fund | 102 bps | 26 bps | 127 bps | 388% |
| Fidelity Advisor Freedom 2040 Fund | 104 bps | 26 bps | 129 bps | 396% |

### 3.  Mutual Funds Added to the Plan July 22, 2015

99.    The mutual funds that were recently added to the Plan effective July 22, 2015 also charged significantly higher fees than readily available separate accounts.

| Newly-Added Mutual Fund Investments[33] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund | 80 bps | 20 bps | 68 bps | 240% |
| T. Rowe Price Blue Chip Growth Fund | 72 bps | 18 bps | 98 bps | 444% |
| Hartford SmallCap Growth HLS Fund | 128 bps | 32 bps | 90 bps | 181% |
| T. Rowe Price Real Estate Fund | 76 bps | 19 bps | 102 bps | 437% |

100.   The portfolio managers of the Plan's mutual funds, or subadvisers contracted to manage the fund's assets, commonly offer separate accounts in the same or similar investment strategies as the Plan's mutual funds to institutional clients. These managers often publish separate account fee schedules for these strategies in their Form ADV filed with the United States Securities and Exchange Commission. The published fee schedule represents the maximum fee charged to clients because this fee is subject to negotiation between the manager and the client based on the client's portfolio and asset size.

---

[33] Fee information was obtained from Morningstar.

101.   For those managers or subadvisers of the Plan's mutual fund options that published separate account fee schedules, the chart below demonstrates the pre-negotiation maximum separate account fee available based on the fund's latest annual reported asset amount for the same or similar strategy. A comparison between this maximum published fee before negotiation due to the size of the assets and the fee charged to the Plan's investments further demonstrates the unreasonable fees charged on Plan investment options. These maximum published fees are subject to negotiated lower fees for funds, like those in the Plan, whose asset size is greater than specified amounts. [34]

---

[34] The separate account fee was obtained from the adviser's Form ADV. See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=338809 (Allianz Global Investors U.S., LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=308650 (NFJ Investment Group); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=307808 (Barrow Hanley Mewhinney and Strauss, LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=341866 (Capital Research and Management Company; reporting fee for managed account programs); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=331647 (Winslow Capital Management, LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=316451 (Victory Capital Management Inc.); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=342918 (Duff and Phelps Investment Management Co.);

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund | 117 bps | $64,930,339 | NFJ Investment Group | 100 bps | 17% |
| AllianzGI High Yield Bond | 97 bps | $32,914,144 | Allianz Global Investors U.S., LLC | 50 bps | 94% |
| American Beacon Mid Cap Value Fund | 114 bps | $103,448,427 | Barrow Hanley Mewhinney and Strauss, LLC[35] | 49 bps | 133% |
| American Funds EuroPacific Growth Fund | 114 bps | $113,188,795 | Capital Research and Management Co. | 51 bps | 124% |

http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=300740 (Columbia Management Investment Advisers, LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=309437 (Goldman Sachs Asset Management, LLP); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=305938 (Dodge & Cox). For the Buffalo Small Cap Fund, the fund adviser (Kornitzer Capital Management, Inc.) reported only a general fee for fixed income and equities and, therefore, was not listed for comparison. See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=329398.

[35] Barrow Hanley Mewhinney and Strauss, LLC is one of three subadvisers for the fund.

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| American Funds Growth Fund of America | 97 bps | $60,060,301 | Capital Research and Management Co. | 49 bps | 98% |
| American Funds High Income Trust | 102 bps | $20,936,278 | Capital Research and Management Co. | 30 bps | 240% |
| Mainstay Large Cap Growth Fund | 109 bps | $90,134,981 | Winslow Capital Management, LLC | 58 bps | 88% |
| Munder Midcap Core Growth Fund | 132 bps | $86,255,539 | Victory Capital Management, Inc. | 62 bps | 113% |
| Virtus Real Estate Securities Fund | 138 bps | $63,058,966 | Duff and Phelps Investment Management Co. | 61 bps | 126% |
| Columbia Strategic Income Fund | 103 bps | $31,328,730 | Columbia Management Investment Advisers, LLC | 60 bps | 72% |

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| Goldman Sachs Mid Cap Value Fund | 124 bps | $91,459,412 | Goldman Sachs Asset Management, LP | 75 bps | 65% |
| Dodge & Cox Stock Fund | 52 bps | 136,448,827 | Dodge & Cox | 44 bps | 18% |

102. Other fund advisers of the Plan's mutual funds also offer separate accounts to institutional clients but do not publish their pre-negotiation separate account fees. These funds and advisers include: BlackRock Equity Dividend Fund (BlackRock Advisors, LLC),[36] Eaton Vance Floating-Rate Fund (Boston Management and Research),[37] John Hancock Income Fund (John Hancock Asset Management),[38] PIMCO Total Return

---

[36] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=317083.

[37] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=329468.

[38] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=304235.

Fund (Pacific Investment Management Company, LLC),[39] Davis New York Venture Fund (Davis Selected Advisers NY Inc.),[40] Met West Total Return Bond Fund (Metropolitan West Asset Management, LLC),[41] T. Rowe Price Blue Chip Growth Fund and T. Rowe Price Real Estate Fund (T. Rowe Price Associates, Inc.),[42] and Hartford SmallCap Growth HLS Fund (Wellington Management Company, LLP).[43] Thus, virtually all of the investment managers of the Plan's mutual funds offered lower-cost separate accounts with all their advantages over mutual funds, yet Defendants failed to consider or use them.

