## IN THE UNITED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RONDA A. PLEDGER, SANDRA BRITT, JENNIFER L. PRIMM, ALEX BROOKS, JR., AND EDWARD COMER BUCK, individually and as representatives of a class of similarly situated persons of the Insperity 401(k) Plan, | CIVIL ACTION NO. 1:15-cv-04444-MHC<br><br>COMPLAINT—CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs*, | |
| v. | |
| RELIANCE TRUST COMPANY, INSPERITY, INC., INSPERITY HOLDINGS, INC., INSPERITY RETIREMENT SERVICES, L.P., INSPERITY RETIREMENT PLAN COMMITTEE, AND JOHN DOES 1–20, | |
| *Defendants*. | |

### AMENDED COMPLAINT

1.     Plaintiffs Ronda A. Pledger, Sandra Britt, Jennifer L. Primm, and Alex Brooks, Jr., individually and as representatives of a class of participants and beneficiaries in the Insperity 401(k) Plan ("Plan") bring this action under 29 U.S.C. §§1132(a)(2) and (3) on behalf of the Plan against Defendants Reliance Trust Company, Insperity, Inc., Insperity Holdings, Inc.,

Insperity Retirement Services, L.P., Insperity Retirement Plan Committee, and John Does 1–20 for breach of fiduciary duties.

2. Today, 401(k) defined contribution plans, in which the employee's retirement assets are at risk of high fees and underperformance, have become America's primary retirement system, departing from traditional defined benefit (pension) plans in which the employer assumes the risk.[1] With over $2 billion in assets, the Plan is in the largest *0.08%* of over 621,000 401(k) plans in the United States based on plan assets.[2] The marketplace for 401(k) retirement plan services is established and competitive. As one of the very largest multi-billion dollar defined contribution plans in the country, the Plan enjoys tremendous bargaining power and an ability to demand high-quality, low-cost services that are unavailable to smaller plans. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that plan expenses are reasonable. These duties have been defined as the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and

---

[1] Nancy Trejos, *Retirement Wreck,* WASHINGTON POST (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

[2] *The BrightScope / ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* at 11 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

2

beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Reliance Trust acted to benefit itself and the other defendants by selecting and retaining high-cost and poorly performing investments for the Plan, including investing $500 million of the Plan's assets in its own newly-created and untested proprietary target-date funds. Insperity also hired its own subsidiary as the Plan's recordkeeper and allowed it to receive excessive compensation, thereby driving revenues and profits to Insperity entities at the expense of Plan participants.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District and Division is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found. In addition, Named Plaintiffs Pledger and Britt reside in this District, participated in the Plan from this District, and received Plan information from Defendants in this District. Defendant Reliance Trust, who is the discretionary trustee for the Plan, resides in this District where it held and controlled Plan assets and made investment selection, deselection and other decisions regarding the Plan.

## PARTIES

### The Insperity 401(k) Plan

6.     The Insperity 401(k) Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a), which was last amended and restated effective January 1, 2014.

8.     Generally, Insperity offers the Plan to employees of small- and medium-sized businesses whose employer has contracted with Insperity to serve as its off-site human resources department. These employees are referred to as "eligible worksite employees."

9.     Specifically, an Insperity client company enters into a "Client Service Agreement" with a subsidiary of Insperity—Insperity PEO Services, L.P. (formerly named Administaff Companies II, L.P.)—to provide off-site, full-service human resource services to the client company. Under this Client Service Agreement, the employees of the client company are designated as co-employees of Insperity PEO Services, L.P. The client then has the option of entering into an "Election Agreement" with another subsidiary of Insperity—Defendant Insperity Holdings, Inc.—to permit its employees to participate in the Plan.

10.    Although the Plan includes participants from many Insperity clients, according to the Plan's annual reports filed with the Department of Labor (Form 5500), Insperity Holdings has informed the DOL that the Plan is "a single-employer plan," and *not* a "multiple-employer plan."

11.     The Plan provides for retirement benefits for the eligible worksite employees of Insperity Holdings, Inc. and its affiliates, including the co-employees of Insperity PEO Services, L.P. The amount of these retirement benefits depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

12.     As of December 31, 2014, the Plan is one of the country's largest 401(k) plans and is what is known as a jumbo plan, with over $2 billion in total assets and over 50,000 participants with account balances.

## Plaintiffs

13.     Ronda A. Pledger resides in Roswell, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

14.     Sandra Britt resides in Ackworth, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

15.     Jennifer L. Primm resides in Pinehurst, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

16.     Alex Brooks, Jr. resides in Houston, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

17.     Edward Comer Buck resides in Atlanta, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

**Defendants**

18.     Reliance Trust Company ("Reliance Trust") is a domestic bank organized under Georgia law with its principal place of business in Atlanta, Georgia. Under the Trust Agreement between Insperity Holdings, Inc. and Reliance Trust Company, Reliance Trust functions as the Plan's discretionary trustee to "hold, manage and control the assets of the Plan," including the selection, retention and monitoring of investment options made available to participants for the investment of their contributions and provision of their retirement income.

19.     Insperity, Inc., formerly named Administaff, Inc., ("Insperity") is a publicly traded corporation organized under Delaware law with its principal place of business in Kingwood, Texas, trading on the New York Stock Exchange as NSP (formerly ASF). Insperity, Inc. serves as a professional employer organization providing human resources and business

7

solutions to small- and medium-sized businesses (5 to 5,000 employees) throughout the United States.

20.     Insperity, Inc. acts through its officers, including those acting as Plan fiduciary committee members, and administers the Plan through its subsidiaries.

21.     Insperity Holdings, Inc. (formerly named Administaff of Texas, Inc.) is a for-profit domestic corporation organized under Delaware law with its principal place of business in Kingwood, Texas. Insperity Holdings, Inc. is a wholly owned subsidiary of Insperity, Inc.

22.     Section 10.2 of the Plan names Insperity Holdings, Inc. as the fiduciary responsible for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a), with all powers necessary to enable it properly to carry out such responsibilities, which includes the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. Insperity Holdings, Inc. is the Plan sponsor under 29 U.S.C. §1002(16)(B) and Plan administrator under 29 U.S.C. §1002(16)(A)(i). Insperity Holdings, Inc. is a fiduciary to the Plan also under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or

8

discretionary control respecting the management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan.

23.     Under Section 10.3 of the Plan, Insperity Holdings, Inc. may delegate, by written instrument, all or any part of its responsibilities under the Plan and may revoke such delegation. Insperity Holdings, Inc. delegated its fiduciary responsibility to hold, manage and control the assets of the Plan to Reliance Trust, which includes the selection, retention and monitoring of Plan investment options. Thus, Insperity Holdings retained for itself the remainder of its fiduciary authority and responsibilities, including as to the selection, retention, and compensation of administrative service providers. Insperity Holdings also remains liable for Reliance Trust's acts or omissions in carrying out delegated responsibilities because Insperity Holdings knowingly participated in or failed to remedy Reliance Trust's breaches of fiduciary duties.

24.     According to the Plan's annual reports that Insperity Holdings, Inc. filed with the U.S. Department of Labor, "the Plan is advised by a committee that consists of certain officers and members of management" of Insperity Holdings, Inc. For the purpose of this complaint, the committee is

referred to as the "Insperity Retirement Plan Committee." Plaintiffs are currently unaware of the identities of the individual members of the committee or the formal name of the committee. Those individuals are collectively named as John Does 1–20. Plaintiffs will substitute the real names of the John Does and the formal name of the committee when Plaintiffs know them.

25.     Through the actions of the officers and members of management of Insperity Inc.'s wholly owned subsidiary serving on the Insperity Retirement Plan Committee, Insperity, Inc. and the Insperity Retirement Plan Committee had and exercised authority or control over certain of Insperity Holdings, Inc.'s actions with respect to the Plan, and thereby exercised discretionary authority or discretionary control respecting the management of the Plan or management or disposition of its assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. Accordingly, Insperity, Inc., the Insperity Retirement Plan Committee, and John Does 1–20 are fiduciaries to the Plan.

26.     Insperity Retirement Services, L.P. (formerly Administaff Retirement Services, L.P.) is a domestic limited partnership organized under Delaware law with its principal place of business in Kingwood, Texas. Insperity Retirement Services is a wholly owned subsidiary of Insperity, Inc.

10

Since October 1, 2003, Insperity Retirement Services has served as the Plan recordkeeper, providing in-house administrative and recordkeeping services.

27.     All of the Insperity-related individuals and entities have acted as alleged herein as the agents of Insperity, Inc.

## BACKGROUND FACTS APPLICABLE TO ALL COUNTS

### Insperity's Principal Business as a Provider of HR Outsourcing Services

28.     As a professional employer organization ("PEO"), Insperity Inc.'s core business is providing human resources services, such as payroll processing and employee training, to small- and medium-sized businesses.

29.     According to its filings with the SEC, Insperity assumes an employer/employee relationship with the employees of the client company, and expressly lists efficiencies and economies of scale as benefits of its PEO services.

> In a PEO arrangement, the PEO assumes certain aspects of the employer/employee relationship as defined in the contract between the PEO and its client. Because PEOs provide employer-related services to a large number of employees, they can achieve economies of scale that allow them to perform employment-related functions more efficiently, provide a greater variety of employee benefits, and devote more attention to human resources management than a client can individually.[3]

---

[3] Insperity, Inc. Form 10-K at 3 (Dec. 31, 2014) (available at http://www.sec.gov/Archives/edgar/data/1000753/000100075315000008/document-12312014x10k.htm).

30.     Among the "key factors" driving demand for its PEO services, Insperity lists "the need to provide competitive health care and related benefits to attract and retain employees." To obtain Insperity's PEO outsourcing services client companies execute a "Client Service Agreement" whereby they contract with Insperity to provide off-site human resource services. This agreement provides for an ongoing relationship between Insperity and the client company.

31.     The Client Service Agreement divides responsibility between Insperity and the client company. Through this division, Insperity is responsible for providing employee benefits through Insperity-sponsored plans in compliance with ERISA and other federal laws.

32.     As previously noted, employees of clients who enter into this Client Service Agreement with Insperity (referred to as "Workforce Optimization® clients") become co-employees of Insperity. These employees are eligible to participate in the Plan upon the client's execution of an Election Agreement designating the Plan as the retirement savings plan for their employees.

33.     Insperity promotes the Plan to client companies, emphasizing the

fiduciary role it assumes on behalf of clients when administering and

managing the Plan for their employees.

> For Insperity® Workforce Optimization® clients, the Insperity
> 401(k) Plan removes burdens of plan sponsorship[.]
> …
> **Relief from plan sponsorship and fiduciary responsibility.**
> As plan sponsor, Insperity assumes all of the responsibilities
> inherent in plan sponsorship, including fiduciary obligations.
> …
> **Elimination of your day-to-day 401(k) tasks**
> We take care of everything. We already have your data because
> you're a Workforce Optimization® client. You won't be bothered
> with sending payrolls, tracking eligibility or approving QDROs
> and loans. Insperity deposits all contributions; distributes all
> participant communications; and prepares and submits IRS Form
> 5500.[4]

34.     Consequently, assuming complete fiduciary responsibility and

authority over the Plan and its assets by Insperity is a central selling point of

the Plan.

35.     Insperity also promotes the investment services provided by

Reliance Trust with respect to the Plan. In participant communications,

Insperity refers to Reliance Trust as the "investment manager and trustee"

---

[4] This statement previously appeared at
http://www.insperity.com/services/retirement/401k-plans/insperity-401k-plan,
but it was deleted after Plaintiffs filed their original complaint. An archived
version is available at
https://web.archive.org/web/20150323033500/http:/www.insperity.com/service
s/retirement/401k-plans/insperity-401k-plan (emphasis in original).

for the Plan who "selects and continually monitors the investment options available to participants in the Plan."

36.     In promotional materials for its retirement services business, Insperity states that it has "partnered" with Reliance Trust, and markets Reliance Trust as a provider of investment products whose "experts" "carefully manage[]" available investment options to ensure participants are provided "the best possible choice."[5]

## The Plan Seeded and Continues to Sustain Insperity's Proprietary 401(k) Recordkeeping Business

37.     After providing human resource services to businesses since the company was founded in 1986, Insperity saw an opportunity to enter the 401(k) recordkeeping marketplace to further enhance its revenue generated from PEO arrangements.

38.     In February 2003, Insperity announced its plans to provide recordkeeping services to the Plan and other defined contribution plans. During the year, Insperity established Insperity Retirement Services to perform such services.

---

[5] See http://www.insperity.com/services/retirement/investment-choices.

39.     By October 1, 2003, rather than obtaining bids, Insperity hired

Insperity Retirement Services as the Plan's recordkeeper. In doing so,

Insperity became its own first recordkeeping client.

