IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RONDA A. PLEDGER, SANDRA BRITT, JENNIFER L. PRIMM, AND ALEX BROOKS, JR., individually and as representatives of a class of similarly situated persons of the Insperity 401(k) Plan,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>RELIANCE TRUST COMPANY, INSPERITY, INC., INSPERITY HOLDINGS, INC., INSPERITY RETIREMENT SERVICES, L.P., INSPERITY RETIREMENT PLAN COMMITTEE, AND JOHN DOES 1-20,<br><br>　　　　　Defendants. | Civil Action No. 1:15-cv-04444-MHC |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT RELIANCE TRUST COMPANY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................4

ARGUMENT ........................................................................................5

I.     THE AMENDED COMPLAINT CAN SURVIVE ONLY IF
PLAINTIFFS PLEAD FACTS FROM WHICH A
DEFECTIVE FIDUCIARY PROCESS CAN BE INFERRED...........5

II.    PLAINTIFFS' CHALLENGES TO THE PLAN'S EXPENSE
STRUCTURE SHOULD BE DISMISSED. .......................................7

     A.    Count II Fails Because Reliance Had No Fiduciary
Authority Over The Choice Of Recordkeeper, And
Plaintiffs Do Not Plausibly Allege That The Plan Has
Borne Excessive Administrative Fees. ......................................7

     B.    Count III Fails Because Reliance Had No Duty To
Pursue The Cheapest Possible Investment Options.................10

III.   PLAINTIFFS' CLAIMS THAT THE PLAN'S INVESTMENT
OPTIONS WERE INAPPROPRIATE FOR REASONS
OTHER THAN THEIR COST ARE LIKEWISE DEFECTIVE. .....16

     A.    Reliance Did Not Act Improperly in Including the
Insperity Horizon Risk-Managed Funds as Plan
Investment Options. ................................................................16

     B.    Reliance Did Not Act Imprudently in Deciding to Offer a
Money Market Fund Rather Than a Stable Value Fund..........18

     C.    The Amended Complaint Offers No Factual Basis for the
Conclusion that Reliance Breached Fiduciary Duties in
Selecting New York Life to Run the Plan's Stable Value
Option.....................................................................................25

     D.    Plaintiffs' Prohibited Transaction Claims Should be
Dismissed for Failing to Properly Address Longstanding
Exemptions..............................................................................25

**TABLE OF CONTENTS**
**(continued)**

**Page**

IV.   COUNT VIII SHOULD BE DISMISSED BECAUSE IT DOES
      NOT SEEK "APPROPRIATE EQUITABLE RELIEF." .................28

CONCLUSION .......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Lockheed Martin Corp.*,
  725 F.3d 803 (7th Cir. 2013) .............................................................20

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
  446 F.3d 728 (7th Cir. 2006) .............................................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................1,5,6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................6

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .........................................................10,28

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...........................................................6

*Buford v. UNUM Life Ins. Co. of Am.*,
  290 F. Supp. 2d 92 (D.D.C. 2003).......................................................23

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.*,
  920 F.2d 457 (7th Cir. 1990) ........................................................23,25

*Dupree v. The Prudential Ins. Co. of Am.*,
  2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) .........................................15,17

*Epolito v. Prudential Ins. Co. of Am.*,
  737 F. Supp. 2d 1364 (M.D. Fla. 2010)..................................................31

*Fuller v. SunTrust Banks, Inc.*,
  2012 WL 1432306 (N.D. Ga. Mar. 20, 2012) ...........................................28

*Fuller v. SunTrust Banks, Inc.*,
  744 F.3d 685 (11th Cir. 2014) .............................................................6

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002).....................................................................30,31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ........................................................................10,14

*Hecker v. Deere & Co.*,
  569 F.3d 708 (7th Cir. 2009) ........................................................................11,14

*Henderson v. Sun Pharm. Indus., Ltd.*,
  809 F. Supp. 2d 1373 (N.D. Ga. 2011)..............................................................6

*Hozier v. Midwest Fasteners, Inc.*,
  908 F.2d 1155 (3d Cir. 1990) ...............................................................................8

*Johnson v. Ga.-Pac. Corp.*,
  19 F.3d 1184 (7th Cir. 1994) ................................................................................8

*Laborers Nat. Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
  173 F.3d 313 (5th Cir. 1999) ..............................................................................18

*Leber v. Citigroup, Inc.*,
  2010 WL 935442 (S.D.N.Y. Mar. 16, 2010)....................................................28

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) .................................................................12,13,14

*Mehling v. N.Y. Life Ins. Co.*,
  163 F. Supp. 2d 502 (E.D. Pa. 2001)................................................................28

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993)..............................................................................................29

*Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*,
  136 S. Ct. 651 (2016)...........................................................................................30

*New Orleans Emp'rs. Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*,
  635 F. Supp. 2d 1351 (N.D. Ga. 2009).........................................................7,18

*Ogden v. Blue Bell Creameries U.S.A, Inc.*,
  348 F.3d 1284 (11th Cir. 2003) .........................................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) ...................................................................6

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)...............................................................................6,8

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) ...............................................................12

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers
   Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) .................................................18,24,25

*Taylor v. NCR Corp.*,
   2015 WL 5603040 (N.D. Ga. Sept. 23, 2015)....................................6

*Taylor v. United Techs. Corp.*,
   2009 WL 535779 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x
   525 (2d Cir. 2009)................................................................................11

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013), *judgment vacated on other grounds*,
   135 S. Ct. 1823 (2015).....................................................10,12,20,21

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ...............................................................15

*In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*,
   579 F.3d 220 (3d Cir. 2009) ...............................................................31

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996)..............................................................................29

*White v. Chevron Corp.*,
   No. 4:16-cv-00793-MEJ (N.D. Cal. Feb. 17, 2016)...........................14

**Statutes**

15 U.S.C. § 80a-8,................................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

15 U.S.C. § 80a-18(a)(1)-(f) ...................................................................12

15 U.S.C. § 80a-30 ..............................................................................12

15 U.S.C. § 7241(a) .............................................................................12

26 U.S.C. § 851(b)(3) ...........................................................................12

29 U.S.C. § 1002(21)(A) ........................................................................8

29 U.S.C. § 1002(21)(B) .......................................................................11

29 U.S.C. § 1104 .................................................................................7

29 U.S.C. § 1104(a)(1)(B) .....................................................................24

29 U.S.C. § 1106 ................................................................................26

29 U.S.C. § 1108(b)(8) ......................................................................3,26

29 U.S.C. § 1109(a) ............................................................................30

ERISA § 406 ..................................................................................26,28

ERISA § 408(b)(8) .............................................................................26

ERISA § 409(a) .................................................................................30

ERISA § 502(a)(2) ..............................................................................30

ERISA § 502(a)(3) ..............................................................................29

## Rules and Regulations

17 C.F.R. § 270.0-1(a)(7) .....................................................................12

17 C.F.R. § 270.2a-7 ...........................................................................22

17 C.F.R. § 270.38a-1 ..........................................................................12

29 C.F.R. § 404c-1(b)(1)(ii) ..................................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

29 C.F.R. § 404c-1(b)(2).................................................................19

29 C.F.R. § 404c-1(b)(3).................................................................19

29 C.F.R. § 2550.404a-1(b)(2)(ii)(B) ...................................23

72 Fed. Reg. 60,452 ..............................................................19,21

72 Fed. Reg. 60,463 ...................................................................19

72 Fed. Reg. 60,473 ...................................................................20

Fed. R. Civ. P. 12 ........................................................................28

