IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RONDA A. PLEDGER, *et al.*,

                        *Plaintiffs*,

v.

RELIANCE TRUST COMPANY, *et al.*,

                        *Defendants*.

Civil Action No.
1:15-cv-04444-MHC

**MEMORANDUM IN OPPOSITION TO RELIANCE TRUST COMPANY'S
MOTION TO DISMISS AMENDED COMPLAINT [DOC. 43]**

# CONTENTS

Authorities ............................................................................................................ ii

Introduction .......................................................................................................... 1

Legal Standards ................................................................................................... 2

   I.    Rule 8 pleading standard. ....................................................................... 2

   II.   ERISA standards. ................................................................................... 3

Background .......................................................................................................... 5

Argument ........................................................................................................... 10

   I.    Count I states a claim based on Reliance's self-dealing and
imprudence in selecting and retaining its own target date funds in the
Plan. ...................................................................................................... 10

   II.   Count II states a claim based on Reliance's role in allowing
excessive recordkeeping and administrative fees to be paid from the
Plan. ...................................................................................................... 15

   III.  Count III states a claim based on Reliance's selection and retention
of investment options with excessive fees. ......................................... 17

   IV.  Count IV states a claim based on Reliance's selection and retention
of a microscopically yielding money market fund that failed to
provide any meaningful retirement benefits, instead of a stable value
fund. ...................................................................................................... 22

   V.   Counts VI and VII state prohibited transactions claims. ..................... 26

   VI.  Count VIII seeks appropriate equitable relief. .................................... 29

Conclusion ......................................................................................................... 30

# AUTHORITIES

## Cases

*Abbott v. Lockheed Martin Corp.*,
   725 F.3d 803 (7th Cir. 2013) ...............................................................23

*Abbott v. Lockheed Martin Corp.*,
   No. 06-701, 2009 U.S.Dist.LEXIS 26878 (S.D.Ill. Mar. 31, 2009)..................23

*Armstrong v. LaSalle Bank N.A.*,
   446 F.3d 728 (7th Cir. 2006) ...............................................................24

*Barboza v. Cal. Assn. of Prof'l Firefighters*,
   799 F.3d 1257 (9th Cir. 2015) .............................................................29

*Bowers v. BB&T Corp.*,
   No. 15-732, Doc. 58 (M.D.N.C. Apr. 18, 2016) ................................................23

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ....................................... 2, 3, 10, 11, 13, 18, 25, 27

*Brotherston v. Putnam Invs., LLC*,
   No. 15-13825, 2016 U.S.Dist.LEXIS 50849 (D.Mass. Apr. 6, 2016) .................4

*Buford v. Unum Life Ins. Co. of Am.*,
   290 F.Supp.2d 92 (D.D.C. 2003).........................................................24

*Chaparro v. Carnival Corp.*,
   693 F.3d 1333 (11th Cir. 2012) .............................................................2

*Deak v. Masters, Mates & Pilots Pension Plan*,
   821 F.2d 572 (11th Cir. 1987) ...............................................................3

*Donovan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1983) .............................................................27

*Elmore v. Cone Mills Corp.*,
   23 F.3d 855 (4th Cir. 1994) ...............................................................27

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S.Ct. 2459 (2014)................................................................ 15, 22

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989)........................................................................24

*Fish v. Greatbanc Trust Co.*,
  749 F.3d 671 (7th Cir. 2014) .............................................................27

*Fuller v. Suntrust Banks, Inc.*,
  744 F.3d 685 (11th Cir. 2014) ..............................................................3

*Fuller v. Suntrust Banks, Inc.*,
  No. 11-784, 2012 U.S.Dist.LEXIS 56602 (N.D.Ga. Mar. 20, 2012) .......... 27, 29

*George v. Kraft Foods Global, Inc.*,
  641 F.3d 786 (7th Cir. 2011) ................................................ 14, 16, 24

*Goldenberg v. Indel, Inc.*,
  741 F.Supp.2d 618 (D.N.J. 2010) .........................................................27

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ......................................................................4, 30

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir.), *supplemented*, 569 F.3d 708 (2009) .............. 19, 20, 21

*Howard v. Shay*,
  100 F.3d 1484 (9th Cir. 1996) .............................................................27

*Hunt v. Hawthorne Assocs.*,
  119 F.3d 888 (11th Cir. 1997) .............................................................16

*In re Regions Morgan Keegan ERISA Litig.*,
  692 F.Supp.2d 944 (W.D.Tenn. 2010) .................................................16

*In re Reserve Fund Sec. & Deriv. Litig.*,
  732 F.Supp.2d 310 (S.D.N.Y. 2010) ...................................................25

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) ......................................................... 11, 26

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ............................................................2

*Krueger v. Ameriprise Fin., Inc.*,
  No. 11-02781, 2012 U.S.Dist.LEXIS 166191
  (D.Minn. Nov. 20, 2012) .................................................. 10, 11, 12, 13, 18, 28

*Kruger v. Novant Health, Inc.*,
  131 F.Supp.3d 470 (M.D.N.C. 2015) ..................................................18

iii

*Leber v. Citigroup, Inc.*,
 No. 07-9329, 2010 U.S.Dist.LEXIS 25097 (S.D.N.Y. Mar. 16, 2010) .............27

*Loomis v. Exelon Corp.*,
 658 F.3d 667 (7th Cir. 2011) .................................................... 20, 21

*Lowen v. Tower Asset Mgmt., Inc.*,
 829 F.2d 1209 (2d Cir. 1987) ...............................................27

*Mehling v. N.Y. Life Ins. Co.*,
 163 F.Supp.2d 502 (E.D.Pa. 2001) .......................................27

*Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Ben. Plan*,
 136 S.Ct. 651 (2016)...............................................................30

*Nat'l Sec. Sys. v. Iola*,
 700 F.3d 65 (3d Cir. 2012) ...................................................29

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
 781 F.3d 1245 (11th Cir. 2015) ..............................................2

*Rankin v. Rots*,
 278 F.Supp.2d 853 (E.D.Mich. 2003) ...................................16

*Renfro v. Unisys Corp.*,
 671 F.3d 314 (3d Cir. 2011) .................................................. 20, 21

*Shirk v. Fifth Third Bancorp*,
 No. 05-49, 2008 U.S.Dist.LEXIS 108089 (S.D.Ohio Sep. 26, 2008) ................29

*Silva v. Metro. Life Ins. Co.*,
 762 F.3d 711 (8th Cir. 2014) ...............................................30

*Stargel v. Suntrust Banks, Inc.*,
 791 F.3d 1309 (11th Cir. 2015) ...........................................3, 4

