# Exhibit 002

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

RONDA A. PLEDGER, *et al.*,

                            *Plaintiffs*,

 v.

RELIANCE TRUST COMPANY, *et al.*,

                           *Defendants*.

Civil Action No.
1:15-cv-04444-MHC

---

## EXPERT REPORT OF GERALD BUETOW

---

March 1, 2018

CONFIDENTIAL

TABLE OF CONTENTS

I.     Engagement ....................................................................................... 1

II.    Qualifications and Experience ............................................................ 1

III.   Executive Summary ........................................................................... 5

IV.    Fiduciary Duties and Responsibilities ................................................ 6

       A.    Selecting, monitoring and removing investments for a DCP ....... 7

       B.    Selecting and monitoring target date funds ............................. 11

       C.    Investment Policy Statements ................................................. 12

V.     Factual background ......................................................................... 14

       A.    Insperity and the Insperity 401(k) Plan .................................... 14

       B.    Reliance Trust ......................................................................... 17

       C.    Plan's Investment Policy Statement ......................................... 20

VI.    The Horizon Funds .......................................................................... 22

       A.    Defendants engaged in a disloyal and imprudent process in
             selecting and retaining the Horizon Funds .............................. 22

       B.    Plan sustained damages because of the disloyal and
             imprudent process of including and retaining the Horizon
             Funds ...................................................................................... 41

VII.   Plan included Share classes of funds that charge excessive fees ... 49

i

## I.      Engagement

1.      I have been retained by Plaintiffs' counsel in this matter to provide

expert analysis and opinions related to the investment decisions and

related matters concerning Defendants' selection, monitoring and/or

retention of the Insperity Horizon Risk Managed Target Date Funds

("Horizon Funds") that were included in the Insperity 401(k) Plan. I have

also been retained to provide expert analysis and opinions related to

higher-cost, share classes of investments offered in the Plan.

2.      I am compensated at the rate of $375 per hour. My compensation

is not dependent on my opinions or on the outcome in this matter. My

opinions are based on my review of the documents in this case, deposition

testimony, and my professional experience. My opinions on this matter are

ongoing. I specifically reserve the right to supplement, revise, or amend

these opinions.

3.      A list of the materials considered in this matter is attached hereto

as **Exhibit 1**.

## II.     Qualifications and Experience

4.      In February 1998, I formalized my consulting efforts by creating

BFRC Services, LLC ("BFRC"), a financial consulting firm located in

Charlottesville, Virginia.  I have served as President of BFRC since January

1

2000.

5.     From March 1998 to December 1999, I was Vice President of Curriculum Development and a consultant for the Chartered Financial Analyst Institute ("CFA").  My primary responsibility at the Institute was the development of curriculum for the Chartered Financial Analyst ("CFA®") program.  A critical role involved the writing and editing of in-depth portfolio management educational materials. This included editing several cutting-edge textbooks in both Portfolio Management and Quantitative Methods. I also sat on the Senior Investment Committee for the Institute's Defined Contribution Plan (as noted again below, I refer to Defined Contribution Plans generally herein as "DCP(s)").

6.     Concurrent with some of my work for the Institute, I was the Wheat First Professor of Finance and Director of the Quantitative Finance program at James Madison University in Harrisonburg, Virginia.  Among my responsibilities at James Madison was the development and teaching of Investment classes at both the graduate and undergraduate levels. I also assisted with oversight of the student-run equity fund. During my tenure at James Madison (namely from June 1996 through August 1997), I also served as lead quantitative researcher for Prudential Investment's Quantitative Investment Management Group.  In that position, I managed

enhanced equity index funds, developed structured securities, and participated as a discretionary manager for several pension funds.

7.     Later, I also served as a consultant for a firm called mPower (subsequently, 401k Forum which merged into Morningstar). In this role, I developed algorithms mapping existing DCP plans to asset classes to determine diversification characteristics within plans; additionally, this role included creating a new DCP using investment options that ensured theoretically and conceptually defensible and optimal wealth strategies.

8.     As the Director of Research at Atlantic Asset Management I was responsible for the development of Strategic ("SAA") and Tactical Asset Allocation ("TAA") for various pension funds. In that role, we were given discretion by the fiduciary over multi-asset pension funds using derivative-based overlay strategies.  We also served in a monitoring capacity for underlying asset managers. As a consultant, I performed extensive due diligence on asset managers quantifying and advising clients on the performance of multi-asset class investment solutions in both the Defined Benefit Plan (DBP) and DCP space. Quarterly and annual due diligence was performed as part of this role. This included using advanced quantitative methodologies such as multi-factor analysis, optimization routines, and attribution techniques. I also developed sophisticated SAA

3

and TAA algorithms during this time that were subsequently used as the genesis of two investment firms based exclusively on Exchange Traded Fund (ETF) strategies. Eventually, I became Chief Investment Officer (CIO) responsible (fiduciary and discretionary) for various multi-asset investment solutions specifically designed to ensure proper diversification within the DCP space. These roles were all encompassing in terms of the management, monitoring, operation, and administration of several multi-asset investment portfolios. The strategies included Target Date funds, TAA strategies using both relative and absolute risk management, and various leveraged alternatives. Many of these investment strategies were part of DCPs. In the capacity as a CIO, I am intimately familiar with the phenomenon of perfect hindsight and so it is with great care that I evaluate the performance history of a portfolio manager and the activities of fiduciaries.

9.      Most recently I served in a consultant capacity for the development of several hybrid multi-asset class investment solutions deploying both ETFs and mutual funds. The target space for these strategies is DCP. This included extensive due diligence across both the ETF and mutual fund space to ensure that proper diversification characteristics were met and that optimal asset class targets developed.

4

10.   I also have taught and developed Advanced Portfolio Management classes at Washington and Lee University and George Washington University. Current research includes analyzing performance of active investment strategies underlying several ETFs. This research includes running econometric factor analyses to determine sources of risk and return. I have spent most of the last two decades conducting research in the management of multi-asset class portfolios for wealth solutions including the retirement space.

11.   I have also authored numerous publications in various academic and practitioner journals such as the Journal of Investment Management, the Journal of Fixed Income and the Journal of Portfolio Management among others.  I have also contributed extensively to several edited works such as the Handbook of Finance, the Handbook of Fixed Income, and the Encyclopedia of Financial Models among others. I also serve as an editorial board member to the Journal of Portfolio Management. Moreover, I have written two books in the area of investments.

12.   I hold both the CFA® and the CIPM designations in addition to my formal education. A copy of my curriculum vitae is attached as **Exhibit 2**.

III.   **Executive Summary**

13.   Although all my opinions are set forth in full in this report, the below

provides a brief summary of my primary opinions.

   a. Plan fiduciaries failed to properly and loyally assess the reasonableness of including and retaining the Horizon Funds;

   b. Plan fiduciaries improperly and disloyally removed the JP Morgan Target Date Funds from the Plan;

   c. Plan fiduciaries failed to properly consider alternative target date funds; and,

   d. Plan fiduciaries included higher-cost share classes of Plan investments.

## IV.    Fiduciary Duties and Responsibilities

14.   A fiduciary of a DCP who is responsible for investing plan assets is held to strict fiduciary standards under the Employee Retirement Income Security Act of 1974 (ERISA). The fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries". 29 U.S.C. §1104(a)(1). He must act "for the exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan". 29 U.S.C. §1104(a)(1)(A). And, of critical importance when making investment decisions, the fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

6

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(B). Throughout this report, I describe the actions of a "prudent fiduciary", which to refer to the actions of fiduciaries of a DCP acting in accordance with these standards.

15.   It has been my experience that best practices within the defined contribution space require that the DCP fiduciary be accountable for three primary functions. First, the fiduciary is responsible for maintaining a DCP after conducting appropriate due diligence for each investment option that enables the plan participant to obtain an optimal asset allocation. Second, the fiduciary should educate participants to ensure that they understand the basic principles of diversification and accumulating wealth. Within this function, the fiduciary should outline recommended default allocations across the DCP. Finally, the fiduciary must regularly monitor the investment performance of the plan overall and at the fund level at least quarterly. As part of the due diligence process, the fiduciary eliminates underperforming funds.

**A.   Selecting, monitoring and removing investments for a DCP**

16.   Standard fiduciary best practices include several relative performance criteria for inclusion, monitoring and replacement of a fund in

a DCP. Performance monitoring and manager due diligence is an essential

role of the fiduciary. This includes the establishment of minimum thresholds

required for inclusion and retention of funds.

17.   A prudent fiduciary designs an investment lineup that includes

passively managed alternatives for all capitalizations and investment styles.

This is an established best practice because, properly measured, actively

managed investments tend to underperform passively managed

investments net of fees over time.[1] Actively managed alternatives should

be used as a complement to passively managed alternatives.

18.   An actively managed fund must have at least a five-year

performance history to be considered a candidate fund for a DCP. In order

to conduct appropriate due diligence of a fund, a sufficient performance

history is required. A live performance history of at least five years will

enable the fiduciary to evaluate the investment process of the investment

manager, risk and return characteristics of the fund, and the adherence to

the fund's investment style and strategy over a full market cycle. A ten-year

performance history is preferred to conduct this analysis.

---

[1] E.g., William F. Sharpe, *The Arithmetic of Active Management*, 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991), https://web.stanford.edu/~wfsharpe/art/active/active.htm; Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.479.3099&rep=rep1&type=pdf .

19.   Following this thorough analysis, the fiduciary must make a reasoned determination that the actively managed fund is likely to generate returns in excess of the benchmark index and fees in subsequent periods.

20.   My experience has been that a typical DCP fiduciary will thoroughly monitor a DCP's performance, including each investment option at least on a quarterly basis. An actively managed fund's time-weighted returns and volatility of returns over the prior rolling three-year period must compare favorably with the performance of the appropriate benchmark index or passively managed equivalent. When the fund's prior rolling three-year performance falls below the benchmark, the fiduciary would remove (and replace if necessary) the fund from the DCP. It has been my experience that if a fund underperforms the proper benchmark for three-years trailing, then it is highly unlikely it will outperform in the coming years. Moreover, the path to meeting this criterion would have included several other triggers whereby the fiduciary would have initiated other analysis and communicated accordingly to the underperforming manager. With this in mind, this measure is an objective amalgam of several factors.

21.   To appropriately evaluate a candidate fund for inclusion in the DCP, the fiduciary would perform proper Performance Measurement Evaluation (PME), attribution (or an analysis to determine why a fund's

performance differed from the benchmark), and, preferably, demanding

Global Investment Performance Standards (GIPS) compliance for reported

investment results. PME includes: evaluating an investment option's

annualized and rolling historical performance over one-, three-, five-,

seven-, and ten-year periods, if available; style exposure over prior periods;

risk-return profile; and other quantitative measures.

22.   Triggering events must be recorded and thoroughly evaluated.

These triggering events that require additional due diligence by the

fiduciary to determine whether the fund should be maintained in the DCP

include personnel turnover in the fund management, changes in investment

style of the portfolio, and failure to adhere to the stated investment

approach or strategy. The evaluation must include standard due diligence

procedures particularly once short-term metrics begin to deteriorate. These

standard measures include a performance measurement evaluation of

quantitative data and a detailed evaluation of qualitative information to

understand the reason for the investment underperformance.

23.   The fiduciary of the DCP may engage the services of an

investment consultant to assist in the selection, monitoring and removal of

investment options. The fiduciary is required to conduct an independent

investigation of the analysis and recommendations provided by the

consultant to ensure that each investment option is appropriate for

inclusion or retention in the DCP. The fiduciary should also request

additional and extensive analysis on any fund that has experienced a

triggering event or any kind of unexpected performance.

**B.    Selecting and monitoring target date funds**

24.   Target Date Funds ("TDF") funds have become common

throughout the DCP space and have often become the Qualified Default

Investment Alternative ("QDIA") for many plans. TDF funds offer a multi-

asset class investment solution across a wide spectrum of asset classes. In

general, they offer diversification and a dynamic transition from an

aggressive to a conservative asset allocation as the assumed investment

horizon decreases. The investment horizon is based on the target date of

the fund and presumably represents the approximate retirement date of the

investor. The transition is often referred to as a glide path. Throughout the

industry, the glide path is conceptually consistent across TDF offerings.

Variation exists but generally the theoretical underpinnings are consistently

applied as a function of investment horizon. Depending on the TDF, the

strategy can be defined as either a "to" or a "through" strategy. A "to"

strategy becomes a static asset allocation upon hitting the Target Date; a

"through" strategy continues to transition to a static allocation for a period

following the Target Date. The Horizon Funds discussed herein were of the "to" variety.