103.   The separate accounts offered by the Plan's mutual fund advisers only represent a fraction of available low-cost separate accounts offered by

---

[39] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=308495.

[40] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=290127.

[41] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=306081.

[42] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=306081.

[43] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=297723.

other institutional investment management firms for the same or similar investment strategies.

104.   Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost separate accounts and negotiated far lower prices for the Plan. Defendants failed to adequately investigate and consider the use of these institutional alternatives without any prudent or loyal reason for failing to do so. Instead, Defendants Reliance Trust and Insperity selected and retained high-cost investments that generated excess revenue to benefit themselves through investment management fees and asset-based, revenue sharing payments.

105.   Overall, had Defendants offered separate accounts rather than high-cost mutual funds for the Plan's investment options, Plan participants would have paid significantly less of their retirement savings for investment management services, thereby having available millions of dollars to build their retirement assets.

### D. *Excessive fees compared to collective trusts*

106.   Generally, collective trusts provide much lower investment management fees than mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more, a tiny fraction of the size of the

Plan. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015).[44]

107.   Prior to offering Reliance Trust's Insperity Horizon Risk-Managed Funds as the Plan's target date fund option, Defendants offered Plan participants target date funds from Fidelity and later J. P. Morgan. In contrast to the funds offered by Fidelity and J. P. Morgan, the Reliance Trust target date funds are structured as collective trusts rather than mutual funds. Despite their collective trust structure, the Reliance Trust target date funds charge much higher fees to participants in comparison to target date collective trusts that were available to the Plan. The mutual fund target date funds previously selected by Defendants from Fidelity and J. P. Morgan also have expense ratios far in excess of available collective trust target date funds.

108.   Vanguard has offered collective trust target date funds since at least June 21, 2007 through the Vanguard Target Retirement Trust I Funds.[45] The expense ratio of the Vanguard Target Retirement Trust I Funds is 8 bps. In comparison, these fees are dramatically lower than the Plan's

---

[44] Available at http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

[45] Collective trust information provided on Vanguard's website for institutional investors, available at https://institutional.vanguard.com/.

previously offered target date funds and the current Reliance Trust target date funds. For instance, the Fidelity Advisor Freedom Funds (T) charged between 117 bps and 129 bps, the J. P. Morgan SmartRetirement Funds (Select) charged between 91 bps and 117 bps, and the Insperity Horizon Risk-Managed Funds charged 53 bps, when offered as Plan investments. Thus, the Fidelity funds were over *16 times* more expensive than the Vanguard collective trust funds, the J. P. Morgan funds over *14 times* more expensive, and the Reliance Trust funds over *5 times* more expensive.

109.   Since August 14, 2011, Vanguard has also offered even lower-cost collective trust target date funds, known as the Vanguard Trust Retirement Trust Plus Funds. These funds charge 6 bps—25% more than the Vanguard collective trust target retirement funds noted in ¶108—and were available at the time the Insperity Horizon Risk-Managed Funds were selected and retained in the Plan at a significantly higher fee of 53 bps, or almost *9 times* more expensive.

110.   Apart from target date funds, the fund advisers for many of the Plan's mutual funds similarly provide investment management services for collective trusts to institutional investors. See, e.g., Allianz Global Investors U.S. LLC, Barrow Hanley Mewhinney and Strauss LLC, American Century Investments, BlackRock Advisors, LLC, Capital Research and Management

Company, John Hancock Asset Management, Winslow Capital Management, LLC, Victory Capital Management Inc., Pacific Investment Management Company, LLC, Columbia Management Investment Advisers, LLC, FMR, Co.,[46] Inc., Goldman Sachs Asset Management, L.P., T. Rowe Price Associates, Inc., and Wellington Management Company, LLP.[47]

111.   As another alternative to high-priced mutual funds aside from separate accounts, Defendants should have used the Plan's bargaining power to obtain high-quality, low-cost collective trusts and negotiated far lower prices for the Plan. Defendants failed to adequately investigate and consider the use of these institutional alternatives without any prudent or loyal reason to do so. Instead, Defendants Reliance Trust and Insperity selected and retained high-cost investments that generated excess revenue to benefit themselves through investment management fees and asset-based, revenue sharing payments.

112.   Overall, had Defendants offered low-cost collective trusts rather than high-cost mutual funds and Reliance Trust investments for the Plan's investment options, Plan participants would have paid significantly lower

---

[46] See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=340499.

[47] For the fund advisers' Form ADV, see *infra* ¶102.

amounts of their retirement savings for investment management services, thereby having available millions of additional dollars to build their retirement assets.

## Selection and Retention of Reliance Trust Proprietary Target Date Funds

113.   In general, target date funds can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date, and is often part of the name of the fund. For instance, target date "2030" funds are designed for individuals who intend to retire in the year 2030.

114.   For the target date funds offered to participants, Reliance Trust selected its own proprietary funds, called the Insperity Horizon Risk-Managed Funds. These funds were added to the Plan on November 15, 2012, literally <u>two days</u> after they were established on November 13, 2012, and, thus, had no prior performance history to be considered by Reliance Trust and other Plan fiduciaries when making the investment selection on behalf of Plan participants. This violates the most fundamental investment

65

management principle requiring a multi-year performance history prior to any selection of a fund.