40.     On December 31, 2003, Insperity began providing recordkeeping

services to the separate Insperity Corporate 401(k) Plan (formerly

Administaff Corporate 401(k) Plan) and other defined contribution plans.[6]

41.     Expanding its business beyond human resource outsourcing

services occurred at a time when the company was recovering from financial

shortfalls that included a net loss in 2002.[7] In 2003, the company reflected on

these past challenges:

> [Insperity] experienced an extraordinary recovery and return to
> profitability in 2003. While emerging from one of the most
> challenging periods in our 17-year history, we overcame
> significant obstacles, accomplished major objectives and posted
> some of our best-ever financial results.[8]

42.     Providing recordkeeping services to Insperity-sponsored

retirement plans was a departure from Insperity's prior business. Previously,

---

[6] 2003 Annual Report, Insperity, Inc., Form 10-K at 2, 41 (Dec. 31, 2003),
available at http://library.corporate-
ir.net/library/10/105/105568/Items/103119/C31BB24A-A60E-4BB8-BD69-
6CCB511056B1_ASF_2003AR.pdf.

[7] Insperity, Inc. Form 10-K at 29 (Dec. 31, 2002), available at
http://www.sec.gov/Archives/edgar/data/1000753/000095013403004206/h0334
7e10vk.htm#011.

[8] See 2003 Insperity Annual Report at 1 (Letter to Shareholders).

Insperity retained a third-party service provider to perform the majority of the recordkeeping functions associated with the Plan. Insperity noted that the way in which it managed this new recordkeeping business could critically affect the company's financial condition.[9] Since the Plan's inception, Insperity has used the retirement assets of the Plan to seed its new and untested 401(k) recordkeeping business. The Plan has been and continues to notably be by far Insperity's largest, and also its most profitable, recordkeeping client. In 2013, Insperity boasted that the 401(k) plan assets it recordkept and administered exceeded $2 billion.[10] At that time, the Plan represented over $1.9 billion in assets, or *95%* of Insperity's 401(k) recordkeeping assets.[11] As a result, the Plan's assets, and the revenues derived from proprietary services provided to the Plan, have built and sustained Insperity's retirement business.

### Effect of Fees and Performance in Defined Contribution Plans

43.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined

---

[9] See 2003 Insperity Annual Report, Form 10-K at 41.

[10] Press Release, *Insperity Retirement Services Tops $2 Billion in 401(k) Plan Assets*, BUSINESSWIRE (Apr. 9, 2013), available at http://www.businesswire.com/news/home/20130409005098/en/Insperity-Retirement-Services-Tops-2-Billion-401.

[11] See 2013 Insperity 401(k) Plan Form 5500.

solely by employee and employer contributions plus the amount gained

through investment in the options made available in the plan, less expenses.

See 29 U.S.C. §1002(34). Accordingly, poor investment performance and

unreasonable fees can significantly impair the value of a participant's

account. Over time, even seemingly small differences in fees and performance

can result in vast differences in the amount of savings available at

retirement. See, *e.g.*, U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2

(Aug. 2013)(illustrating impact of expenses with example in which 1%

difference in fees and expenses over 35 years reduces participant's account

balance at retirement by 28%).[12]

44.    The majority of fees assessed to participants in a defined

contribution plan are attributable to two general categories of services: plan

administration (including recordkeeping), and investment management.

Fiduciaries of defined contribution plans must engage in a rigorous process to

control these costs and ensure that participants pay no more than a

reasonable level of fees. This is particularly true for multi-billion dollar plans

like the Plan, which have the bargaining power to obtain the highest level of

service at the best price. As to administrative fees, prudent large plan

fiduciaries solicit competitive bids, which is often the only way to determine

_____

[12] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

the reasonable market rate for the services provided. Regarding investment expenses, prudent large plan fiduciaries thoroughly analyze various investment alternatives, including low-cost funds specifically designed for large institutional investors.

**Defined Contribution Plan Recordkeeping Services**

45.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are capable of providing a high level of service to jumbo 401(k) plans, like the Plan, and will readily respond to a request for proposal. These vendors primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

46.    The cost of providing recordkeeping services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 50,000 participants can negotiate a much lower per-participant fee for recordkeeping services than a plan with 1,000 participants.

18

47.     Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services.

48.     Mutual funds have thousands of shareholders and the expense ratios for those funds includes within them a portion for recordkeeping those thousands of shareholders' accounts. However, since a mutual fund in a 401(k) plan has only one aggregate amount in the plan to track, the recordkeeping must be done by the plan for each participant. In these circumstances, some mutual funds engage in a practice in 401(k) plans known as revenue sharing.

49.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing recordkeeping and administrative services for the investment vehicle. Because revenue sharing arrangements provide asset-based fees, and recordkeeping costs have nothing to do with the size of 401(k) participants' assets, prudent fiduciaries monitor the total amount of revenue sharing a

19

recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, flat per-participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Because revenue sharing payments are asset-based, they can bear no relation to a reasonable recordkeeping fee and can provide excessive compensation.

50.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services, the payments can effectively be "kickbacks" to induce recordkeepers to include the funds in a plan's investment lineup. There are vendors readily available that do recordkeeping only and do not sell investment products. These vendors can offer pricing on a pure per-participant basis, without any revenue sharing component.

51.    To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large 401(k) plans, such as the Plan, put plan recordkeeping and administrative services out for competitive bidding at regular intervals of around three years.

52.    With the exception of the Plan's passively managed BNY Mellon S&P 500 Index Fund II, with an expense ratio of 5 bps, all of the other funds

in the Plan paid or continue to pay revenue sharing payments to Insperity Retirement Services, and in turn, Insperity, Inc. The revenue sharing payments reduced the retirement savings of participants who invested in those funds.

53.     A hard dollar fee refers to a direct payment from a participant's account rather than an indirect or revenue sharing payment from an investment fund. All participants in the Plan paid the same hard dollar fee.

54.     In order to make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, the responsible fiduciary must identify *all* fees, including revenue sharing, hard dollar fees, and any other sources of compensation paid to the recordkeeper.

55.     When providing recordkeeping services, Insperity Retirement Services, and hence Insperity, Inc., is compensated based on a combination of hard dollar fees and revenue sharing payments from the Plan's investments.

56.     As described in further detail below, the amount paid by the Plan for recordkeeping services was and is excessive for the services provided, and the responsible Defendants failed to obtain rebates from Insperity Retirement Services of the revenue sharing that exceeded a reasonable, flat per-participant recordkeeping fee. In doing so, these Defendants acted to

drive revenue and profits to Insperity's own recordkeeping business and hence Insperity, Inc., at the expense of Plan participants.

### Reliance Trust's Role in the Plan

57.    Through a Trust Agreement dated December 31, 2003, the sponsor of the Plan, Insperity Holdings, Inc., retained Reliance Trust as discretionary trustee to hold, manage, and control the assets of the Plan and to be responsible for selecting, retaining, and monitoring the investment options available to participants for the investment of their retirement assets.

58.    As explained in greater detail below, as the delegated fiduciary responsible for Plan investment selections, Reliance Trust selected the investment funds for the Plan. Reliance Trust did not limit the investment funds to non-proprietary funds offered by third-party investment management firms. Rather, Reliance Trust, who must act for the exclusive benefit of Plan participants, selected and retained its own high-cost and poorly performing Reliance Trust investments, to benefit itself at the expense of Plan participants. In return for Insperity allowing Reliance Trust to include its own products in the Plan, Reliance Trust selected investments that paid asset-based revenue sharing to Insperity's subsidiary, Insperity Retirement Services, and consequently, Insperity, Inc., for providing

22

recordkeeping services, and allowed the amount of such asset-based compensation to skyrocket unchecked as the Plan's assets grew.

59.    For providing investment services as set forth in the Plan's Trust Agreement, Reliance Trust is paid an asset-based fee according to the following fee schedule.

| Annual Asset Market Value | Fee |
|---|---|
| First $30,000,000 | 18 basis points (0.18%) |
| Next $70,000,000 | 12.5 basis points (0.125%) |
| Next $700,000,000 | 6.5 basis points (0.065%) |
| Over $800,000,000 | 4.5 basis points (0.045%) |

60.    The amount of this compensation was and remains unreasonable for the services provided to the Plan. As the discretionary trustee, Reliance Trust is required to act solely in the interest of Plan participants and to engage in a rigorous investment selection and monitoring process. However, there is no value to the Plan when an investment adviser, who has a financial incentive to favor its own products, merely selects, monitors and retains its own proprietary investments to benefit itself, or when the adviser selects investment options laden with asset-based revenue sharing payments designed to benefit other plan fiduciaries and services providers, who in turn permit the adviser to benefit from its conflicted investment decisions.

23

## FACTS APPLICABLE TO SPECIFIC COUNTS

**Reliance Trust Selected and Retained its own Newly-Created Proprietary Target Date Funds, which Enriched itself and Insperity Defendants at the Expense of Plan Participants**

61.    In general, target date funds can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's expected retirement date, and is often part of the name of the fund. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

62.    On November 13, 2012, Reliance Trust established a new series of collective trust target date funds, called the Insperity Horizon Risk-Managed Funds. [13] Literally two days later, on November 15, 2012, Reliance Trust added the funds to the Plan, even though the funds had no prior performance history to be considered by Reliance Trust and other Plan fiduciaries when making the investment selection. Upon adding these funds to the Plan, assets that participants had invested in the prior target date

---

[13] See, *e.g.*, Insperity Horizon Risk-Managed 2020 Fund Fact Sheet, available at https://retirementdocs.insperity.com/fundfact/NSP2020.pdf.

24

options (about $466 million), were "mapped" (transferred) from the previous funds to the new Insperity-branded funds.

63.    Selecting investment options for plan participants that have no performance history is wholly contrary to the most basic prudent fiduciary practices. When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate superior long-term investment results compared to the fund's benchmark or peer group of managers with similar mandates. At a minimum, prudent fiduciaries require a three-year performance history for an investment option prior to its inclusion in a 401(k) plan. There was no prudent or loyal reason to select the Reliance Trust target date funds in the Plan without a performance history and to retain these funds when they served to only benefit Defendants at the expense of Plan participants.

64.    At the time of this investment decision, Reliance Trust did not have any meaningful investment management experience managing target date fund investment strategies. Its only other target date fund series, the non-Insperity branded "Reliance Trust Risk-Managed Target Date Funds,"

25

had only been in existence since June 1, 2012, less than six months before the Plan's "Insperity Horizon Risk-Managed Funds" were created.

65. Because the funds were brand new, Reliance Trust and other Plan fiduciaries could not possibly have engaged in a reasoned decision-making process to determine that using these funds was in the best interests of Plan participants, especially compared to the many target date funds that were available to this Plan. Reliance Trust added its own target date funds to the Plan either without adequately considering, or considering at all, whether participants would be better served with any of the other established target date funds available in the market. Instead, Reliance Trust decided to include the newly-created proprietary funds to advance its own interests, using the Plan as seed money for the new funds, and to generate investment management fees for itself and revenue sharing payments to Insperity Retirement Services.

66. Prior to this selection, the Plan offered the J.P. Morgan SmartRetirement Funds as the target date fund option. These funds, as well as the Vanguard Target Retirement Funds and T. Rowe Price Retirement Funds, had proven track records. The J.P. Morgan and Vanguard funds were established on May 15 and June 7, 2006, respectively, while the T. Rowe Price funds were established on September 30, 2002.

67.     Despite the availability of target date funds offered by established investment managers, Reliance Trust created and then offered the Reliance Trust target date funds even though those funds had no performance history. The Plan was either the first or virtually the first investor in those newly-created funds, and immediately by far the largest asset holder in those funds.

68.     The Plan's Reliance Trust target date funds charge 53 bps in total operating expenses. Upon information and belief, these expenses are allocated between an administrative service fee (25 bps) shared with Insperity Retirement Services, an acquired fund fee (10 bps),[14] and an investment management fee (up to 18 bps). The Reliance Trust target date funds are made up of multiple component funds which have their own expense ratios. Thus, the additional layer of fees for management of the target date funds means there are fees on fees in these funds.

69.     In contrast, the J.P. Morgan, Vanguard and T. Rowe Price target date funds charge only an acquired or component fund fee and not an additional "investment management fee" layer. Reliance Trust therefore charges an unnecessary and excessive additional layer of fees on its

_____

[14] Acquired fund fees refer to expenses of the underlying investments or component funds in which the target date fund invests.

proprietary target date funds to benefit itself at the expense of Plan participants.

70.     From their inception, the Reliance Trust target date funds have significantly underperformed and continue to underperform target date fund alternatives with proven track records from established and reputable investment managers. Thus, not only did Reliance Trust place its own target date funds in the Plan at a time when they had no performance history by which to evaluate them, in violation of the most elemental rule of investment management, but it also retained the funds even *after* they developed an abysmal performance history.