## Other Authorities

Ben Baden, *When Will The Fed Finally Raise Rates? It's uncertain, but few are expecting a hike in the near future*, US News & World Rpt., Apr. 28, 2010 .................................................................24

Dep't of Labor, 401(k) Fiduciary Education Campaign, http://www.dol.gov/ebsa/pdf/401kfefm.pdf ...................................11

DOL ERISA Advisory Council, *Report on Stable Value Funds and Retirement Security in the Current Economic Conditions* (2009), http://www.dol.gov/ebsa/publications/2009ACreport3.html ............22

Dow Jones, *New York Life Stable Value Sales Hit $4.39 Billion in '96* (Jan. 30, 1997)......................................................................26

*Economic Forecasting Survey*, Wall St. J., Jan. 2011, http://projects.wsj.com/econforecast/#ind=fed_ funds&r=16&e=8...................24

Federated Prime Obligations Money Market Fund (SS) (PRSXX) Prospectus at 14-15 (Sept. 30, 2015), http://www.federatedinvestors.com/FII/daf/pdf/regulatory/prospectus/Q450466.pdf?title=Prime%20Obligations%20Fund%20(SS%20Shares)%20-%20Prospectus ...................................................22

http://www.morningstar.com/funds/XNAS/MWTRX/quote.html .........................21

# TABLE OF AUTHORITIES
## (continued)

Page(s)

http://www.morningstar.com/funds/XNAS/PTRAX/quote.html ...........................21

http://www.relico.com/CIT/Pages/FeesExpenses.aspx .....................................16,27

MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5 (2015), https://www.metlife.com/assets/cao/institutional-retirement/2015StableValueStudy.pdf.......................................................20,21

N-1A, https://www.sec.gov/about/forms/formn-1a.pdf; ........................................12

Office of the Comptroller of the Currency, Comptroller's Handbook: Asset Management (AM), Retirement Plan Products & Services, at 35 (Feb. 2014), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/file-pub-employee-benefits-retirement-plan.pd.................................................................................22

Plan Fiduciaries (Feb. 2013), http://www.dol.gov/ebsa/newsroom/fstdf.html;...................................................17

Rebecca Moore, *The Risk of Rising Interest Rates for Stable Value Funds*, Plan Sponsor, Mar. 26, 2014, http://www.plansponsor.com/The_Risk_of_Rising_Interest_Rates_on_Stable_Value_Funds.aspx?fullstory=tru...........................................24

Reliance Trust, Risk-Managed Target Date Funds Offering Stmt., at 8-9 (2012), http://www.relico.com/CIT/Pages/DocView.aspx?k=docs/Target_Date/Risk_Managed/Offering/Offering_Statement.pdf .....................................27

Reliance Trust, Risk-Managed Target Date Funds Offering Stmt., at 8, *available at* http://www.relico.com/CIT/Pages/InsperityHorizonTargetDate.aspx (last visited Apr. 28, 2016) .............................................................................17

St. Louis, *Chasing Returns Has a High Cost for Investors*, https://www.stlouisfed.org/On-The-Economy/2014/April/Chasing-Returns-Has-a-High-Cost-for-Investors ...........................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

U.S. Government Accountability Office, *401(k) Plans: Certain
   Investment Options and Practices that May Restrict Withdrawals
   Not Widely Understood*, at 11-12 (Mar. 2011),
   www.gao.gov/new.items/d11291.pdf ...............................................................22

## INTRODUCTION

Plaintiffs in this purported ERISA class action challenge virtually every investment selection and administrative choice made for the Insperity 401(k) Plan (the "Plan"), contending—largely on "information and belief"—that the Plan's sponsor and the state-regulated trust company that provided the Plan trustee services had "conflicted" motives in making Plan decisions.  Plaintiffs overlook that the trustee, Reliance Trust Company ("Reliance"), lacked discretionary powers as to some of the challenged decisions, negating the crucial fiduciary status element of plaintiffs' claim.  Moreover, plaintiffs cite no facts beyond the investment selections and other Plan choices in attempting to infer that defendants breached their procedural duties as ERISA fiduciaries.  Because the choices plaintiffs assail are indisputably mainstream choices of 401(k) fiduciaries, plaintiffs' allegations do not support a "reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Complaint alleges that "defendants" (without distinguishing among Reliance and the Insperity entities) caused the Plan to retain Insperity Retirement Services, L.P. ("Insperity Retirement") as recordkeeper, and to pay Insperity Retirement "uncapped," excessive fees for recordkeeping services.  Plaintiffs assert that Insperity Retirement has captured all asset-based "revenue sharing" payments

from the Plan's investment options—exceeding the "direct expenses" that plaintiffs say is the limit of Insperity Retirement's entitlement.  Yet the Trust Agreement gives Reliance no power to select or remove the recordkeeper.  Reliance's only power as to recordkeeping is that it approves the reimbursement of Insperity Retirement's expenses.  Moreover, as the Insperity defendants explain in their own motion to dismiss, documents under which the Plan is operated show that Reliance properly limits Insperity Retirement to the reimbursement of direct expenses.

Plaintiffs also challenge the Plan's investment options as having excessive fees, but none of the alleged facts support that conclusion.  Plaintiffs allege that the choice of mutual funds over cheaper investment products invites an inference that Reliance has acted imprudently, but in similar cookie-cutter challenges brought by plaintiffs' counsel, courts have rejected this attack, explaining that mutual funds offer services that cheaper institutional vehicles do not, and that a fiduciary has no duty to forego these extra benefits by searching for the cheapest possible investment solutions in the market.  Moreover, plaintiffs' suggestion that Reliance failed to consider non-mutual fund products is contradicted by their own allegations, which acknowledge that Reliance replaced the Plan's largest mutual fund holdings with collective investment trusts years ago.  Finally, while plaintiffs correctly note that cheaper "share classes" of the Plan's mutual funds were

available, the difference in cost is explained by the additional revenue sharing that was available to the Plan to defray its recordkeeping and other administrative costs.

Plaintiffs continue their broadside attack on the Plan by complaining that, prior to 2014, Reliance offered a money market fund, rather than a stable value fund, as the Plan's capital preservation option, and suggesting that the stable value fund that Reliance added to the lineup in 2014 was "imprudent."  Here again, the facts plaintiffs allege do not invite a reasonable inference of imprudence.  The very materials plaintiffs cite show that 401(k) fiduciaries commonly relied on money market funds to provide participants a "safe" capital preservation option as late as 2015, and the Complaint establishes that Reliance offered longer-duration fixed income options as well.  And plaintiffs offer no facts to suggest that the stable value fund Reliance selected for the Plan in 2014 was an imprudent choice.