*Tatum v. RJR Pension Inv. Comm.*,
 761 F.3d 346 (4th Cir. 2014) ...............................................4, 14

*Tibble v. Edison Int'l*,
 135 S.Ct. 1823 (2015).......................................................... 4, 25, 26

*Tibble v. Edison Int'l*,
 729 F.3d 1110 (9th Cir. 2013) ................................. 11, 18, 20, 21, 25

*Tussey v. ABB, Inc.*,
 746 F.3d 327 (8th Cir. 2014) ................................... 4, 21, 22

iv

*Tussey v. ABB, Inc.*,
   No. 06-4305, 2008 U.S.Dist.LEXIS 9806 (W.D.Mo. Feb. 11, 2008) ................16

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ...........................................................................................29

*Will v. Gen. Dynamics Corp.*,
   No. 06-698, 2009 U.S.Dist.LEXIS 105987 (S.D.Ill. Nov. 14, 2009) ................16

*Willett v. Blue Cross & Blue Shield of Ala.*,
   953 F.2d 1335 (11th Cir. 1992) .........................................................................14

*Woods v. S. Co.*,
   396 F.Supp.2d 1351 (N.D. Ga. 2005) ................................................................16

**Statutes**

29 U.S.C. §1002(21)(A) .......................................................................................16

29 U.S.C. §1002(21)(B) .......................................................................................20

29 U.S.C. §1002(34) ..............................................................................................5

29 U.S.C. §1102(a) ............................................................................................5, 16

29 U.S.C. §1103(c)(1) ...................................................................................... 3, 6, 7

29 U.S.C. §1104(a)(1)(A) ................................................................................. 3, 6, 7

29 U.S.C. §1104(a)(1)(A)(i) ...............................................................................22

29 U.S.C. §1104(a)(1)(A)(ii) ..............................................................................22

29 U.S.C. §1104(a)(1)(B) ......................................................................................4

29 U.S.C. §1104(a)(1)(D) ....................................................................................15

29 U.S.C. §1105(a) ...........................................................................................5, 17

29 U.S.C. §1106 ............................................................................................ 4, 7, 27

29 U.S.C. §1106(a) ...............................................................................................29

29 U.S.C. §1106(b) ...............................................................................................29

29 U.S.C. §1106(b)(3) ..........................................................................................27

29 U.S.C. §1108 ............................................................................................. 27, 29

29 U.S.C. §1108(b)(8) .................................................................................... 26, 27

29 U.S.C. §1108(b)(8)(B) .....................................................................................28

29 U.S.C. §1109(a) ...........................................................5, 14

29 U.S.C. §1132(a) ..............................................................29

29 U.S.C. §1132(a)(1)(B) ...................................................24

29 U.S.C. §1132(a)(2) ................................................... 29, 30

29 U.S.C. §1132(a)(3) ................................................... 29, 30

**Rules**

Fed.R.Civ.P. 8(a)(2) .............................................................2

Fed.R.Civ.P. 8(a)(3) ...........................................................30

Fed.R.Civ.P. 8(d)(2) ...........................................................30

**Regulations**

29 C.F.R. §2550.404c-1(b) .................................................24

72 Fed. Reg. 60452 (Oct. 24, 2007)....................................24

74 Fed. Reg. 32688 (proposed July 8, 2009) ......................25

Notice of Proposed Rulemaking, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991) ........................................28

**Other**

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974)....................28

U.S. Government Accountability Office, *401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood* (Mar. 2011) ........................................25

William A. Birdthistle, *Breaking Bucks In Money Market Funds*, 2010 WIS.L.REV. 1155 (2010) ........................................25

**INTRODUCTION**

Reliance Trust Company is the trustee of the $2 billion Insperity 401(k) Plan. In that role, it is the fiduciary responsible for the investment options that are included in the Plan and provided for participants to invest their retirement savings. Reliance abused that position of trust to improperly line its own pockets by transferring $466 million of the Plan's assets into its proprietary "target date funds" just two days after they had been created, using Plan assets as seed money for its new funds and causing massive losses of retirement savings for the Plan and its participants. Reliance also provided mutual funds that were vastly more expensive than cheaper versions of the same investments that were available to this Plan, but which enriched an Insperity affiliate with excessive recordkeeping fees. Reliance provided participants as their low-risk investment option a money market mutual fund that provided virtually no return, when stable value fund options were available exclusively to retirement plans, especially a Plan of this size, that have consistently and vastly outperformed money market funds with the same safety of principal and liquidity and would have protected the participants in this Plan from the ravages of inflation and provided them a meaningful return.

Plaintiffs' 132-page, 227-paragraph amended complaint sets forth in detail facts that plausibly show Reliance breached its fiduciary duties in these respects

and caused the Plan millions of dollars in losses. The Amended Complaint states a

claim and the Court should deny Reliance's motion to dismiss it.

## LEGAL STANDARDS

### I.     Rule 8 pleading standard.

To satisfy the "simplified pleading standard" of Federal Rule of Civil

Procedure 8(a)(2), "the complaint need only 'give the defendant fair notice of what

the plaintiff's claim is and the grounds upon which it rests.'" *Palm Beach Golf*

*Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir.

2015)(citations omitted). A claim is plausible if it provides "'enough fact to raise a

reasonable expectation that discovery will reveal evidence'" of liability. *Chaparro*

*v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)(per curiam).

Assessing the sufficiency of a complaint is "a context-specific task[.]" *Jacobs*

*v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010)(citation omitted).

In the "practical context of ERISA litigation," specifics of how fiduciaries made

plan decisions and which fiduciaries did what "tend systemically to be in the sole

possession of defendants." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th

Cir. 2009). "No matter how clever or diligent, ERISA plaintiffs generally lack the

inside information necessary to make out their claims in detail unless and until

discovery commences." *Id.* "If plaintiffs cannot state a claim without pleading"

facts in the sole possession of defendants, "the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Id.*; *see also id.* at 597 n.8, 602. A fiduciary breach claim is plausible if the Court may "infer from what is alleged that the process was flawed" and "tainted by failure of effort, competence, or loyalty." *Id.* at 596.

## II.    ERISA standards.

"ERISA's fiduciary duties are the highest known to law." *Fuller v. Suntrust Banks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014)(quotation marks and citation omitted).[1] The duty of loyalty requires fiduciaries to discharge their duties "*solely in the interest of the participants and beneficiaries and for the exclusive* purpose of providing benefits to participants and their beneficiaries and defraying *reasonable* expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A)(emphasis added); §1103(c)(1). Fiduciary decisions "must be made with an eye single to the interest of the participants and beneficiaries." *Deak v. Masters, Mates & Pilots Pension Plan*, 821 F.2d 572, 580 (11th Cir. 1987)(quotation marks and citation omitted).

The duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

---

[1] Abrogated on other grounds as noted in *Stargel v. Suntrust Banks, Inc.*, 791 F.3d 1309, 1311 (11th Cir. 2015)(per curiam).

enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). "[I]n all cases, evaluating the prudence of an investment decision requires a totality-of-the-circumstances inquiry[.]" *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014)(citation omitted). Because ERISA fiduciary breach claims are "inevitably fact intensive" (*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)), dismissal "is often inappropriate" until the record can be developed (*Brotherston v. Putnam Invs., LLC*, No. 15-13825, 2016 U.S.Dist.LEXIS 50849, *3 (D.Mass. Apr. 6, 2016)(citing cases)).

The fiduciary duties are ongoing, meaning fiduciaries must continue to periodically review plan investments and fees and remove imprudent or excessive cost investments. *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1829 (2015); *Stargel*, 791 F.3d at 1311.

To supplement these general fiduciary duties, certain transactions deemed "likely to injure" the plan are prohibited *per se*, that is, regardless of whether the Plan suffers any damage from the transaction. *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000); 29 U.S.C. §1106.

A breaching fiduciary is "personally liable" for any resulting "losses to the plan," must restore any profits the fiduciary "made through use of assets of the plan," and is "subject to such other equitable or remedial relief as the court may

deem appropriate, including removal of such fiduciary." 29 U.S.C. §1109(a). A

fiduciary also is liable if it participates or conceals, enables, or knows of but fails

to remedy the breaches of its co-fiduciaries. 29 U.S.C. §1105(a).

## BACKGROUND

Plaintiffs are five participants in the Insperity 401(k) Plan, an individual

account, defined contribution retirement plan governed by ERISA. Amended

Complaint (AC) ¶¶6–17 (Doc. 37); 29 U.S.C. §1002(34). The Plan is one of the

largest 401(k) plans in the United States, with over $2 billion in assets and 50,000

participants as of December 31, 2014. AC ¶12. In defined contribution plans,

excessive fees, as well as poor investment performance, can significantly reduce

the value of a participant's individual account. *Id.* ¶43; *Tibble*, 135 S.Ct. at 1826.

Reliance is the Plan's discretionary trustee "to hold, manage and control the

assets of the Plan" under a Trust Agreement with Insperity Holdings, who is the

Plan sponsor and named fiduciary responsible for administering the Plan. AC ¶23,

57; Doc. 43-4 at 5; [2] 29 U.S.C. §1102(a). Reliance is responsible for the selection,

retention, monitoring, and replacement of the Plan's investment options. AC ¶¶18,

23, 57–58; Doc. 43-4 at 9 (§3.2). Reliance also is responsible for "review[ing] any

expenses and fees the Plan Sponsor, its ERISA Affiliates or third parties incur in

---

[2] All "Doc." page number citations refer to the page numbers shown on the ECF header. All ECF documents are hyperlinked.

connection with their performance of services for the Plan or Trust," and determining whether the expenses and fees are reasonable. AC ¶77; Doc. 43-4 at 9 (§3.4); 29 U.S.C. §1104(a)(1)(A), §1103(c)(1). Reliance was therefore responsible for monitoring the amount of compensation that the Plan's recordkeeper, Insperity Retirement Services, received from the Plan. AC ¶77.

Plaintiffs allege four ways in which Reliance breached its fiduciary duties, severely harming the Plan as a result. Three relate directly to the Plan's investment options for which Reliance had primary responsibility (Counts I, III, IV), while the fourth arises from the excessive recordkeeping and administrative fees that Reliance allowed to be paid to Insperity Retirement Services (Count II).

**Count I.** In 2012, Reliance removed the Plan's target date funds that had been managed by J.P. Morgan and replaced them with the "Insperity Horizon Risk-Managed Funds," a group of target date funds for which Reliance is the investment manager and which had been created only *two days* before Reliance put them in the Plan. AC ¶¶61–74, 169–74.[3] Reliance then transferred $466 million of the Plan's assets from the J.P. Morgan funds to its own newly-hatched funds, using the Plan's assets as seed money. *Id*. ¶¶62, 65. Like other target date funds, Reliance's

---

[3] In a target date fund series, investors select the fund that corresponds to their "target" retirement date (*e.g*., "2030 fund"). The portfolio adjusts to a higher fixed-income allocation as the target date approaches. *Id*. ¶61.

funds invested in other funds that had their own fees and expenses that were deducted from fund assets. *Id.* ¶68. Unlike other target date funds, including those offered by established competitors such as J.P. Morgan, Vanguard, and T. Rowe Price, Reliance charged its own fee in addition to the underlying funds' fees, which was almost twice the underlying fund fees of the investment managers who performed the actual investment management work. *Id.* ¶¶68–69. In addition, Reliance added a third layer of administrative service fees that it delivered to Insperity Retirement Services. *Id.* ¶68. Reliance's new-fangled funds drastically underperformed established alternatives from J.P. Morgan, Vanguard, and T. Rowe Price, as the amended complaint shows in graphic detail. *Id.* at 30–36. Reliance's self-serving actions caused the Plan losses of over $56 million compared to prudent alternatives. *Id.* ¶¶73–74.

**Count II.** Insperity Retirement Services was the Plan's recordkeeper and received asset-based fees from Plan investments as compensation. Reliance was responsible for monitoring that compensation to ensure it was reasonable and in compliance with ERISA. 29 U.S.C. §1103(c)(1), §1104(a)(1)(A), §1106.

As the Plan's assets tripled in size from 2009 through 2014, the Plan's recordkeeping fees grew to approximately $119 to $142 per participant annually— *four to five times higher* than the market rate for similar services. AC ¶¶81, 83,

178. Reliance failed to prudently monitor this explosion in recordkeeping compensation. *Id.* ¶¶58, 77–79, 91. Reliance also failed to conduct any competitive bidding for the Plan's recordkeeping services. *Id.* ¶85. Consequently, Reliance failed altogether to determine a reasonable recordkeeping fee for this Plan and to ensure Insperity Retirement Services received only reasonable compensation. In fact, Reliance did the opposite (as shown below), by consistently providing Plan investment options that were more expensive than what could have been provided, but which paid more fees to Insperity Retirement Services. Reliance thus caused over $30 million in Plan losses from unreasonable recordkeeping fees. *Id.*

**Count III.** The excessive revenue sharing paid to Insperity Retirement Services came from the Plan's investment lineup, which consisted nearly exclusively of "retail" class funds designed for investors with a small amount of assets, instead of lower-cost alternatives designed for large institutional investors like the Plan. Plaintiffs allege that Reliance selected these higher-cost retail shares despite the ready availability of various institutional options that a prudent and loyal fiduciary would have considered, including: lower-cost, but otherwise identical "institutional" share classes of the same mutual funds; other low-cost institutional mutual funds offered by different firms, collective trusts, or separately-managed accounts, any of which would have charged a fraction of the

cost of the Plan's retail funds. *Id.* ¶¶92–127, 181–89.[4] The Plan's excessive retail fees caused millions of dollars in lost retirement savings.