25. Finally, TDFs operate using a fund of funds approach; this simply means that each asset class within the TDF strategy is populated by an existing fund. These underlying funds can be actively or passively managed. Generally, and as discussed below, the Horizon Funds used passively managed funds to represent the asset classes. The exceptions were the commodities and high yield allocations.

26. The asset allocation associated with the glide path for a TDF is vitally important in ensuring that plan participants are exposed to an appropriate multi-asset class solution where the diversification and risk-return tradeoff is optimal. The asset allocation decision is the most important decision that a long-term investor makes.

**C. Investment Policy Statements**

27. A well-structured Investment Policy Statement ("IPS") serves as the foundation of the investment framework. It is normally composed of a set of risk and return objectives and various constraints (liquidity requirements, time horizon, tax considerations, legal and regulatory, and

12

any unique circumstances).[2] Partly due to where the discretion lays within a DCP, the DCP IPS must have some distinguishing features. The role of the fiduciary is to ensure that appropriate investment options are available to ensure the participants' investment goals can be achieved.

28.   Also, the IPS, must account for the human capital diversification as well. It must clearly set criteria for how a fund is monitored, replaced, and included in the plan. It should outline the due diligence criteria of candidate funds. It also should outline the educational responsibilities of the fiduciary for the benefit of the participant. A primary criterion for a fund's inclusion and/or retention is a three-year favorable performance comparison relative to an appropriate passively managed index investment alternative or passive benchmark.

29.   Further, the IPS should also include the operating procedures in the event of sequentially deteriorating funds so the preparation of replacing funds is smooth and minimizes disruptions to plan participants. In my experience, if an actively managed fund does not have a minimum five years of performance history, it would not get through any reasonable due diligence screening process. In the case of TDFs, a three or four year history might be acceptable, depending on the unique facts and

---

[2] J. Maginn, D. Tuttle, J. Pinto, and D. McLeavey, *Managing Investment Portfolios: A Dynamic Process*, CFA INSTITUTE (2007, 3rd ed.).

circumstances, as long as the underlying funds met the five year performance history criterion.

30.    Once an IPS is adopted by the fiduciary to govern the selection, monitoring, and removal of investment options included in the DCP, the fiduciary must follow its terms and those terms should be objectively applied. Failure to follow the terms of an IPS is direct evidence that the fiduciary failed to employ a prudent investment process. This is because the IPS represents the standards set by the fiduciary to govern its conduct.

31.    The terms of the IPS should never be amended in order to include or remove an investment options that that would otherwise not be included or remain in the DCP. Changes to an IPS must always be done to ensure that plan participants are being served optimally.

## V.    Factual background

### A. Insperity and the Insperity 401(k) Plan

32.    Insperity, Inc. ("Insperity") is a company that provides outsourced human resource services and employee benefits to small and medium-sized businesses. Insperity's stated strategy is to offer and leverage its buying power to provide valuable services to its clients.[3]

33.    Part of the benefits Insperity provides its worksite employees is a

---

[3] https://insperityinc.gcs-web.com/static-files/66dfc19c-424a-4026-9550-b9a6e9fc6fcd, *4.

retirement plan known as the Insperity 401(k) Plan ("Plan"). The Plan is a defined contribution 401(k) plan that is sponsored by a subsidiary of Insperity known as Insperity Holdings, Inc. ("Holdings"). In addition to serving as the Plan's sponsor, Holdings serves as the Plan's administrator.

34.    Holdings, as the plan sponsor and plan administrator acts through its Board of Directors. During the relevant time period, the Board of Directors for Holdings consisted of Paul J. Sarvadi – Chief Executive Officer of Insperity, Richard G. Rawson – President of Insperity, and Daniel D. Herink – General Counsel of Insperity. Ex. 2, Ex. 3 at NSP-000026644, Ex. 4, Ex. 7.

35.   From 2009 to 2016, Plan has increased in plan assets of $990 million to $2.7 billion. Plan Forms 5500 from 2009 and 2016.

36.   In December of 2003, Holdings entered into a Trust Agreement with Reliance Trust, Inc. ("Reliance") in which Reliance would serve as a discretionary trustee for the Plan with authority to manage and control the investments of the Plan. Ex. 8 at NSP-000026754. In particular, for the Plan, Reliance had authority regarding researching, selecting, monitoring and replacing investment offerings made available in the Plan and providing quarterly investment performance analyses and reports for the investments in the Plan to Holdings. *Id.* at NSP-000026758–59.

15

37.   Per the term of the Trust Agreement, the authorized investments available for inclusion in the Plan included "bonds, debentures, notes or other evidences of indebtedness; stocks (regardless of class) or other evidences of ownership in any association, business trust, corporation, investment company and mutual fund, annuity contracts (other than life annuity contracts unless the Plan provides for distribution in such form), guaranteed income or investment contracts, and certificates of deposit, savings accounts and interest-bearing deposits in any depository institution (including if applicable the Trustee of any affiliate of the Trustee)". *Id.* at NSP-000026763

38.   Per an amendment to the Trust Agreement, the authorized investments available for inclusion in the Plan was broadened to include "collective investment funds…that a bank or trust company maintains "(including collective investment funds or group trusts that the Trustee [Reliance] maintains)." Ex. 152 at NSP-000032793. This amendment allowing these additional types of authorized investments was fully executed in January of 2013. NSP-000040710, NSP-000040712.

39.   This development introduced a clear conflict of interest between Reliance's business decisions and the Plan's best interests. Academic research exists that shows that the existence of proprietary funds within a

16

plan can negatively impact the decision making of fiduciaries.[4]

Underperforming proprietary funds tend to be retained in plans even when

it is clearly not in the best interest of plan participants. This bias is best

avoided by not including proprietary funds of a fiduciary within a DCP.

### B.    Reliance Trust

40.    Reliance Trust Company is a trust company that provides wealth

management and retirement investment offerings along with retirement

trust and fiduciary services.

41.    In conducting its business, Reliance was comprised of a variety of

committees with a bottom-up reporting structure. Ex. 33, 34,

RTCPLEDGER00002778.

42.    Relative to the selection, retention and ongoing due diligence of

third party investment managers hired by Reliance, the Reliance Manager

Due Diligence Committee ("MDDC") was provided oversight of and

performed "due diligence on all of the third party investment managers"

Reliance utilized in "its discretionary investment programs." Ex. 34 at

RTCPLEDGER00303493. Essentially, this was the first stop committee for

investment manager hirings, firings, and monitoring.

---

[4] *See* Pool, V., C. Sialm and I. Stefanescu, 2016, It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans, Journal of Finance 71 (4), 1779-1812.

43.   The MDDC was to review "manager performance, highlight qualitative aspects of each manager such as corporate, legal or regulatory issues and changes in key people or investment process." *Id.*

44.   The MDDC was to provide quarterly performance reviews of all managers utilized by Reliance including "subadvisors utilized" in collective investment trusts ("CITs") and provide information "pertaining to notable performance, compliance exceptions, manager additions or removals and managers who have been added to or removed from the [Reliance] 'watch list'" to the Reliance Investment Policy Committee. *Id.* During the relevant time period, Nick Cotter was the chair of the MDDC. Ex. 46.

45.   In performing its due diligence, the MDDC would typically complete its "Investment Manager Due Diligence" questionnaire and report up to the Investment Policy Committee. Ex. 41; Cotter Dep. 21:22–25:1.

46.   The actions of the MDDC were then reported to the Reliance Investment Policy Committee ("IPC"). RTCPLEDGER00002778. The chair of the MDDC, Mr. Cotter, was a member of the IPC as was Mr. William Harlow, head of Reliance's Retirement Strategies Group (sales) and Mr. Mark Teichner, Chief Investment Officer of Reliance, among others. *Id.*; Ex. 44. Membership of the IPC was determined by the Board of Reliance. RTCPLEDGER00389291.

18

47.    In addition to reviewing the actions taken by its subcommittees, the IPC, among other things, was responsible for the oversight of the "operation and administration of collective investment funds managed by" Reliance. RTCPLEDGER00162267 at RTCPLEDGER00162268.

48.    The IPC in turn reported to the Trust Committee. The Trust Committee was responsible for reviewing and approving the actions of the standing fiduciary committees, including the IPC. RTCPLEDGER00162267.

49.    The Trust Committee was responsible for approving "the plans of operation of all collective investment funds of the Trust Company and amendments to such plans of operation, and all ancillary agreements required or appropriate for implementation of such plans of operation, and exercise general supervisory authority over all such collective investment funds and their operations and activities." *Id.*

50.    In performing its duties in selecting and retaining investments, Reliance maintained written processes relating to the analysis and selection of third party managers, including a host of qualitative and quantitative measures such as the following:

      a.  Management experience and tenure;

      b.  Historical absolute performance, historical relative performance (comparison to peers), performance consistency, up and down

market capture ratios;

    c.  Portfolio statistics (examples: Beta Sharpe Ratio, Alpha, Standard Deviation, Information Ratio);

    d.  Operational capabilities/fees and expenses/portfolio turnover;

    e.  Historical and current portfolio composition /position concentrations; and,

    f.  Style analysis and factor weightings.

See, e.g., Ex. 54 (Mutual Fund Approved List).

**C.   Plan's Investment Policy Statement**

51.    Starting in at least in 2010, the Plan fiduciaries adopted an Investment Policy Statement. Ex. 148. Per the Plan's IPS, among many other responsibilities, Reliance was responsible for "ensuring that a disciplined investment process is established and maintained" to meet the fiduciary responsibilities owed to the Plan and its participants. *Id.* at 7. Further, per the IPS, Reliance was "responsible for managing the investment process." *Id.* at 8.

52.    Reliance was further required to "[u]se the same care, skill, prudence, and due diligence under the circumstances then prevailing that experienced investment professionals acting in a like capacity and fully familiar with such matters would use in like activities for like retirement

plans with like aims in accordance and compliance with ERISA and all applicable laws, rules, and regulations." *Id*. at 8.

53.   Reliance was required to select funds based on a variety of metrics including quantitative, "fundamental", and qualitative analyses. Ex. 20 at NSP-000023377. This included a ranking of all managers from the particular universe being considered, performance analysis, fee analysis, and a qualitative analysis, including, among other items, the experience, and stability of the managers. *Id*.

54.   The selection criteria were laid out in more detail in the IPS. Per the IPS, the "investment portfolio's inception date will normally be greater than three years." Ex. 148 at 10. This performance history specifically applied to any target date fund selection. *Id*. at 11. In addition, the IPS had style consistency requirements and quantitative factors including the manager's organizational stability. *Id*. at 10.

55.   The selection of target date funds and qualification of those funds as the QDIA was also, per the IPS, subject to several criteria. *Id*. at 11. The regulations and requirements for the selected funds to qualify as the Plan's QDIA were specifically set forth in the IPS. *Id*.

56.   In monitoring the funds included in the Plan, Reliance could place a fund on a "Watchlist" if one or more of the following criteria applied:

a. fund performed below the median for its peer group over a 1, 3, and 5 year cumulative period;

b. fund's 3 year risk adjusted return fell below the peer group's median risk adjusted return;

c. a change in fund portfolio management;

d. a significant decrease in the fund's assets;

e. the fund manager deviated from the fund's stated style and/or strategy;

f. an increase in the fund's fees and expenses; and,

g. an extraordinary event occurred that "may interfere with the manager's ability to fulfill their role in the future";

Ex. 145 at 12−14, Ex. 20 at NSP-000023378.

## VI.  The Horizon Funds

### A. Defendants engaged in a disloyal and imprudent process in selecting and retaining the Horizon Funds

57. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

58.   A collective investment trust or "CIT" is an investment operated by a bank or trust company that consists of a group of pooled trust accounts.

They are not registered products and are exclusive to retirement plans.

59. 

60.

61.    The AlphaSector strategy, purportedly developed by F-Squared, was designed to provide "risk controls for down markets, and participation in up markets." Ex. 42 at RTCPLEDGER00398691. In my experience, this is a common goal for any active manager and an objective of every investor. In order to protect investments during the down markets and participate in up markets, the AlphaSector strategy would make decisions to either eliminate or include specific investments. Ex. 42 at

RTCPLEDGER00398695. The AlphaSector strategy was marketed to Reliance, among others.

62.   In its marketing efforts, F-Squared disseminated, as explained below and as later admitted by F-Squared, "clearly overstated" returns: *Id.* at RTCPLEDGER00398691.[5]



**Cumulative Returns:  Comparison vs. S&P 500**

[1]*April, 2001 – December, 2010*
[2]*Source: NASDQ OMX, Morningstar, Active Index Solutions*

Copyright 2010 – Confidential; Patents Pending.  Please see "Important     5
Information" on last page for disclosures that are an integral part of presentation.