115.   At the time of this investment decision, Reliance Trust did not have any meaningful investment management experience managing target date fund investment strategies since it only established its non-Insperity branded "Reliance Trust Risk-Managed Target Date Funds" on June 1, 2012, less than six months before the Plan's Reliance Trust target date funds, the "Insperity Horizon Risk-Managed Funds", were created.

116.   Defendants added the Reliance Trust target date funds to the Plan without either adequately considering or considering at all non-proprietary target date fund investments and without engaging in a process to determine whether those funds were solely in the interest of participants. Rather, Defendants Reliance Trust and Insperity added the funds to the Plan to generate investment management fees for Reliance Trust and direct revenue sharing payments to Insperity Retirement Services.

117.   Prior to this selection, the Plan offered the J.P. Morgan SmartRetirement Funds as the target date fund option. These funds, as well as the Vanguard Target Retirement Funds and T. Rowe Price Retirement Funds, had proven track records. The J.P. Morgan and Vanguard funds were

established on May 15 and June 7, 2006, respectively, while the T. Rowe Price funds were established on September 30, 2002.[48]

118.   Despite the availability of target date funds offered by established investment managers, Reliance Trust created and then offered the Reliance Trust target date funds even though those funds had no performance history. The Plan was either the first or virtually the first investor in those newly-created funds, and immediately by far the largest asset holder in those funds.

119.   The Plan's Reliance Trust target date funds charge 53 bps in total operating expenses. Upon information and belief, these expenses are allocated between an administrative service fee (25 bps) shared with the recordkeeper, an acquired fund fee (10 bps),[49] and an investment management fee (up to 18 bps). The Reliance Trust target date funds are made up of multiple component funds which have their own expense ratios. As such, the additional layer of fees for management of the target date funds means there are fees on fees in these funds.

---

[48] Inception dates were obtained from Yahoo!Finance, a provider of independent investment research. See finance.yahoo.com.

[49] Acquired fund fees refer to expenses of the underlying investments or component funds in which the target date fund invests.

120.   In contrast, for the J.P. Morgan, Vanguard and T. Rowe Price target date funds, these investment managers do not charge an additional layer of fees for management of the funds, but rather only charge shareholders the acquired or component fund fee for such services.

121.   Reliance Trust therefore charges an unnecessary and excessive additional layer of fees on its proprietary target date funds to benefit itself at the expense of Plan participants. Reliance Trust is generating fees on top of fees for only considering and selecting itself as the target date fund provider for the Plan.

122.   From their inception, the Reliance Trust target date funds have significantly underperformed and continue to underperform target date fund alternatives with proven track records from established and reputable investment managers. Thus, not only did Defendants place Reliance Trust target date funds in the Plan with no performance history by which to evaluate them, in violation of the most elemental rule of investment management, but when they developed a performance record, it was abysmal.

123.   The mutual fund target date alternatives to the Reliance Trust target date funds include the J.P. Morgan SmartRetirement Funds (institutional share class), the Vanguard Target Retirement Funds, and the T. Rowe Price Retirement Funds. Since their inception, every Reliance Trust

target date fund with a retirement year designated in the fund name
underperformed these comparators in each year from 2013 through June 30,
2015. The investment returns of the Reliance Trust target date funds and
available alternatives are shown in the following tables.[50]

| 2013 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **13.19%** | 15.85% | 18.05% | 13.77% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |
| **17.02%** | 20.49% | 23.09% | 19.94% |
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **19.34%** | 24.37% | 25.93% | 22.19% |
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **20.26%** | 24.34% | 25.90% | 23.02% |

| 2014 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **4.28%** | 7.11% | 5.63% | 6.91% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |
| **4.60%** | 7.17% | 6.05% | 7.70% |
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **4.73%** | 7.15% | 6.18% | 7.78% |

[50] For mutual fund performance as of June 30, 2015, the returns were
estimated based on returns from the funds' prior two quarters. Performance
for the Reliance Trust target date funds was obtained from Reliance Trust,
see http://www.relico.com/CIT/Pages/InsperityHorizonTargetDate.aspx.

| 2014 | | | |
|---|---|---|---|
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **4.77%** | 7.18% | 6.19% | 7.83% |

| As of June 30, 2015 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **-0.90%** | 1.60% | 2.56% | 1.80% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |
| **-1.10%** | 2.07% | 3.33% | 2.18% |
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **-1.07%** | 2.52% | 3.91% | 2.39% |
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **-1.14%** | 2.49% | 3.86% | 2.58% |

124.   Graphically, the investment returns of the Insperity Horizon Risk-Managed 2020, 2030, 2040, and 2050 Funds were compared to available prudent alternatives for 2013, 2014 and 2015 (as of June 30, 2015) in the following performance charts:

a. Target date fund 2020







b.  Target date fund 2030







c. Target date fund 2040







d.  Target date fund 2050







125.    Defendants' imprudent and disloyal selection of Reliance Trust's own target date funds to benefit themselves has significantly and detrimentally impacted Plan participants' retirement savings. To demonstrate this loss in retirement savings, the Plan's initial investment of *over $466 million* in the proprietary target date funds is shown below using the investment returns of the proprietary funds compared to the returns of the target date fund alternatives. This conservative analysis, *which does not even take into account future contributions*, amply shows that Plan participants would have avoided at least $41 million to over $56 million in losses due to Defendants' self-interested conduct.[51] These losses are building and will continue to build because Plaintiffs have been deprived and continue to be deprived of the earnings these losses would have produced.