71.     As noted, established alternatives to the Reliance Trust target date funds include the J.P. Morgan SmartRetirement Funds (institutional share class), the Vanguard Target Retirement Funds, and the T. Rowe Price Retirement Funds. Since their inception, every Reliance Trust target date fund with a designated retirement year in its name has underperformed these comparators in each year from 2013 through June 30, 2015. The investment returns of the Reliance Trust target date funds and the comparators are shown in the following tables.[15]

---

[15] For mutual fund performance as of June 30, 2015, the returns were estimated based on returns from the funds' prior two quarters. Performance

| 2013 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **13.19%** | 15.85% | 18.05% | 13.77% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |
| **17.02%** | 20.49% | 23.09% | 19.94% |
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **19.34%** | 24.37% | 25.93% | 22.19% |
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **20.26%** | 24.34% | 25.90% | 23.02% |

| 2014 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **4.28%** | 7.11% | 5.63% | 6.91% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |
| **4.60%** | 7.17% | 6.05% | 7.70% |
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **4.73%** | 7.15% | 6.18% | 7.78% |
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **4.77%** | 7.18% | 6.19% | 7.83% |

| As of June 30, 2015 | | | |
|---|---|---|---|
| Insperity/Reliance 2020 | Vanguard 2020 | T. Rowe Price 2020 | J.P. Morgan 2020 |
| **-0.90%** | 1.60% | 2.56% | 1.80% |
| Insperity/Reliance 2030 | Vanguard 2030 | T. Rowe Price 2030 | J.P. Morgan 2030 |

for the Reliance Trust target date funds was obtained from Reliance Trust,
see http://www.relico.com/CIT/Pages/InsperityHorizonTargetDate.aspx.

| **-1.10%** | 2.07% | 3.33% | 2.18% |
|---|---|---|---|
| Insperity/Reliance 2040 | Vanguard 2040 | T. Rowe Price 2040 | J.P. Morgan 2040 |
| **-1.07%** | 2.52% | 3.91% | 2.39% |
| Insperity/Reliance 2050 | Vanguard 2050 | T. Rowe Price 2050 | J.P. Morgan 2050 |
| **-1.14%** | 2.49% | 3.86% | 2.58% |

72.    Graphically, the investment returns of the Insperity Horizon Risk-Managed 2020, 2030, 2040, and 2050 Funds compared to available prudent alternatives for 2013, 2014 and 2015 (as of June 30, 2015) are shown in the following performance charts:

a.  Target date fund 2020



30





b. Target date fund 2030







c. Target date fund 2040







d.  Target date fund 2050







73.     Reliance Trust's imprudent and disloyal selection of its own target date funds to benefit itself has significantly harmed Plan participants' retirement savings. To demonstrate this loss in retirement savings, the returns of the Plan's initial investment of *over $466 million* in the proprietary target date funds is shown below compared to the returns of the target date fund alternatives. This conservative analysis, *which does not even take into account subsequent contributions*, amply shows that Plan participants lost at least $41 million and as much as over $56 million compared to what they

would have earned by investing in the alternative target date fund options.[16]

These losses will continue to build because Plaintiffs have been deprived and

continue to be deprived of the earnings these losses would have produced.



74.     Had the amounts invested in the Insperity Horizon Risk-

Managed Funds instead been invested in *any* of the target date alternatives

_____

[16] This calculation uses a weighted-average of the investment returns for each target date fund based on the amount invested by the Plan in each fund (e.g., 2020, 2030, 2040, 2050, income). Because the amount invested in the Reliance Trust funds in 2015 is not currently available, end-of-year assets for 2014 were used as an estimate.

identified above, Plan participants would have earned roughly an additional $50 million in retirement savings.

### Excessive Recordkeeping and Administrative Fees

75.     Insperity Holdings, Inc. is responsible for selecting and retaining a recordkeeper for the Plan. Since 2003, Insperity and Insperity Holdings have selected and retained Insperity's own wholly-owned subsidiary, Insperity Retirement Services, as the Plan's recordkeeper.

76.     Upon information and belief, Insperity and Insperity Holdings selected and retained Insperity Retirement Services as the Plan's recordkeeper without ever conducting any competitive bidding process and without any negotiation over the compensation to be paid for its administrative and recordkeeping services. Had Insperity and Insperity Holdings used a competitive bidding process, other outside entities would have offered to provide the same services at a far lower cost to the Plan.

77.     The Trust Agreement between Insperity Holdings and Reliance Trust states that Reliance Trust is responsible for reviewing the expenses and fees of third parties performing services to the Plan. Thus, Reliance Trust was responsible for monitoring the compensation received by Insperity Retirement Services, including the hard dollar and revenue sharing payments it received from the funds in the Plan. Insperity Holdings was also

38

required to monitor Reliance Trust to ensure that it acted prudently and loyally in monitoring the compensation received by Insperity Retirement Services.

78.     Since Insperity Holdings, which is a wholly owned Insperity, Inc. subsidiary, must monitor Insperity Retirement Services' recordkeeping fees, there is a direct conflict of interest, and the Plan's recordkeeping fees were excessive in part because Reliance Trust and Insperity Holdings failed to monitor and control the amount of the hard dollar and asset-based revenue sharing payments from the Plan's investments to Insperity Retirement Services, and in turn, Insperity, Inc.

79.     Insperity Holdings and Reliance Trust also failed to even attempt to obtain a rebate of excessive fees. This allowed Insperity Retirement Services, and in turn Insperity, Inc., to self-deal by receiving significant revenues and profits, and unreasonable recordkeeping fees, which came at the direct expense of Plan participants.

80.     As noted, in the Plan's annual reports, Insperity Holdings has represented to the federal government that the Plan is "a single-employer plan." The nature of the administrative services required by the Plan is similar to other single-employer plans with a similar number of participants (roughly 50,000). Taking into account the administrative services required by

the Plan and provided by Insperity Retirement Services, the Plan's participant level, and the market rates for these services, the outside limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant.

81.    The Plan paid much more than $30 per participant. Based on the direct compensation reported on the Plan's annual reports filed with the DOL, and the estimated revenue sharing or indirect compensation available through the funds in the Plan's investment lineup, the Plan paid approximately $119 to $142 per participant per year from 2009 through 2014, as much as 473% higher than a reasonable fee for these services, resulting in millions of dollars in excessive fees.

82.    In addition to those amounts, Insperity also billed participating employers directly on a quarterly basis for "Retirement Services." These charges included a $500 "Annual Base Recordkeeping" charge and a $30 "Annual Participant Service Fee" for each participant with an account balance. Thus, Insperity Retirement Services received significant additional recordkeeping compensation on top of the excessive amounts paid by the Plan.

83.    Insperity Holdings and Reliance Trust also failed to control recordkeeping costs as the Plan's assets grew. From the beginning of 2009 to

the end of 2014, the Plan's assets almost tripled, from $704 million to over

$2.04 billion. Because revenue sharing payments are asset-based, the already

excessive compensation paid to Insperity Retirement Services became even

more excessive as the Plan's assets grew, even though the administrative

services provided to the Plan remained essentially the same. Insperity

Holdings and Reliance Trust could have capped the amount of revenue

sharing to ensure that any excessive amounts were returned to the Plan, but

failed to do so.

84.    The compensation paid to Insperity Retirement Services was

unreasonable for the additional and independent reason that the expenses it

charged vastly exceeded the direct expenses that were actually incurred in

the administration of the plan, and included costs that are not properly

chargeable to the plan, such as overhead.

85.    Insperity Holdings and Reliance Trust failed to prudently

monitor and control Insperity Retirement Services' recordkeeping

compensation, including the amount of asset-based, uncapped revenue

sharing. By allowing Insperity Retirement Services to receive an uncapped

amount of revenue sharing, these Defendants allowed Insperity Retirement

Services to receive greatly excessive compensation. The failure of Insperity

Holdings and Reliance Trust to conduct a competitive bidding process to

41

select the Plan's recordkeeper and to ensure that only reasonable fees were charged for administrative and recordkeeping services caused Plan participants to lose over $30 million through unreasonable recordkeeping expenses.[17]

### Excessive Investment Management Fees

86.    Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after

---

[17] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

87.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

88.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ

Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000).

89.     Many Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (January/February 1991).[18]

90.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses. And if a fiduciary does decide to use an actively-managed fund despite the strong likelihood that it will underperform an index, a prudent fiduciary must still carefully consider the fund's level of fees, bearing in mind the negative correlation with expected performance.

---

[18] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

91.     Reliance Trust and Insperity entities engaged in blatant self-dealing when offering higher-cost investments to Plan participants. In order to drive revenue to Reliance Trust, Reliance Trust selected, and Insperity entities allowed, Reliance Trust proprietary investments to be offered as Plan investment options. In return, Reliance Trust selected higher-cost share classes of the Plan's funds, which paid a larger amount of asset-based revenue sharing to Insperity entities than the available lower-cost share classes would have paid. This conflicted scheme ensured that excessive fee revenue from Plan investments was fully captured by these conflicted fiduciaries on an ongoing basis.

92.     As demonstrated below, at all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan compared to institutional alternatives that were readily available to the Plan, including lower-cost share classes of the identical mutual fund and collective trust investments, lower-cost mutual fund options with similar investment styles, lower cost separate accounts, and lower-cost collective trusts, which in some instances have even lower costs than separate accounts. The high fees in the Plan's funds were not justified by superior investment performance.

45

### A. *Excessive fees compared to the lower-cost, but otherwise identical, institutional class shares of the Plan's mutual fund and collective trust investments.*

93.    It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees that can be obtained in the market. Thus, large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Jumbo multi-billion dollar plans, such as the Plan, have even greater bargaining power.

94.    Mutual funds and collective trusts frequently offer multiple share classes, which are often classified as either "retail" class or "institutional" class. Retail-class shares are identical to institutional-class shares in every way, except that retail shares charge higher fees, which reduce the investor's assets. Although institutional share classes typically have minimum investment thresholds, funds will waive the minimums for large institutional investors, even those much smaller than the Plan.

95.    Because the only difference between the share classes is cost, a prudent investor will select the lower cost option, because doing so saves money. That did not happen in the Plan. Throughout the relevant time period, the Plan's investment lineup has included higher-cost share classes

46

instead of the identical lower-cost share classes that were available to the Plan.

### 1. Mutual Funds in the Plan as of December 31, 2014

96.     As of December 31, 2014, the Plan included the following retail mutual funds, which were up to 76% more expensive than the available institutional alternatives:

| Plan Investment[19] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) (PCVAX) | 117 bps | $65,930,339 | PSVIX | 77 bps | 52% |
| AllianzGI High Yield Bond (Adm) (AYBVX) | 97 bps | $32,914,144 | AYBIX | 64 bps | 52% |
| American Beacon Mid Cap Value Fund (Inv) (AMPAX) | 114 bps | $103,448,427 | AACIX | 93 bps | 23% |

---

[19] Expense ratios were primarily obtained from Morningstar, a provider of independent investment research. See www.morningstar.com. For the Virtus Real Estate Securities Fund, the expense ratio was obtained from the fund's prospectus dated Nov. 12, 2014, available at http://www.sec.gov/Archives/edgar/data/1005020/000157104914006219/t1402057_485bpos.htm.

| Plan Investment[19] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| American Funds EuroPacific Growth Fund (R3) (RERCX) | 114 bps | $113,188,795 | RERGX | 49 bps | 133% |
| BlackRock Equity Dividend Fund (S) (MSDVX) | 101 bps | $101,123,975 | MADVX | 70 bps | 44% |
| Eaton Vance Floating-Rate Fund (A) (EVBLX) | 99 bps | $14,008,553 | EIBLX | 74 bps | 34% |
| Mainstay Large Cap Growth Fund (R2) (MLRTX) | 109 bps | $90,134,981 | MLRSX | 62 bps | 76% |
| Munder Midcap Core Growth Fund (A) (MGOAX) | 132 bps | $86,255,539 | MGOSX | 89 bps | 48% |
| PIMCO Total Return Fund (Adm) (PTRAX) | 71 bps | $86,022,139 | PTTRX | 46 bps | 54% |
| Virtus Real Estate Securities Fund (A) (PHRAX) | 138 bps | $63,058,966 | VRREX | 96 bps | 44% |
| John Hancock Income Fund (R4) (JSNFX) | 69 bps | $33,621,881 | JSNWX | 42 bps | 64% |

### 2. Mutual Funds in the Plan prior to December 31, 2014

97.    Investments in the Plan in previous years but removed before year-end-2014 also included higher-cost share classes instead of the identical lower-cost share classes available to the Plan. The retail shares were up to 185% more expensive than the institutional alternatives:

| Prior Mutual Fund Investments[20] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund (SS) (PRSXX) | 29 bps | $120,004,672 | POIXX | 20 bps | 45% |
| American Funds Growth Fund of America (R3) (RGACX) | 97 bps | $60,060,301 | RGAGX | 34 bps | 185% |
| American Funds High Income Trust (R3) (RITCX) | 102 bps | $20,936,278 | RITGX | 37 bps | 176% |