Finally, plaintiffs contend that Reliance has engaged in self-dealing prohibited transactions by offering to Plan participants certain commingled trust investments for which it serves as trustee.  But plaintiffs ignore that ERISA exempts regulated trust companies like Reliance from prohibited transaction liability for these very kinds of investments where the governing plan documents allow them, and the compensation is no more than "reasonable."  29 U.S.C. § 1108(b)(8).  The governing Plan document here expressly allows such

investments, and plaintiffs offer no factual basis to question the reasonableness of the fees charged for them.  While some courts have held that such ERISA exemptions are affirmative defenses, and must be established outside the pleadings, defendants submit that—where, as here, an express statutory ERISA exemption shelters the very conduct plaintiffs challenge—the better view is that plaintiffs must plead facts that plausibly establish the exemption is unavailable.  Plaintiffs do not do so.  The entire Complaint must be dismissed as to Reliance.

## BACKGROUND

Insperity, Inc. is a professional employer organization that provides human resource services to client businesses by designating the clients' employees as "co-employees" of an Insperity subsidiary.  Amended Complaint ("AC") ¶¶ 9, 19.  The clients can elect to allow their "co-employees" to participate in the Plan, a defined contribution employee pension plan.  AC ¶¶ 6, 11.  Plan participants can make pre-tax contributions from their salary or wages, which may be matched by employer contributions at the client' election.  Barrett Decl. Ex. A §§ 4.2, 5.1.  These contributions are allocated to accounts that the Plan maintains for each employee.  Participants can then decide how to invest their accounts in one or more options from an investment lineup selected by the Plan's trustee.  *Id.* § 6.1(a).

-4-

The Plan's governing document names Insperity Holdings, Inc. as the fiduciary responsible for Plan management and administration.  AC ¶ 22; Plan §§ 2.4, 2.12, 10.2.  Insperity Holdings hired Insperity Retirement as the Plan's recordkeeper by October 2003, AC ¶¶ 26, 39, but did not retain Reliance to be the Plan's trustee until December 2003, *see* Barrett Decl. Ex. B (Trust Agmt.) §§ 1.15, 9.10.  As trustee, Reliance assumed responsibility for selecting and monitoring the Plan's investment options and reviewing Plan expenses to be charged against Plan assets (except its own trustee fees, which were approved by Insperity Holdings, Inc.).  *Id.* §§ 3.2(a), 3.4.  But the Trust Agreement does not authorize Reliance to select or remove the Plan's recordkeeper, which the agreement specifies as Insperity Retirement.  *Id.* § 1.12 & First Am.  In exercise of its power as trustee, Reliance selected a diverse investment lineup for the Plan, including mutual funds and collective trusts covering a wide range of asset classes.  AC ¶¶ 96-100.

## ARGUMENT

I. **THE AMENDED COMPLAINT CAN SURVIVE ONLY IF PLAINTIFFS PLEAD FACTS FROM WHICH A DEFECTIVE FIDUCIARY PROCESS CAN BE INFERRED.**

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation omitted).  "[A] plaintiff's obligation to provide the

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original). "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, meaning a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The Court must accept well-pleaded facts as true but need not accept "conclusory allegations, unwarranted deductions of fact[]." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).[1]

Courts must apply these standards in light of the elements of the substantive ERISA claims plaintiffs purport to pursue.  Here, plaintiffs must establish that defendant was a fiduciary as to the conduct in question.  *See Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000).  If relevant fiduciary status is shown, plaintiffs must then establish a breach by showing that the fiduciary did not act loyally or with the

---

[1] A district court may consider documents outside the complaint when "a plaintiff refers to a document in its complaint, the document is central to [his] claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 696 (11th Cir. 2014) (quotation omitted).  Courts may also take judicial notice of information in official public records.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-78 (11th Cir. 1999); *Henderson v. Sun Pharm. Indus., Ltd.*, 809 F. Supp. 2d 1373, 1379 n.4 (N.D. Ga. 2011); *Taylor v. NCR Corp.*, 2015 WL 5603040, at *5 (N.D. Ga. Sept. 23, 2015) (taking judicial notice of Department of Labor filings).

diligence of a "prudent man."  29 U.S.C. § 1104.[2]  Plaintiffs' claims fall broadly

into two categories: those challenging the Plan's expenses and those attacking the

Plan's investment options on other grounds.  Both sets of claims are inadequate.

## II.    PLAINTIFFS' CHALLENGES TO THE PLAN'S EXPENSE STRUCTURE SHOULD BE DISMISSED.

### A.    Count II Fails Because Reliance Had No Fiduciary Authority Over The Choice Of Recordkeeper, And Plaintiffs Do Not Plausibly Allege That The Plan Has Borne Excessive Administrative Fees.

Count II asserts that defendants breached ERISA duties by causing the Plan

to retain Insperity Retirement as the Plan's recordkeeper and to bear excessive fees

for administrative services.  AC ¶¶ 175-80.  This Count fails as to Reliance.  To the

extent plaintiffs seek to hold Reliance liable for "fail[ing] to engage in a prudent

and loyal process for the selection and retention of a Plan recordkeeper," AC ¶

178, it fails because Reliance had no authority to select or remove the Plan's

recordkeeper.  Under ERISA, a person is only a fiduciary "to the extent" that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he

---

[2] *New Orleans Emp'rs. Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1372 (N.D. Ga. 2009) ("When evaluating an alleged breach of fiduciary duty under ERISA, courts use an objective standard, focusing on whether the fiduciary employed appropriate methods to reach an investment decision.  The results of the fiduciary's investment decision are not the focus of the inquiry.") (internal citation omitted).

> renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Because a person is a fiduciary only "to the extent" the person performs fiduciary functions, a fiduciary as to one function is not necessarily a fiduciary as to others.  *Pegram*, 530 U.S. at 225-26.[3]  Thus, "[i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Id.* at 226.

While Reliance has fiduciary duties to the Plan, it was not a fiduciary as to the selection or retention of Insperity Retirement as Plan recordkeeper.  The Amended Complaint itself admits that the Plan gave ***Insperity Holdings*** (not Reliance) fiduciary responsibility for choosing the Plan's administrative service providers and that Insperity Holdings hired Insperity Retirement as recordkeeper months before Reliance became Plan trustee.[4]  Once retained, Reliance had

---

[3] *Johnson v. Ga.-Pac. Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) ("A person 'is a fiduciary to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others."); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions.").

[4] *See* AC ¶¶ 22-23, 39; Trust Agmt. § 9.10.

responsibility to review any expenses incurred by Insperity Retirement in providing Plan services (Trust Agmt. § 3.4), but the Trust Agreement granted Reliance no power to remove Insperity Retirement as recordkeeper.  To the contrary, Insperity Retirement's recordkeeper role was baked into the agreement's terms.[5]  Because Reliance had no authority to select or remove the Plan's recordkeeper, Reliance cannot be held liable for Insperity Retirement's retention.[6]

While Reliance did have authority, as the Plan's trustee, to approve Plan expenses (including reimbursement of Insperity Retirement's direct expenses of Plan servicing), Count II fails to allege facts plausibly showing that Reliance approved the payment of unreasonable Plan fees.  As explained in the Insperity defendants' motion to dismiss, Count II ignores the Plan's complexity and misconstrues the Plan's expense review structure, which limits Insperity Retirement to reimbursement of its direct expenses, without profit or overhead. Reliance joins the Insperity defendants' argument on these points in full.