**Count IV.** Stable value funds are unique investments that are made available only to retirement plans, especially to large retirement plans such as this one, and that provide the same safety of principal and liquidity but vastly higher returns than money market mutual funds, which are used by retail investors with much shorter investment horizons and more rapid trading activity than retirement investors. *Id.* ¶¶128–31. Even during the market turbulence of 2008, when money market mutual funds suffered a crisis that led to the collapse of the oldest fund and massive corporate and government intervention to prop up the others, stable value funds provided full protection of principal without any sacrifice in returns. *Id.* ¶130. Consequently, the vast majority of retirement Plans provide their participants the higher returns but same safety and liquidity of stable value funds. *Id.* ¶131.

Until 2014, however, Reliance provided Plan participants a money market fund that had practically no return at all. *Id.* ¶132, p. 85. And when Reliance finally moved the Plan into a stable value fund in 2014, it chose its own in-house proprietary fund that had been in existence for less than a year and charged

_____

[4] In its similar role as trustee of Insperity's Corporate 401(k) Plan in which Insperity's in-house employees participate, Reliance obtained the lower-cost institutional versions, even though that plan is *one-tenth* the size of the Plan. *Id.* ¶¶137–44.

excessive fees. *Id*. ¶135. Reliance's failure to provide a reasonable cost and prudent stable value fund cost the Plan $14 million in additional returns from 2009–14. *Id*. ¶¶128–136, 190–96.

In addition to the four fiduciary breach counts, Plaintiffs allege that Reliance's use of its own proprietary funds and receipt of payments from those funds were prohibited transactions (Count VI–VII). Count VIII seeks other equitable relief from Reliance to the extent such relief is not recovered under the preceding counts.

## ARGUMENT

The amended complaint states plausible claims for breach of fiduciary duties and prohibited transactions. Reliance's arguments to the contrary lack merit.

**I.      Count I states a claim based on Reliance's self-dealing and imprudence in selecting and retaining its own target date funds in the Plan.**

Plaintiffs' allegations plausibly show that, despite the ready availability of target date funds with established track records and lower costs from reputable firms, Reliance removed the Plan's J.P. Morgan-managed target date funds from the Plan and replaced them with its own proprietary target date funds two days after they were created, in order to benefit itself at the expense of participants. AC ¶¶61–74. Courts have found that similar allegations state a claim for breach of fiduciary duty. *Braden*, 588 F.3d at 596; *Krueger v. Ameriprise Fin., Inc*., No. 11-02781, 2012 U.S.Dist.LEXIS 166191, *28–33 (D.Minn. Nov. 20, 2012).

The "duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties[.]" *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). A fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134 (9th Cir. 2013)(quoting *Unisys*, 74 F.3d at 434).

A non-conflicted fiduciary objectively evaluating the target date fund market as if he were looking for a place to invest his own money would not select funds with no performance history and that charge an extra layer of unnecessary fees. Selecting newly-created funds from which the fiduciary will earn substantial profits, and using plan assets as seed money for the funds, instead of superior, lower-cost alternatives with an established performance history raises an inference (at the least) that the process by which Reliance selected these investments was "tainted by failure of effort, competence, or loyalty," *Braden*, 588 F.3d at 596, if not by an outright desire to enrich itself at the participants' expense.

The denial of the motion to dismiss in *Krueger* is instructive. The plaintiffs alleged that the defendant fiduciaries breached their duties by selecting proprietary Ameriprise funds, including a series of target date funds that were significantly more expensive than comparable funds offered by other firms. 2012 U.S.Dist.

LEXIS 166191, *11. Plaintiffs alleged that despite many investment options available in the market, the defendants selected these proprietary Ameriprise funds because they were "managed by, paid fees to, and generated profits for Ameriprise." *Id*. *28–29. Plaintiffs included specific comparisons showing that the fees in the proprietary funds "were significantly higher than the median fees for comparable mutual funds in 401(k) plans such as funds offered by the Vanguard firm." *Id*. *29. Plaintiffs further alleged that Ameriprise used the plan's assets "to seed new and untested affiliated mutual funds, which made those funds more marketable to outside investors." *Id*. *29–30.

The court concluded that plaintiffs had plausibly alleged that defendants breached their fiduciary duty by selecting Ameriprise affiliated funds "to benefit themselves at the expense of participants." *Id*. *28, 30. The court reasoned that defendants' selection of "investment options with poor or non-existent performance histories relative to other investment options that were available to the Plan … instead of more established and better performing alternatives" presented a plausible claim that "Defendants did not discharge their duties solely in the interest of the participants and beneficiaries of the Plans." *Id*. *30.

Here, Plaintiffs similarly allege that despite the availability of high-quality target funds with established performance histories, Reliance replaced the Plan's

target date option which had an established performance history with Reliance's newly-created and untested proprietary funds, which charged an unnecessary and excessive layer of fees not charged by competitor funds. AC ¶¶66–69. In so doing, Reliance transferred $466 million in Plan assets to its new funds, using the Plan as seed money for the new funds, and making the Plan practically the first, and immediately the largest, investor in the funds. *Id.* ¶¶62, 65, 67. Like *Krueger*, Plaintiffs here specifically identify prudent alternatives that Reliance could have chosen. *Id.* ¶¶72–74. Plaintiffs further allege that Reliance selected its target date funds with non-existent performance histories to benefit itself and because they paid revenue sharing to Insperity. *Id.* ¶65. Thus, Plaintiffs have plausibly alleged that Reliance's selection of the Insperity Horizon Risk-Managed Funds for the Plan was "tainted by failure of effort, competence, or loyalty." *Braden*, 588 F.3d at 596.

Plaintiffs do not contend that the "mere fact that the funds were newly-formed" made them imprudent. *Cf.* Doc. 43-1 at 26. Replacing established funds with newly-created proprietary funds that charge additional layers of fees raises an inference that Reliance *acted* imprudently and disloyally, by failing to engage in a reasoned decision-making process and by acting to benefit itself and Insperity at the expense of participants. Nothing in the pleadings indicates, and Reliance does not argue, that Reliance considered the relevant factors and came to a reasoned

decision regarding the investment options it provided, which otherwise appear to be clearly imprudent and unreasonably expensive. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011).