63.   In the "Important Information" contained in the F-Squared

---

[5] As explained below, and as a result of a Securities and Exchange Commission investigation, F-Squared later admitted that these returns were "clearly overstated." RTCPLEDGER00303916

performance materials, F-Squared provided the following information about these performance results:

> The Indexes are based on active strategies, with the strategy that the AlphaSector Rotation Index and the AlphaSector Premium Index are based on having an inception date of April 1, 2001.  The process of converting the active strategy to an index implies that the returns presented, while not backtested, reflect theoretical performance an investor would have obtained had it invested in the manner shown and does not represent returns that an investor may have actually attained as an investor cannot invest directly into an index.  Theoretical  and hypothetical performance has many inherent limitations.  The performance is adjusted to reflect the reinvestment of dividends.  The fee schedule are included in the client agreement.  F-Squared's fees are available upon request and also found in Part II of its Form ADV.  Past performance is no guarantee of future results.

*Id.* at RTCPLEDGER00398701.

Even this disclaimer contains contradictory statements. The second sentence makes clear, by definition, that this is backtested data.  This language  somehow confuses the idea that by creating an "index," the concerns with backtesting data is avoided. This should have been a tremendous red flag to any fiduciary. It represents a gross conceptual error that was never addressed by Reliance.

64.   Even though F-Squared and its AlphaSector strategy bypassed the Reliance MDDC due diligence process and vetting, Reliance competed in a request for proposal for the right to venture with F-Squared in marketing Reliance's CITs using the AlphaSector strategy models. Ex. 38 ("F-Squared Investments Collective Trust RFP").

65.   ███████████████████████████

███████████████████████████████████

████████████████████████████████

████████████████████

66.   As noted above, in December of 2010, Reliance won the F-Squared business and the right to be the "partner" with F-Squared on the "development and launch of [F-Squared's] Alpha Sector Premium Collective Trust into the group retirement marketplace." Ex. 38 RTCPLEDGER00056461.

67.   Prior to "winning" F-Squared's business, there is no indication that Reliance's MDDC or IPC vetted or performed any of its standard due diligence on F-Squared or its AlphaSector strategy. Ex 41, 44, and 46. Rather, by all accounts, almost a month *after* Reliance won the F-Squared CIT business did members of Reliance's IPC or the MDDC even receive materials from F-Squared. Ex. 40, 41, 42.

68.   The materials received by Reliance from F-Squared at this time were basic information about F-Squared's personnel and investment performance marketing materials. Exs. 41, 42.

69.   The marketing material provided to Reliance from F-Squared contained express language in the disclaimer sections that the performance history of F-Squared's AlphaSector strategy was hypothetical and backtested. Ex. 42 at RTCPLEDGER00398701. Indeed, Mr. Cotter of Reliance, and chair of the MDDC at the time, noted to others internally at

Reliance that the performance information was not based on live or actual performance history. Ex. 45. At that time, Mr. Cotter inquired if F-Squared explained these statements. *Id.* ("According to the footnotes in the last page of the presentation, the performance for the strategy is theoretical. At least that's what I think it says. Did they talk about that on the call?").

70.   In early 2011, and while Reliance was in the development stage with F-Squared in constructing their new CIT investments with the AlphaSector strategy, as well as using the AlphaSector signal within a target date fund application, Reliance prepared its annual Trustee Report for Holdings regarding the Plan, including the Plan's investments. Ex. 20. As noted above, Reliance provided these reports only annually to Holdings.

71.   In that March of 2011 Trustee Report, Reliance specifically noted that the JP Morgan SmartRetirement Funds ("JP Morgan TDFs"), the Plan's target date funds at that time, were added to the Plan in 2010 replacing the Fidelity Freedom Funds. Ex. 20 at NSP-000023385. At that time, Insperity was reminded that the Freedom Funds "were put on watch in Q1 2009 due to poor performance" and were "no longer best-in-class." *Id.*

72.   Indeed, as a result of target date search conducted by Reliance in February of 2010, Reliance performed a thorough search of the universe of

target date funds in the market at that time and screened those funds based on objective quantitative and qualitative fund screening criteria. Ex. 36.

73.  From these types of searches, Reliance developed an approved list of funds, including target date funds. Ex. 54. These approved funds included target date funds, including target date funds offered by JP Morgan, T. Rowe Price and Vanguard. See, e.g., RTCPLEDGER00179519.

74.  The JP Morgan TDFs, as noted at that time, consisted of a "glidepath designed based on real life 401(k) participant behavior", strong underlying funds with a "broadly diversified exposure to investment strategies that charged "low expense ratios." Ex. 20 at NSP-000023385. The JP Morgan TDFs were added to the Plan in 2010 as a result of this search and were the Plan's QDIA investments. RTCPLEDGER00155172.

75.  Despite the historically strong performance of the JP Morgan TDFs, Reliance continued to move forward in May of 2011 in its venture with F-Squared in the development of its CITs, including target date fund CITs. Cotter Dep. 33:13–16; Ex. 23; Ex. 44 at RTCPLEDGER00003309 (May 18, 2011)

76.  In particular, on May 18, 2011, and rather than going through the

28

typical MDDC process in evaluating a new manager and/or its product offerings, Reliance's IPC met to "review and approve" F-Squared Retirement Solutions as a sub advisor for Reliance's CITs. Ex. 44 at RTCPLEDGER00033098. Reliance's IPC approved F-Squared based on, by all accounts, a few of the IPC's members' previous review of F-Squared's product information and a discussion with F-Squared on a phone call. *Id.* As mentioned below, the MDDC did not even mention or reference F-Squared until almost a year later, in March of 2012. Ex. 46 at RTCPLEDGER00023644.

77.  ███████████████████████████████████████████████████

█████████████████████████████████ Reliance and Insperity started discussions in Summer of 2011 about the development and deployment of a new suite of TDFs in the Plan that would also serve as the Plan's QDIA. Ex. 23, 24, 56. These discussions included naming or branding the funds "Insperity." Ex. 56, Ex. 25 at RTCPLEDGER00414670. At this time, the Plan's current TDFs, the JP Morgan TDFs, have almost $400 million in Plan assets (Ex. 55 at RTCPLEDGER00423242) and were admittedly performing well. Cotter Dep. 33:13−16.

78.  Critically, Reliance and Insperity were having these business discussions despite the fact that Reliance had no experience in creating,

operating or managing TDFs and glide paths for TDFs. Cotter Dep.

29:12−32:9; Ex. 23 at NSP-000096478.

79.   Although I see no indication that Reliance conducted an actual

search for new TDFs in the Plan (albeit JP Morgan, T. Rowe, and

Vanguard were already on Reliance's approved list of vetted target date

funds), two potential target date funds were identified as replacements for

the JP Morgan TDFs. Ex. 25. One of these candidate replacement TDFs

not surprisingly included the Reliance CITs that were *in development*

between Reliance and F-Squared. *Id*.

80.   Near the end of 2011, there is compelling documentation that

Reliance and Insperity ultimately agreed to move forward with the new and

proprietary Reliance CIT TDFs. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

81.   Despite these dealings, only on March 6, 2012 did Reliance's

MDDC first mention F-Squared. Ex. 46 at RTCPLEDGER00023644. With

no record that the MDDC fully vetted F-Squared, the MDDC noted that new

Reliance CIT target funds were to be added in the Plan replacing the JP

Morgan TDFs and Reliance intended to contract with F-Squared to provide

30

its AlphaSector signal in the "guidance on the tactical overlay decisions" for the TDFs. *Id.* at RTCPLEDGER00023644−45. The MDDC then approved at the same meeting its underlying investment strategies for these funds and a glide path for these funds. *Id.* at RTCPLEDGER00023645.

82.   I can find no documentation adequately explaining exactly how this signal, a domestic large cap sector model, would translate into a TDF containing multiple equity and non-equity allocations outside the fixed income targets. With my experience and training, it is extraordinarily difficult to comprehend how a DCP fiduciary would not raise the most basic due diligence questions regarding both the signal generation and how to properly interpret it. Moreover, I am unable find any adequate and supporting documentation that thoroughly explains exactly how the tactical asset allocation decision would be implemented within the context of the TDF strategies.

83.   In these meeting minutes of the MDDC there is no discussion regarding any search for alternative TDF providers for the Plan or any discussion about any concern related to the performance of the JP Morgan TDFs. Further, I see no discussion that the JP Morgan TDFs were excessively priced or did not provide adequate protection to Plan participants.

31

84.   Just eight days following this MDDC meeting, on March 14, 2012, Reliance provided its Trustee's report to Insperity. Ex. 43. In this report, Reliance noted the upcoming changes to the Plan's investment options to include the Reliance TDFs. Ex. 43 at 36, 48–54.

85.   Despite the lack of any meaningful due diligence by either Reliance or Insperity, the listed reasons for replacing the outperforming JP Morgan TDFs was a "desire for a more cost-effective approach" and "more robust risk-management capabilities." *Id*. at 36. The listed highlights in adding Reliance's to-be-launched "Risk Managed Target Date Funds" were the following:

  a.   the Horizon Funds followed a "Target-To" glide-path ("most conservative allocation reached at the stated target date");

  b.   the underlying portfolio investments charged low expenses; and,

  c.   the F-Squared "[r]isk managed … tactical overlay" AlphaSector Premium Strategy meant to "reduce equity exposure during down markets while participating in up markets."

*Id*. at 36.

86.   This Reliance-issued Trustee Report expressly contained what Insperity and Reliance knew to be "back-tested" and hypothetical (i.e.,

32

fictional) performance history. *Id.* at 51−54.

87.    Indeed, in the months leading up to the inclusion of the new Horizon Funds in the Plan, Reliance specifically informed Insperity that the performance history of the anticipated new funds was "back-tested" that meant its performance history had "limitations." That is an understatement. From my review of the documentation, no adequate efforts were made to address these "limitations." Ex. 43 at 51–53; Ex. 81.



Ex. 43 at 51.

88.    Despite the above, in November 2012, the "Insperity" branded Horizon Risk Managed Target Date Funds (ie. the Horizon Funds) were added to the Plan and the JP Morgan TDFs were replaced. Ex. 21 at RTCPLEDGER00154476.

89.    As noted above, Reliance had no experience in creating target

date funds or constructing a glide path. In addition, F-Squared serving as an advisor/consultant, provided the AlphaSector signal (again, a domestic large cap signal being applied across all asset classes outside fixed income) to be used in implementing the tactical asset allocation changes to the TD funds. This was supposedly being done to offer downside protection to the TD funds. Ex. 70 at RTCPLEDGER00065718, Ex. 43, Ex. 74.

90.   As noted below, there are no materials that appropriately or sufficiently address how these funds, the Horizon Funds, operated or how either the allocations or the glide path was created. Ex. 46 at RTCPLEDGER00023644 (March 6, 2012 meeting and materials). The material that was provided merely illustrates summary top line performance statistics for hypothetical portfolios using unsubstantiated signals from a third-party provider, F-Squared, that owns the intellectual property. Moreover, the hypothetical returns are not explained in any kind of detail on how they were generated, how the trades were executed, who/what executed those trades, how F-Squared signals were to be interpreted and why, among many others. The F-Squared presentations are simply of no value.

91.   In my experience, I can think of no situation where a decision of this magnitude, a 401(k) plan with almost $400 million at stake for this

34

single suite of investments, could have possibly have been made with such a lack of information and due diligence. To replace an existing manager, the JP Morgan TDFs, which are admittedly meeting expectations with proprietary funds that are untested and largely based on unverifiable hypotheticals is inconsistent with my experience and not in the best interest of participants. Cotter Dep. 33:13−16. Given the above referenced and documented profit motive of Reliance, the adding of these funds is clearly untenable for any fiduciary.

92.   The purported reason for replacing the JP Morgan TDFs was to provide the Plan with target date funds containing this downside protection and with a reduction in fees. Ex. 43 at 54. However, prior to the time Reliance won the CIT business with F-Squared, I have seen no documented concern that the JP Morgan TDFs were too aggressive or that there was a need for downside protection in the Plan's TDF investments. In fact, if the Plan fiduciaries were concerned regarding the risk associated with Plan's QDIA, I would expect there to have been meaningful and documented due diligence and attribution analysis. I have seen no such documentation to support any concern over the JP Morgan TDFs whatsoever.

93.   At no time were the JP Morgan TDFs ever placed on the Plan's

IPS watch list. Ex. 20 at NSP-000023387; Ex. 14, 43. In fact, in May of 2011, Reliance internally noted that the Reliance-approved JP Morgan TDFs were upgraded to "top tier" by Morningstar. Ex. 78.