---

[51] The weighted-average of the investment returns for each of the target date fund alternatives was used based on the amount invested by the Plan in each fund (e.g., 2020, 2030, 2040, 2050, income). For 2015, because the amount invested in the Reliance Trust funds is not currently available, end-of-year assets for 2014 were used as an estimate.



126.   Had the amounts invested in the Insperity Horizon Risk-

Managed Funds instead been invested in *any* of the target date alternatives

identified above, Plan participants would not have lost well over $50 million

from the funds being selected and retained in the Plan.[52]

---

[52] Plan losses as of June 30, 2015 have been brought forward to the present
value using the investment returns of the S&P 500 index to compensate
participants who have not been reimbursed for their losses.

## Imprudent Retention of Money Market Fund

127.   Stable value funds are a common investment in large defined contribution plans and in fact are designed specifically for use in such plans. Stable value funds are conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006)(In contrast to money market funds, stable value funds "invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").

128.   In addition to longer duration instruments generating significantly higher returns than money market investments, stable value funds also provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against loss of principal and accrued interest.

129.   Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no

sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[53]

130.   According to the 2015 Stable Value Study published by MetLife, only 18% of plan sponsors of defined contribution plans offer a money market fund without also offering a stable value fund in comparison to over 80% of plan sponsors who offer such investment. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[54] The study also noted that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

131.   Unlike the majority of 401(k) plans, prior to 2014, the Plan did not offer a stable value fund but only offered an extremely low-yielding money market fund, the Federated Prime Obligations Money Market Fund (SS) (PRSXX). From 2010 to 2014, the money market fund earned only 1 bp despite charging participants 29 to 37 bps for the "benefit" of receiving 1/100th

[53] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

[54] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

of a percent return for each of those years, far below even keeping pace with inflation.[55]

132.   Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the returns of a typical stable value fund. The returns of the funds in the Hueler universe on average have far exceeded the returns of the Federated Prime Obligations Money Market Fund in the Plan.



---

[55] Even though the money market fund returned 37 bps in 2009, the return was still over *8 times* lower than the Hueler index's return of 312 bps.

133.   Hueler Index returns over the preceding 3, 5, 10, 15 and 20 years reflect similar disparities between money market funds and stable value investments.

134.   In light of stable value funds' clear advantages and enhanced returns compared to other fixed income options, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would consider using a stable value fund. Defendants imprudently and disloyally failed to consider providing or to provide a stable value fund for the Plan until recently in 2014. Rather than considering an outside stable value fund, Defendants added Reliance Trust's in-house proprietary stable value fund, the Reliance Trust New York Life Anchor Account (Series 1, Class 25). Defendants failed to adequately consider a stable value fund until they did add a stable value fund to benefit themselves, or come to a reasoned decision as to their course of action after weighing the benefits of a stable value fund compared to a money market fund prior 2014 when they added a stable value fund.

135.   Had the amounts invested in the Federated Prime Obligations Money Market Fund (SS) instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index, from December 22, 2009 to September 30, 2014, Plan participants would not

have lost over $14 million in their retirement savings as a result of the fund being retained in the Plan.[56]

### In Violation of Their Fiduciary Duties, Reliance Trust and Insperity Gave Preferential Treatment to the Much Smaller 401(k) Plan Offered to Insperity's Corporate Employees

136.   Insperity also sponsors a separate 401(k) plan for its own corporate employees, called the Insperity Corporate 401(k) Plan. These employees differ from those participating in the Plan because they are directly employed by Insperity at Insperity's corporate offices rather than co-employed by Insperity and employers who have contracted with Insperity for off-site human resource services, and thus, offer the Plan to their employees.

137.   Defendants serve in the same role as plan fiduciaries to the corporate 401(k) plan as Plaintiffs' Plan and are therefore charged with the same fiduciary responsibilities when administering each plan, which includes making sure fees are reasonable, exercising prudence and loyalty when selecting investments and service providers, and acting with an "eye single" to the interests of plan participants and beneficiaries.

138.   As of December 31, 2014, the corporate 401(k) plan, with only $208 million in total assets, was only *10%* of the size of the Plan's assets. The

---

[56] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

corporate 401(k) plan currently offers the same investment options as the Plan.

139.   With assets almost *10 times* the amount of assets in the corporate 401(k) plan, the Plan could have and should have demanded far lower-cost investments than the much smaller corporate plan. However, for six of these investment options, Insperity not only failed to do so, but actually offers its corporate employees *lower-cost* share classes for those funds than the Plan.[57]

| Plan | Plan's Fee | Far Smaller Corporate 401(k) Plan | Far Smaller Corporate 401(k) Plan Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) (PCVAX) | 117 bps | Allianz NFJ Small Cap Value Fund (P) (ASVPX) | 92 bps | 27% |
| AllianzGI High Yield Bond (Adm) (AYBVX) | 97 bps | AllianzGI High Yield Bond (Instl) (AYBIX) | 64 bps | 52% |
| American Funds EuroPacific Growth Fund (R3) (RERCX) | 114 bps | American Funds EuroPacific Growth Fund (R4) (REREX) | 84 bps | 36% |
| BlackRock Equity Dividend Fund (S) (MSDVX) | 101 bps | BlackRock Equity Dividend Fund (Instl) (MADVX) | 70 bps | 44% |

---

[57] See 2014 Insperity Corporate 401(k) Plan Form 5500. The expense ratios were obtained from Morningstar.

| Plan | Plan's Fee | Far Smaller Corporate 401(k) Plan | Far Smaller Corporate 401(k) Plan Fee | Plan's Excess |
|------|-----------|-----------------------------------|----------------------------------------|---------------|
| Mainstay Large Cap Growth Fund (R2) (MLRTX) | 109 bps | Mainstay Large Cap Growth Fund (R1) | 84 bps | 30% |
| Virtus Real Estate Securities Fund (A) (PHRAX) | 138 bps | Virtus Real Estate Securities Fund (Instl) (PHRIX) | 113 bps | 22% |

140.   Since the Insperity Plan fiduciaries are corporate employees, upon information and belief, some participate in the Insperity Corporate 401(k) Plan, and therefore, benefited themselves by favoring their corporate 401(k) plan over Plaintiffs' Plan.