---

[20] For asset amounts, the end-of-year assets for the mutual funds prior to their removal from the Plan were included, as well as their corresponding expense ratios and the expense ratios of the lower-cost mutual fund alternatives. Expense ratios were primarily obtained from Morningstar. For the American Funds Growth Fund of America, the expense ratio was obtained from the fund's annual report dated Aug. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/44201/000005193110000690/gfa_ncsr .htm. For the Davis New York Venture Fund, the expense ratio was obtained from the fund's annual report dated July 31, 2010, available at http://www.sec.gov/Archives/edgar/data/71701/000007170110000045/dnyvf_dr fncsr.htm. For the J.P. Morgan SmartRetirement Funds, the expense ratios were obtained from the funds' prospectus dated Nov. 1, 2010, available at http://www.sec.gov/Archives/edgar/data/1217286/000114544310002212/d2737 8.htm. For the Fidelity Advisor Freedom Funds, the expense ratios were obtained from the funds' prospectus dated May 30, 2009, available at http://www.sec.gov/Archives/edgar/data/880195/000088019509000089/main.h tm#fid4666.

| Prior Mutual Fund Investments[20] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Columbia Strategic Income Fund (A) (COSIX) | 103 bps | $31,328,730 | LSIZX | 78 bps | 32% |
| Davis New York Venture Fund (R) (NYVRX) | 123 bps | $60,639,007 | DNVYX | 63 bps | 95% |
| Fidelity Spartan U.S. Equity Index Fund (Inv) (FUSEX) | 10 bps | $76,572,314 | FUSVX | 7 bps | 43% |
| Goldman Sachs Mid Cap Value Fund (Svc) (GSMSX) | 124 bps | $91,459,412 | GSMCX | 74 bps | 68% |
| JPMorgan SmartRetirement 2010 Fund Select (JSWSX) | 76 bps | $46,585,514 | JSWIX | 61 bps | 25% |
| JPMorgan SmartRetirement 2020 Fund Select (JTTSX) | 84 bps | $118,464,448 | JTTIX | 69 bps | 22% |
| JPMorgan SmartRetirement 2030 Fund Select (JSMSX) | 92 bps | $109,109,831 | JSMIX | 77 bps | 19% |

| Prior Mutual Fund Investments[20] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 Fund Select (SMTSX) | 94 bps | $78,657,794 | SMTIX | 79 bps | 19% |
| JPMorgan SmartRetirement 2050 Fund Select (JTSSX) | 94 bps | $8,236,242 | JTSIX | 79 bps | 19% |
| Fidelity Advisor Freedom 2010 Fund (T) (FCFTX) | 117 bps | $40,728,638 | FCIFX | 67 bps | 75% |
| Fidelity Advisor Freedom 2020 Fund (T) (FDTFX) | 123 bps | $82,919,255 | FDIFX | 73 bps | 68% |
| Fidelity Advisor Freedom 2030 Fund (T) (FTFEX) | 127 bps | $65,792,236 | FEFIX | 77 bps | 65% |
| Fidelity Advisor Freedom 2040 Fund (T) (FTFFX) | 129 bps | $45,146,999 | FIFFX | 79 bps | 63% |

### 3.  Mutual Funds Added to the Plan July 22, 2015

98.    Effective July 22, 2015, several investment options were replaced. The newly added funds were also in higher-cost share classes even though a lower-cost institutional share class was available:

| Newly-Added Mutual Fund Investments[21] | Plan Fee | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund (M) (MWTRX) | 68 bps | MWTIX | 44 bps | 55% |
| T. Rowe Price Blue Chip Growth Fund (Adv) (PABGX) | 98 bps | TRBCX | 72 bps | 36% |
| Hartford SmallCap Growth HLS Fund (IB) (HBSGX) | 90 bps | HISCX | 65 bps | 38% |
| T. Rowe Price Real Estate Fund (Adv) (PAREX) | 102 bps | TRREX | 76 bps | 34% |

### 4. Collective Trusts in the Plan as of December 31, 2014

99.   Since November 2012, certain of the Plan's investment options have been collective trusts, which are pooled investment vehicles provided by a trust company or bank. These investments are commonly offered to institutional clients, including 401(k) plans.

100.   In November 2012, Reliance Trust added a series of its own proprietary target-date funds to the Plan, the Insperity Horizon Risk-Managed funds. In 2014, Reliance Trust added the New York Life Anchor

---

[21] Expense ratios were obtained from Morningstar. The T. Rowe Price Blue Chip Growth Fund (Instl) (TBCIX) is also lower cost at 58 bps, see prospectus dated Dec. 15, 2015, available at http://www.sec.gov/Archives/edgar/data/902259/000090225915000017/BCGBCI485b.htm#1_2.

Fund, a stable value fund. For each of these collective trusts, Reliance Trust selected and retained a higher-cost share class, even though a lower-cost but otherwise identical version was available to the Plan. As of December 31, 2014, the Plan's higher-cost versions, and the institutional alternatives, were as follows:

| Plan Investment[22] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| New York Life Anchor Fund, Series I, Class 25 | 72 bps | $113,782,101 | New York Life Anchor Fund, Series I, Class 0 | 47 bps | 53% |
| Insperity Horizon Risk-Managed 2020 Fund I | 53 bps | $177,602,148 | Reliance Trust Risk-Managed 2020 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed 2030 Fund I | 53 bps | $197,592,343 | Reliance Trust Risk-Managed 2030 Target Date Fund I | 28 bps | 89% |

[22] Expense ratios were obtained from Reliance Trust, see http://www.relico.com/CIT/Pages/CITHome.aspx. Based on information presently available, the Plan also offered the BNY Mellon S&P 500 Index Fund II as a Plan investment option. Plaintiffs do not have sufficient information to determine whether a lower-cost share class for the fund existed during the relevant time period.

| Plan Investment[22] | Plan Fee | Plan Assets | Identical Lower-Cost Fund | Identical Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|---|
| Insperity Horizon Risk-Managed 2040 Fund I | 53 bps | $155,842,314 | Reliance Trust Risk-Managed 2040 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed 2050 Fund I | 53 bps | $49,662,836 | Reliance Trust Risk-Managed 2050 Target Date Fund I | 28 bps | 89% |
| Insperity Horizon Risk-Managed Retirement Income Fund | 53 bps | $58,300,748 | Reliance Trust Risk-Managed Retirement Income Fund I | 28 bps | 89% |

101. The lower-cost share classes of the Plan's mutual funds and collective trusts shown above were available throughout the time these funds were in the Plan.

102. By using higher-cost share classes while failing to adequately investigate the use of the identical lower-cost share classes or foregoing the lower-cost alternatives without any prudent or loyal reason for doing so, Reliance Trust and Insperity Holdings caused Plan participants to lose over $26 million of their retirement savings through excessive fees.

## B. *Excessive fees compared to mutual funds from other mutual fund companies*

103.   The fees charged on the Plan's investments are far higher than reasonable investment management fees for such funds. These fees were and are significantly higher than comparable institutional mutual funds available to 401(k) plans, including actively-managed and passively-managed index Vanguard institutional funds with similar investment styles that were readily available to the Plan.

### 1. Funds in the Plan as of December 31, 2014

104.   As of December 31, 2014, the fees for the investment options then in the Plan were up to *16 times* more expensive than available Vanguard alternatives in the same investment style.

| Plan Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|

---

[23] The Plan's Form 5500 identified the "Instl" share class for the AllianzGI High Yield Bond Fund but participant communications reference the "Adm" share class (AYBVX). Similarly, the Form 5500 identified the "Instl" share class for the BlackRock Equity Dividend Fund but participant communications reference the "Serv" share class (MSDVX). Expense ratio information was obtained primarily from Morningstar. For the Vanguard Target Retirement Funds, fee information was obtained from the funds' annual report dated September 30, 2014, available at http://www.sec.gov/Archives/edgar/data/752177/000093247114006878/chester _final.htm.

| Plan Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) | 117 bps | Vanguard Small-Cap Value Index (Instl) (VSIIX) | 8 bps | 1363% |
| | | Vanguard Explorer Value Fund (VEVFX) | 57 bps | 105% |
| AllianzGI High Yield Bond (Adm) | 97 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 13 bps | 646% |
| American Century Inflation-Adjusted Bond Fund (Instl) | 27 bps | Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX) | 7 bps | 286% |
| American Beacon Mid Cap Value Fund (Inv) | 114 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 9 bps | 1167% |
| | | Vanguard Selected Value Fund (VASVX) | 41 bps | 178% |
| American Funds EuroPacific Growth Fund (R3) | 114 bps | Vanguard Total International Stock Index Fund (Instl) (VTSNX) | 12 bps | 850% |
| | | Vanguard International Growth Fund (Adm) (VWILX) | 34 bps | 235% |
| BlackRock Equity Dividend Fund (S) | 101 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 1163% |

| Plan Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| | | Vanguard U.S. Value Fund (Inv) (VUVLX) | 29 bps | 248% |
| Buffalo Small Cap Fund | 100 bps | Vanguard Small-Cap Growth Index (Instl) (VSGIX) | 8 bps | 1150% |
| | | Vanguard Explorer Fund (Adm) (VEXRX) | 35 bps | 186% |
| Dodge & Cox Stock Fund | 52 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 550% |
| Eaton Vance Floating-Rate Fund (A) | 99 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 6 bps | 1550% |
| BNY Mellon S&P 500 Index Fund II | 5 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2 bps | 150% |
| Insperity Horizon Risk-Managed 2020 Fund I | 53 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 16 bps | 231% |
| Insperity Horizon Risk-Managed 2030 Fund I | 53 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 17 bps | 212% |
| Insperity Horizon Risk-Managed 2040 Fund I | 53 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 18 bps | 194% |

| Plan Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Insperity Horizon Risk-Managed 2050 Fund I | 53 bps | Vanguard Target Retirement 2050 Fund (VFIFX) | 18 bps | 194% |
| Insperity Horizon Risk-Managed Retirement Income Fund | 53 bps | Vanguard Target Retirement Income Fund (VTINX) | 16 bps | 231% |
| Mainstay Large Cap Growth Fund (R2) | 109 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 1263% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 263% |
| Munder Midcap Core Growth Fund (A) | 132 bps | Vanguard Mid-Cap Growth Index Fund (Instl) (VMCIX) | 8 bps | 1550% |
| | | Vanguard Mid-Cap Growth Fund (VMGRX) | 44 bps | 200% |
| PIMCO Total Return Fund (Adm) | 72 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIUX) | 5 bps | 1340% |
| Virtus Real Estate Securities Fund (A) | 138 bps | Vanguard REIT Index (Instl) (VGSNX) | 8 bps | 1625% |

| Plan Investment[23] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| John Hancock Income Fund (R4) | 69 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 6 bps | 1050% |

### 2.  Funds in the Plan prior to December 31, 2014

105.   The mutual fund options that were in the Plan in previous years but removed before December 31, 2014 also had excessive fees compared to comparable Vanguard institutional mutual funds available to 401(k) plans.

| Prior Mutual Fund Investment[24] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund (SS) | 29 bps | Vanguard Prime Money Market Fund (Adm) (VMRXX) | 10 bps | 190% |

---

[24] The asset amount and expense ratio of the Plan option, and the expense ratio of the comparator fund, are identified for the final full year the Plan option was offered to participants. Expense ratios were primarily obtained from Morningstar. For the Vanguard U.S. Growth Fund, the expense ratio was obtained from the fund's annual report dated Aug. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/52848/000093247110003304/worldfundsfinal.htm. For the Vanguard Growth Index, the expense ratio was obtained from the fund's annual report dated Dec. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/36405/000093247111001799/indexfunds_final.htm. For Vanguard Institutional Index, for 2010, the expense ratio was obtained from the fund's annual report dated Dec. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/862084/000093247111001805/institutionalindexfund_final.htm. For the Vanguard Target Retirement Funds, for 2009, the expense ratios were obtained from the funds' annual report dated Sept. 30, 2009, available at http://www.sec.gov/Archives/edgar/data/752177/000093247109001899/chesterfundsfinal.htm.

| Prior Mutual Fund Investment[24] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| American Funds Growth Fund of America (R3) | 97 bps | Vanguard Growth Index (Instl) (VIGIX) | 9 bps | 978% |
| | | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 223% |
| American Funds High Income Trust (R3) | 102 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 13 bps | 685% |
| Columbia Strategic Income Fund (A) | 103 bps | Vanguard Total Bond Market Fund (Instl) (VBTIX) | 7 bps | 1371% |
| Davis New York Venture Fund (R) | 123 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2.5 bps[25] | 4820% |
| Fidelity Spartan U.S. Equity Index Fund (Inv) | 10 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2 bps | 400% |
| Goldman Sachs Mid Cap Value Fund (Svc) | 124 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 9 bps | 1278% |
| | | Vanguard Selected Value Fund (VASVX) | 43 bps | 188% |