---

[5] Trust Agmt. § 1.12 (defining "Recordkeeper" to mean "Administaff Retirement Services, L.P., and any of its respective agents or assigns, including processing agents") & First Amend. (substituting name "Insperity Retirement Services, L.P." for "Administaff Retirement Services, L.P.").

[6] Likewise, absent the ability to retain a different recordkeeper, Reliance cannot be faulted for "fail[ing] to solicit competitive bids from vendors on a flat per participant fee."  AC ¶ 178.

**B.      Count III Fails Because Reliance Had No Duty To Pursue The Cheapest Possible Investment Options.**

Count III alleges that the Plan relied primarily on mutual funds rather than cheaper "institutional" vehicles, and plaintiffs infer from that allegation that Reliance did not adequately investigate less costly investment alternatives.  The inference is not plausible; it rests on the flawed premise that Reliance had a duty to seek out the cheapest possible options, even if doing so required the Plan to rely on different investment managers, to accept different investment structures, or to forego other potential benefits.  Courts have rejected that suggestion:  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).[7]  While cost is a factor in selecting investment options, it is not the only one; nor need it be dispositive.[8]  Because a prudent fiduciary can make investment choices based on factors beyond cost, plaintiffs' assertion that cheaper options were available cannot support an

---

[7] *See also Tibble v. Edison Int'l*, 729 F.3d 1110, 1136 (9th Cir. 2013) (quoting same with approval), *judgment vacated on other grounds*, 135 S. Ct. 1823 (2015); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (8th Cir. 2009) ("[W]e do not suggest that a claim is stated by a bare allegation that cheaper alternative investments exist in the marketplace.").

[8] *See* Dep't of Labor, 401(k) Fiduciary Education Campaign, http://www.dol.gov/ebsa/pdf/401kfefm.pdf ("The service provider offering the lowest cost services is not necessarily the best choice for [a 401(k)] plan.").

inference that Reliance failed to appropriately consider investment alternatives.

### 1.  <u>Reliance's inclusion of mutual funds in the Plan's lineup does not support an inference of misconduct.</u>

Plaintiffs assert that Reliance's selection of mutual funds for the Plan's lineup was imprudent because the Plan could have invested in lower-cost separate accounts.  AC ¶ 108.  But courts have rejected such categorical attacks on the inclusion of mutual funds in plan lineups, including in cases brought by plaintiffs' counsel.[9]  And ERISA *expressly contemplates* plan investments in mutual funds, 29 U.S.C. § 1002(21)(B), reflecting Congress's judgment that such options are not categorically imprudent investments for 401(k) plans.

As the Seventh Circuit explained in dismissing a claim predicated on essentially the same theory as plaintiffs' here, mutual funds offer advantages that institutional products such as separate accounts do not.  *See Loomis v. Exelon Corp.*, 658 F.3d 667, 671-73 (7th Cir. 2011) ("private held trusts or commingled pools … lack[] the mark-to-market benchmarks provided by a retail mutual fund").  In addition, unlike many institutional products, "brand-name mutual funds are

---

[9] *See, e.g.*, *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) (opinion denying rehearing); *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009) (rejecting claim that "less-costly managed separate trust accounts outweigh the advantages of mutual funds"), *aff'd*, 354 F. App'x 525, 527 (2d Cir. 2009) (affirming "substantially for the reasons stated in the District Court's thorough and well-reasoned memorandum of decision").

generally easy to track via newspaper or internet sources." *Tibble*, 729 F.3d at 1134. Mutual funds are also uniquely subject to intense regulatory oversight, and to strict disclosure requirements.[10] Given these advantages of mutual funds, one cannot reasonably infer that separate accounts, or other non-mutual fund products, are unquestionably superior—or that the selection of mutual funds is categorically imprudent—simply because non-mutual fund vehicles are allegedly cheaper.

Plaintiffs try to salvage their attack on the Plan's mutual fund options by asserting, in conclusory fashion, that defendants did not "adequately" consider the use of institutional alternatives. AC ¶ 119. But the mere presence of mutual funds in the lineup does not provide plausible support for that inference—and that's the only fact plaintiffs allege. Moreover, as the Complaint reflects, Reliance not only *considered* institutional alternatives, but also *included* several—in the form of collective trusts. AC ¶ 62. Plaintiffs' conclusory contention that Reliance's

---

[10] *See, e.g.*, *Tibble*, 729 F.3d at 1134 ("Mutual funds, however, have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison to judge them against [separate accounts and commingled trusts]."); *Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011) (mutual funds "are subject to a variety of reporting, governance, and transparency requirements that do not apply to other investment vehicles"). Mutual funds provide transparency, with standardized disclosure of risks, performance and fees, SEC Form N-1A, https://www.sec.gov/about/forms/formn-1a.pdf; 15 U.S.C. § 80a-8, 80a-30; governance by a board, the majority of whose members must be independent, 17 C.F.R. § 270.0-1(a)(7); substantive investment regulation, 15 U.S.C. § 80a-18(a)(1)-(f); 26 U.S.C. § 851(b)(3); and a compliance regime dictated by SEC regulation, 15 U.S.C. § 7241(a); 17 C.F.R. § 270.38a-1.

consideration of institutional alternatives was "inadequate" thus rests on no more than the fact that Reliance chose to offer mutual funds *in addition to* institutional options.  That is just a dressed-up version of the categorical attack on mutual funds that other courts have rejected and that this Court should likewise reject here.[11]

### 2.   Reliance's failure to include Vanguard mutual funds does not support an inference of imprudence or disloyalty.

Plaintiffs ask the Court to infer an imprudent and disloyal investment process merely because Reliance failed to include Vanguard funds in the lineup.[12] AC ¶¶ 103-107.  Plaintiffs, in essence, "scour[ed] the market to find . . . the cheapest possible fund[s]," *Hecker*, 556 F.3d at 586, and criticize Reliance for not selecting those discount-rate funds.  That is precisely the penny-wise claim that courts (such as the Seventh Circuit in *Hecker* and *Loomis*) and the Department of Labor have disfavored.  Plaintiffs do not (and cannot) allege that Reliance could have obtained the same investment services through the same investment managers by selecting Vanguard funds rather than the Plan's actual investment options.  To the contrary:  To take advantage of Vanguard's rates, the Plan would have had to

---

[11] *See, e.g., Loomis*, 658 F.3d at 671 (rejecting claim that it was imprudent to offer mutual funds in addition to institutional vehicles).

[12] Notably, plaintiffs' counsel have filed suits against other plans' fiduciaries for doing precisely what they suggest defendants should have done here—offering Vanguard mutual funds as investment options.  *See, e.g., White v. Chevron Corp.*, No. 4:16-cv-00793-MEJ (N.D. Cal. Feb. 17, 2016) (ECF No. 1), ¶¶ 47-48.

accept Vanguard's managers and Vanguard's investment strategies.  Nor do plaintiffs allege facts from which the Court can infer that the Vanguard funds were superior to the Plan's mutual fund options across all relevant factors.  Plaintiffs instead allege no more than that the Vanguard funds—and perhaps some other funds on the market—are cheaper than those Reliance chose.  That is not enough to support an inference of imprudence or disloyalty.  If nothing else, the prevalence of non-Vanguard funds in the 401(k) market demonstrates that it is common for investors to accept higher expenses in favor of other investment considerations.[13]

3.   **Because the Plan's funds offered revenue sharing to defray Plan expenses, the mere fact that those funds offered cheaper share classes does not establish a breach**.