That the managers of the underlying funds may have had experience is beside the point—Reliance itself had virtually no experience managing target date fund allocations. AC ¶64. Although the DOL has suggested that fiduciaries may consider the possibility of "custom" target date funds among a list of other considerations, it does not recommend hiring an inexperienced manager for the task.[5] It is reasonable to infer that Reliance's inexperience contributed to the funds' abysmal performance.

Plaintiffs do not allege that Reliance breached its fiduciary duties *because* the funds underperformed, or that it should have "chase[d] after" higher-performing options. *Cf.* Doc. 43-1 at 27–28 & n.21. The magnitude of the funds' underperformance is the *result* of its breach, and establishes the losses Reliance must make good to the Plan under §1109(a).[6] AC ¶¶70–74.

---

[5] DOL recommends considering whether a "*non-proprietary* target date fund would be a better fit for your plan." (emphasis added), https://www.dol.gov/ebsa/newsroom/fstdf.html.

[6] *See Tatum*, 761 F.3d at 364–65, 369 (once plaintiff shows breach of duty and loss to plan, fiduciary will be liable for monetary losses unless it proves that a prudent fiduciary "would have" made the same decision); *accord Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992)(defendant's

**II.    Count II states a claim based on Reliance's role in allowing excessive recordkeeping and administrative fees to be paid from the Plan.**

The amended complaint explains in detail how Defendants breached their duties in causing the Plan to pay excessive recordkeeping and administrative fees. AC ¶¶75–85, 175–80. Reliance joins Insperity's argument on this point in contending the fees are reasonable but makes no such argument of its own. Doc. 43-1 at 19.[7] Instead, while acknowledging its duty to monitor the reasonableness of payments to the recordkeeper, Reliance claims it was not a fiduciary as to the "retention" of Insperity Retirement Services, because it had no authority under the Trust Agreement to select or remove the recordkeeper, and the Trust Agreement defined the recordkeeper as Insperity Retirement Services. *Id*. at 17–19.

That "Insperity Retirement's recordkeeper role was 'baked' into the agreement's terms" is not a defense. *Cf. id*. at 19. The terms of plan documents do not trump ERISA's strict fiduciary duties. *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2468–69 (2014); 29 U.S.C. §1104(a)(1)(D). Plaintiffs contend that a prudent and loyal fiduciary who was aware that the recordkeeper was receiving excessive fees would have engaged in a process, in consultation with Insperity Holdings if necessary, to review whether changing providers would benefit the

burden to show losses were *not* caused by failure to cure co-fiduciary's breach).
  [7] It should be rejected for the reasons stated in opposition to Insperity's motion.

Plan.

That the Plan designated Insperity Holdings as the fiduciary responsible for choosing the Plan's recordkeeper is also not dispositive. The definition of a fiduciary under ERISA is not limited to those formally designated in the plan documents, §1102(a), but includes those who exercise "functional … control and authority over the plan," as broadly defined in §1002(21)(A). *Hunt v. Hawthorne Assocs.*, 119 F.3d 888, 892 n.2 (11th Cir. 1997)(citation omitted). In light of "the flexible and fact-intensive concept of a 'functional fiduciary' under ERISA," precisely determining "the outer contours" of each defendant's "fiduciary capacities" is generally inappropriate at the pleading stage. *Woods v. S. Co.*, 396 F.Supp.2d 1351, 1365 (N.D. Ga. 2005)(citing cases).[8]

The duty to monitor a recordkeeper's fees cannot be cleanly separated from the decision to retain or replace the recordkeeper. Periodically obtaining competitive bids is often the only way to ensure that a plan is not overpaying. AC ¶44; *see George*, 641 F.3d at 800 (consultant testified that without "a bid from another service provider—it 'could not comment on the competitiveness of [the

---

[8] *See also Rankin v. Rots*, 278 F.Supp.2d 853, 879 (E.D.Mich. 2003)(describing actual fiduciary process as "something of a black box" at the pleading stage); *In re Regions Morgan Keegan ERISA Litig.*, 692 F.Supp.2d 944, 964 (W.D.Tenn. 2010) *Will v. Gen. Dynamics Corp.*, No. 06-698, 2009 U.S.Dist.LEXIS 105987, *10 (S.D.Ill. Nov. 14, 2009); *Tussey v. ABB, Inc.*, No. 06-4305, 2008 U.S.Dist.LEXIS 9806, *21 (W.D.Mo. Feb. 11, 2008).

recordkeeper's] fee amount'"). Regardless of the Trust terms, a prudent and loyal fiduciary who knew the Plan was paying excessive recordkeeping fees would have at least recommended remedial action, including a competitive bidding process and possible replacement. Plaintiffs' allegations show that Reliance failed to do so, and thus "failed to engage in a prudent and loyal process for the selection and retention of a Plan recordkeeper." AC ¶178. At a minimum, Plaintiffs plausibly allege Reliance's liability under §1105(a) for participating, enabling, or failing to rectify its co-fiduciaries' imprudent and disloyal retention of the recordkeeper. *Id*. ¶180.

## III. Count III states a claim based on Reliance's selection and retention of investment options with excessive fees.

Plaintiffs identify 37 funds for which Reliance selected a higher-cost share class for the Plan even though a lower-cost, but otherwise identical, institutional share class of the same fund was available. AC ¶¶93–102. The higher-cost shares paid more in asset-based revenue sharing to Insperity Retirement Services; selecting the lower-cost shares would have eliminated or substantially reduced those payments. *Id*. ¶¶58, 91.[9] In contrast, as a fiduciary of the Insperity Corporate 401(k) Plan, which is about one-tenth the size of the Plan and has much less bargaining power, Reliance selected the lower-cost institutional versions of several

_____

[9] Plaintiffs therefore have not made merely a "bare allegation that cheaper alternative investments exist in the marketplace." *Cf*. Doc. 43-1 at 20 n.7.

of the same mutual funds that are in the Plan. AC ¶¶137–41.

In addition to lower-cost shares of the same fund, for virtually every investment option that Reliance has included in the Plan, there was another mutual fund that charged far lower fees, as would have non-mutual fund alternatives such as separate accounts and collective trusts. *Id.* ¶¶103–27. The investment managers of at least 20 of the Plan's mutual funds also offered their advisory services in the same investment styles through separately-managed accounts, at a much lower cost than the mutual fund. *Id*. ¶¶116–20. The Plan paid up to 1,600% more in annual fees than it would have in the lower-cost alternatives. *Id.* ¶104.