94.    In order to implement the change to the Horizon Funds, the Plan's IPS had to be amended to eliminate the requirement that the funds have a three year performance history. Compare Ex. 149 at p. 10 with Ex. 148 at p. 10. This was necessary because the Horizon Funds, as new, untested funds, had no performance history. This change was clearly made to benefit Reliance and Insperity but not the plan participants.

95.    Within a short time after the Horizon Funds being included in the Plan, and as explained below due to apparent implementation inefficiencies and being over-weighted in certain assets, the Horizon Funds underperformed. Indeed, as early as the March 2014 Trustee Report from Reliance to Insperity, 4 of the 5 Horizon funds were already underperforming:

| Target-Date Funds | Morningstar Category | 3 Mo Return | Rank | 1 Year Return | Rank | 3 Year Return | Rank | 5 Year Return | Rank | 10 Year Return | Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Insperity Horizon Retirement Income | Retirement Income | 3.51% | - | 9.38% | - | - | - | - | - | - | - |
| S&P Target-Date Retirement Income Index | | 2.41% | - | 6.54% | - | 6.18% | - | 7.88% | - | 5.11% | - |
| Insperity Horizon 2020 | Target Date 2016-2020 | 4.57% | - | 13.18% | - | - | - | - | - | - | - |
| S&P Target-Date 2020 Index | | 4.82% | - | 15.04% | - | 9.04% | - | 12.03% | - | 6.53% | - |
| Insperity Horizon 2030 | Target Date 2026-2030 | 5.64% | - | 17.00% | - | - | - | - | - | - | - |
| S&P Target-Date 2030 Index | | 5.97% | - | 19.44% | - | 10.40% | - | 13.88% | - | 6.99% | - |
| Insperity Horizon 2040 | Target Date 2036-2040 | 6.22% | - | 19.33% | - | - | - | - | - | - | - |
| S&P Target-Date 2040 Index | | 6.84% | - | 22.40% | - | 11.34% | - | 15.05% | - | 7.23% | - |
| Insperity Horizon 2050 | Target Date 2050+ | 6.42% | - | 20.25% | - | - | - | - | - | - | - |
| S&P Target-Date 2050 Index | | 7.46% | - | 24.44% | - | - | - | - | - | - | - |

Ex. 51 at 24.

96.    Despite the lack of performance history of these funds, coupled with the immediate underperformance of these funds, Reliance did not place the Horizon Funds the Plan's IPS' watch list.

97.    Even after the launch of the Horizon Funds, F-Squared continued to make significant adjustments to its team and its product strategies. Ex. 47, 48, 49, 50, 51.

98.    Critically, in late 2013, the Securities and Exchange Commission ("SEC") launched an investigation relative to F-Squared's performance and advertising materials.[6]

99.    As described in the SEC order and findings, F-Squared's performance and marketing information contained "materially inflated"

---

[6] *In the Matter of F-Squared Investments, Inc.*, Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and Cease-And-Desist Order, Securities and Exchange Commission, Admin. Proceeding File No. 3-16325 (Dec. 22, 2014), available at https://www.sec.gov/litigation/admin/2014/ia-3988.pdf.

results and F-Squared recklessly compiled the back-tested and

hypothetical performance history for the period of April 2001 to September

2008" in connection with its AlphaSector strategy. SEC Order at 2.

100. This F-Squared strategy and materials were the same materials

repeatedly presented to Reliance and Insperity throughout this time period.

These false materials overstated the returns of the F-Squared strategy by

over 350%. *Id.* at 2. As a result of these false statements, F-Squared

admitted wrongdoing and paid $35 million.[7]

101. In my experience, any prudent investment professional would have

viewed this level of outperformance with the utmost skepticism. See also

Ex. 43 at 51−54.

102. As noted above, Reliance and Insperity fully understood that F-

Squared's performance history was back-tested and hypothetical yet did

very little, if anything, to fully investigate F-Squared's product. Ex. 43 at

51−54, Ex. 81.

103. Despite the SEC investigation, the Horizon Funds were not

removed from the Plan nor was F-Squared removed from its role with the

Horizon Funds. Rather, F-Squared provided Reliance with "revised back-

tested[ed]" performance history for its product including the "Beta-Hedge

---

[7] https://www.sec.gov/news/pressrelease/2014-289.html

[AlphaSector strategy] overlay used for the Insperity Horizon Funds." Ex. 49, 50.  In my opinion the profit motive clearly clouded the judgement of the plan fiduciaries in this instance.

104.  Despite F-Squared's admission relating to the misleading performance information and disclaimers along with the clear error in reporting returns that led to the wild outperformance claims relied upon by Reliance, Plan fiduciaries continued with the Horizon Funds and did not even place the funds on the IPS's watch list. Only in January of 2015 did the Reliance MDDC place F-Squared on its watch list. Ex. 46 (March 2, 2015).

105.  In late 2014, and as detailed below, F-Squared, based on the signals from its AlphaSector strategy, prompted Reliance to make material changes to the asset allocation (significantly over-weighted into cash and out of the non fixed income portion of the portfolios) of the Horizon Funds which compounded massive underperformance relative not only to the stated benchmark for the Horizon Funds but also to the Reliance-approved, yet non-proprietary, TDFs, including those offered by JP Morgan  and Vanguard.

106.  Ultimately, at the end March of 2015, yet only after substantial underperformance of the Horizon Funds, F-Squared and its AlphaSector

strategy was removed as the advisor/consultant to the Horizon Funds. Ex. 46 at RTCPLEDGER00010794 (June 3, 2015).

107.  However, rather than shutting the Horizon Funds down and deploying approved target date funds with established track records, Reliance selected another advisor, Allianz, to provide a similar tactical signal for the Horizon Funds.  Ex. 46 RTCPLEDGER00010794 (June 3, 2015).

108.  Again, however, by all accounts, Allianz did not have sufficient performance history to provide these services and provided Reliance with simulated and back-tested performance data. RTCPLEDGER00062471, RTCPLEDGER00062494, RTCPLEDGER00062499.

109.  ███████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████████
█████████████████████████████████
██████████████████████████████████
███████████████████████████████
███████████████████

110. 

111. Despite this documented concern, the Horizon Funds continued in the Plan, consistently underperforming until they were ultimately replaced in the Plan with "traditional, more strategic target date fund[s]", the American Fund Target Date Series funds. NSP-000036541 at NSP-000036564. Plan participants suffered extensive losses as a result.

**B.    Plan sustained damages because of the disloyal and imprudent process of including and retaining the Horizon Funds.**

112.   At the time the Horizon Funds became part of the Plan, the TDF space was well established. In fact, the Horizon Funds replaced a series of well-functioning JP Morgan TDFs (SmartRetirement). Other well-established TDFs were available from Vanguard and T. Rowe Price. All had robust performance histories within the TDF market place.

113.  A fiduciary should have performed a detailed PME on the entire

TDF space to select the best suited offerings to plan participants. As demonstrated above, this was not done at the time of the addition of the Horizon Funds to the Plan.

114. A robust PME throughout the selection process would include understanding the investment characteristics that contribute to the benchmarks used in the TDF space.

115. The Horizon Funds used the S&P Target Date benchmark series. See, e.g., Ex. 51 at 24. The benchmark characteristics are important in order to understand the sources of return and risk of any given TDF strategy. It also serves as a baseline when creating new TDF strategies as is the case with the Horizon Funds. Any material divergences from the benchmark can be considered active or tactical decisions by the TDF manager. There are two levels of decision making.

116. The relative weightings between Non-Fixed Income (NFI) asset classes and Fixed Income (FI) is the first level of tactical decision to be made in a TDF. In other words, how much NFI will the participants be exposed to prior to transitioning through time. A higher NFI than both the benchmark and competitors is an active decision by the TDF manager. Reliance, in the creation of the Horizon Funds, made the active  strategy decision to be more aggressive than both the benchmark and competitors

42

across the investment horizon. For example, Horizon Fund 2050's strategy had approximately 12% more NFI than its competitors and 11% more NFI than the corresponding S&P TD 2050 benchmark. This higher NFI holds across the entire Horizon TD series. This is a significant difference that had a material impact on the performance of the strategies. As noted above, given Reliance's lack of any experience in creating and managing TDFs, this deviation is surprising and partially to blame for the significant underperformance.

117.   Another level of active decision making is the exposures within both NFI and FI. Within NFI, the Horizon Funds were allocated aggressively to both REIT (i.e. real estate) and Commodities relative to both competitors and the benchmark. For example, the Vanguard TD funds have no allocation to either of these asset classes; the S&P TD 2050 benchmark has allocations to Commodities that is about 50% smaller than the Horizon Fund's allocation in this asset class. The same benchmark has approximately a 3.3% allocation to REIT's, while the Horizon Funds targeted 9.3%. These are significant divergences. As a result, the equity allocations are actually lower than averages. Moreover, the Horizon TD funds added an emerging market allocation adding even more risk to the funds in 2015 following the disastrous TAA changes.

43

RTCPLEDGER00320177.

118.  An experienced fiduciary would easily have highlighted these differences and documented their potential in impacting the investment characteristics of the Horizon Funds. I have seen no documentation that offers such analysis. Understanding the investment characteristics of the multi-asset class strategies is a vital role played by a fiduciary to a DCP. This is particularly true when the TDF is the Plan's QDIA.

119.  The Horizon Funds had a third level of tactical decision making. This involves using F-Squared's Alpha Sector signal that was used to materially alter overall NFI allocations within the Horizon Funds.  This is a TAA strategy that presumably was deployed to greatly reduce NFI exposures in an effort to add risk adjusted performance to the strategies. In the case of the Horizon Funds, the TAA approach was irresponsible. Within the context of a TDF, adhering to a prudently devised and constructed glide path is essential. As mentioned above, the entire purpose of the TDF is to ensure that the plan participant is exposed to the multi-asset exposures (defined by the glide path) at all times. It ensures that the investment discipline required for long term investment success is retained over the life of the investment. Diverging from that glide path is anathema to the very existence of TDFs and should never have been allowed by the Plan's

fiduciaries. Indeed, at times, the Horizon Funds allocated up to 75% of their NFI to cash over the life of these funds. RTCPLEDGER00178881 and RTCPLEDGER00178970. No responsible fiduciary would have ever allowed this in their Plan's TDFs, much less the QDIA.

120. I am unable to find any compelling evidence that Reliance had any conceptual understanding of what the F-squared signal represented or how to properly interpret it. From my review of the documentation, Reliance simply applied the AlphaSector signals blindly across the Horizon funds as if they were constructed in the same manner as the AlphaSector strategy. It is clear that they didn't fully understand the impact of this approach on management of a TDF. This is largely due to Reliance's absolute inexperience in both the TAA and the TDF space. As a result plan participants suffered material losses.

121. Interestingly, the Horizon Funds were aggressive in there NFI/FI decisions and further aggressive within NFI relative to both their competitors and the benchmark. The NFI allocations were much higher than both the benchmark and their competitors; additionally, within NFI they made very aggressive allocations outside of traditional equity allocations. Given that the purported concept in launching these funds was to reduce risk, it is beyond comprehension why Reliance was so aggressive in the

original NFI allocations. Again, neither an experienced fiduciary nor an experienced TDF manager would have accepted or created such a conceptually inconsistent strategy.

122. Ultimately, the massive underperformance of the Horizon Funds relative to both competitors and the benchmark were due to multiple factors that were all avoidable:

a. **Poor implementation/execution**. Performance relative to competitors throughout the fourth quarter of 2012 was poor. This was the quarter when the Horizon funds were launched. For example, the Horizon Fund 2050 underperformed Vanguard 2050 by 4.32%. Results relative to JP Morgan TDFs were more severe. Clearly, if the JP Morgan TDFs were retained then this cost would not have been incurred by Plan participants;

b. **Inordinate high exposures to real estate and commodities relative to both competitors and benchmark**. For example, DCMSX (the selected commodity fund within the Horizon Funds) underperformed the S&P TD 2050 by 18.61% for the five years ending in 2017, and the DJ US Select REIT index (the benchmark used by the selected index fund manager

46

within the REIT allocation) underperformed by 2.41% over the

same period;

123.  As noted above, the F-Squared AlphaSector strategy (or "Beta

Hedge") for TAA produced extremely large positions in cash at the expense

of the NFI allocations from the end of 2014 through the first quarter of

2015.These large cash position contributed to the underperformance

across all the Horizon Funds. Specifically, as seen in the following table,

the five Horizon Funds over this period underperformed their respective

benchmarks by huge amounts.

| HTD Fund | Underperformance Relative to S&P Target Date Benchmark (4Q14-1Q15) |
|---|---|
| Retirement Income | -1.84% |
| HTD 2020 | -3.25% |
| HTD 2030 | -3.72% |
| HTD 2040 | -4.27% |
| HTD 2050 | -4.53% |

124.  The Horizon Funds should not have replaced the JP Morgan TDFs.

First, the JP Morgan TDFs were exceeding appropriate strategies. Second,

they were being managed by experienced managers within the TDF space

and the underlying funds were also being managed by experienced

managers. Third, Reliance had no performance history, experience, or

expertise in the TDF universe. Fourth, the Horizon Funds followed a

47

strategy where they effectively ignored the glide path when implementing

the TAA strategy. Fifth, the Horizon Funds' glide path included very

aggressive and unexplained NFI allocations. Sixth, the TAA strategy

materially impacted the asset allocation by increasing cash allocations to

indefensible levels.