141.   The preferential treatment of the separate corporate 401(k) plan is not limited to the inclusion of lower-cost share classes of the Plan's mutual fund options. These same Defendants also managed that 401(k) plan's assets in stark contrast to their imprudent and disloyal investment decisions on behalf of the Plan.

142.   Rather than selecting and retaining a money market fund in the Plan, these same Defendants, as plan fiduciaries to the separate corporate 401(k) plan, offered a stable value fund for Insperity's corporate employees

since at least 2009. As a result, these corporate 401(k) participants did not suffer from the microscopic investment returns of the Plan's money market fund that did not even come close to keeping pace with inflation.

143.   Had Defendants managed Plan assets consistent with the manner in which they managed the assets of Insperity's separate corporate 401(k) plan, Plan participants would not have paid excessive fees through higher-cost share classes for certain of the Plan's mutual fund options, and would not have lost tens of millions of dollars due to the Plan's money market fund being retained in the Plan.

## Defendants Concealed Their Fiduciary Breaches

144.   Defendants concealed their breaches of fiduciary duty and prohibited transactions through a series of false and misleading statements and by omitting disclosure of material information, thereby preventing Plaintiffs from discovering Defendants' breaches and violations.

145.   Throughout the relevant time period, Defendants have failed to disclose the amount of revenue sharing or indirect compensation received from Plan investments for recordkeeping and administrative services.

146.   Starting for the 2009 plan year, Insperity was required to report annually to the Department of Labor the amount of all direct and indirect compensation received by each of the Plan's service providers. While each

86

year Insperity reported that Insperity Retirement Services received indirect compensation, Insperity did not provide either the formulas or the amount of the indirect compensation in its annual Form 5500 filing to the Department of Labor as required, or in other communications to Plan participants. Thus, participants had no way of knowing the amount of indirect compensation received by Insperity Retirement Services.

147.   Concealing the total amount of compensation received by the Plan's proprietary recordkeeper is further compounded in the Plan's Summary Annual Report provided to participants. In that report, Insperity falsely informed participants that the Plan's administrative expenses were of an amount that was only a fraction of the actual amounts received by Insperity Retirement Services for recordkeeping and administrative services.

148.   Insperity currently represents that it "is able to include share classes with lower costs, helping participants keep more of their contributions."[58] Upon information and belief, similar representations were previously made to Plan participants. This and other similar statements concealed the fact that Defendants selected and retained high-cost share classes of investments than were available to the Plan to drive revenue

---

[58] See http://www.insperity.com/services/retirement/401k-plans/insperity-401k-plan.

through revenue sharing payments to Insperity Retirement Services, and to benefit Reliance Trust and Insperity in doing so.

149.   For the fund selection list of available investment options for defined contribution plan clients, Insperity currently represents that:

> Each mutual fund on the list must have a proven track record; it must come from a stable, registered financial institution; it must invest in a way that is consistent with its asset class; and it must meet our standards for competitive expense ratios. The list is carefully managed by the experts at Reliance Trust to ensure that we preserve a strong portfolio and you have the best possible choice.[59]

150.   Upon information and belief, similar representations were previously made to Plan participants. This statement and similar statements related to the requirement of a "proven track record" concealed the fact that Reliance Trust's target date funds, the Insperity Horizon Risk-Managed Funds, were selected and included in the Plan in 2012 *without any prior performance history*, and the Reliance Trust New York Anchor Account was added to the Plan in 2014 *less than one year after it was established*.

151.   The statement and similar statements of "competitive expense ratios" of Plan investments further concealed the fact that Defendants selected and retained investments with expenses significantly higher than

---

[59] See http://www.insperity.com/services/retirement/investment-choices.

available investment alternatives, including separate accounts, collective trusts, and institutional share class investments.

152.    Moreover, the statement and similar statements related to the assurance that the "best possible choice" among available investment options was selected for Plan participants concealed the fact that Defendants consistently offered higher-cost and poorly-performing investments compared to available investment alternatives for the Plan, including the selection of the Reliance Trust target date funds with no prior performance history or consideration of prudent alternatives that were readily available to the Plan.

153.    Insperity represents to Plan participants that Reliance Trust "continually monitors the investment options available to participants in the Plan." This statement and similar statements concealed the fact that Defendants retained high-cost investment options that underperformed prudent alternatives that were available to the Plan in order to financially benefit Defendants.

154.    Insperity represents that the Plan allows participants to "[s]ave on retirement plan costs while providing a first-class retirement package."[60] Upon information and belief, similar representations were made to Plan participants in prior years. This statement and similar statements related to

---

[60] See http://www.insperity.com/services/retirement/401k-plans.

a "first-class retirement package" concealed the fact that Plan participants were offered excessively-priced investments and recordkeeping services that cost participants tens of millions of dollars of their retirement savings.