[25] In 2011, the expense ratio was lowered to 2 bps.

| Prior Mutual Fund Investment[24] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2010 Fund (Select) | 76 bps | Vanguard Target Retirement 2010 Fund (VTENX) | 17 bps | 347% |
| JPMorgan SmartRetirement 2020 Fund (Select) | 84 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 17 bps | 394% |
| JPMorgan SmartRetirement 2030 Fund (Select) | 92 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 19 bps | 384% |
| JPMorgan SmartRetirement 2040 Fund (Select) | 94 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 19 bps | 395% |
| JPMorgan SmartRetirement 2050 Fund (Select) | 94 bps | Vanguard Target Retirement 2050 Fund (VFIFX) | 19 bps | 395% |
| Fidelity Advisor Freedom 2010 Fund (T) | 117 bps | Vanguard Target Retirement 2010 Fund (VTENX) | 19 bps[26] | 516% |
| Fidelity Advisor Freedom 2020 Fund (T) | 123 bps | Vanguard Target Retirement 2020 Fund (VTWNX) | 19 bps[27] | 547% |
| Fidelity Advisor Freedom 2030 Fund (T) | 127 bps | Vanguard Target Retirement 2030 Fund (VTHRX) | 19 bps | 568% |

---

[26] In 2010, the expense ratio was lowered to 17 bps.
[27] In 2010, the expense ratio was lowered to 17 bps.

| Prior Mutual Fund Investment[24] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Fidelity Advisor Freedom 2040 Fund (T) | 129 bps | Vanguard Target Retirement 2040 Fund (VFORX) | 19 bps | 579% |

### 3. Mutual Funds Added to the Plan July 22, 2015

106.   The mutual funds that were recently added to the Plan effective July 22, 2015 also charged significantly higher fees than readily available Vanguard mutual funds.

| Newly-Added Mutual Fund Investments[28] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund (M) | 68 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIUX) | 5 bps | 1260% |
| T. Rowe Price Blue Chip Growth Fund (Adv) | 98 bps | Vanguard Growth Index Fund (Instl) (VIGIX) | 8 bps | 1125% |

---

[28] Expense ratios were obtained from Morningstar.

| Newly-Added Mutual Fund Investments[28] | Plan's Fee | Lower-Cost Mutual Fund | Lower-Cost Mutual Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Hartford SmallCap Growth HLS Fund (IB) | 90 bps | Vanguard Small-Cap Growth Index (Instl) (VSGIX) | 8 bps | 1025% |
| T. Rowe Price Real Estate Fund (Adv) | 102 bps | Vanguard REIT Index (Instl) (VGSNX) | 10 bps | 920% |

107.   By selecting and retaining the Plan's excessive cost investments while failing to adequately investigate the use of superior lower-cost mutual funds from other fund companies that were readily available to the Plan or foregoing those alternatives without any prudent or loyal reason for doing so Reliance Trust and Insperity Holdings caused Plan participants to lose tens of millions of dollars of their retirement savings through excessive fees.

## C. *Excessive fees compared to separate accounts*

108.   Retirement plans with assets over $500 million can hire investment advisers directly to manage separate accounts tailored to the plan's specific investment parameters. These accounts are often available from the same investment managers who manage mutual funds, in the same investment style as the mutual fund. Use of such accounts greatly reduces the cost of investing with the same adviser through a retail mutual fund.

109.   According to the Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, can "commonly" reduce "[t]otal investment management expenses" by "*one-fourth of the expenses incurred through retail mutual funds.*" *Id.* U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, §2.4.1.3 (Apr. 13, 1998)(emphasis added).[29]

110.   As the Plan had assets of well over $900 million at all relevant times, including over $2 billion as of December 31, 2014, separate accounts were readily available to achieve economies of scale.

111.   Separate accounts have a number of advantages over mutual funds, including the ability to negotiate fees, control by the plan sponsor over the investment guidelines, ability to avoid marketing fees built into the cost of mutual funds,[30] and ability to avoid holding significant cash for shareholder redemptions.[31] In a mutual fund, all investors are charged the

---

[29] Available on the Department of Labor's website at http://www.dol.gov/ebsa/pdf/401krept.pdf.

[30] Mutual fund expense ratios include fees for marketing costs, which are wholly unnecessary in a 401(k) plan since participants cannot choose funds other than those provided by the plan's fiduciaries.

[31] Unlike mutual fund shareholders at large, 401(k) participants rarely make trades in their account. Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeski Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006), available at http://www.mrrc.isr.umich.edu/publications/Papers/pdf/wp115.pdf.

same fee, and investors have no ability to modify the fund's investment guidelines, which are set by the fund's investment adviser. In a separate account, the plan sponsor can negotiate the best possible fee for the plan using its bargaining power, and can tailor the investment guidelines to fit the demographics of the workforce.

## 1. Funds in the Plan as of December 31, 2014

112.   While many of the Plan's mutual funds offered identical institutional-class shares, the institutional-class mutual fund fees were still much greater than the fees available through separate accounts with the same investment style/guidelines. Based on the DOL's finding that separate accounts fees are one-fourth the cost of retail mutual funds, had the mutual funds in the Plan as of December 31, 2014 been replaced with separate accounts, the Plan's expenses would have been reduced dramatically:[32]

---

[32] The asset amount and expense ratio of the Plan option, and the expense ratio of the comparator fund, are identified for the final full year the Plan option was offered to participants. Expense ratios were primarily obtained from Morningstar. For the American Funds Growth Fund of America, for 2010, the expense ratio was obtained from the fund's annual report dated Aug. 31, 2010, available at http://www.sec.gov/Archives/edgar/data/44201/000005193110000690/gfa_ncsr .htm. For the Davis New York Venture Fund, for 2010, the expense ratio was obtained from the fund's annual report dated July 31, 2010, available at http://www.sec.gov/Archives/edgar/data/71701/000007170110000045/dnyvf_dr fncsr.htm. For the J.P. Morgan SmartRetirement Funds, for 2011, the expense ratios were obtained from the funds' prospectus dated Nov. 1, 2010,

| Mutual Fund Investment[33] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund | 117 bps | 29 bps | 117 bps | 303% |
| AllianzGI High Yield Bond | 94 bps | 24 bps | 97 bps | 304% |
| American Century Inflation-Adjusted Bond Fund | 72 bps | 18 bps | 27 bps | 50% |
| American Beacon Mid Cap Value Fund | 133 bps | 33 bps | 114 bps | 245% |
| American Funds EuroPacific Growth Fund | 84 bps | 21 bps | 114 bps | 443% |
| BlackRock Equity Dividend Fund | 95 bps | 24 bps | 101 bps | 321% |
| Buffalo Small Cap Fund Inc. | 100 bps | 25 bps | 100 bps | 300% |
| Dodge & Cox Stock Fund | 52 bps | 13 bps | 52 bps | 300% |
| Eaton Vance Floating-Rate Fund | 99 bps | 25 bps | 99 bps | 296% |

available at http://www.sec.gov/Archives/edgar/data/1217286/000114544310002212/d27378.htm. For the Fidelity Advisor Freedom Funds, for 2009, the expense ratios were obtained from the fund's prospectus dated May 30, 2009, available at http://www.sec.gov/Archives/edgar/data/880195/000088019509000089/main.htm#fid4666.

[33] Expense ratios were obtained from Morningstar.

| Mutual Fund Investment[33] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Mainstay Large Cap Growth Fund | 99 bps | 25 bps | 109 bps | 336% |
| Munder Midcap Core Growth Fund | 132 bps | 33 bps | 132 bps | 300% |
| PIMCO Total Return Fund | 85 bps | 21 bps | 72 bps | 243% |
| Virtus Real Estate Securities Fund | 138 bps | 35 bps | 138 bps | 294% |
| John Hancock Income Fund | 86 bps | 22 bps | 69 bps | 214% |

## 2. Funds in the Plan prior to December 31, 2014

113.   The Plan's mutual funds offered in prior years but removed before December 31, 2014 also had excessive fees compared to readily-available separate accounts:

| Prior Mutual Fund Investments | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Federated Prime Obligations Money Market Fund | 29 bps | 7 bps | 29 bps | 314% |
| American Funds Growth Fund of America | 69 bps | 17 bps | 97 bps | 471% |
| American Funds High Income Trust | 67 bps | 17 bps | 102 bps | 500% |
| Columbia Strategic Income Fund | 103 bps | 26 bps | 103 bps | 296% |
| Davis New York Venture Fund | 89 bps | 22 bps | 123 bps | 459% |
| Fidelity Spartan U.S. Equity Index Fund | 10 bps | 3 bps | 10 bps | 233% |
| Goldman Sachs Mid Cap Value Fund | 114 bps | 29 bps | 124 bps | 328% |
| JPMorgan SmartRetirement 2010 Fund | 94 bps | 24 bps | 76 bps | 217% |
| JPMorgan SmartRetirement 2020 Fund | 106 bps | 27 bps | 84 bps | 211% |
| JPMorgan SmartRetirement 2030 Fund | 114 bps | 29 bps | 92 bps | 217% |

| Prior Mutual Fund Investments | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 Fund | 117 bps | 30 bps | 94 bps | 213% |
| JPMorgan SmartRetirement 2050 Fund | 116 bps | 29 bps | 94 bps | 224% |
| Fidelity Advisor Freedom 2010 Fund | 92 bps | 23 bps | 117 bps | 409% |
| Fidelity Advisor Freedom 2020 Fund | 98 bps | 25 bps | 123 bps | 392% |
| Fidelity Advisor Freedom 2030 Fund | 102 bps | 26 bps | 127 bps | 388% |
| Fidelity Advisor Freedom 2040 Fund | 104 bps | 26 bps | 129 bps | 396% |

### 3. Mutual Funds Added to the Plan July 22, 2015

114.   The mutual funds that were recently added to the Plan effective July 22, 2015 also charged significantly higher fees than readily available separate accounts:

71

| Newly-Added Mutual Fund Investments[34] | Retail Fee | Separate Account rate as per DOL: 1/4 of the cost of retail | Plan's Fee | Plan's Excess |
|---|---|---|---|---|
| Met West Total Return Bond Fund | 80 bps | 20 bps | 68 bps | 240% |
| T. Rowe Price Blue Chip Growth Fund | 72 bps | 18 bps | 98 bps | 444% |
| Hartford SmallCap Growth HLS Fund | 128 bps | 32 bps | 90 bps | 181% |
| T. Rowe Price Real Estate Fund | 76 bps | 19 bps | 102 bps | 437% |

115.   In addition to the DOL's findings regarding the costs of separate accounts, the advertised fee schedules published by the portfolio managers of the Plan's mutual funds also show the excessiveness of the mutual fund fees. The portfolio managers of the Plan's mutual funds, or subadvisers contracted to manage the fund's assets, commonly offer their institutional clients separate accounts in the same or similar investment strategies as the Plan's mutual funds. These managers often publish separate account fee schedules for these strategies in their Form ADV filed with the SEC. The published fee schedule represents the maximum fee charged to clients because this fee is

---

[34] Fee information was obtained from Morningstar.

subject to negotiation between the manager and the client based on the client's portfolio and asset size.

116.   For those managers or subadvisers of the Plan's mutual fund options that published separate account fee schedules, the chart below shows the fees of the Plan's mutual funds compared to what the pre-negotiation separate account fee would have been had the amount of fund assets shown on the Plan's 2014 annual report been invested in a separate account of the same or similar strategy. The fact that even lower separate account fees could have been negotiated further demonstrates the excessiveness of the fees in the Plan's options.[35]

---

[35] The separate account fee was obtained from the adviser's Form ADV. See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=338809 (Allianz Global Investors U.S., LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=308650 (NFJ Investment Group); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=307808 (Barrow Hanley Mewhinney and Strauss, LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=341866 (Capital Research and Management Company; reporting fee for managed account programs); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=331647 (Winslow Capital Management, LLC); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=316451 (Victory Capital Management Inc.); http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=342918 (Duff and Phelps Investment Management Co.);

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund | 117 bps | $64,930,339 | NFJ Investment Group | 100 bps | 17% |
| AllianzGI High Yield Bond | 97 bps | $32,914,144 | Allianz Global Investors U.S., LLC | 50 bps | 94% |
| American Beacon Mid Cap Value Fund | 114 bps | $103,448,427 | Barrow Hanley Mewhinney and Strauss, LLC[36] | 49 bps | 133% |
| American Funds EuroPacific Growth Fund | 114 bps | $113,188,795 | Capital Research and Management Co. | 51 bps | 124% |

http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=300740 (Columbia Management Investment Advisers, LLC):
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=309437 (Goldman Sachs Asset Management, LLP);
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=305938 (Dodge & Cox). For the Buffalo Small Cap Fund, the fund adviser (Kornitzer Capital Management, Inc.) reported only a general fee for fixed income and equities and, therefore, was not listed for comparison. See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=329398.