Plaintiffs contend that Reliance breached its duties by selecting share classes in the Plan's investment options when share classes with lower expense ratios were available.  Yet as the Amended Complaint admits, the Plan's current investments generate "revenue sharing payments" that may be used to pay for Plan recordkeeping and other Plan services.  AC ¶¶ 48-49, 55, 77.[14]  The rates at which

---

[13] *Dupree v. The Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *41 (S.D. Fla. Aug. 7, 2007) (fiduciary did not violate ERISA in offering plan participants the option of investing in an investment account at a fee that "unrelated plans' fiduciaries, independent of the [defendant], have determined is reasonable").

[14] *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (describing revenue sharing as a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans").

-14-

funds are willing to share revenue to defray plan recordkeeping costs commonly vary depending on the share class in which a plan invests.  For example, plaintiffs challenge the selection of New York Life Anchor Fund Series I, Class 25 (a commingled trust) because its expense ratio was 25 basis points higher than the expense ratio for Class 0 of that fund.  AC ¶ 100.  But Class 25 has a 25 basis point "Administrative Services Fee" "to fund plan level fees and expenses paid to third parties for services, including, among others, participant recordkeeping, communications and education services, and other administrative services provided to the . . . Plan."  Barrett Decl. Ex. C (screenshot from http://www.relico.com/CIT/Pages/FeesExpenses.aspx).[15]  Class 0 includes no such provision.  *Id.*  Thus, by accepting a higher expense ratio, the Plan obtained an equivalent economic benefit—the availability of monies to defray the Plan's recordkeeping and trustee costs.  Nowhere do plaintiffs allege that the alternative "lower-cost" share classes would have provided the same level of revenue sharing as those offered in the Plan.  Plaintiffs thus have not plausibly alleged that the selection of share classes with higher expense ratios was improper.

---

[15] The Amended Complaint relies on the Reliance website for the costs of New York Life Anchor Fund share classes.  AC ¶ 100 n.22.

III.  **PLAINTIFFS' CLAIMS THAT THE PLAN'S INVESTMENT
OPTIONS WERE INAPPROPRIATE FOR REASONS OTHER THAN
THEIR COST ARE LIKEWISE DEFECTIVE.**

A.  **Reliance Did Not Act Improperly in Including the Insperity
Horizon Risk-Managed Funds as Plan Investment Options.**

Count I asserts that Reliance acted imprudently and disloyally in including

the Insperity Horizon Risk Managed Target Date Funds (the "Insperity TDFs") as

Plan investment options.  Beyond base speculation regarding Reliance's motives,

plaintiffs' chief criticism concerning the funds is that they were "newly-created"

and thus had "no prior performance history."  AC ¶ 172.  The mere fact that the

funds were newly-formed does not provide a plausible basis for inferring that they

were imprudent, however.  Indeed, the Department of Labor has encouraged plan

fiduciaries to consider the possibility of "custom" target date fund-of-fund

structures out of other plan investment options, despite the fact that such structures

are by their very nature newly-formed and without a performance history.[16]

Plaintiff's attack on the Insperity TDFs is particularly misdirected because the

underlying funds in the "funds-of-funds" consist almost exclusively of non-

---

[16] U.S. Dept. of Labor Employee Benefits Security Admin., Target Date
Retirement Funds – Tips for ERISA Plan Fiduciaries (Feb. 2013),
http://www.dol.gov/ebsa/newsroom/fstdf.html; *see Dupree v. Prudential Ins. Co.
of Am.*, No. 99-8337-CIV.-JORDAN, 2007 WL 2263892, at *15 (S.D. Fla. Aug. 7,
2007), as amended (Aug. 10, 2007) (rejecting claims where defendant was "the
first investor in about seven of approximately 12 new investment strategies").

proprietary passive index funds, designed simply to mirror broad, established market indices.[17]  The sole underlying actively-managed funds—a commodities fund and a high-yield bond fund—are run by managers with long track records.[18]  The only "new" aspect of the Insperity TDFs was how their assets were allocated among the underlying funds and how that allocation was intended to change over time.  But plaintiffs offer no factual allegations that call Reliance's judgment into question with regard to those allocations.

In the end, the only specific fact plaintiffs are able to point to is that the Insperity TDFs have recently underperformed certain other target date funds, including those that they replaced.[19]  But hindsight is a plainly improper basis for judging fiduciary decision-making.[20]  It is improper for plaintiffs to judge

---

[17] *See* Reliance Trust, Risk-Managed Target Date Funds Offering Stmt. , at 8, *available at* http://www.relico.com/CIT/Pages/InsperityHorizonTargetDate.aspx (last visited Apr. 28, 2016) (via "download center".).

[18] Decl. ¶ D, DFA Commodity Strategy Summary Prospectus, Feb. 28, 2016 (noting manager, David A. Plecha has been a portfolio manager since 1989); Decl. ¶ E, American High Income Trust Summary Prospectus, Dec. 1, 2015, at 7 (reporting managers with 12, 18, and 26 years of "experience in this fund").

[19] Plaintiffs attack the Insperity TDFs' fees, as well as the fees of other Plan investment options, as the basis for Counts III, VI, and VII.  Reliance responds to those attacks in its response to those counts.  *See supra* at 9-16 & *infra* at 25-28.

[20] *Laborers Nat. Pension Fund v. N. Trust Quantitative Advisors, Inc*., 173 F.3d 313, 317 (5th Cir. 1999) (ERISA's prudence test "is one of conduct, and not a test of the result of performance of the investment.") (citation omitted);  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("[W]e judge a

Reliance's conduct on the basis of market performance that was unknowable at the time of its decision.[21]

### B. Reliance Did Not Act Imprudently in Deciding to Offer a Money Market Fund Rather Than a Stable Value Fund.

Count IV asserts that defendants breached fiduciary duties by offering a money market fund—and not a stable value fund—as an investment option prior to 2014.  AC ¶¶ 132, 190-96.  Plaintiffs allege that stable value funds are superior to money market funds solely because they tend to offer higher returns.  *Id.* ¶¶ 128-35, 193-94.  But, once again, plaintiffs' focus on a single investment feature ignores legitimate reasons that have led many other plans' fiduciaries to choose money market funds over stable value accounts as safe options for participants.

---

fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight. . . .") (quotation omitted); *New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1372 (N.D. Ga. 2009) ("The results of the fiduciary's investment decision are not the focus of the inquiry.  Rather, the fiduciary's conduct is to be evaluated . . . without the benefit of hindsight." (citation omitted)).

[21] To the extent that plaintiffs suggest that Reliance acted imprudently by not removing the TDFs in response to their underperforming a few other funds, that argument also fails.  Nothing in ERISA or sound investment practice requires fiduciaries to chase after the funds that report the best returns at a particular point in time, as government reports note that such "returns chasing" is counterproductive.  Chien, Fed. Reserve Bank of St. Louis, *Chasing Returns Has a High Cost for Investors*, https://www.stlouisfed.org/On-The-Economy/2014/April/Chasing-Returns-Has-a-High-Cost-for-Investors (last visited May 12, 2016) ("[C]hasing returns caused the average U.S. mutual fund investor to miss around 2 percent return per year, which is very significant.").