Courts have repeatedly found similar allegations sufficient to state a claim. *Braden*, 588 F.3d at 596 (reversing dismissal of allegations that fiduciaries selected higher cost retail shares "despite the ready availability of better options" in order "to benefit the trustee at the expense of the participants"); *Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470, 477–78 (M.D.N.C. 2015)(plaintiffs stated a claim "based on the imprudent retention of the retail class funds when institutional class shares were available"); *Krueger*, 2012 U.S.Dist.LEXIS 166191, *29–30 (allegation that fiduciary chose a higher-cost share class of one mutual fund instead of lower-cost share which would have provided "identical investment management"); *see also Tibble*, 729 F.3d at 1137 (fiduciaries breached duties by

selecting higher-cost retail shares instead of institutional shares with "no salient differences in the investment quality or management").

Reliance misconstrues this Count as alleging that it was required to "scour the market" to find the "cheapest possible fund (which might, of course, be plagued by other problems)." Doc. 43-1 at 20 (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir.), *supplemented*, 569 F.3d 708 (2009)). The institutional share classes would have required no "scouring" whatsoever; the available share classes are disclosed in a fund's prospectus. Indeed, Reliance was aware of the institutional shares because it used them in the Corporate plan. AC ¶140. And because there are "no salient differences" between share classes, there is no possibility that the institutional shares would be "plagued by other problems."

Plaintiffs do not contend that mutual funds are "categorically imprudent" or that Reliance was required to pick a particular option such as Vanguard or separate accounts, if it reasonably concluded that a different option was preferable after engaging in a reasoned selection process. *Cf.* Doc. 43-1 at 21, 23. Reliance's defense of the supposed virtues of mutual funds compared to separate accounts is thus beside the point. Plaintiffs' comparisons show that there were many high-quality, low-cost alternatives to retail funds available to Reliance—including institutional shares of the same funds, other mutual funds, collective trusts and

separate accounts (AC ¶¶93–127)—yet it wound up picking an investment menu loaded with retail class funds that provided vast revenue sharing payments to Insperity (*id.* ¶¶58, 91). These allegations raise a strong inference that Reliance did not engage in a reasoned decision-making process.

That Reliance eventually included collective trusts in the Plan in November 2012, *id.* ¶¶99–100, does not suggest that it considered such options as part of a regular investment selection process before that date. The only collective trusts Reliance used were *its own* proprietary funds, *id.*, which it included in the Plan because they would pay Reliance and Insperity additional fees, not because they were prudent and in the interest of participants. *Cf.* Doc. 43-1 at 22.

It is also irrelevant that ERISA "expressly contemplates" plan investments in mutual funds under §1002(21)(B). The Plan is among the very largest in the country (AC ¶2); the vast majority of ERISA plans have relatively small amounts of assets and do not enjoy the type of bargaining power that a $2 billion plan can wield. They are relegated to the retail mutual fund market. That does not make mutual funds *per se* prudent for a plan with completely different characteristics.

Reliance's citations to *Hecker*, 556 F.3d 575, *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), and *Tibble*, 729 F.3d 1110, are off-point. Those cases "carefully limited their decisions

to the facts presented" and *Hecker* itself expressly notes that it is "tethered closely" to its facts. *Tussey*, 746 F.3d at 336; *Hecker*, 569 F.3d at 711. As Reliance notes (Doc. 43-1 at 21), they involved challenges to the mere inclusion of mutual funds in a 401(k) plan, and hold that such an allegation, without more, is not enough to state a plausible claim for breach of fiduciary duty. *Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 670; *Renfro*, 671 F.3d at 319; *Tibble*, 729 F.3d at 1134–35 (rejecting argument that retail mutual funds were "categorically imprudent").[10]

That is not this case. Plaintiffs specifically identify mutual funds among the options that would have saved the Plan millions in fees, including institutional version of the same funds that were in the Plan. AC ¶¶93–107.

The use of higher cost retail shares was not justified by their payment of administrative fees. *Cf*. Doc. 43-1 at 24. As explained in Count II, Plaintiffs' calculations show that the amount of administrative fees paid to Insperity Retirement Services were grossly excessive and unreasonable—four to five times higher than market rates. AC ¶81. Had Reliance prudently selected available institutional shares and curtailed revenue sharing, the excessiveness of the administrative fees would have been somewhat ameliorated. While *Tussey* notes that revenue sharing is an "acceptable" industry practice, it also holds that failure

---

[10] *Tibble* does not support dismissal also because it involved a summary judgment.

to "monitor and control" the *amount* of revenue sharing payments is a fiduciary breach. 746 F.3d at 336; *cf*. Doc. 43-1 at 24 n.14. Count III states a claim.

## IV. Count IV states a claim based on Reliance's selection and retention of a microscopically yielding money market fund that failed to provide any meaningful retirement benefits, instead of a stable value fund.

ERISA fiduciaries must act for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." *Fifth Third*, 134 S.Ct. at 2468 (quoting 29 U.S.C. §§1104(a)(1)(A)(i), (ii)). "[B]enefits" refers "to the sort of financial benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries[.]" *Id*. Thus, a prudent person managing an enterprise with the "character" and "aims" of a 401(k) plan seeks "to *maximize* retirement savings for participants[.]" *See id*. at 2467–68 (emphasis added).

The Plan's Federated Prime Obligations Money Market Fund did not provide meaningful retirement benefits to participants. For five years, from 2010 through its removal in 2014, the fund returned 1 bp (0.01%) annually—*one one-hundredth of a percent*—while charging a fee that was *30 times higher* than the fund's return. AC ¶132. Even though the fund returned slightly more in 2009, it was still outpaced eight times over by the return of a typical stable value fund. *Id*. n.51.

The fund's sub-inflationary returns were predictable because it invested in very

short-duration investment vehicles, such as short-term U.S. Treasury notes, which provide minimal returns. AC ¶¶128, 132. In contrast, a stable value fund, which invests in longer-duration instruments, would have provided significantly higher returns with the same liquidity and preservation of principal. *Id*. ¶¶128–31, 133–34; *Abbott v. Lockheed Martin Corp*., 725 F.3d 803, 806 (7th Cir. 2013). The *Abbott* district court denied summary judgment where the fiduciaries operated a so-called "stable value fund" in a manner that failed to keep pace with inflation. *Abbott v. Lockheed Martin Corp*., No. 06-701, 2009 U.S.Dist.LEXIS 26878, *26–31 (S.D.Ill. Mar. 31, 2009).[11] Plaintiffs' allegations here are comparable.