125. By replacing the JPM Morgan TDFs with the Horizon Funds, Plan

participants experienced losses of:

| Horizon Funds | Participant Losses as a result of not using JP Morgan TDFs |
|---|---|
| HTD Retirement Income | $2,063,104 |
| HTD 2020 | $19,792,787 |
| HTD 2030 | $28,756,572 |
| HTD 2040 | $25,020,691 |
| HTD 2050 | $7,466,306 |

These computations assume that the inferred cash flows in each fund

would have been the same as incurred within the Horizon Funds. All losses

are carried through the end of 2017. Total damages are $83 million.

126.   By using the Horizon Funds instead of the Vanguard TDFs, the

losses incurred are:

| Horizon Funds | Participant Losses as a result of not usingVanguard TDFs |
|---|---|
| HTD Retirement Income | $554,452 |
| HTD 2020 | $26,248,158 |
| HTD 2030 | $31,652,940 |
| HTD 2040 | $28,720,223 |
| HTD 2050 | $9,340,503 |

All losses are carried through the end of 2017. Total losses in this case are $96 million.

## VII.   Plan included Share classes of funds that charge excessive fees

127.  If the Plan fiduciaries were properly monitoring the funds used in the Plan and acted in the best interest of plan participants, then total fee savings would have been $31 million. Simply, if the Plan fiduciaries used the cheapest share class available during the analysis period the plan participants would have been far better off.

128.  Prudent fiduciaries ensure that plan participants are invested in the lowest share class of a selected fund. These lower cost share classes are, in all material respects, identical to the more expensive share classes with the only difference between the share classes of the same funds being fees.

129.  During the relevant time period, the following Plan investments had lower share classes available:

49

| |
|---|
| AllianzGI High Yield Bond (Adm) |
| AllianzGI NFJ Small Cap Value Fund (A) |
| American Beacon Mid Cap Value Fund (Inv) |
| American Funds EuroPacific Growth Fund (R3) |
| American Funds Growth Fund of America (R3) |
| American Funds High Income Trust (R3) |
| BlackRock Equity Dividend Fund (S) |
| Columbia Strategic Income Fund (A) |
| Davis New York Venture Fund (R) |
| Eaton Vance Floating-Rate Fund (A) |
| Federated Prime Obligations Money Market (SS) |
| Fidelity Spartan U.S. Equity Index Fund (Inv) |
| Goldman Sachs Mid Cap Value Fund (Svc) |
| Hartford Small Cap Growth HLS (IB) |
| John Hancock Income Fund (R4) |
| JPMorgan SmartRetirement 2010 Fund (Select) |
| JPMorgan SmartRetirement 2020 Fund (Select) |
| JPMorgan SmartRetirement 2030 Fund (Select) |
| JPMorgan SmartRetirement 2040 Fund (Select) |
| JPMorgan SmartRetirement 2050 Fund (Select) |
| Mainstay Large Cap Growth Fund (R2) |
| Metropolitan West Total Return Plan (M) |
| Munder Midcap Core Growth Fund (A) |
| PIMCO Total Return Fund (Adm) |
| T. Rowe Price Blue Chip Growth (Adv) |
| T. Rowe Price Real Estate (Adv) |

130. Had the Plan fiduciaries utilized these lower share classes, the Plan would not have lost almost $32 million.

Respectfully Submitted,

Gerald W. Buetow

Materials Considered

In addition to the materials cited in my report, I considered the following documents:

- Meeting Minutes Compilation for the Investment Policy Committee and the Manager Due Diligence Committee
- Investment Policy Statements
- Annual Trustee's Reports
- Deposition Exhibits
- Deposition transcripts
- Insperity 401(k) Plan 5500s (fka Administaff 401(k) Plan) for years 2010–2016
- Inspeirty Horizon Fund Fact Sheets
- Insperity 401(k) Plan Trial Balances
- Trust Agreement and Amendments
- Plan Documents and Amendments

And the following bates stamped documents:

| | | |
|---|---|---|
| NSP-000010949 | NSP-000036517 | RTCPLEDGER00000341 |
| NSP-000011258 | NSP-000036541 | RTCPLEDGER00000651 |
| NSP-000021319 | NSP-000037771 | RTCPLEDGER00000654 |
| NSP-000021362 | NSP-000037772 | RTCPLEDGER00000757 |
| NSP-000022179 | NSP-000042385 | RTCPLEDGER00000760 |
| NSP-000023355 | NSP-000044852 | RTCPLEDGER00001248 |
| NSP-000026596 | NSP-000046225 | RTCPLEDGER00001252 |
| NSP-000026672 | NSP-000047103 | RTCPLEDGER00001258 |
| NSP-000026673 | NSP-000051720 | RTCPLEDGER00001349 |
| NSP-000026751 | NSP-000062198 | RTCPLEDGER00001358 |
| NSP-000027811 | NSP-000067535 | RTCPLEDGER00001470 |
| NSP-000032790 | NSP-000075990 | RTCPLEDGER00001483 |
| NSP-000032793 | NSP-000081511 | RTCPLEDGER00001592 |
| NSP-000033068 | NSP-000081536 | RTCPLEDGER00001599 |
| NSP-000034661 | NSP-000081545 | RTCPLEDGER00001702 |
| NSP-000035995 | NSP-000081868 | RTCPLEDGER00001750 |
| NSP-000036001 | NSP-000090291 | RTCPLEDGER00001846 |
| NSP-000036221 | RTCPLEDGER00000337 | RTCPLEDGER00001885 |

| | | |
|---|---|---|
| RTCPLEDGER00002052 | RTCPLEDGER00010164 | RTCPLEDGER00013178 |
| RTCPLEDGER00002283 | RTCPLEDGER00010229 | RTCPLEDGER00013453 |
| RTCPLEDGER00002675 | RTCPLEDGER00010237 | RTCPLEDGER00013530 |
| RTCPLEDGER00002774 | RTCPLEDGER00010470 | RTCPLEDGER00013661 |
| RTCPLEDGER00002902 | RTCPLEDGER00010579 | RTCPLEDGER00013684 |
| RTCPLEDGER00003599 | RTCPLEDGER00010582 | RTCPLEDGER00013690 |
| RTCPLEDGER00003634 | RTCPLEDGER00010598 | RTCPLEDGER00014033 |
| RTCPLEDGER00003787 | RTCPLEDGER00010605 | RTCPLEDGER00014046 |
| RTCPLEDGER00003821 | RTCPLEDGER00010792 | RTCPLEDGER00014063 |
| RTCPLEDGER00004179 | RTCPLEDGER00010800 | RTCPLEDGER00014067 |
| RTCPLEDGER00004341 | RTCPLEDGER00011095 | RTCPLEDGER00014078 |
| RTCPLEDGER00004371 | RTCPLEDGER00011216 | RTCPLEDGER00014501 |
| RTCPLEDGER00004487 | RTCPLEDGER00011246 | RTCPLEDGER00014502 |
| RTCPLEDGER00004972 | RTCPLEDGER00011310 | RTCPLEDGER00014503 |
| RTCPLEDGER00004981 | RTCPLEDGER00011354 | RTCPLEDGER00014504 |
| RTCPLEDGER00005415 | RTCPLEDGER00011419 | RTCPLEDGER00014505 |
| RTCPLEDGER00005542 | RTCPLEDGER00011565 | RTCPLEDGER00014517 |
| RTCPLEDGER00005720 | RTCPLEDGER00011720 | RTCPLEDGER00014534 |
| RTCPLEDGER00006144 | RTCPLEDGER00011723 | RTCPLEDGER00014537 |
| RTCPLEDGER00006149 | RTCPLEDGER00011724 | RTCPLEDGER00014539 |
| RTCPLEDGER00006162 | RTCPLEDGER00011733 | RTCPLEDGER00014555 |
| RTCPLEDGER00006506 | RTCPLEDGER00011759 | RTCPLEDGER00014741 |
| RTCPLEDGER00006508 | RTCPLEDGER00011820 | RTCPLEDGER00014744 |
| RTCPLEDGER00006609 | RTCPLEDGER00011834 | RTCPLEDGER00015183 |
| RTCPLEDGER00006814 | RTCPLEDGER00011835 | RTCPLEDGER00016272 |
| RTCPLEDGER00006823 | RTCPLEDGER00011841 | RTCPLEDGER00016284 |
| RTCPLEDGER00006875 | RTCPLEDGER00011862 | RTCPLEDGER00016294 |
| RTCPLEDGER00006920 | RTCPLEDGER00012300 | RTCPLEDGER00016295 |
| RTCPLEDGER00007160 | RTCPLEDGER00012482 | RTCPLEDGER00017860 |
| RTCPLEDGER00007319 | RTCPLEDGER00012633 | RTCPLEDGER00018653 |
| RTCPLEDGER00007937 | RTCPLEDGER00012638 | RTCPLEDGER00019283 |
| RTCPLEDGER00007948 | RTCPLEDGER00012641 | RTCPLEDGER00019432 |
| RTCPLEDGER00008388 | RTCPLEDGER00012642 | RTCPLEDGER00019666 |
| RTCPLEDGER00009007 | RTCPLEDGER00012645 | RTCPLEDGER00021025 |
| RTCPLEDGER00009085 | RTCPLEDGER00012647 | RTCPLEDGER00021259 |
| RTCPLEDGER00009583 | RTCPLEDGER00012650 | RTCPLEDGER00021493 |
| RTCPLEDGER00009588 | RTCPLEDGER00012759 | RTCPLEDGER00021737 |
| RTCPLEDGER00009720 | RTCPLEDGER00012760 | RTCPLEDGER00021957 |
| RTCPLEDGER00009723 | RTCPLEDGER00012783 | RTCPLEDGER00023184 |
| RTCPLEDGER00009819 | RTCPLEDGER00013076 | RTCPLEDGER00023406 |