## ERISA'S FIDUCIARY STANDARDS

155.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)   for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

156.   Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of

> providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

157.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

158.   ERISA's fiduciary duties are "the highest known to the law" and must be done "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8.

159.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

160.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

161.   ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

92

> (1)    if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

162.   The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>       * * *
> (C)    furnishing of goods, services, or facilities between the plan and  party in interest;
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

    (1)    deal with the assets of the plan in his own interest or for his own account,

    (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

    (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

163.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

164.   29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited

94

transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## CLASS ACTION ALLEGATIONS

165.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

166.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Insperity 401(k) Plan from December 22, 2009 through the date of judgment, excluding the Defendants.

167.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 50,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of

96

(A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

168.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

169.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.   Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper*

*Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

      b.  The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of hours
> for the benefit of employees and retirees. No case had previously
> been brought by either the Department of Labor or private attorneys
> against large employers for excessive fees in a 401(k) plan. Class
> Counsel performed substantial work…, investigating the facts,
> examining documents, and consulting and paying experts to
> determine whether it was viable. This case has been pending since
> September 11, 2006. Litigating the case required Class Counsel to
> be of the highest caliber and committed to the interests of the
> participants and beneficiaries of the General Dynamics 401(k)
> Plans.

*Will v. General Dynamics*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9

(S.D.Ill. Nov. 22, 2010).

      c.  Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in 401(k) plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

      d.  Schlichter, Bogard & Denton is also class counsel in *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect defined contribution plans generally.

e.  The firm's work in ERISA excessive fee class actions has been

featured in the New York Times and Wall Street Journal, among other media

outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y.

TIMES (Mar. 29, 2014);[61]  Liz Moyer, *High Court Spotlight Put on 401(k)*

*Plans*, WALL ST. J. (Feb. 23, 2015);[62]  Floyd Norris, *What a 401(k) Plan*

*Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[63]  Jess Bravin and Liz

Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*,

WALL ST. J. (May 18, 2015);[64] Jim Zarroli, *Lockheed Martin Case Puts 401(k)*

*Plans on Trial*, NPR (Dec. 15, 2014);[65] Darla Mercado, *Public Enemy No. 1 to*

*401(k) Profiteers*, INVESTMENTNEWS (Jan. 26, 2014).[66]

---

[61] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[62] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[63] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[64] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[65] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[66] Available at http://www.investmentnews.com/article/20140126/REG/301269992/public-enemy-no-1-for-401-k-profiteers.

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative and Recordkeeping Fees

170.   Plaintiffs restate and incorporate herein the preceding allegations of this complaint.

171.   This Count alleges breach of fiduciary duties against all Defendants.

172.   The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries and defraying reasonable expenses of administering the plan, and acting with the care, skill, prudence, and diligence required by ERISA.

173.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying

excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

174.   Defendants failed to engage in a prudent and loyal process for the selection and retention of a Plan recordkeeper. Defendants failed to solicit competitive bids from vendors on a flat per participant fee and did not institute a flat per participant fee. Defendants allowed the Plan's recordkeeper, Insperity Retirement Services, to receive asset-based revenue sharing and hard dollar fees charged to participants, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeeper grew, even though the services provided by the recordkeeper remained the same. This contributed to the excessive recordkeeping compensation paid to the recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

175.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

176.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other

Defendants to commit a breach by failing to lawfully discharge its own

fiduciary duties, and knew of the breach by the other Defendants and failed

to make any reasonable effort under the circumstances to remedy the breach,

and thus each Defendant is liable for the losses caused by the breach of its co-

fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees

177.   Plaintiffs restate and incorporate the allegations contained in the

preceding paragraphs as though fully set forth here.

178.   This Count alleges breach of fiduciary duties against all

Defendants.

179.   The scope of the fiduciary duties and responsibilities of these

Defendants includes managing the assets of the Plan for the sole and

exclusive benefit of Plan participants and beneficiaries, defraying reasonable

expenses of administering the Plan, and acting with the care, skill, diligence,

and prudence required by ERISA. These Defendants are directly responsible

for ensuring that the Plan's fees are reasonable, selecting prudent investment

options, evaluating and monitoring the Plan's investments on an ongoing

basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

180.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

181.   Defendants selected and retained as Plan investment options mutual funds and collective trusts with high expenses relative to other investment options, including separate accounts, collective trusts, and lower-cost share class mutual funds with the identical investment manager and investments, that were readily available to this jumbo Plan at all relevant times.

182.   In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

183.   Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

184.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

185.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Breach of Duties of Loyalty and Prudence—Use of a Microscopically Low-Yielding Money Market Fund Without Consideration or Use of a Stable Value Fund Until Adding a Stable Value Fund and Then Adding an Imprudent One

186.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

187.   This Count alleges breach of fiduciary duties against all Defendants.

188.   The scope of the fiduciary duties and responsibilities of these Defendants includes direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.

189.   Defendants maintained as a Plan investment option the Federated Prime Obligations Money Market Fund. This fund holds very short-term instruments and generated only the most microscopic returns above zero for consecutive years that did not keep pace with inflation. As a result, this investment option did not provide any meaningful retirement benefits to participants, and participants in fact lost more purchasing power year after year.