[36] Barrow Hanley Mewhinney and Strauss, LLC is one of three subadvisers for the fund.

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| American Funds Growth Fund of America | 97 bps | $60,060,301 | Capital Research and Management Co. | 49 bps | 98% |
| American Funds High Income Trust | 102 bps | $20,936,278 | Capital Research and Management Co. | 30 bps | 240% |
| Mainstay Large Cap Growth Fund | 109 bps | $90,134,981 | Winslow Capital Management, LLC | 58 bps | 88% |
| Munder Midcap Core Growth Fund | 132 bps | $86,255,539 | Victory Capital Management, Inc. | 62 bps | 113% |
| Virtus Real Estate Securities Fund | 138 bps | $63,058,966 | Duff and Phelps Investment Management Co. | 61 bps | 126% |
| Columbia Strategic Income Fund | 103 bps | $31,328,730 | Columbia Management Investment Advisers, LLC | 60 bps | 72% |

| Mutual Fund Investment | Plan's Fee | Assets | Portfolio Manager or Subadviser | Max. Separate Account Fee | Plan's excess |
|---|---|---|---|---|---|
| Goldman Sachs Mid Cap Value Fund | 124 bps | $91,459,412 | Goldman Sachs Asset Management, LP | 75 bps | 65% |
| Dodge & Cox Stock Fund | 52 bps | 136,448,827 | Dodge & Cox | 44 bps | 18% |

117.   Other fund advisers of the Plan's mutual funds also offer

separate accounts to institutional clients but do not publish their pre-

negotiation separate account fees. These funds and advisers include:

BlackRock Equity Dividend Fund (BlackRock Advisors, LLC),[37] Eaton Vance

Floating-Rate Fund (Boston Management and Research),[38] John Hancock

Income Fund (John Hancock Asset Management),[39] PIMCO Total Return

[37] See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.asp
x?BRCHR_VRSN_ID=317083.

[38] See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.asp
x?BRCHR_VRSN_ID=329468.

[39] See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.asp
x?BRCHR_VRSN_ID=304235.

Fund (Pacific Investment Management Company, LLC),[40] Davis New York Venture Fund (Davis Selected Advisers NY Inc.),[41] Met West Total Return Bond Fund (Metropolitan West Asset Management, LLC),[42] T. Rowe Price Blue Chip Growth Fund and T. Rowe Price Real Estate Fund (T. Rowe Price Associates, Inc.),[43] and Hartford SmallCap Growth HLS Fund (Wellington Management Company, LLP).[44] Thus, virtually all of the investment managers of the Plan's mutual funds offered lower-cost separate accounts with all their advantages over mutual funds, yet Reliance Trust and Insperity Holdings failed to consider or use them.

118.   The separate accounts offered by the Plan's mutual fund advisers represent only a fraction of the low-cost separate accounts available in the

---

[40] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=308495.

[41] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=290127.

[42] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=306081.

[43] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=306081.

[44] See http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=297723.

market. Other institutional investment management firms also offered low-cost separate accounts for the same or similar investment strategies.

119. Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost separate accounts and negotiated far lower prices for the Plan. Defendants failed to adequately investigate and consider the use of these institutional alternatives without any prudent or loyal reason for failing to do so. Instead, Defendants Reliance Trust and Insperity Holdings selected and retained high-cost investments that generated excess revenue to benefit themselves and other Insperity Defendants through investment management fees and asset-based revenue sharing payments.

120. Had Defendants offered separate accounts rather than high-cost mutual funds for the Plan's investment options, Plan participants would have paid significantly less of their retirement savings for investment management services, thereby having available millions of additional dollars to build their retirement assets.

### D. *Excessive fees compared to collective trusts*

121. Generally, collective trusts have much lower investment management fees than mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize

plans with at least $100 million in assets, about 5% of the size of the Plan. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015).[45]

122.   The Plan's current target date fund option is a series of Reliance Trust Insperity Horizon Risk-Managed Funds. Previously, the Plan included target date funds from Fidelity and later J.P. Morgan. While the Fidelity and J. P. Morgan funds were mutual funds, the Reliance Trust target date funds are collective trusts. Despite their collective trust structure, the Reliance Trust target date funds charge much higher fees than other target date collective trusts that were available to the Plan. The Fidelity and J. P. Morgan mutual fund target date funds also had expense ratios far in excess of available collective trust target date funds.

123.   Vanguard has offered collective trust target date funds since at least June 21, 2007 through the Vanguard Target Retirement Trust I Funds.[46] The expense ratio of the Vanguard Target Retirement Trust I Funds is 8 bps. These fees are dramatically lower than the fees in the Plan's previous target date funds and the current Reliance Trust target date funds. When they were in the Plan, The Fidelity Advisor Freedom Funds (T)

---

[45] Available at http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

[46] Collective trust information provided on Vanguard's website for institutional investors, available at https://institutional.vanguard.com/.

charged between 117 bps and 129 bps, the J. P. Morgan SmartRetirement Funds (Select) charged between 91 bps and 117 bps, and the Insperity Horizon Risk-Managed Funds currently charge 53 bps. Thus, the Fidelity funds were up to *16 times* more expensive than the Vanguard collective trust funds, the J. P. Morgan funds up to *14 times* more expensive, and the Reliance Trust funds are over *6 times* more expensive.

124.   Since August 14, 2011, Vanguard has offered even lower-cost collective trust target date funds, known as the Vanguard Trust Retirement Trust Plus Funds. These funds charge 6 bps—25% less than the Vanguard collective trust target retirement funds noted in ¶123—and were available at the time the Insperity Horizon Risk-Managed Funds were selected and retained in the Plan at a significantly higher fee of 53 bps, or almost *9 times* more expensive.

125.   Apart from target date funds, the fund advisers for many of the Plan's mutual funds also offer collective trusts to institutional investors. See, e.g., Allianz Global Investors U.S. LLC, Barrow Hanley Mewhinney and Strauss LLC, American Century Investments, BlackRock Advisors, LLC, Capital Research and Management Company, John Hancock Asset Management, Winslow Capital Management, LLC, Victory Capital Management Inc., Pacific Investment Management Company, LLC, Columbia

Management Investment Advisers, LLC, FMR, Co.,[47] Inc., Goldman Sachs

Asset Management, L.P., T. Rowe Price Associates, Inc., and Wellington

Management Company, LLP.[48]

126.  As another alternative to high-priced mutual funds, Defendants

could have used the Plan's bargaining power to obtain high-quality collective

trusts at a far lower cost to the Plan. Defendants failed to adequately

investigate and consider the use of these institutional alternatives without

any prudent or loyal reason for failing to do so. Instead, Defendants Reliance

Trust and Insperity Holdings selected and retained high-cost investments

that generated excess revenue to benefit themselves and other Insperity

Defendants through investment management fees and asset-based revenue

sharing payments.

127.  Had Defendants offered low-cost collective trusts rather than

high-cost mutual funds and Reliance Trust investments for the Plan's

investment options, Plan participants would have paid significantly lower

amounts of their retirement savings for investment management services,

---

[47] See
http://www.adviserinfo.sec.gov/Iapd/Content/Common/crd_iapd_Brochure.asp
x?BRCHR_VRSN_ID=340499.

[48] For the fund advisers' Form ADV, see *infra* ¶117.

thereby having available millions of additional dollars to build their retirement assets.

## Imprudent Retention of Money Market Fund

128.   Stable value funds are a common investment in large defined contribution plans and in fact are designed specifically for use in such plans. Stable value funds are conservatively managed to preserve principal and provide a stable crediting rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006)(In contrast to money market funds, stable value funds "invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").

129.   In addition to longer duration instruments generating significantly higher returns than money market investments, stable value funds also provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against loss of principal and accrued interest.

130.   Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[49]

131.   According to the 2015 Stable Value Study published by MetLife, only 18% of plan sponsors of defined contribution plans offer a money market fund without also offering a stable value fund, while 82% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[50] The study also found that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last *25 years*." *Id.* at 7 (emphasis added).

132.   Unlike the 82% of 401(k) plans that offer a stable value fund, prior to 2014, the Plan did not offer a stable value fund but offered only an extremely low-yielding money market fund, the Federated Prime Obligations

---

[49] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

[50] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

Money Market Fund (SS) (PRSXX). From 2010 to 2014, the money market fund earned only 1 bp annually—0.01%—despite charging participants 29 to 37 bps—roughly *30 times* more than the fund's return—for the "benefit" of receiving 1/100th of a percent return for each of those years, far below even keeping pace with inflation.[51]

133.   Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the returns of a typical stable value fund. The returns of the funds in the Hueler universe on average have far exceeded the returns of the Federated Prime Obligations Money Market Fund in the Plan.

---

[51] Even though the money market fund returned 37 bps in 2009, the return was still over *8 times* lower than the Hueler index's return of 312 bps.



134.   Hueler Index returns over the preceding 3, 5, 10, 15 and 20 years reflect similar disparities between money market funds and stable value investments.

135.   In light of stable value funds' clear advantages and enhanced returns compared to other fixed income options, when deciding which fixed income investment option to provide in a defined contribution plan, a prudent fiduciary would consider a stable value fund. Reliance Trust imprudently and disloyally failed to adequately consider including a stable value fund in the Plan by weighing the benefits of a stable value fund compared to a money

market fund, and declined to include a stable value option in the Plan

without any prudent or loyal basis to do so, until recently in 2014. Even then,

rather than considering the many high-quality outside stable value fund

providers, Reliance Trust added its own in-house proprietary stable value

fund, the Reliance Trust New York Life Anchor Account (Series 1, Class 25).

At the time the fund was added to the Plan, it had been in existence for *less

than a year*. Thus, when Reliance Trust finally decided to add a stable value

fund it chose one to benefit itself. The Anchor fund has also underperformed

the Hueler Index since it was added to the Plan, and charges 72 bps, an

excessive amount for a stable value fund.

136.   Had the amounts invested in the Federated Prime Obligations

Money Market Fund (SS) instead been invested in a stable value fund

returning average benchmark returns, as represented by the Hueler Index,

from December 22, 2009 to September 30, 2014, Plan participants would have

earned an additional $14 million in retirement savings.[52]

---

[52] Plan losses have been brought forward to the present value using the
investment returns of the Hueler Index to compensate participants who have
not been reimbursed for their losses.

**In Violation of Their Fiduciary Duties, Reliance Trust and Insperity
Entities Gave Preferential Treatment to the Much Smaller 401(k)
Plan Offered to Insperity's Corporate Employees**

137.   Insperity Holdings, Inc. sponsors a separate 401(k) plan for

Insperity's own corporate employees, called the Insperity Corporate 401(k)

Plan. These employees differ from those participating in the Plan because

they are directly employed by Insperity at Insperity's corporate offices rather

than co-employed by Insperity and employers who have contracted with

Insperity for off-site human resource services.

138.   The same Defendants also serve as plan fiduciaries to the

corporate 401(k) plan, and are therefore charged with the same fiduciary

responsibilities that they have when administering Plaintiffs' Plan, which

include making sure fees are reasonable, exercising prudence and loyalty

when selecting investments and service providers, and acting with an "eye

single" to the interests of plan participants and beneficiaries.

139.   As of December 31, 2014, the corporate 401(k) plan, with only

$208 million in total assets, was only *10%* of the size of the Plan's assets. The

corporate 401(k) plan currently offers the same investment options as the

Plan.

140.   With assets almost *10 times* the amount of assets in the corporate

401(k) plan, the Plan could have and should have demanded far lower-cost

87

investments than the much smaller corporate plan. However, for six of these investment options, Insperity Holdings and Reliance Trust not only failed to do so, but actually offered Insperity's corporate employees *lower-cost* share classes for those funds than the Plan.[53]

| Plan | Plan's Fee | Far Smaller Corporate 401(k) Plan | Far Smaller Corporate 401(k) Plan Fee | Plan's Excess |
|---|---|---|---|---|
| Allianz NFJ Small Cap Value Fund (A) (PCVAX) | 117 bps | Allianz NFJ Small Cap Value Fund (P) (ASVPX) | 92 bps | 27% |
| AllianzGI High Yield Bond (Adm) (AYBVX) | 97 bps | AllianzGI High Yield Bond (Instl) (AYBIX) | 64 bps | 52% |
| American Funds EuroPacific Growth Fund (R3) (RERCX) | 114 bps | American Funds EuroPacific Growth Fund (R4) (REREX) | 84 bps | 36% |
| BlackRock Equity Dividend Fund (S) (MSDVX) | 101 bps | BlackRock Equity Dividend Fund (Instl) (MADVX) | 70 bps | 44% |
| Mainstay Large Cap Growth Fund (R2) (MLRTX) | 109 bps | Mainstay Large Cap Growth Fund (R1) | 84 bps | 30% |

---

[53] See 2014 Insperity Corporate 401(k) Plan Form 5500. The expense ratios were obtained from Morningstar.

| Plan | Plan's Fee | Far Smaller Corporate 401(k) Plan | Far Smaller Corporate 401(k) Plan Fee | Plan's Excess |
|------|-----------|-----------------------------------|--------------------------------------|---------------|
| Virtus Real Estate Securities Fund (A) (PHRAX) | 138 bps | Virtus Real Estate Securities Fund (Instl) (PHRIX) | 113 bps | 22% |

141.   Since the Insperity Plan fiduciaries are corporate employees, upon information and belief, some participate in the Insperity Corporate 401(k) Plan, and therefore, benefited themselves by favoring their corporate 401(k) plan over Plaintiffs' Plan.