-18-

To begin with, there is no authority for the contention that money market funds are forbidden as 401(k) plan options.  Department of Labor regulations provide that one option in an investment lineup should be "safe," viz., an "income producing, low risk, liquid" investment, 29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3); they do not require a stable value fund.  Indeed, the Department has recognized that money market funds may be valuable components of retirement portfolios and avoid risks inherent in stable value options.  72 Fed. Reg. 60,452, 60,463 (Oct. 24, 2007) (money market funds "can, and in many instances will, play an important role as a component of a diversified portfolio that constitutes a qualified default investment alternative"); *see also Tibble*, 729 F.3d at 1136 (rejecting ERISA claim based on offering money market-type fund instead of stable value fund).[22]

Consistent with that guidance, 401(k) fiduciaries have commonly included money market funds as capital preservation options in their plan lineups.  The Amended Complaint itself cites a 2015 study published by stable value fund

---

[22] *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013), does not hold otherwise.  The claim in *Abbott* was not merely that a money market fund was imprudent but instead that defendants misled participants by falsely labeling a money market fund as a stable value product.  *Id.* at 806.  Although plaintiffs cite *Abbott* for the point that stable value funds tend to outperform money market funds, the two products have materially different features that prevent an apples-to-apples comparison of their returns.  *See infra* at 19-20; 72 Fed. Reg. at 60,473 n.35 (noting it is "likely that there are important differences between money market and stable value funds beyond any difference in average returns").

provider MetLife for the fact that nearly one-fifth (18%) of all defined contribution plans offer money market funds without also offering a stable value product.[23] And even that 18% figure cited by plaintiffs greatly understates the use of money market funds in that it captures only those plans that offer a money market fund *to the exclusion* of any stable value product.  The same study reflects that a solid majority of plans (62%) currently offer a money market fund, even in today's environment of low short-term interest rates.  MetLife Study at 5.  It cannot be that more than half of the fiduciaries in the country have chosen to offer an investment option that is generally recognized as imprudent.

This range of choices is explained by both the ways in which money market funds and stable value funds are similar, and the key ways in which they differ. Money market and stable value funds are both "conservative in that they emphasize capital preservation rather than the maximization of returns."  *Tibble*, 729 F.3d at 1136; *see also* 72 Fed. Reg. at 60,452 ("[I]nvestments in money market funds, stable value products and other capital preservation investment vehicles may be prudent for some participants or beneficiaries . . . .").  But they differ greatly in how they achieve capital preservation.  Stable value funds invest in "longer-

---

[23] AC ¶ 131 & n.50; *see* MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5 (2015) ("MetLife Study"), https://www.metlife.com/assets/cao/institutional-retirement/2015StableValueStudy.pdf.

duration instruments" than the "short-term securities" in which money market funds invest.  Compl. ¶ 128.[24]  By their nature longer-duration instruments are more volatile, requiring stable value providers to limit liquidity by restricting the ability of plans or participants to withdraw their accounts from the fund—delaying payment or charging monetary penalties for withdrawal.[25]  They also often restrict participants from transferring investments from a stable value fund to other fixed-income options.[26]  The Plan's money market fund imposes no such restrictions.[27]

---

[24] Although the money market fund invested in shorter-term securities than a stable value fund, the Plan at all relevant times offered participants access to longer term debt instruments through an intermediate bond fund option.  *See* AC ¶¶ 98, 96; http://www.morningstar.com/funds/XNAS/MWTRX/quote.html (indicating that Met West Total Return Bond Fund (M) (MWTRX) is an intermediate bond fund); http://www.morningstar.com/funds/XNAS/PTRAX/quote.html (indicating that PIMCO Total Return Fund (Adm) (PTRAX) is an intermediate bond fund).

[25] *See* U.S. Government Accountability Office, *401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood*, at 11-12 (Mar. 2011) ("GAO Stable Value Report"), www.gao.gov/new.items/d11291.pdf (stable value providers "typically require certain restrictions on plan sponsor and participant withdrawals or transfers of plan assets from stable value funds"); *id* at 23; DOL ERISA Advisory Council, *Report on Stable Value Funds and Retirement Security in the Current Economic Conditions* (2009), http://www.dol.gov/ebsa/publications/2009ACreport3.html.

[26] Office of the Comptroller of the Currency, Comptroller's Handbook: Asset Management (AM), Retirement Plan Products & Services, at 35 (Feb. 2014), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/file-pub-employee-benefits-retirement-plan.pdf; GAO Stable Value Report at 28.

[27] Federated Prime Obligations Money Market Fund (SS) (PRSXX) Prospectus at 14-15 (Sept. 30, 2015), http://www.federatedinvestors.com/FII/daf/pdf/regulatory/prospectus/Q450466.pdf

Such restrictions pose acute concerns for the Plan here.  Due to Insperity's unique business model, the Plan experiences high volatility in its participant base. Insperity's client companies can add or withdraw their employees from Insperity's employment or from the Plan.  This dynamic is apparent in the Plan's Form 5500 to the DOL, which show that each year many worksite groups are spun out to other plans.[28]  This high turnover in worksite employees' Plan participation requires the Plan to be able to transfer the exiting participants' account balances to their new plans—which requires full liquidity in the Plan's investment options.[29]

To be sure, Reliance was able in 2014 to secure a stable value option that accommodated the Plan's unique liquidity needs, but its decision to add a stable value option then does not support an inference that it did not prudently consider stable value options earlier.  As courts have recognized, a fiduciary may choose

---

?title=Prime%20Obligations%20Fund%20(SS%20Shares)%20-%20Prospectus; *see also* 17 C.F.R. § 270.2a-7 (requiring liquidity of money market funds).

[28] Barrett Decl. Exs. F-I (Insperity Plan Forms 5500 for 2011-14), at Schedule H. Part IV. 5b.

[29] *Cf.* 29 C.F.R. § 2550.404a-1(b)(2)(ii)(B) (fiduciary must consider "liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan").  This volatility in the Plan's participant base also makes futile plaintiffs' effort, AC ¶ 143, to contrast that Plan to Insperity's Corporate Plan—which offered a stable value product prior to 2014.  Unlike the Plan, the Corporate Plan's participant base consists of individuals who work exclusively for Insperity.  Insperity's corporate employees may have, from time to time, left Insperity and withdrawn from the Corporate Plan, but the level of volatility in the Corporate Plan is nowhere close to that inherent in the Plan.  *See* Barrett Decl. Exs. J-M (Corporate Plan Forms 5500 for 2011 - 2014), at Schedule H. Part IV. 5b.

among multiple prudent courses,[30] and 401(k) fiduciaries have varied in their decisions whether to offer only a money market fund option or to offer a stable value option as well.  Where multiple accepted investment choices exist, it is permissible for a fiduciary to adopt different courses of action at different times.