Reliance's effort to distinguish *Abbott* as a "false[] labeling" claim fails. *Cf*. Doc. 43-1 at 29 n.22. The *Abbott* defendants made the same argument, which the Seventh Circuit resoundingly rejected as a "distort[ion]" that "fail[ed] on many levels." *Abbott*, 725 F.3d at 810–11. The court recognized that plaintiffs' theory that a 401(k) investment "was not structured to beat inflation" or "to provide a suitable retirement asset" was a viable claim, *id*. at 811, which is what Plaintiffs assert here. Any mislabeling was merely some evidence of wrongdoing. *Id*.

Plaintiffs do not contend that money market funds are "forbidden" as 401(k) plan investments. *Cf*. Doc. 43-1 at 29. Neither are they *per se* prudent. While

---

[11] *See also Bowers v. BB&T Corp.*, No. 15-732, Doc. 58 (M.D.N.C. Apr. 18, 2016)(denying motion to dismiss claim regarding imprudent money market fund).

fiduciaries may "choose among multiple prudent courses," *id*. 32–33, the choice

cannot be deemed prudent if the fiduciary did not follow a reasoned decision-

making process.[12] *George*, 641 F.3d at 796. That the Department of Labor has

stated that certain money market funds "can" or "may" be prudent investments for

certain plans under certain circumstances, and that some fiduciaries have also

included money market funds in their plans, says nothing about whether those

decisions were prudent under the circumstances facing those fiduciaries, and says

nothing about this money market fund and this plan.[13] *This* fund returned next to

nothing year after year and thus flunked the fundamental purpose of a retirement

plan investment,[14] yet Reliance did not replace it with an option that would provide

---

[12] Reliance cites *Armstrong v. LaSalle Bank N.A.*, 446 F.3d 728 (7th Cir. 2006) for this point, but omits the sentence that follows its quote. "But a discretionary judgment cannot be upheld when discretion has not been exercised … A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Id*. at 733–34. *Buford v. Unum Life Ins. Co. of Am.*, 290 F.Supp.2d 92, 99 (D.D.C. 2003), is inapposite because it involved a §1132(a)(1)(B) claim and the "deferential standard" that applies to such claims, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108, 115 (1989).

[13] Reliance's citation to 72 Fed. Reg. 60452, 60463 (Oct. 24, 2007) does not support its suggestion that the Department has approved money market funds as standalone 401(k) options—the quoted passage, "a component of a … qualified default investment alternative" (QDIA), refers to the underlying components of a "fund of funds" such as a target date fund, which are QDIAs under the regulation. *Id*. at 60461. Any money market holding in such a fund may well be *de minimis*.

[14] While the fund had a 0.01% nominal rate of return, its return was negative on a real (inflation-adjusted) basis, and thus was not "income producing" within the meaning of 29 C.F.R. §2550.404c-1(b). *Cf*. Doc. 43-1 at 29.

a meaningful return until it created a proprietary fund from which it could profit. AC ¶¶132–33, 135.[15] Fiduciaries must periodically review whether an investment remains prudent for the plan. *Tibble*, 135 S.Ct. at 1829. The alleged facts raise a plausible inference that Reliance's investment review process was "flawed" and "tainted by failure of effort, competence, or loyalty." *Braden*, 588 F.3d at 596.

Reliance discusses potential reasons plan fiduciaries "could" decline to invest in stable value funds, Doc. 43-1 at 30–34,[16] but whether *it actually* considered any of those factors involves a factual dispute to be resolved based on evidence, not on the pleadings. *Tibble v. Edison Int'l*, cited by Reliance, was a summary judgment decision based on such evidence. 729 F.3d at 1136. It does not support dismissal.

Reliance's suggestion that stable value funds' withdrawal restrictions are incompatible with the nature of a PEO's plan is undermined by the Plan's current inclusion of a stable value fund. Reliance does not explain what changed in 2014

---

[15] Insperity also profited from the 25 bps in revenue sharing in the Reliance Trust New York Life Anchor Account. AC ¶100. Plaintiffs have plausibly alleged that its fees were excessive. AC ¶135; *cf*. Doc. 43-1 at 35.

[16] Unlike stable value funds, which weathered the financial crisis without losses (AC ¶130), the GAO report cited by Reliance shows that "during 2007 and 2008, many money market funds experienced severe financial difficulties from exposure to losses from debt securities[.]" *401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood*, 21 (Mar. 2011), www.gao.gov/new.items/d11291.pdf; see also *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F.Supp.2d 310 (S.D.N.Y. 2010); Money Market Fund Reform, 74 Fed. Reg. 32688, 32691–94 (proposed July 8, 2009); William A. Birdthistle, *Breaking Bucks In Money Market Funds*, 2010 WIS.L.REV. 1155, 1180 (2010).

or how the Reliance Trust New York Life Anchor Account now in the Plan is supposedly different than the stable value options previously available to the Plan.

It did not require predictive powers to anticipate that stable value funds would continue to provide superior returns after 2009, because they had done so consistently and significantly for the last 20 years, even when interest rates were at higher levels. AC ¶134; Doc. 43-1 at 34. It was not necessarily imprudent to retain the money market fund after one year of "near zero" returns. Doc. 43-1 at 33–34. However, Plaintiffs plausibly allege that a prudent fiduciary fulfilling his duty to review plan investments and remove imprudent ones (*Tibble*, 135 S.Ct. at 1829), and investing as if his own money were at stake (*Unisys*, 74 F.3d at 434), would have taken action at *some* point during the *five years* that participants suffered through 0.01% yearly returns. Then, when it finally added a stable value fund in 2014, Reliance chose a proprietary option that was less than a year old and charged excessive fees compared to similar funds. AC ¶135. Count IV states a claim.

## V.      Counts VI and VII state prohibited transactions claims.

Reliance's only argument for dismissal of Counts VI and VII is that Plaintiffs failed to plead that the transactions do not qualify for an exemption under §1108(b)(8). Doc. 43-1 at 35–36. This argument fails.

"[T]he burden of proof is on a defendant to show that a transaction that is

otherwise prohibited under §1106 qualifies for an exemption under §1108." *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 685 (7th Cir. 2014).[17] Plaintiffs cannot be expected to refute exemptions at the pleading stage, because the facts relevant to the exemption are in the fiduciaries' sole possession. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601–02 (8th Cir. 2009)("It would be perverse to require plaintiffs bringing prohibited transaction claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing."); *Lowen v. Tower Asset Mgmt., Inc*., 829 F.2d 1209, 1215 (2d Cir. 1987)("[B]ecause the fiduciary has a virtual monopoly of information concerning the transaction in question, it is in the best position to demonstrate the absence of self-dealing.").