| | | |
|---|---|---|
| RTCPLEDGER00023624 | RTCPLEDGER00032056 | RTCPLEDGER00038747 |
| RTCPLEDGER00023629 | RTCPLEDGER00032058 | RTCPLEDGER00038748 |
| RTCPLEDGER00023631 | RTCPLEDGER00032062 | RTCPLEDGER00038794 |
| RTCPLEDGER00023633 | RTCPLEDGER00032064 | RTCPLEDGER00038795 |
| RTCPLEDGER00023638 | RTCPLEDGER00032066 | RTCPLEDGER00038841 |
| RTCPLEDGER00023640 | RTCPLEDGER00032068 | RTCPLEDGER00038842 |
| RTCPLEDGER00023642 | RTCPLEDGER00032070 | RTCPLEDGER00038845 |
| RTCPLEDGER00023644 | RTCPLEDGER00032072 | RTCPLEDGER00038886 |
| RTCPLEDGER00023651 | RTCPLEDGER00032074 | RTCPLEDGER00038887 |
| RTCPLEDGER00023654 | RTCPLEDGER00032209 | RTCPLEDGER00038938 |
| RTCPLEDGER00023660 | RTCPLEDGER00032212 | RTCPLEDGER00038942 |
| RTCPLEDGER00023665 | RTCPLEDGER00032268 | RTCPLEDGER00038980 |
| RTCPLEDGER00023679 | RTCPLEDGER00032313 | RTCPLEDGER00038988 |
| RTCPLEDGER00023688 | RTCPLEDGER00032486 | RTCPLEDGER00039014 |
| RTCPLEDGER00023697 | RTCPLEDGER00032489 | RTCPLEDGER00039054 |
| RTCPLEDGER00023743 | RTCPLEDGER00032636 | RTCPLEDGER00039055 |
| RTCPLEDGER00027905 | RTCPLEDGER00032640 | RTCPLEDGER00039252 |
| RTCPLEDGER00028075 | RTCPLEDGER00032673 | RTCPLEDGER00039253 |
| RTCPLEDGER00028273 | RTCPLEDGER00032818 | RTCPLEDGER00039317 |
| RTCPLEDGER00028501 | RTCPLEDGER00032871 | RTCPLEDGER00039360 |
| RTCPLEDGER00028726 | RTCPLEDGER00032901 | RTCPLEDGER00043433 |
| RTCPLEDGER00028967 | RTCPLEDGER00032904 | RTCPLEDGER00043441 |
| RTCPLEDGER00029153 | RTCPLEDGER00032946 | RTCPLEDGER00045142 |
| RTCPLEDGER00029374 | RTCPLEDGER00032998 | RTCPLEDGER00046318 |
| RTCPLEDGER00029603 | RTCPLEDGER00033047 | RTCPLEDGER00046330 |
| RTCPLEDGER00029849 | RTCPLEDGER00033090 | RTCPLEDGER00046403 |
| RTCPLEDGER00030073 | RTCPLEDGER00033095 | RTCPLEDGER00046414 |
| RTCPLEDGER00030255 | RTCPLEDGER00033098 | RTCPLEDGER00046431 |
| RTCPLEDGER00030476 | RTCPLEDGER00033214 | RTCPLEDGER00046432 |
| RTCPLEDGER00030696 | RTCPLEDGER00033276 | RTCPLEDGER00046633 |
| RTCPLEDGER00030729 | RTCPLEDGER00033329 | RTCPLEDGER00046634 |
| RTCPLEDGER00030937 | RTCPLEDGER00033359 | RTCPLEDGER00046847 |
| RTCPLEDGER00031127 | RTCPLEDGER00033361 | RTCPLEDGER00046892 |
| RTCPLEDGER00031346 | RTCPLEDGER00034209 | RTCPLEDGER00046937 |
| RTCPLEDGER00031569 | RTCPLEDGER00037930 | RTCPLEDGER00046941 |
| RTCPLEDGER00032046 | RTCPLEDGER00037931 | RTCPLEDGER00046960 |
| RTCPLEDGER00032048 | RTCPLEDGER00038011 | RTCPLEDGER00046976 |
| RTCPLEDGER00032050 | RTCPLEDGER00038019 | RTCPLEDGER00046985 |
| RTCPLEDGER00032052 | RTCPLEDGER00038118 | RTCPLEDGER00046989 |
| RTCPLEDGER00032054 | RTCPLEDGER00038468 | RTCPLEDGER00047011 |

| | | |
|---|---|---|
| RTCPLEDGER00047045 | RTCPLEDGER00060965 | RTCPLEDGER00142525 |
| RTCPLEDGER00047070 | RTCPLEDGER00060968 | RTCPLEDGER00143340 |
| RTCPLEDGER00047086 | RTCPLEDGER00060972 | RTCPLEDGER00145891 |
| RTCPLEDGER00049161 | RTCPLEDGER00060973 | RTCPLEDGER00151611 |
| RTCPLEDGER00049307 | RTCPLEDGER00061004 | RTCPLEDGER00155123 |
| RTCPLEDGER00049684 | RTCPLEDGER00061102 | RTCPLEDGER00176533 |
| RTCPLEDGER00060346 | RTCPLEDGER00061103 | RTCPLEDGER00177444 |
| RTCPLEDGER00060347 | RTCPLEDGER00061106 | RTCPLEDGER00178881 |
| RTCPLEDGER00060356 | RTCPLEDGER00061123 | RTCPLEDGER00178911 |
| RTCPLEDGER00060367 | RTCPLEDGER00061125 | RTCPLEDGER00178970 |
| RTCPLEDGER00060384 | RTCPLEDGER00061147 | RTCPLEDGER00178913 |
| RTCPLEDGER00060447 | RTCPLEDGER00061153 | RTCPLEDGER00179517 |
| RTCPLEDGER00060451 | RTCPLEDGER00061169 | RTCPLEDGER00179518 |
| RTCPLEDGER00060466 | RTCPLEDGER00061170 | RTCPLEDGER00179519 |
| RTCPLEDGER00060468 | RTCPLEDGER00061209 | RTCPLEDGER00179520 |
| RTCPLEDGER00060525 | RTCPLEDGER00061242 | RTCPLEDGER00179521 |
| RTCPLEDGER00060526 | RTCPLEDGER00061253 | RTCPLEDGER00179522 |
| RTCPLEDGER00060527 | RTCPLEDGER00061255 | RTCPLEDGER00179523 |
| RTCPLEDGER00060537 | RTCPLEDGER00061265 | RTCPLEDGER00179540 |
| RTCPLEDGER00060554 | RTCPLEDGER00061338 | RTCPLEDGER00179541 |
| RTCPLEDGER00060556 | RTCPLEDGER00061339 | RTCPLEDGER00179555 |
| RTCPLEDGER00060558 | RTCPLEDGER00061554 | RTCPLEDGER00180497 |
| RTCPLEDGER00060570 | RTCPLEDGER00061575 | RTCPLEDGER00180498 |
| RTCPLEDGER00060637 | RTCPLEDGER00065709 | RTCPLEDGER00180501 |
| RTCPLEDGER00060639 | RTCPLEDGER00067367 | RTCPLEDGER00180505 |
| RTCPLEDGER00060696 | RTCPLEDGER00069363 | RTCPLEDGER00180509 |
| RTCPLEDGER00060716 | RTCPLEDGER00093317 | RTCPLEDGER00180513 |
| RTCPLEDGER00060718 | RTCPLEDGER00093417 | RTCPLEDGER00180517 |
| RTCPLEDGER00060735 | RTCPLEDGER00093648 | RTCPLEDGER00180518 |
| RTCPLEDGER00060760 | RTCPLEDGER00093793 | RTCPLEDGER00180519 |
| RTCPLEDGER00060772 | RTCPLEDGER00095100 | RTCPLEDGER00180520 |
| RTCPLEDGER00060835 | RTCPLEDGER00095880 | RTCPLEDGER00180664 |
| RTCPLEDGER00060836 | RTCPLEDGER00104509 | RTCPLEDGER00183409 |
| RTCPLEDGER00060838 | RTCPLEDGER00108355 | RTCPLEDGER00183571 |
| RTCPLEDGER00060937 | RTCPLEDGER00109271 | RTCPLEDGER00183612 |
| RTCPLEDGER00060938 | RTCPLEDGER00109277 | RTCPLEDGER00214097 |
| RTCPLEDGER00060949 | RTCPLEDGER00109280 | RTCPLEDGER00217108 |
| RTCPLEDGER00060952 | RTCPLEDGER00109283 | RTCPLEDGER00234075 |
| RTCPLEDGER00060953 | RTCPLEDGER00110986 | RTCPLEDGER00263328 |
| RTCPLEDGER00060954 | RTCPLEDGER00122153 | RTCPLEDGER00269691 |

| | | |
|---|---|---|
| RTCPLEDGER00276933 | RTCPLEDGER00344488 | RTCPLEDGER00344608 |
| RTCPLEDGER00278186 | RTCPLEDGER00344489 | RTCPLEDGER00344609 |
| RTCPLEDGER00278744 | RTCPLEDGER00344490 | RTCPLEDGER00344613 |
| RTCPLEDGER00279835 | RTCPLEDGER00344494 | RTCPLEDGER00344614 |
| RTCPLEDGER00284441 | RTCPLEDGER00344495 | RTCPLEDGER00344615 |
| RTCPLEDGER00284826 | RTCPLEDGER00344496 | RTCPLEDGER00344619 |
| RTCPLEDGER00284848 | RTCPLEDGER00344500 | RTCPLEDGER00344620 |
| RTCPLEDGER00285422 | RTCPLEDGER00344501 | RTCPLEDGER00344624 |
| RTCPLEDGER00287608 | RTCPLEDGER00344502 | RTCPLEDGER00344625 |
| RTCPLEDGER00287771 | RTCPLEDGER00344506 | RTCPLEDGER00344626 |
| RTCPLEDGER00289765 | RTCPLEDGER00344507 | RTCPLEDGER00344663 |
| RTCPLEDGER00298969 | RTCPLEDGER00344511 | RTCPLEDGER00344666 |
| RTCPLEDGER00298985 | RTCPLEDGER00344512 | RTCPLEDGER00344669 |
| RTCPLEDGER00304756 | RTCPLEDGER00344513 | RTCPLEDGER00344705 |
| RTCPLEDGER00307863 | RTCPLEDGER00344531 | RTCPLEDGER00344706 |
| RTCPLEDGER00307868 | RTCPLEDGER00344534 | RTCPLEDGER00344707 |
| RTCPLEDGER00307870 | RTCPLEDGER00344537 | RTCPLEDGER00344708 |
| RTCPLEDGER00308041 | RTCPLEDGER00344544 | RTCPLEDGER00344712 |
| RTCPLEDGER00308045 | RTCPLEDGER00344545 | RTCPLEDGER00344713 |
| RTCPLEDGER00308125 | RTCPLEDGER00344546 | RTCPLEDGER00344714 |
| RTCPLEDGER00308129 | RTCPLEDGER00344547 | RTCPLEDGER00344718 |
| RTCPLEDGER00308266 | RTCPLEDGER00344551 | RTCPLEDGER00344719 |
| RTCPLEDGER00308270 | RTCPLEDGER00344552 | RTCPLEDGER00344720 |
| RTCPLEDGER00308328 | RTCPLEDGER00344553 | RTCPLEDGER00344724 |
| RTCPLEDGER00308332 | RTCPLEDGER00344557 | RTCPLEDGER00344725 |
| RTCPLEDGER00308571 | RTCPLEDGER00344558 | RTCPLEDGER00344729 |
| RTCPLEDGER00308574 | RTCPLEDGER00344559 | RTCPLEDGER00344730 |
| RTCPLEDGER00320176 | RTCPLEDGER00344563 | RTCPLEDGER00344731 |
| RTCPLEDGER00320177 | RTCPLEDGER00344564 | RTCPLEDGER00344749 |
| RTCPLEDGER00320200 | RTCPLEDGER00344568 | RTCPLEDGER00344752 |
| RTCPLEDGER00320201 | RTCPLEDGER00344569 | RTCPLEDGER00344755 |
| RTCPLEDGER00320361 | RTCPLEDGER00344570 | RTCPLEDGER00344761 |
| RTCPLEDGER00320362 | RTCPLEDGER00344588 | RTCPLEDGER00344762 |
| RTCPLEDGER00320379 | RTCPLEDGER00344591 | RTCPLEDGER00344763 |
| RTCPLEDGER00325390 | RTCPLEDGER00344594 | RTCPLEDGER00344764 |
| RTCPLEDGER00331601 | RTCPLEDGER00344600 | RTCPLEDGER00344768 |
| RTCPLEDGER00341724 | RTCPLEDGER00344601 | RTCPLEDGER00344769 |
| RTCPLEDGER00344457 | RTCPLEDGER00344602 | RTCPLEDGER00344770 |
| RTCPLEDGER00344483 | RTCPLEDGER00344603 | RTCPLEDGER00344774 |
| RTCPLEDGER00344487 | RTCPLEDGER00344607 | RTCPLEDGER00344775 |