190.   Prudent fiduciaries of defined contribution plans know that such minimally returning funds will not and have not kept pace with inflation. However, until adding Reliance Trust's stable value fund in 2014, these Defendants failed to make a reasoned decision or consider whether to use a stable value fund for the Plan, which invests in medium-term instruments that have consistently provided much greater returns than money market funds while offering greater protection through a guarantee. Had Defendants considered a stable value fund, weighed the benefits and higher returns relative to a money market fund, and provided a stable value fund prior to 2014, a prudent stable value fund would have provided significantly higher returns than the Plan's money market fund without any greater increase in risk. Maintaining the money market fund in the Plan while failing to offer a stable value fund as a core investment option caused the Plan millions of dollars in losses compared to what the assets of the fund would have earned if invested in a stable value fund.

191.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

192.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

## Failure to Monitor Fiduciaries

193.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

194.   This Count alleges breach of fiduciary duties against Insperity Holdings, Inc.

195.   Under Section 10.2 of the Plan, Insperity Holdings, Inc. has responsibility to control and manage the operation and administration of the Plan, including the selection of Plan service providers, with all powers necessary to enable it properly to carry out such responsibilities. Exercising this discretionary authority, Insperity Holdings, Inc. appointed Reliance Trust to hold, control and manage the assets of the Plan.

196.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

197.   To the extent any of Insperity Holdings, Inc.'s fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

198.   Insperity Holdings, Inc. breached its fiduciary monitoring duties by, among other things:

a.   failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring

110

that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

     d.  failing to ensure that the monitored fiduciaries, including Reliance Trust, considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's proprietary Reliance Trust funds and other investments;

     e.  failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, and options that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

199.  As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Insperity Holdings, Inc. discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct

result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

## COUNT V

### 29 U.S.C. §1106(a)—Prohibited Transactions between the Plan and Parties In Interest

200.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

201.   This Count alleges prohibited transactions against all Defendants.

202.   Defendants caused the Plan to use Reliance Trust-managed investment options and to use Insperity's subsidiary, Insperity Retirement Services, as the Plan's recordkeeper.

203.   Defendants are all parties in interest because they are entities providing services to the Plan or are fiduciaries to the Plan under 29 U.S.C. §1002(14).

204.   Defendants caused the Plan to engage in transactions between the Plan and a party in interest in violation of 29 U.S.C. §1106(a) by:

      a. causing the Plan to use Reliance Trust proprietary investments, including the selection and retention of the Reliance Trust target date funds

and stable value fund, that benefitted Reliance Trust through excessive

investment management fees charged to participants for those investments,

and caused the Plan to pay Insperity Retirement Services, and in turn

Insperity, Inc., revenue sharing payments from those proprietary

investments and other Plan investment options for providing in-house

recordkeeping services to the Plan for the benefit of Defendants; and causing

the Plan to use Insperity's proprietary recordkeeping services to financially

benefit Defendants through uncapped, asset-based revenue sharing

payments from Plan investments, all of which constituted an exchange of

property between the Plan and a party in interest, 29 U.S.C. §1106(a)(1)(A);

     b.  causing the Plan to use Reliance Trust proprietary investments

and services, including the selection and retention of the Reliance Trust

target date funds and stable value fund, that benefitted Reliance Trust

through excessive investment management fees charged to participants for

those investments, and caused the Plan to use Insperity's proprietary

recordkeeping services to financially benefit Defendants through uncapped,

revenue sharing payments from Plan investments, all of which constituted a

direct or indirect furnishing of services between the Plan and a party in

interest for more than reasonable compensation, 29 U.S.C. §1106(a)(1)(C);

and

c.  causing the Plan to use Reliance Trust proprietary investments, including the selection and retention of the Reliance Trust target date funds and stable value fund, that benefitted Reliance Trust through excessive investment management fees charged to participants for those investments, and caused the Plan to pay Insperity Retirement Services, and in turn Insperity, Inc., revenue sharing payments from those proprietary investments and other Plan investment options for providing proprietary recordkeeping services to the Plan for the benefit of Defendants; causing the Plan to use Insperity's proprietary recordkeeping services to financially benefit Defendants through uncapped, asset-based revenue sharing payments from Plan investments; and causing the Plan to invest in high-cost mutual funds and collective trusts compared to institutional investment alternatives that were readily available to the Plan, including separate accounts, collective trusts, and lower-cost share classes of the identical investment, to drive uncapped, asset-based revenue to Defendants for their financial benefit, all of which constituted a transfer to or use of Plan assets by or for the benefit of a party in interest, 29 U.S.C. §1106(a)(1)(D).

205.  Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge all revenues received by Reliance Trust, Insperity, Inc., Insperity

Retirement Services, and their subsidiaries from the fees and revenue sharing payments paid by the Plan to these entities, as well as other appropriate equitable or remedial relief.