142.   The preferential treatment of the separate corporate 401(k) plan is not limited to the inclusion of lower-cost share classes of the Plan's mutual fund options. These same Defendants also managed that 401(k) plan's assets in stark contrast to their imprudent and disloyal investment decisions on behalf of the Plan.

143.   Rather than selecting and retaining a money market fund in the Plan, these same Defendants, as plan fiduciaries to the separate corporate 401(k) plan, offered a stable value fund for Insperity's corporate employees since at least 2009. As a result, these corporate 401(k) participants did not

suffer from the microscopic investment returns of the Plan's money market fund that did not even come close to keeping pace with inflation.

144.   Had these Defendants managed Plan assets consistent with the manner in which they managed the assets of Insperity's separate corporate 401(k) plan, Plan participants would not have paid excessive fees through higher-cost share classes for certain of the Plan's mutual fund options, and would not have lost tens of millions of dollars due to the Plan's money market fund being retained in the Plan.

### Defendants Concealed Their Fiduciary Breaches

145.   Defendants concealed their breaches of fiduciary duty and prohibited transactions through a series of false and misleading statements and by omitting disclosure of material information, thereby preventing Plaintiffs from discovering Defendants' breaches and violations.

146.   Throughout the relevant time period, Insperity Holdings and Reliance Trust have failed to disclose the amount of revenue sharing or indirect compensation received by Insperity Retirement Services from Plan investments for recordkeeping and administrative services.

147.   Starting for the 2009 plan year, Insperity Holdings as the Plan's sponsor was required to report annually to the Department of Labor the amount of all direct and indirect compensation received by each of the Plan's

service providers. While each year Insperity Holdings reported that Insperity Retirement Services received indirect compensation, Insperity Holdings did not provide either the formulas or the amount of the indirect compensation in its annual Form 5500 filing to the Department of Labor as required, or in any other communications to Plan participants. Thus, participants had no way of knowing the amount of indirect compensation received by Insperity Retirement Services.

148.   Concealing the total amount of compensation received by the Plan's proprietary recordkeeper is further compounded in the Plan's Summary Annual Report provided to participants. For example, the 2011 report stated that the Plan's administrative expenses were only $768,356, when in fact Insperity Retirement Services received approximately an additional $4 million in revenue sharing payments. The reports for other years similarly concealed the true amount of compensation paid to Insperity Retirement Services.

149.   Insperity currently represents that it "is able to include share classes with lower costs, helping participants keep more of their contributions."[54] Upon information and belief, similar representations were

---

[54] This statement previously appeared at http://www.insperity.com/services/retirement/401k-plans/insperity-401k-plan,

previously made to Plan participants. This and other similar statements concealed the fact that Reliance Trust and Insperity Holdings selected and retained high-cost share classes of investments when lower-cost shares were available to the Plan, in order to drive more revenue through revenue sharing payments to Insperity Retirement Services, and to benefit Reliance Trust and Insperity entities in doing so.

150.   For the fund selection list of available investment options for defined contribution plan clients, Insperity currently represents that:

> Each mutual fund on the list must have a proven track record; it must come from a stable, registered financial institution; it must invest in a way that is consistent with its asset class; and it must meet our standards for competitive expense ratios. The list is carefully managed by the experts at Reliance Trust to ensure that we preserve a strong portfolio and you have the best possible choice.[55]

151.   Upon information and belief, similar representations were previously made to Plan participants. This statement and similar statements related to the requirement of a "proven track record" concealed the fact that Reliance Trust's target date funds, the Insperity Horizon Risk-Managed

---

but it was deleted after Plaintiffs filed their original complaint. An archived version is available at https://web.archive.org/web/20150323033500/http:/www.insperity.com/services/retirement/401k-plans/insperity-401k-plan.

[55] See http://www.insperity.com/services/retirement/investment-choices.

Funds, were selected and included in the Plan in 2012 *without any prior performance history*, and the Reliance Trust New York Anchor Account was added to the Plan in 2014 *less than one year after it was established*.

152.   The statement and similar statements of "competitive expense ratios" of Plan investments further concealed the fact that Reliance Trust and Insperity Holdings selected and retained investments with expenses significantly higher than available investment alternatives, including separate accounts, collective trusts, and institutional share class investments.

153.   Moreover, the statement and similar statements assuring that the "best possible choice" among available investment options was selected for the Plan concealed the fact that Reliance Trust and Insperity Holdings consistently offered higher-cost and poorly-performing investments compared to available investment alternatives for the Plan, including by selecting the Reliance Trust target date funds with no prior performance history, and without considering prudent alternatives that were readily available to the Plan.

154.   Insperity represents to Plan participants that Reliance Trust "continually monitors the investment options available to participants in the Plan." This statement and similar statements concealed the fact that

93

Reliance Trust and Insperity Holdings retained high-cost investment options that underperformed prudent alternatives that were available to the Plan in order to financially benefit themselves and other Insperity entities.

155.  Insperity represents that the Plan allows participants to "[s]ave on retirement plan costs while providing a first-class retirement package."[56] Upon information and belief, similar representations were made to Plan participants in prior years. This statement and similar statements related to a "first-class retirement package" concealed the fact that Plan participants were offered excessively-priced investments and recordkeeping services that cost participants tens of millions of dollars of their retirement savings due to excessive fees.

## ERISA'S FIDUCIARY STANDARDS

156.  ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

---

[56] This statement previously appeared at http://www.insperity.com/services/retirement/401k-plans, but it was deleted after Plaintiffs filed their original complaint. An archived version is available at http://web.archive.org/web/20150928125754/http://www.insperity.com/services/retirement/401k-plans/.

(A)     for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan; [and]

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

157.   Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

158.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

95

159.    ERISA's fiduciary duties are "the highest known to the law" and must be discharged "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8.

160.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

161.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a

civil action to enforce a breaching fiduciary's liability to the plan under 29

U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any
> of the responsibilities, obligations, or duties imposed upon fiduciaries
> by this subchapter shall be personally liable to make good to such plan
> any losses to the plan resulting from each such breach, and to restore to
> such plan any profits of such fiduciary which have been made through
> use of assets of the plan by the fiduciary, and shall be subject to such
> other equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

162.   The general duties of loyalty and prudence imposed by 29 U.S.C.

§1104 are supplemented by a detailed list of transactions that are expressly

prohibited by 29 U.S.C. §1106, and are considered "*per se*" violations because

they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent

part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to
> engage in a transaction, if he knows or should know that such
> transaction constitutes a direct or indirect –
>
> (A)   sale or exchange, or leasing, of any property between the
>         plan and a party in interest;
>         * * *
> (C)   furnishing of goods, services, or facilities between the plan
>         and a party in interest;

97

(D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

163.   29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## CLASS ACTION ALLEGATIONS

164.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

165.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Insperity 401(k) Plan from December 22, 2009 through the date of judgment, excluding the Defendants.

166.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 50,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan

and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C.

§1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

167.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

168.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and should be appointed as Class Counsel under Rule 23(g).

a.   Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to

102

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

      b.  U.S. District Judge G. Patrick Murphy recognized the work of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

      c.  Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees, emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance

of monitoring fees in 401(k) plans.

> Of special importance is the significant, national contribution
> made by the Plaintiffs whose litigation clarified ERISA standards
> in the context of investment fees. The litigation educated plan
> administrators, the Department of Labor, the courts and
> retirement plan participants about the importance of monitoring
> recordkeeping fees and separating a fiduciary's corporate interest
> from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9,

2015).

   d.  Schlichter, Bogard & Denton is also class counsel in *Tibble v.

Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held

in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty

to monitor investments and remove imprudent ones[.]" Schlichter, Bogard &

Denton successfully petitioned for a writ of certiorari, and obtained amicus

support from the United States Solicitor General and AARP, among others.

Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble*

decision will affect defined contribution plans generally.

   e.  The firm's work in ERISA excessive fee class actions has been

featured in the New York Times and Wall Street Journal, among other media

outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y.

TIMES (Mar. 29, 2014);[57] Liz Moyer, *High Court Spotlight Put on 401(k)*

*Plans*, WALL ST. J. (Feb. 23, 2015);[58] Floyd Norris, *What a 401(k) Plan*

*Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[59] Jess Bravin and Liz

Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*,

WALL ST. J. (May 18, 2015);[60] Jim Zarroli, *Lockheed Martin Case Puts 401(k)*

*Plans on Trial*, NPR (Dec. 15, 2014);[61] Darla Mercado, *Public Enemy No. 1 to*

*401(k) Profiteers*, INVESTMENTNEWS (Jan. 26, 2014).[62]

---

[57] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[58] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[59] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[60] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[61] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[62] Available at http://www.investmentnews.com/article/20140126/REG/301269992/public-enemy-no-1-for-401-k-profiteers.

## COUNT I

### Breach of Duties of Loyalty and Prudence—Selection and Retention of Untested, Excessive-Cost, and Poorly-Performing Proprietary Target Date Funds

169.   Plaintiffs restate and incorporate herein the allegations of paragraphs 6–74.

170.   This Count alleges breach of fiduciary duties against Reliance Trust, Insperity Holdings, Insperity, Inc., Insperity Retirement Plan Committee, and John Does 1–20.

171.   The scope of the fiduciary duties and responsibilities of these Defendants includes responsibility for selecting investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently. In discharging those duties, these Defendants were required to act solely in the interest of Plan participants, rather than acting for their own interests or the interests of third parties.

172.   These Defendants breached their fiduciary duties by selecting and retaining the Insperity Horizon Risk-Managed Funds in the Plan. These Defendants included these funds in the Plan even though the funds were newly-created, had no prior performance history, and were managed by an investment manager with almost no experience managing target date fund

106

investment strategies. Because the funds were brand new, these Defendants could not possibly have engaged in a reasoned decision-making process to determine that using these funds was in the best interests of Plan participants, before placing the funds in the Plan. Thus, these Defendants added the Reliance Trust target date funds to the Plan either without either adequately considering, or considering at all, whether participants would be better served with any of the other established target date funds available in the market. These Defendants decided to include and retain the newly-created proprietary funds to advance their own interests, using the Plan as seed money for the new funds, and to generate investment management fees for Reliance Trust and direct revenue sharing payments to Insperity Retirement Services, and in turn, Insperity, Inc. Not surprisingly, since their inception, the performance of these funds has been poor compared to other established target date funds, yet these Defendants have retained the Insperity Horizon Risk-Managed Funds in the Plan. As a result, these Defendants have caused Plan participants to lose tens of millions of dollars in retirement savings.

173.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of

fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

174.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative and Recordkeeping Fees

175.   Plaintiffs restate and incorporate herein the allegations of paragraphs 6–60 and 75–85. This Count alleges breach of fiduciary duties against all Defendants.

176.   The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries and defraying reasonable expenses of

administering the plan, and acting with the care, skill, prudence, and diligence required by ERISA.

177.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

178.   Defendants failed to engage in a prudent and loyal process for the selection and retention of a Plan recordkeeper. Defendants failed to solicit competitive bids from vendors on a flat per-participant basis and did not institute a flat per-participant fee. Defendants allowed the Plan's recordkeeper, Insperity Retirement Services, to receive asset-based revenue sharing and hard dollar fees charged to participants, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeeper grew, even though the services provided by the recordkeeper remained the same. This contributed to the

excessive recordkeeping compensation paid to the recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

179.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

180.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees

181.   Plaintiffs restate and incorporate herein the allegations contained in paragraphs 6–60 and 86–127.

182.   This Count alleges breach of fiduciary duties against Reliance Trust, Insperity Holdings, Insperity, Inc., Insperity Retirement Plan

110

Committee, and John Does 1–20. Reliance Trust had direct responsibility for selecting and retaining Plan investment options. Plaintiffs are not privy to the precise investment-related actions and omissions of each of the remaining Defendants, but contend upon information and belief that each Defendant knowingly participated in or failed to remedy Reliance Trust's breaches of fiduciary duties, and Insperity Holdings failed to ensure that its delegee acted prudently and loyally in discharging its responsibilities.