To suggest otherwise would ignore that fiduciary decisions must be viewed in light of the circumstances at the time of those decisions.[31]  Here, there are sound reasons why a fiduciary could view a stable value fund trade off differently in 2014 than in earlier years.  Following the financial crisis and the decline of short-term interest rates to near zero in 2009, plan fiduciaries, and investors in general, faced great uncertainty as to when interest rates would rebound.[32]  In hindsight, short-

---

[30] *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006) (fiduciary decision "involves a balancing of competing interests under conditions of uncertainty [that] requires an exercise of discretion."); *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("assertions of what a 'typical' balanced fund portfolio manager might have done in 1987 say little about the wisdom of Equitable's investments, only that Equitable may not have followed the crowd."); *Buford v. UNUM Life Ins. Co. of Am.*, 290 F. Supp. 2d 92, 99-100 (D.D.C. 2003) ("[I]f there is more than one action that is 'reasonable,' the Court must not overturn a decision found to be reasonable, even if an alternative decision also could have been considered reasonable.").

[31] 29 U.S.C. § 1104(a)(1)(B); *St. Vincent*, 712 F.3d at 723 (citing need to focus on "how a prudent investor would have viewed the [p]ortfolio's securities at the relevant times").

[32] Financial trade press articles from 2010 through 2014 revealed sharp, continuous divisions of opinion on whether the Federal Reserve would allow short-term interest rates to rise in the near term.  *E.g.*, *Economic Forecasting Survey*, Wall St. J., Jan. 2011, http://projects.wsj.com/econforecast/#ind=fed

term rates in fact remained near zero for years afterward, driven by the Federal Reserve's easy monetary policy. But a fiduciary's actions are not judged in hindsight,[33] and, in the wake of the financial crisis, no fiduciary could have been expected to predict that interest rates would not return to previous levels in the near term. By 2014, fiduciaries could reasonably have a different economic outlook in light of the several-year period of lower interest rates ushered in by the financial crisis. Because fiduciaries must make decisions "under the circumstances then prevailing," Reliance's addition of a stable value option in 2014 does not support an inference that it failed to conduct a prudent investigation years earlier.

---

funds&r=16&e=87 (Select "2011-01-01" edition and select "Download data") (asking "When will the Fed begin raising rates?" to which 37% of surveyed economists predicted 2011 and 55% predicted 2012); Ben Baden, *When Will The Fed Finally Raise Rates? It's uncertain, but few are expecting a hike in the near future*, US News & World Rpt., Apr. 28, 2010 ("No one is certain when the Fed will increase rates . . ."). That uncertainty created a risk for investors in stable value funds (which invest in longer-duration fixed income products) because an interest rate spike could plunder investors' longer-term crediting rates. Rebecca Moore, *The Risk of Rising Interest Rates for Stable Value Funds*, Plan Sponsor, Mar. 26, 2014, http://www.plansponsor.com/The_Risk_of_Rising_Interest_ Rates_on_Stable_Value_Funds.aspx?fullstory=true ("While retirement plan sponsors will find the market for getting into stable value funds has improved, the threat of rising interest rates poses a risk they need to keep in mind.").

[33] *St. Vincent*, 712 F.3d at 716 ("[W]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."); *DeBruyne*, 920 F.2d at 465 (ERISA "requires prudence, not prescience." (quotation omitted)).

**C.  The Amended Complaint Offers No Factual Basis for the Conclusion that Reliance Breached Fiduciary Duties in Selecting New York Life to Run the Plan's Stable Value Option.**

The title to Count IV suggests that plaintiffs may have also intended to challenge the prudence of the New York Life Anchor Fund as the Plan's stable value option in 2014.  But the allegations in Count IV say nothing about that fund, and the Amended Complaint offers no plausible basis to conclude that it was an imprudent fund choice.  Plaintiffs note the fund itself was relatively new, but they do not and cannot allege that New York Life was a new or unknown stable value provider.[34]  Plaintiffs also allege that Reliance could have chosen a share class with a lower expense ratio, AC ¶ 100, but this would have denied the Plan the benefit of revenue sharing to offset Plan expenses.  *See supra* at 15-16.

**D.  Plaintiffs' Prohibited Transaction Claims Should be Dismissed for Failing to Properly Address Longstanding Exemptions.**

Counts VI and VII assert that defendants violated the prohibitions of ERISA § 406, 29 U.S.C. § 1106, by causing the Plan to use Insperity Retirement as recordkeeper and to offer Reliance's proprietary collective trusts.  AC ¶¶ 206, 208-09.  The former theory fails for the same reasons as Count II:  Reliance did not retain Insperity Retirement as the Plan's recordkeeper, and Insperity Retirement

---

[34] *See* Dow Jones, *New York Life Stable Value Sales Hit $4.39 Billion in '96* (Jan. 30, 1997) (New York Life "manages more than $21 billion in stable value assets and is the largest provider of GICs.").

received only reimbursement of its direct expenses.  *Supra* at 7-10.

The latter theory, in turn, ignores ERISA § 408(b)(8), which specifically allows plan investment in a fiduciary trust company's proprietary collective trusts.  29 U.S.C. § 1108(b)(8).  The exemption has two conditions: (1) the plan document permits (or an independent fiduciary approves) the investment, and (2) the trustee receives only reasonable compensation.  *Id.*  The Plan document incorporates the Trust Agreement which expressly permitted collective trusts investments.  Plan § 7.1; Trust Agmt.§ 5.3.  And plaintiffs offer no plausible challenge to the reasonableness of Reliance's compensation.  To be sure, plaintiffs allege that the Plan could have offered "identical funds" with lower expense ratios.  But this assertion ignores that the Reliance options' allegedly higher expense ratios do not reflect the compensation to Reliance for operating the funds, but are instead attributable to revenue sharing provided to the Plan to cover Plan expenses.[35]

Plaintiffs also contend that the Insperity TDFs' fees were "excessive" because, unlike some target date funds, Reliance's options collect fees both for the

---

[35] *See supra* at 15-16; AC ¶ 100 (alleging 25 basis point difference in expense ratios between Plan's Insperity TDFs and Reliance Trust Risk-Managed target date funds), ¶ 68 (alleging expense ratio for Insperity TDFs includes 25 basis point administrative service fee); Barrett Decl. Ex. C (screenshot from http://www.relico.com/CIT/Pages/FeesExpenses.aspx) (reflecting Reliance Trust Risk-Managed target date funds with 25 basis point administrative service fee have same expense ratio as the Insperity TDFs in the Plan's lineup).

underlying funds in the fund-of-funds structure ("acquired fund" fees), as well as a trustee fee at the fund-of-funds level.  AC ¶¶ 121-22.  But the Complaint itself alleges that the expense ratios of the Insperity TDFs were ***lower*** than those of J. P. Morgan target-date funds—a set of funds that plaintiffs allege do not include fund-of-funds level fees.  AC ¶¶ 69, 97, 104-05.  Further, unlike the products plaintiffs cite, the Insperity TDFs invested solely in funds unaffiliated with Reliance.[36] Thus, Reliance's separate fee necessarily corresponds to its distinct services to the funds—including the service of adjusting the funds' relative allocation to equities and fixed income depending on market conditions.[37]  Plaintiffs offer no basis for questioning the reasonableness of charging distinct fees for distinct services.