Reliance relies only on district court decisions to argue the contrary, but they are not persuasive. *Goldenberg v. Indel, Inc*., 741 F.Supp.2d 618, 632 (D.N.J. 2010)(finding *Mehling v. N.Y. Life Ins. Co*., 163 F.Supp.2d 502 (E.D.Pa. 2001) unpersuasive in light of other "well-reasoned precedent").[18]

Even if plaintiffs were required to anticipate it, §1108(b)(8) is inapplicable as a

---

[17] *See also Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994); *Donovan v. Cunningham*, 716 F.2d 1455, 1467–68 & n.27 (5th Cir. 1983).

[18] *Fuller v. Suntrust Banks, Inc*., No. 11-784, 2012 U.S.Dist.LEXIS 56602, *20 (N.D.Ga. Mar. 20, 2012), cites *Goldenberg* for the point that the exemptions "must be affirmatively proven by defendants." *Leber v. Citigroup, Inc*., No. 07-9329, 2010 U.S.Dist.LEXIS 25097, *29 (S.D.N.Y. Mar. 16, 2010), notes that it is the fiduciary's burden to prove an exemption to a §1106(b)(3) transaction.

matter of law. Its purpose is to allow "a company whose business is financial management" to invest its *own plan's* assets in its own affiliated funds, because it would be "contrary to normal business practice to seek financial management services from a competitor." *Krueger*, 2012 U.S.Dist.LEXIS 166191, *40 (citing H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), and Notice of Proposed Rulemaking, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991)). It does not authorize a third-party fiduciary like Reliance to self-deal by investing its *client's plan* in the fiduciary's own proprietary investments.

Moreover, Plaintiffs' allegations show that Reliance received unreasonable compensation from the target date funds by paying itself an extra layer of fees on top of the acquired fund fees, when similar funds do not charge such a fee. AC ¶¶68–69.[19] Reliance's fee was nearly double that of the investment managers of the underlying funds, who do the actual work of portfolio management. *Id*. ¶68. Thus, Plaintiffs' allegations plausibly show that Reliance received more than "reasonable compensation," negating compliance with §1108(b)(8)(B).[20]

---

[19] Reliance's comparison of the total expense ratios of its passively-managed funds to J.P. Morgan's actively-managed funds is inapt. The relevant comparison is the fund-of-funds level fee, because that corresponds to the service provided by Reliance. Reliance charged up to 18 basis points; J.P. Morgan charged nothing.

[20] *Krueger*, 2012 U.S.Dist.LEXIS 166191, *48–49 (allegations that defendants "engaged in self-interested transactions, profited from the management of Plan assets to the detriment of the Plan," and "entered into agreements under which the

As to Count VII, the §1108 exemptions do not even apply to §1106(b) prohibited transactions. In contrast to §1106(a), which refers to §1108, §1106(b) states unequivocally that fiduciaries "shall not" engage in the listed transactions and "admits of no exceptions," even when the "transaction discloses 'no taint of scandal, no hint of self-dealing, no trace of bad faith' and involves 'fair and reasonable' terms[.]" *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 94–95 (3d Cir. 2012)(citation omitted);[21] *Barboza v. Cal. Assn. of Prof'l Firefighters*, 799 F.3d 1257, 1269–70 & n.5 (9th Cir. 2015). Thus, §1108 is not a defense to Count VII.[22]

## VI.   Count VIII seeks appropriate equitable relief.

Count VIII seeks relief under §1132(a)(3) "to the extent" the unlawful fees are not recovered based on the §1132(a)(2) claims in the preceding Counts. AC ¶¶219, 226. Although relief under §1132(a)(3) is generally unavailable if adequate relief is available under another part of §1132(a) (*Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996)), whether such relief will in fact be available cannot be determined at the

---

Plan paid unreasonable fees and expenses" defeated possible exemptions); *Shirk v. Fifth Third Bancorp*, No. 05-49, 2008 U.S.Dist.LEXIS 108089, *45–46 (S.D.Ohio Sep. 26, 2008); *see also Fuller*, 2012 U.S.Dist.LEXIS 56602, *20.

[21] Exemptions are inapplicable to §1106(b) because even when the fiduciary's compensation is reasonable, the very fact that it is receiving a "steady inflow of payments" from the plan can "compromise[] its best judgment as fiduciary," which is what Congress sought to prevent by enacting §1106(b). *Iola*, 700 F.3d at 96.

[22] Even the Insperity defendants concede §1108 does not apply to Count VII. *See* Doc. 41-1 at 31–34, *compare* Argument Part V.B, *with* V.A; *see also* Doc. 51-2.

pleading stage (*Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 727 (8th Cir. 2014)). Count VIII sets forth an alternative theory of liability, which Rule 8(a)(3) and 8(d)(2) allow. *Id.* at 726–28. If Plaintiffs obtain full relief under §1132(a)(2), then the Court "need not reach" the §1132(a)(3) claim. *See id.* at 728 (citation omitted).

Plaintiffs concur that ERISA's equitable remedies are generally limited to recovery of a "specifically identified fund," while other monetary awards are quintessential legal remedies. *Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Ben. Plan*, 136 S.Ct. 651, 658–59 (2016). Plaintiffs seek disgorgement or restitution, which are proper §1132(a)(3) remedies. *Harris*, 530 U.S. at 250, 253. Determining whether Reliance has dissipated the entirety of ill-gotten Plan assets on nontraceable items requires evidence. *Montanile*, 136 S.Ct. at 662 (remanding for evidentiary determination). Plaintiffs cannot be faulted for not yet identifying a specific *res* because they do not have access to Reliance's bank records.

## CONCLUSION

Plaintiffs' allegations show that Reliance Trust Company used a flawed fiduciary process tainted by failure of effort, competence, or loyalty. The Amended Complaint states plausible claims of fiduciary breach and prohibited transactions on which relief can be granted. Reliance Trust's motion should be denied.

July 25, 2016                        Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter (*pro hac vice*)
Michael A. Wolff (*pro hac vice*)
Troy A. Doles (*pro hac vice*)
Kurt C. Struckhoff (*pro hac vice*)
Heather Lea (*pro hac vice*)
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934

*Counsel for Plaintiffs*

/s/ Bradley S. Wolff
Bradley S. Wolff
Georgia Bar No. 773388
SWIFT, CURRIE, MCGHEE, & HIERS, LLP
1355 Peachtree St., N.E., Ste. 300
Atlanta, GA 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
brad.wolff@swiftcurrie.com

*Local Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C. The foregoing was prepared on computer using Times New Roman font (14 point).

/s/ Jerome J. Schlichter
Attorney for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the attorneys of record.

/s/ Jerome J. Schlichter
Attorney for Plaintiffs