| | | |
|---|---|---|
| RTCPLEDGER00344776 | RTCPLEDGER00345058 | RTCPLEDGER00345247 |
| RTCPLEDGER00344780 | RTCPLEDGER00345059 | RTCPLEDGER00345250 |
| RTCPLEDGER00344781 | RTCPLEDGER00345063 | RTCPLEDGER00345256 |
| RTCPLEDGER00344785 | RTCPLEDGER00345064 | RTCPLEDGER00345257 |
| RTCPLEDGER00344786 | RTCPLEDGER00345065 | RTCPLEDGER00345258 |
| RTCPLEDGER00344787 | RTCPLEDGER00345069 | RTCPLEDGER00345259 |
| RTCPLEDGER00344805 | RTCPLEDGER00345070 | RTCPLEDGER00345263 |
| RTCPLEDGER00344808 | RTCPLEDGER00345071 | RTCPLEDGER00345264 |
| RTCPLEDGER00344811 | RTCPLEDGER00345075 | RTCPLEDGER00345265 |
| RTCPLEDGER00344817 | RTCPLEDGER00345076 | RTCPLEDGER00345269 |
| RTCPLEDGER00344818 | RTCPLEDGER00345080 | RTCPLEDGER00345270 |
| RTCPLEDGER00344819 | RTCPLEDGER00345081 | RTCPLEDGER00345271 |
| RTCPLEDGER00344823 | RTCPLEDGER00345082 | RTCPLEDGER00345275 |
| RTCPLEDGER00344824 | RTCPLEDGER00345103 | RTCPLEDGER00345276 |
| RTCPLEDGER00344828 | RTCPLEDGER00345106 | RTCPLEDGER00345280 |
| RTCPLEDGER00344829 | RTCPLEDGER00345109 | RTCPLEDGER00345281 |
| RTCPLEDGER00344833 | RTCPLEDGER00345122 | RTCPLEDGER00345282 |
| RTCPLEDGER00344837 | RTCPLEDGER00345123 | RTCPLEDGER00382264 |
| RTCPLEDGER00344838 | RTCPLEDGER00345134 | RTCPLEDGER00392313 |
| RTCPLEDGER00344899 | RTCPLEDGER00345135 | RTCPLEDGER00393559 |
| RTCPLEDGER00344997 | RTCPLEDGER00345136 | RTCPLEDGER00393835 |
| RTCPLEDGER00344998 | RTCPLEDGER00345188 | RTCPLEDGER00394501 |
| RTCPLEDGER00344999 | RTCPLEDGER00345191 | RTCPLEDGER00394591 |
| RTCPLEDGER00345000 | RTCPLEDGER00345194 | RTCPLEDGER00394592 |
| RTCPLEDGER00345004 | RTCPLEDGER00345200 | RTCPLEDGER00394593 |
| RTCPLEDGER00345005 | RTCPLEDGER00345201 | RTCPLEDGER00394594 |
| RTCPLEDGER00345006 | RTCPLEDGER00345202 | RTCPLEDGER00394595 |
| RTCPLEDGER00345013 | RTCPLEDGER00345203 | RTCPLEDGER00394596 |
| RTCPLEDGER00345014 | RTCPLEDGER00345207 | RTCPLEDGER00394597 |
| RTCPLEDGER00345015 | RTCPLEDGER00345208 | RTCPLEDGER00394598 |
| RTCPLEDGER00345019 | RTCPLEDGER00345209 | RTCPLEDGER00394601 |
| RTCPLEDGER00345020 | RTCPLEDGER00345213 | RTCPLEDGER00394604 |
| RTCPLEDGER00345024 | RTCPLEDGER00345214 | RTCPLEDGER00394605 |
| RTCPLEDGER00345025 | RTCPLEDGER00345215 | RTCPLEDGER00395384 |
| RTCPLEDGER00345026 | RTCPLEDGER00345219 | RTCPLEDGER00395385 |
| RTCPLEDGER00345044 | RTCPLEDGER00345220 | RTCPLEDGER00395386 |
| RTCPLEDGER00345047 | RTCPLEDGER00345224 | RTCPLEDGER00395387 |
| RTCPLEDGER00345050 | RTCPLEDGER00345225 | RTCPLEDGER00395388 |
| RTCPLEDGER00345056 | RTCPLEDGER00345226 | RTCPLEDGER00395389 |
| RTCPLEDGER00345057 | RTCPLEDGER00345244 | RTCPLEDGER00395390 |

| | |
|---|---|
| RTCPLEDGER00395393 | RTCPLEDGER00407843 |
| RTCPLEDGER00395396 | RTCPLEDGER00407988 |
| RTCPLEDGER00395397 | RTCPLEDGER00407995 |
| RTCPLEDGER00396148 | RTCPLEDGER00408699 |
| RTCPLEDGER00396263 | RTCPLEDGER00410632 |
| RTCPLEDGER00396274 | RTCPLEDGER00410635 |
| RTCPLEDGER00396309 | RTCPLEDGER00410637 |
| RTCPLEDGER00396310 | RTCPLEDGER00410877 |
| RTCPLEDGER00396315 | RTCPLEDGER00410882 |
| RTCPLEDGER00396414 | RTCPLEDGER00411015 |
| RTCPLEDGER00396438 | RTCPLEDGER00411351 |
| RTCPLEDGER00396507 | RTCPLEDGER00411769 |
| RTCPLEDGER00396523 | RTCPLEDGER00413010 |
| RTCPLEDGER00396565 | RTCPLEDGER00414574 |
| RTCPLEDGER00396607 | RTCPLEDGER00415801 |
| RTCPLEDGER00396612 | RTCPLEDGER00419705 |
| RTCPLEDGER00396615 | RTCPLEDGER00422399 |
| RTCPLEDGER00396689 | RTCPLEDGER00429712 |
| RTCPLEDGER00396703 | RTCPLEDGER00429873 |
| RTCPLEDGER00396733 | RTCPLEDGER00429917 |
| RTCPLEDGER00396737 | RTCPLEDGER00430006 |
| RTCPLEDGER00396828 | RTCPLEDGER00430473 |
| RTCPLEDGER00396907 | RTCPLEDGER00430550 |
| RTCPLEDGER00397089 | RTCPLEDGER00432673 |
| RTCPLEDGER00397096 | |
| RTCPLEDGER00397097 | |
| RTCPLEDGER00397130 | |
| RTCPLEDGER00397225 | |
| RTCPLEDGER00397226 | |
| RTCPLEDGER00397255 | |
| RTCPLEDGER00397260 | |
| RTCPLEDGER00397333 | |
| RTCPLEDGER00397450 | |
| RTCPLEDGER00399397 | |
| RTCPLEDGER00407620 | |
| RTCPLEDGER00407686 | |
| RTCPLEDGER00407689 | |
| RTCPLEDGER00407741 | |
| RTCPLEDGER00407745 | |
| RTCPLEDGER00407838 | |

**GERALD W. BUETOW, JR., Ph.D., CFA, CIPM**

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

## QUALIFICATION SUMMARY

I am currently president/founder of BFRC Services, LLC, a consulting firm based in Charlottesville, VA. Recently (and concurrently with BFRC) I was Chief Investment Officer at Innealta Capital and XTF GAM LLC. Previous roles have included Director of Research and Product Development at Atlantic Asset Management, LLC, VP of Curriculum Development at the CFA Institute, Wheat First Professor of Finance and Director of the Quantitative Finance (Financial Engineering) Program at James Madison University, and Director of Quantitative Research for Prudential Investment's Quantitative Investment Management Group.

### ---ACADEMIC/WORK EXPERIENCE---

**PRESIDENT AND FOUNDER, BFRC Services, LLC,** Charlottesville, VA, <u>January 1996 – Present.</u>

- Foremost expert in quantitative financial modeling as it relates to portfolio construction and management.
- Leading expert in the analysis and application of Exchange Traded Funds (ETFs).
- Extensive econometric analysis, valuation modeling, macroeconomic analysis, investment analysis, and trading attribution across all asset classes for expert witness testimony.
- Quantitative research in derivatives, equity and fixed income to assist in the management of fixed income and enhanced equity portfolios.
- Derivative security valuation and modeling, fixed income portfolio and risk management advice, enhanced index optimization development, and portfolio asset allocation expertise.
- Professional training and education for CFA©, CIPM, licensing exams, among others.
- Customized training and education for fixed income, derivatives, ETFs, equity analysis, and applied quantitative methods including econometric applications.
- Foremost expert in equity research analysis and Independent Consultant for the Global Research Analyst Settlement, Deutsche Bank.
- Complete Outsourced Chief Investment Officer (OCIO) capabilities.
- Performance measurement and verification (GIPS) capabilities.
- SAA/TAA implementation expert using ETFs and/or derivative overlay strategies.
- Recent expert witness cases: *Sims v. BB&T Corp*., No. 17-00061 October 2017.

**VISITING PROFESSOR OF FINANCE,** George Washington University, Washington, DC, <u>January 2017 - Present</u>.

- Developed and taught Investments and Financial Engineering.

**CHIEF INVESTMENT OFFICER AND FOUNDER, Innealta Capital,** Charlottesville, VA, <u>December 2008 – December 2016.</u>

- Responsible for all product creation, trading, portfolio management, and research for active ETF based tactical, sector, and country portfolios.
- Developed all proprietary portfolio strategies and own all intellectual property associated with investment strategies including derivative overlay and valuation verification.
- Managed a team of investment professionals and oversaw the creation of back office operations and trading.
- Managed in excess of $5 billion in assets including mutual funds, separately managed accounts, and through various platforms including Envestnet, Ameriprise, and LPL.

**GERALD W. BUETOW, JR., Ph.D., CFA, CIPM**

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

**VISITING PROFESSOR OF FINANCE,** Washington and Lee University, Lexington, VA, <u>July 2009 - July 2010</u>.

- Developed and taught Investments and Risk Management (Derivatives);
- Faculty Advisor to the William Investment Fund (student run equity only fund);

**SENIOR PORTFOLIO MANAGER, MANAGING DIRECTOR**, Portfolio Management Consultants, Chicago, IL<u>, March 2008-December 2008</u>.

- Responsible for all product creation, trading, portfolio management, and research for active ETF based tactical, sector, and country portfolios -
- Transitioned into a Sub-Advisor relationship.
- Developed all proprietary portfolio strategies and own all intellectual property associated with investment strategies.

**CHIEF INVESTMENT OFFICER, XTF Global Asset Management, LLC,** NY, NY, <u>July 2006 – March 2008</u>.

- Responsible for all product creation, trading, portfolio management, and research for active ETF based tactical, sector, and country portfolios.
- Developed all proprietary portfolio strategies and own all intellectual property associated with investment strategies.
- Managed the research, marketing, and trading groups.

**DIRECTOR OF RESEARCH and PRODUCT DEVELOPMENT, Atlantic Asset Management, LLC,** Stamford, CT, <u>January 2003 -  July 2006</u>.

- Responsibilities include the creation of new quantitatively oriented fixed income products and the improvement of existing fixed income products.
- Assist with the day to day management of fixed income portfolios – including hedge funds.
- Develop quantitative modeling techniques to both actively manage portfolios and to monitor risk exposure.

**VICE PRESIDENT OF CURRICULUM DEVELOPMENT,** Association of Investment Management and Research, Charlottesville, VA, <u>May 1999-January 2000</u>.

- Responsible for the development of the entire Chartered Financial Analyst (CFA) curriculum.
- Editor for the following texts: Quantitative Methods for Investment Analysis, Fixed Income, and Real Estate Analysis for the CFA curriculum.
- Member of the AIMR Investment Committee.

**WHEAT FIRST PROFESSOR OF QUANTITATIVE FINANCE,** James Madison University, Harrisonburg, VA, <u>August 1997-May 1999</u>.

- Director of Quantitative Finance Program;
- Tenured and Chaired Professor;
- For responsibilities please see Assistant Professor below.

**GERALD W. BUETOW, JR., Ph.D., CFA, CIPM**
1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

**DIRECTOR OF QUANTITATIVE RESEARCH,** Prudential Investments Quantitative Investment Management Group, Short Hills, NJ, June 1996-August 1997.

- Created/Built/Modeled/Implemented a quantitative portfolio optimizer to produce various enhanced index funds using the most advanced methods.
- Created, priced, and managed various financial derivative structures and structured notes.
- Assist with various other quantitative research projects including an asset allocation model.

**ASSISTANT PROFESSOR OF QUANTITATIVE FINANCE,** James Madison University, Harrisonburg, VA, August 1993-July 1996.

- Developed and Taught the following: Financial Mathematics, Derivative Securities, Security Pricing, Risk Management, Numerical Methods, Investments, Corporate Finance, Fixed Income Securities.
- Extensive Research in the following areas: Pricing of Hybrid Instruments, Risk Management, and Financial Engineering.
- Developed an Actuarial Science Program.
- Received a joint appointment as an Assistant Professor of Mathematics.

**Project Design Engineer,** Texas Instruments 1989-1990.

**US Navy (Nuclear Power Program),** 1984-1989.

---

### ---EDUCATION AND TRAINING---

**Ph.D. Finance and Econometrics (1993), M.S. Economics (1992), B.S. Electrical Engineering (1985), Lehigh University.**
**M.S. Finance, University of Texas, Dallas (1990).**
**Chartered Financial Analyst (1993), Certificate in Investment Performance Measurement (2016), Series 66.**
**Extreme Facility in the following programming software:** SAS, VBA, MatLab, among several others.

### Professional Affiliations – Past and Present

**Advisory Board Member –** *Journal of Portfolio Management*.

**Alliance-Ibbotson Research Institute (AIRI)**

Member of the following committees for the CFA Institute:

**Candidate Curriculum Committee** (CCC): **Topic Chairman** for Derivative Securities and Fixed Income.

**Senior Editor CFA Level III – Curriculum and Examinations.**
**CFA Exam Writer – Levels I, II, and III**
**Project Director for the Fixed Income Specialization Applications Program**.

- Developed application based fixed income cases and accompanying software for the Fixed Income Specialization program. Team members included globally recognized experts in various fixed income areas.

BFRC Services, LLC

**GERALD W. BUETOW, JR., Ph.D., CFA, CIPM**

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

## PUBLICATIONS

"The Implications of the VIX Futures Bases," with B. Henderson, *Journal of Portfolio Management*, Winter 2016.