## COUNT VI

### 29 U.S.C. §1106(b)—Prohibited Transactions between the Plan and Fiduciaries

206.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

207.   This Count alleges prohibited transactions against all Defendants.

208.   Reliance Trust violated 29 U.S.C. §1106(b) as follows:

a.   In causing the Plan to use Reliance Trust proprietary investments that benefitted Reliance Trust through excessive investment management fees charged to participants for those investments, causing the Plan to use the Reliance Trust proprietary target date funds, which had no prior performance history at the time of inclusion, and failing to consider prudent alternatives to the proprietary target date funds that were readily available to the Plan, Reliance Trust dealt with the assets of the plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1).

b.  In causing the Plan to use Reliance Trust proprietary investments that benefitted Reliance Trust through excessive investment management fees charged to participants for those investments, causing the Plan to use Reliance Trust proprietary target date funds, which had no prior performance history at the time of inclusion, and failing to consider prudent alternatives to the proprietary target date funds that were readily available to the Plan, Reliance Trust acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

c.  In causing the Plan to pay excessive investment management fees charged to the Reliance Trust proprietary investments, including the Reliance Trust target date funds and the stable value fund, causing the Plan to use Reliance trust proprietary investments, which then directed asset-based revenue sharing payments to Insperity Retirement Services, and in turn Insperity, Inc., and allowing these Insperity entities to profit from the Plan through uncapped, asset-based revenue sharing payments from Plan investment decisions that mutually benefitted Defendants, Reliance Trust received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

116

209.   Insperity, Inc., Insperity Holdings, Inc., Insperity Retirement Services, the Insperity Retirement Plan Committee and its members violated 29 U.S.C. §1106(b) as follows:

a.   In causing the Plan to use Insperity's subsidiary, Insperity Retirement Services, as the Plan's recordkeeper, and allowing it, and in turn Insperity, Inc., to receive uncapped, asset-based revenue sharing payments from Plan investments, these Defendants dealt with the assets of the plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1).

b.   In causing the Plan to use Reliance Trust proprietary investments that charged excessive investment management fees, causing the Plan to use Insperity's subsidiary, Insperity Retirement Services, as the Plan's recordkeeper, and allowing it, and in turn Insperity, Inc., to receive uncapped, asset-based revenue sharing payments from Plan investments, these Defendants acted in a transaction involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

210.   In causing the Plan to use Insperity's in-house subsidiary, Insperity Retirement Services, as the Plan's recordkeeper, causing Insperity Retirement Services, and in turn Insperity, Inc., to receive uncapped, asset-

based revenue sharing payments from Plan investments, and allowing Reliance Trust to select its own proprietary investments, which then provided a mutual benefit to Insperity Retirement Services, and in turn Insperity, Inc., through asset-based revenue sharing payments from these investments, these Defendants received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

211.   For the reasons discussed above, the Defendants referenced in this Count were fiduciaries and parties in interest with respect to the Plan.

212.   As a direct result of these prohibited transactions, the Plan, directly or indirectly, paid millions of dollars in investment management and administrative fees that were prohibited by ERISA and suffered tens of millions of dollars in losses.

213.   Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and to disgorge all revenues received by Reliance Trust, Insperity, Inc., Insperity Retirement Services and their subsidiaries from the fees paid by the Plan to these entities, as well as other appropriate equitable or remedial relief.

# COUNT VII

## 29 U.S.C. §1132(a)(3)—Other Equitable Relief Based on Receipt of Ill-Gotten Proceeds

214.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

215.   This Count seeks equitable relief from Reliance Trust, Insperity, Inc., and Insperity Retirement Services.

216.   Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

217.   Reliance Trust, Insperity, Inc., and Insperity Retirement Services knew or should have known that the act or practice of using Reliance Trust-managed investments in the Plan allowed Reliance Trust and its subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

218.   Reliance Trust, Insperity, Inc., and Insperity Retirement Services knew or should have known that the act or practice of using proprietary

Insperity recordkeeping services in the Plan allowed Insperity, Inc., Insperity Retirement Services and their subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

219.   Each of these Defendants knew or should have known that the act or practice of using Reliance Trust-managed investments and Insperity proprietary recordkeeping services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation or a transfer of assets of the Plan to a party in interest.

220.   Each of these Defendants knew or should have known that the act or practice of using Reliance Trust-managed investments and Insperity proprietary recordkeeping services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the Plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan fiduciary received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

221.   Accordingly, each of these Defendants participated in the prohibited transactions described above and knowingly received excessive fees paid from Plan assets.

222.   Therefore, to the extent any ill-gotten proceeds and profits are not disgorged under the fiduciary relief provisions of 29 U.S.C. §1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. §1132(a)(3) to restore these monies to the Plan.

## JURY TRIAL DEMANDED

223.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants breached their fiduciary duties as described above;

- find and declare that Defendants committed prohibited transactions;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each

121

breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

December 22, 2015                    Respectfully submitted,

                                     /s/ Bradley S. Wolff
                                     Bradley S. Wolff, GA No. 773388
                                     SWIFT, CURRIE, MCGHEE, & HIERS, LLP
                                     1355 Peachtree St., N.E., Ste. 300
                                     Atlanta, GA 30309-3231
                                     Phone: (404) 874-8800
                                     Fax: (404) 888-6199
                                     brad.wolff@swiftcurrie.com

                                     Local Counsel for Plaintiffs

                                     SCHLICHTER, BOGARD & DENTON, LLP
                                     Jerome J. Schlichter, MO No. 32225*
                                     Michael A. Wolff, MO No. 38207*
                                     Troy A. Doles, MO No. 47958*
                                     Kurt C. Struckhoff, MO No. 61873*
                                     Heather Lea, MO No. 49872*
                                     100 South Fourth Street
                                     St. Louis, MO 63102
                                     Phone: (314) 621-6115
                                     Fax: (314) 621-7151
                                         *applying to be admitted *Pro Hac Vice*

                                     Lead Counsel for Plaintiffs