183.   The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

184.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

185.   These Defendants selected and retained as Plan investment options mutual funds and collective trusts that charged excessive expenses relative to other investment options that were readily available to this jumbo Plan at all relevant times, including separate accounts, collective trusts, and lower-cost share class mutual funds with the identical investment manager and investments.

186.   In so doing, these Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and in the interest of participants. These Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

187.   These Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. These Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

188.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

189.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Breach of Duties of Loyalty and Prudence—Use of a Microscopically Low-Yielding Money Market Fund Without Consideration or Use of a Stable Value Fund Until Adding a Stable Value Fund and Then Adding an Imprudent One

190.   Plaintiffs restate and incorporate herein the allegations contained in paragraphs 6–60 and 128–136.

191.   This Count alleges breach of fiduciary duties against Reliance Trust, Insperity Holdings, Insperity, Inc., Insperity Retirement Plan Committee, and John Does 1–20.

113

192.   The scope of the fiduciary duties and responsibilities of these Defendants includes direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.

193.   These Defendants maintained as a Plan investment option the Federated Prime Obligations Money Market Fund. This fund holds very short-term instruments and generated only the most microscopic returns above zero for consecutive years that did not keep pace with inflation. As a result, this investment option did not provide any meaningful retirement benefits to participants, and participants in fact lost more purchasing power year after year.

194.   Prudent fiduciaries of defined contribution plans know that such minimally returning funds will not and have not kept pace with inflation. However, until adding Reliance Trust's stable value fund in 2014, these Defendants failed to make a reasoned decision or to adequately consider whether to use a stable value fund for the Plan, which invests in medium-term instruments that have consistently provided much greater returns than money market funds while offering greater protection through a guarantee. Had Defendants adequately considered a stable value fund, weighed the

114

benefits and higher returns relative to a money market fund, and provided a stable value fund prior to 2014, a prudent stable value fund would have provided significantly higher returns than the Plan's money market fund without any greater increase in risk. Maintaining the money market fund in the Plan while failing to offer a stable value fund as a core investment option caused the Plan millions of dollars in losses compared to what the assets of the fund would have earned if invested in a stable value fund.

195.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

196.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

115

## COUNT V

## Failure to Monitor Fiduciaries

197.   Plaintiffs restate and incorporate herein the allegations contained in paragraphs 6–155.

198.   This Count alleges breach of fiduciary duties against Insperity Holdings, Inc.

199.   Under Section 10.2 of the Plan, Insperity Holdings, Inc. has responsibility to control and manage the operation and administration of the Plan, including the selection of Plan service providers, with all powers necessary to enable it properly to carry out such responsibilities. Exercising this discretionary authority, Insperity Holdings, Inc. appointed Reliance Trust to hold, control and manage the assets of the Plan.

200.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

201.   To the extent any of Insperity Holdings, Inc.'s fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

116

202.   Insperity Holdings, Inc. breached its fiduciary monitoring duties by, among other things:

a.  failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.  failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain

117

competitive bids to determine the market rate for the services provided to the Plan;

d.  failing to ensure that the monitored fiduciaries, including Reliance Trust, considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's proprietary Reliance Trust funds and other investments;

e.  failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, and options that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

203.  As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Insperity Holdings, Inc. discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

## COUNT VI

## 29 U.S.C. §1106(a)—Prohibited Transactions between the Plan and Parties in Interest

204.   Plaintiffs restate and incorporate herein the allegations contained in paragraphs 6–155.

205.   This Count alleges prohibited transactions against all Defendants.

206.   All Defendants were involved in either causing the Plan to use Reliance Trust-managed investment options or to use Insperity's subsidiary, Insperity Retirement Services, as the Plan's recordkeeper.

207.   Defendants are all parties in interest because they are entities providing services to the Plan or are fiduciaries to the Plan under 29 U.S.C. §1002(14).

208.   All Defendants caused the Plan to engage in transactions between the Plan and a party in interest in violation of 29 U.S.C. §1106(a), including:

> a. causing the Plan to use Reliance Trust proprietary investments, including the selection and retention of the Reliance Trust target date funds and stable value fund, that benefitted Reliance Trust through excessive investment management fees charged to

119

participants for those investments, and caused the Plan to pay

Insperity Retirement Services, and in turn Insperity, Inc.,

revenue sharing payments from those proprietary investments

and other Plan investment options for providing in-house

recordkeeping services to the Plan for the benefit of Defendants;

and causing the Plan to use Insperity's proprietary recordkeeping

services to financially benefit Defendants through uncapped,

asset-based revenue sharing payments from Plan investments,

all of which constituted an exchange of property between the

Plan and a party in interest, 29 U.S.C. §1106(a)(1)(A);

b. causing the Plan to use Reliance Trust proprietary investments

and services, including the selection and retention of the Reliance

Trust target date funds and stable value fund, that benefitted

Reliance Trust through excessive investment management fees

charged to participants for those investments, and caused the

Plan to use Insperity's proprietary recordkeeping services to

financially benefit Defendants through uncapped, revenue

sharing payments from Plan investments, all of which

constituted a direct or indirect furnishing of services between the

Plan and a party in interest for more than reasonable compensation, 29 U.S.C. §1106(a)(1)(C); and

c.   causing the Plan to use Reliance Trust proprietary investments, including the selection and retention of the Reliance Trust target date funds and stable value fund, that benefitted Reliance Trust through excessive investment management fees charged to participants for those investments, and caused the Plan to pay Insperity Retirement Services, and in turn Insperity, Inc., revenue sharing payments from those proprietary investments and other Plan investment options for providing proprietary recordkeeping services to the Plan for the benefit of Defendants; causing the Plan to use Insperity's proprietary recordkeeping services to financially benefit Defendants through uncapped, asset-based revenue sharing payments from Plan investments; and causing the Plan to invest in high-cost mutual funds and collective trusts compared to institutional investment alternatives that were readily available to the Plan, including separate accounts, collective trusts, and lower-cost share classes of the identical investment, to drive uncapped, asset-based revenue to Defendants for their financial benefit, all of which

121

constituted a transfer to or use of Plan assets by or for the benefit

of a party in interest, 29 U.S.C. §1106(a)(1)(D).

209.   Under 29 U.S.C. §1109(a), these Defendants are liable to restore

all losses suffered by the Plan as a result of these prohibited transactions and

to disgorge or provide restitution of all revenues received by Reliance Trust,

Insperity, Inc., Insperity Retirement Services, and their subsidiaries from the

fees and revenue sharing payments paid by the Plan to these entities, as well

as other appropriate equitable or remedial relief.

## COUNT VII

### 29 U.S.C. §1106(b)—Prohibited Transactions between the Plan and Fiduciaries

210.   Plaintiffs restate and incorporate herein the allegations

contained in paragraphs 6–155.

211.   This Count alleges prohibited transactions against all

Defendants, as described more specifically below.

212.   Reliance Trust violated 29 U.S.C. §1106(b) as follows:

a. In causing the Plan to use Reliance Trust proprietary

investments that benefitted Reliance Trust through excessive

investment management fees charged to participants for those

investments, causing the Plan to use the Reliance Trust

proprietary target date funds, which had no prior performance history at the time of inclusion, and failing to consider prudent alternatives to the proprietary target date funds that were readily available to the Plan, Reliance Trust dealt with the assets of the plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1).

b. In causing the Plan to use Reliance Trust proprietary investments that benefitted Reliance Trust through excessive investment management fees charged to participants for those investments, causing the Plan to use Reliance Trust proprietary target date funds, which had no prior performance history at the time of inclusion, and failing to consider prudent alternatives to the proprietary target date funds that were readily available to the Plan, Reliance Trust acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

c. In causing the Plan to pay excessive investment management fees charged to the Reliance Trust proprietary investments, including the Reliance Trust target date funds and the stable

value fund, causing the Plan to use Reliance trust proprietary
investments, which then directed asset-based revenue sharing
payments to Insperity Retirement Services, and in turn
Insperity, Inc., and allowing these Insperity entities to profit
from the Plan through uncapped, asset-based revenue sharing
payments from Plan investment decisions that mutually
benefitted Defendants, Reliance Trust received consideration for
its own personal account from parties dealing with the Plan in
connection with transactions involving the assets of the Plan, in
violation of 29 U.S.C. §1106(b)(3).

213.   Insperity, Inc., Insperity Holdings, Inc., Insperity Retirement
Services, the Insperity Retirement Plan Committee and its members violated
29 U.S.C. §1106(b) as follows:

d.   In causing the Plan to use Insperity's subsidiary, Insperity
Retirement Services, as the Plan's recordkeeper, and allowing it,
and in turn Insperity, Inc., to receive uncapped, asset-based
revenue sharing payments from Plan investments, these
Defendants dealt with the assets of the plan in their own interest
or for their own account, in violation of 29 U.S.C. §1106(b)(1).

124

e. In causing the Plan to use Reliance Trust proprietary investments that charged excessive investment management fees, causing the Plan to use Insperity's subsidiary, Insperity Retirement Services, as the Plan's recordkeeper, and allowing it, and in turn Insperity, Inc., to receive uncapped, asset-based revenue sharing payments from Plan investments, these Defendants acted in a transaction involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

214. In causing the Plan to use Insperity's in-house subsidiary, Insperity Retirement Services, as the Plan's recordkeeper, causing Insperity Retirement Services, and in turn Insperity, Inc., to receive uncapped, asset-based revenue sharing payments from Plan investments, and allowing Reliance Trust to select its own proprietary investments, which then provided a mutual benefit to Insperity Retirement Services, and in turn Insperity, Inc., through asset-based revenue sharing payments from these investments, these Defendants received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

125

215.   For the reasons discussed above, the Defendants referenced in this Count were fiduciaries and parties in interest with respect to the Plan.

216.   As a direct result of these prohibited transactions, the Plan, directly or indirectly, paid millions of dollars in investment management and administrative fees that were prohibited by ERISA and suffered tens of millions of dollars in losses.

217.   Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and to disgorge or provide restitution of all revenues received by Reliance Trust, Insperity, Inc., Insperity Retirement Services and their subsidiaries from the fees paid by the Plan to these entities, as well as other appropriate equitable or remedial relief.

## COUNT VIII

## 29 U.S.C. §1132(a)(3)—Other Equitable Relief Based on Receipt of Ill-Gotten Proceeds

218.   Plaintiffs restate and incorporate herein the allegations contained in paragraphs 6–155.

219.   This Count seeks equitable relief from Reliance Trust, Insperity, Inc., and Insperity Retirement Services.

220.   Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

221.   Reliance Trust, Insperity, Inc., and Insperity Retirement Services knew or should have known that the act or practice of using Reliance Trust-managed investments in the Plan allowed Reliance Trust and its subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

222.   Reliance Trust, Insperity, Inc., and Insperity Retirement Services knew or should have known that the act or practice of using proprietary Insperity recordkeeping services in the Plan allowed Insperity, Inc., Insperity Retirement Services and their subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

223.   Each of these Defendants knew or should have known that the act or practice of using Reliance Trust-managed investments and Insperity proprietary recordkeeping services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than

127

reasonable compensation or a transfer of assets of the Plan to a party in interest.

224.   Each of these Defendants knew or should have known that the act or practice of using Reliance Trust-managed investments and Insperity proprietary recordkeeping services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the Plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan fiduciary received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

225.   Accordingly, each of these Defendants participated in the prohibited transactions described above and knowingly received excessive fees paid from Plan assets.

226.   Therefore, to the extent any ill-gotten proceeds and profits are not restored to the Plan under the fiduciary relief provisions of 29 U.S.C. §1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. §1132(a)(3) to restore these monies to the Plan.

## JURY TRIAL DEMANDED

227.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants breached their fiduciary duties as described above;

- find and declare that Defendants committed prohibited transactions;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each of their respective breaches of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

April 15, 2016                    Respectfully submitted,

                                 /s/ Jerome J. Schlichter
                                 SCHLICHTER, BOGARD & DENTON, LLP
                                 Jerome J. Schlichter (*pro hac vice*)
                                 Michael A. Wolff (*pro hac vice*)
                                 Troy A. Doles (*pro hac vice*)
                                 Kurt C. Struckhoff (*pro hac vice*)
                                 Heather Lea (*pro hac vice*)
                                 100 South Fourth Street, Ste 1200
                                 St. Louis, MO 63102
                                 Phone: (314) 621-6115
                                 Fax: (314) 621-5934

                                 *Lead Counsel for Plaintiffs*

                                 Bradley S. Wolff, GA No. 773388
                                 SWIFT, CURRIE, MCGHEE, & HIERS, LLP
                                 1355 Peachtree St., N.E., Ste. 300
                                 Atlanta, GA 30309-3231
                                 Phone: (404) 874-8800
                                 Fax: (404) 888-6199
                                 brad.wolff@swiftcurrie.com

                                 *Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the attorneys of record.

/s/ Jerome J. Schlichter
Jerome J. Schlichter