While some courts have held that prohibited transaction exemptions are affirmative defenses, *see Braden*, 588 F.3d at 600-01, others have dismissed ERISA § 406 claims on the basis of such exemptions.[38]  Reliance submits that where, as here, plaintiffs allege no basis for extracting their prohibited transaction

---

[36] Barrett Decl. Ex. N (Reliance Trust, Risk-Managed Target Date Funds Offering Stmt., at 8-9 (2012), http://www.relico.com/CIT/Pages/DocView.aspx?k=docs/Target_Date/Risk_Managed/Offering/Offering_Statement.pdf.

[37] *Id.* at 6 (listing underlying funds).

[38] *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) ("[W]here the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption . . . it is deficient."); *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001).

claims from the safe harbor of an express statutory exemption, courts should dismiss those claims on a Rule 12 motion for reasons of judicial economy.[39]

## IV.   COUNT VIII SHOULD BE DISMISSED BECAUSE IT DOES NOT SEEK "APPROPRIATE EQUITABLE RELIEF."

Count VIII purports to assert a claim under ERISA § 502(a)(3) for the "restitution or disgorgement" of "any ill-gotten proceeds and profits" resulting from defendants' alleged fiduciary breaches.  But Count VIII does not seek any relief available under § 502(a)(3).  Section 502(a)(3) authorizes a court to remedy violations of ERISA or plan terms by granting an injunction or "other appropriate equitable relief," which, as the Supreme Court has noted, "must mean something less than all relief."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 259 nn.8-9 (1993).

To the extent plaintiffs seek relief on the premise that Reliance breached fiduciary duties, Count VIII should be dismissed because such relief would not be "appropriate."  In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court noted: "[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable

---

[39] This District's decision in *Fuller v. SunTrust Banks, Inc.*, 2012 WL 1432306, at \*6 (N.D. Ga. Mar. 20, 2012), is not to the contrary.  Although the court in *Fuller* declined to dismiss on the basis of an available exemption, it did so only after pointing to allegations in the plaintiffs' complaint that plausibly challenged compliance with the exemption's conditions.  *Id.*

relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515.[40]

Not only do plaintiffs fail to allege the inadequacy of other remedies, the relief

Count VIII demands is already sought under other counts. *Compare* AC ¶ 226,

*with id. ¶¶* 188, 195, 209, 217. Even assuming plaintiffs could prove Reliance

breached fiduciary duties, they have an adequate remedy under § 502(a)(2)

which—in combination with § 409(a)—authorizes full monetary relief plus "such

other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §

1109(a). Count VIII is duplicative and no additional relief would be "appropriate."

To the extent plaintiffs assert non-fiduciary liability against Reliance, Count

VIII fails because the monetary relief they seek is not equitable, despite their

efforts to label it otherwise. Rather, "almost invariably," suits "seeking (whether

by judgment, injunction, or declaration) to compel the defendant to pay a sum of

money to the plaintiff are suits for 'money damages,' [which] . . . are, of course,

the classic form of legal relief." *Great-W. Life & Annuity Ins. Co. v. Knudson,* 534

U.S. 204, 210 (2002) (quotation omitted). The Supreme Court has explained that:

> Equitable remedies are, as a general rule, directed against some
> specific thing; they give or enforce a right to or over some particular
> thing . . . rather than a right to recover a sum of money generally out

---

[40] *See also Ogden v. Blue Bell Creameries U.S.A., Inc.,* 348 F.3d 1284, 1285
(11th Cir. 2003) ("[A]n ERISA plaintiff has no cause of action under Section
502(a)(3) where Congress provided for an adequate remedy elsewhere in the
ERISA statutory framework . . .").

> of the defendant's assets. . . . Equitable liens thus are ordinarily enforceable only against a specifically identified fund because an equitable lien is simply a right of a special nature over the thing . . . so that the very thing itself may be proceeded against in an equitable action.

*Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan,* 136 S. Ct. 651, 659 (2016) (quotation omitted).  True, the Court has said that equity allows a recovery "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Great-W.*, 534 U.S. at 213.  But plaintiffs do not seek any specifically identifiable *res* in Reliance's possession that is traceable to the Plan.  They instead seek generally the recovery of "any ill-gotten proceeds or profits."[41]  Their claim for relief under Count VIII is thus "only that of a general creditor," *id.* at 213-14, and must be dismissed.

## CONCLUSION

Reliance respectfully requests that plaintiffs' Complaint be dismissed.

---

[41] AC ¶ 226; *see, e.g.*, *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 238 (3d Cir. 2009) ("Because the plaintiffs are unable to identify 'money or property . . . belonging in good conscience' to them and clearly 'trace[able] to particular funds or property in the defendant's possession,' they cannot recover profits from [defendant] as a form of equitable relief.") (internal citations omitted); *Epolito v. Prudential Ins. Co. of Am.*, 737 F. Supp. 2d 1364, 1382 (M.D. Fla. 2010) ("[I]n order to succeed in its claim for equitable relief, Prudential must identify a specific, intact, fund, in Epolito's possession, belonging in good conscience to Prudential.").

Respectfully submitted this 16th day of May, 2016

*/s/ William Bard Brockman*
W. Bard Brockman
GA Bar No. 084230
Bryan Cave, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree St, N.W.
Atlanta, GA 30309-3488
Phone: 404-572-6600
bard.brockman@bryancave.com

Brian Boyle (pro hac vice)
bboyle@omm.com
Shannon Barrett (pro hac vice)
sbarrett@omm.com
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C.  20006-4001
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407

*Counsel for Reliance Trust Company*

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing ***Memorandum of Law in Support of Defendant Reliance Trust Company's Motion to Dismiss*** complies with the font and point selections approved by the Court in Local Rule 5.1C.  The foregoing was prepared on computer using Times New Roman font (14 point).


Respectfully submitted this 16th day of May, 2016.


<u>*/s/ William Bard Brockman*</u>
W. Bard Brockman
GA Bar No. 084230
Bryan Cave, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree St, N.W.
Atlanta, GA 30309-3488
Phone: 404-572-6600
bard.brockman@bryancave.com

*Counsel for Reliance Trust Company*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RONDA A. PLEDGER, SANDRA BRITT, JENNIFER L. PRIMM, AND ALEX BROOKS, JR., individually and as representatives of a class of similarly situated persons of the Insperity 401(k) Plan,<br><br>Plaintiffs,<br><br>v.<br><br>RELIANCE TRUST COMPANY, INSPERITY, INC., INSPERITY HOLDINGS, INC., INSPERITY RETIREMENT SERVICES, L.P., INSPERITY RETIREMENT PLAN COMMITTEE, AND JOHN DOES 1-20,<br><br>Defendants. | Civil Action No. 1:15-cv-04444-MHC |

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2016, I electronically filed the foregoing *Memorandum of Law in Support of Defendant Reliance Trust Company's Motion to Dismiss* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record.

*/s/ William Bard Brockman*
W. Bard Brockman
GA Bar No. 084230
Bryan Cave, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree St, N.W.
Atlanta, GA 30309-3488
Phone: 404-572-6600
bard.brockman@bryancave.com

-33-

*Counsel for Reliance Trust Company*