"Are Cash Flows Costly to ETF Investors?," with B. Henderson, *Journal of Portfolio Management*, Spring 2014.

"Term Structure Modeling," with B. Henderson, Professional Risk Management Handbook, 2014.

"On The Performance of Leveraged and Inverse Leveraged Exchange Trades Funds," with B. Henderson, *Journal of Investment Management*, Winter 2013.

"A Review of No Arbitrage Interest Rate Models," with J. Sochacki and F. Fabozzi, Encyclopedia of Financial Models, 2012.

"Measuring Interest Rate Risk," with Fabozzi, Johnson, and Henderson, The Handbook of Fixed Income Securities, McGraw Hill, 2012.

"An Empirical Analysis of Exchange Traded Funds,"with B. Henderson, *Journal of Portfolio Management*, Summer 2012.

"Valuation of Interest Rate Swaps and Swaptions," with B Henderson, The Handbook of Fixed Income Securities, McGraw Hill, 2012.

"Term Structure Modeling With No-Arbitrage Interest Rate Models," with B Henderson, The Handbook of Fixed Income Securities, McGraw Hill, 2012.

"Interest Rate Risk," with F. Fabozzi and B. Henderson, The Handbook of Fixed Income Securities, McGraw Hill, 2012.

"Monetary Policy and Interest Rate Factors," with F. Fabozzi and B. Henderson, *Journal of Fixed Income*, Fall 2009.

"Interest Rate Swaps," with F. Fabozzi, Handbook of Finance, 2008, John Wiley and Sons, New Jersey.

"Valuation of Plain Vanilla Swaps," with F. Fabozzi, Handbook of Finance, 2008, John Wiley and Sons, New Jersey.

"Valuation of Forward Rate Swaps and Swaptions," with F. Fabozzi, Handbook of Finance 2008, John Wiley and Sons, New Jersey.

"Effective Duration and Effective Convexity," with R. Johnson, Handbook of Finance, 2008, John Wiley and Sons, New Jersey.

"A Note on Commonly Used Interest Rate Risk Metrics," with F. Fabozzi and B. Hanke, *Journal of Fixed Income*, September 2003.

"An Evaluation of the Developmental Issues and Potential for Real Estate Derivatives," with J. Albert, *Journal of the Academy of Finance*, Spring 2003.

"The Real Estate Asset Allocation Decision: Monetary Policy Implications," with R. Johnson, *Journal of Real Estate Portfolio Management,* Winter 2002.

# GERALD W. BUETOW, JR., Ph.D., CFA, CIPM

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

"The Effects of Different Interest Rate Models on Interest Rate Risk Metrics," with B. Hanke and F. Fabozzi, *Journal of Fixed Income,* Winter 2002.

"Monetary Policy and Fixed Income Returns," with R. Johnson, F. Reilly, and G. Jensen, *The Quarterly Review of Economics and Finance,* Winter 2002.

"The Benefits of Rebalancing," with R. Sellers, D Trotter, and E. Hunt, *The Journal of Portfolio Management,* Winter 2002.

"Using the Lattice Model to Value Forward Start Swaps and Swaptions ," with F. Fabozzi,  Interest Rates, Term Structure Models, and Valuation Models, Frank J. Fabozzi, Ed., 2002.

"A Review of No Arbitrage Interest Rate Models," with J. Sochacki and F. Fabozzi, Interest Rates, Term Structure Models, and Valuation Models, Frank J. Fabozzi, Ed., 2002.

"Incorporating Implied Volatility into Contingent Claim Valuation," *International Mathematical Journal,* Fall 2001.

"The Dangers in using Return Based Style Analysis in Asset Allocation," with Hal Ratner, *Journal of Wealth Management ,*  Summer 2000.

"Equity Styles and Federal Reserve Policy," with R. Johnson and G. Jensen,  *Journal of Private Portfolio Management*, Spring 2000.

"Interest Rate Sensitivity of Equity Mutual Funds," with A. Lipton,  *Journal of Private Portfolio Management*, Spring 2000.

"The Inconsistency of Return-Based Style Analysis and its Implications," with R. Johnson and D. Runkle, *Journal of Portfolio Management*, Spring 2000.

" Measuring Interest Rate Risk"  with R. Johnson and F. Fabozzi, 2001, The Handbook of Fixed Income Securities, 6th Ed, Frank J. Fabozzi, Ed..

"A Primer on Effective Duration and Convexity," with R. Johnson, 2001, Professional Perspectives on Fixed Income Portfolio Management, Frank J. Fabozzi, Ed..

"The Tradeoffs Between Alternative Finite Difference Techniques Used to Price Derivative Securities," with J. Sochacki, October 2000,  *Journal of Applied Mathematics and Computation.*

"Mutual Fund Asset Allocation – The Investment Implications of Federal Reserve Monetary Policy," with R. Johnson, Summer 2001,  *Journal of Investing.*

"International Mutual Fund Returns and Federal Reserve Policy," with R. Johnson, Winter 1999, *Financial Services Review.*

 "A Model for an Undergraduate Program in Quantitative Finance: The James Madison University Experience," with J. Albert,A. Francfort, and H. Hobson, Spring 1999, *Journal of Financial Education.*

 "Financial Engineering Applications in Real Estate," with J. Albert, Winter 1999,  *Real Estate Finance Journal.*

 "Ratchet Options: An Evaluation," *Journal of Financial and Strategic Decisions*, Fall 1999.

"A Continuous Time Pricing Model for Embedded Options in Leases and Real Estate Sale Contracts,"  with J. Albert,  *Journal of Real Estate Research.*, Winter 1998.

"Pricing Contingent Claims Using a More Accurate Finite Difference Method,"   with and J. Sochacki,

BFRC Services, LLC

## GERALD W. BUETOW, JR., Ph.D., CFA, CIPM

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

*Journal of Applied Mathematics and Computation,* Spring 1998.

"An Empirical Evaluation of the Information Signaling and Financial Distress Hypotheses," *Journal of Financial and Strategic Decisions,* Spring 1998.

"Managing Risk with Derivatives," co-authored with C. Baril and R. Benke, *Managerial Accounting* , Fall 1996.**

"A Finite Difference Approach to the Pricing of Options Using Absorbing Boundary Conditions,"  with J. Sochacki, *Journal of Financial Engineering,* September 1995, 263-280.

"An Alternative Call Policy for Convertible Debt,"  with S. Buell,   *Journal of Financial and Strategic Decisions*, Fall 1995, 27-41.

"A Comparative Analysis of Bridge Deterioration Rates," Co-authored with D. Veshosky and C. Beidleman,  *Journal of Structural Engineering*, July 1994, 2123-2136.

"An Empirical Study of the Deterioration of American Bridges," Co-authored with C. Beidleman and D. Veshosky, *NSF Research Report*, ATLSS Engineering Research Center, Lehigh University, 1991.

## BOOKS

Term Structure Modeling Using Binomial Trees, with James Sochacki, AIMR Research Foundation, Fall 2001.

Valuation of Interest Rate Swaps and Swaptions, with Frank J. Fabozzi, John Wiley & Sons, 2000.

## WORKING PAPERS and CURRENT RESEARCH

"Non Cap-Weighted ETF Report Card," with B. Hanke and B. Henderson.

"Security Short Selling: An Empirical Analysis," with B. Henderson.

"The Empirical Relationships between Capital Markets and underlying Fundamentals – Pre and Post Crisis," with B. Henderson.

"Distributional Characteristics of Bond and Equity Returns in the G7 Countries: An Empirical Evaluation," with B. Hanke

"Factor Models by Country Equity Markets," with B. Hanke

"An Empirical Evaluation Products Contingent Upon Volatility Indices," with B. Henderson.

"Independent Research v Sell Side Research," with B. Henderson, 2011.

"Monetary Policy and Fixed Income Portfolio Management Strategies, " with B. Henderson, and F. Fabozzi,  2010.

"Attribution Analysis by Industry between Independents and the Sell Side," with B. Henderson, 2009.

"International Monetary Policy and Interest Rate Factors," with B. Hanke and F. Fabozzi, 2007.

"Yield Curve Dynamics, Inflation, and TIPS," with E. Nelling, 2004.

BFRC Services, LLC

# GERALD W. BUETOW, JR., Ph.D., CFA, CIPM

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

"Spot Curve Dynamics Since 1980," 2004.

"Spot Curve Dynamics and Monetary Policy: A Geometric Analysis," 2004.

"Master Limited Partnerships as an Asset Class," with S. Lummer, 2004.

"Is the Influence on Monetary Policy on Long Run Asset Returns Changing? A Detailed Analysis," with B. Hanke, 2003.

"An Alternative No Arbitrage Term Structure Model," with J. Sochacki, F. Fabozzi, and B. Hanke, 2002.

"Pricing Barrier Options Using the Finite Difference Approach," with James Sochacki, Working Paper, James Madison University, 2001.

"Should Stable Value be an Asset Class?," with Hal Ratner, 2001.

"Portfolio Optimization and Mean Variance Analysis: Some Common Misuses," with David Runkle, 2000.

"Federal Reserve Monetary Policy and Emerging Market Stock Returns," with Mitch Conover, Gerry Jensen, and Robert R. Johnson, 2000.

"International Value and Growth Stock Returns and Fed Policy." with Gerry Jensen and Robert R. Johnson, 2000.

"UK, Germany and Japan Monetary Policy and Asset Returns." with Gerry Jensen and Robert R. Johnson, 2000.

"Using Derivatives in Real Estate Portfolio Management," with J. Albert, Working Paper, James Madison University, 2000.

"Monetary Policy and Real Estate: Investment Implications," with J. Albert, 2001.

"Equity Duration and Federal Reserve Policy," with Amy Lipton, 2001.

"Tactical Asset Allocation with Real Estate under Different Monetary Policy Regimes," with J. Albert, 2000.

"Implied Volatilities and Monetary Policy," with D. McLeavey, 2000.

"The Implications of Federal Reserve Monetary Policy on Global Macroeconomic Variables," 2000.

"Growth or Value?," Working Paper, James Madison University, 1998.

"Pricing Path Dependent Asian Options using Finite Differences," Working Paper," James Madison University, 1998.

"A Non-linear (Bidirectional) Continuous Time Contingent Claim Valuation Model," with J. Sochacki, Working Paper, James Madison University, 1997.

"Using the Inverse Finite Difference Approach to Evaluate the Contingent Claim Diffusion Term," with Tao Lin, Working Paper, James Madison University, 1996.

"Portfolio Insurance and the Opportunity Cost of not Investing in the Market Portfolio," Working Paper, James Madison University, 1995.

"An Efficient Approach for the Application of Ordinary Least Square Regression Analysis to Nonlinear Relationships," with C. Beidleman and D. Veshosky, Working Paper, Lehigh University, 1993.

BFRC Services, LLC

**GERALD W. BUETOW, JR., Ph.D., CFA, CIPM**

1705 Owensfield Drive, Charlottesville, VA 22901; 434-923-3222, E-mail: gwb@bfrcservices.com

**PAPERS PRESENTED/ACCEPTED AT PROFESSIONAL MEETINGS**

"Monetary Policy and Fixed Income Returns," with R. Johnson and F. Reilly, European Financial Management Association, Edinburgh, 2000.

"The equity option volatility smile: an explicit finite-difference approach," Financial Management Association, Fall 1999.

"The equity option volatility smile: an explicit finite-difference approach," Mid Western Finance Association, Spring, 1999.

"Developing a Quantitative Finance Program," with J. Albert, FMA's, Chicago, 1998.

"Applications of Structured Derivatives in Real Estate," with J. Albert, 1998 Annual American Real Estate Society, CA.

"Pricing Contingent Claims Using a More Accurate Finite Difference Method," 1996 Financial Management Association, New Orleans, LA.

"A Finite Difference Approach to the Pricing of Options with Dynamic Boundary Conditions," 1995 Financial Management Association, New York, N.Y.

"Applications of Financial Engineering in Real Estate," with J. Albert, 1994 Annual American Real Estate Society, Santa Barbara, CA.

"The Pricing of Embedded Options in Real Estate Lease Contracts," with J. Albert and J. Sochacki, 1995 Annual American Real Estate Society, Hilton Head, SC.

## Research Awards and Honors

2014 -  William Sharpe Paper of the Year Finalist for "Are Cash Flows Costly to ETF Investors?"
2013 – William Sharpe Paper of the Year Finalist for "An Empirical Analysis of Exchange Traded Funds"
1996-1997 James Madison University College of Business Research Publication Award –best academic paper.
1995-1996 James Madison University College of Business Research Publication Award – best practitioner paper.
1996 Gold Medal Award for Outstanding Paper from the Institute of Managerial Accounting (IMA).