# Exhibit 008

Confidential – Pursuant to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RONDA A. PLEDGER, SANDRA BRITT, JENNIFER L. PRIMM, ALEX BROOKS, JR., AND EDWARD COMER BUCK, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:15-cv-04444-MHC |
| RELIANCE TRUST COMPANY, INSPERITY, INC., INSPERITY HOLDINGS, INC., INSPERITY RETIREMENT SERVICES, L.P., INSPERITY RETIREMENT PLAN COMMITTEE, and JOHN DOES 1-20, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## EXPERT REPORT OF SAMUEL HALPERN
## ON BEHALF OF THE INSPERITY DEFENDANTS

Confidential – Pursuant to Protective Order

# TABLE OF CONTENTS

I.     INTRODUCTION .......................................................................................... 1

II.    SCOPE OF REPORT .................................................................................... 2

III.   BACKGROUND .......................................................................................... 2

IV.   SOURCES AND GENERAL NATURE OF APPLICABLE STANDARDS FOR
MONITORING FIDUCIARIES ..................................................................... 3

V.    PLAINTIFFS' ALLEGATIONS ..................................................................... 5

VI.   EXECUTIVE SUMMARY OF OPINIONS ....................................................... 7

VII.  INSPERITY MET, IF NOT EXCEEDED, APPLICABLE STANDARDS FOR
MONITORING RELIANCE DURING THE CLASS PERIOD, BY
PERFORMING ITS FUNCTIONS WITHIN A WELL-STRUCTURED
FRAMEWORK OF POLICIES, PRACTICES AND CHANNELS OF
COMMUNICATION ..................................................................................... 9

    A.   Under the Governing Plan Documents, Insperity's Role Was Only To
Monitor Reliance .................................................................................. 9

    B.   Insperity's Well-Structured Framework for Monitoring Reliance ....................... 10

    C.   Reliance's Documented Processes for Selecting and Monitoring Investment
Funds ................................................................................................. 12

         1.   The Investment Policy Statement Provided an Initial Framework ........... 12

         2.   Reliance's Processes for Selecting and Monitoring Funds ..................... 12

    D.   Channels of Ongoing Communication .................................................... 15

         1.   Annual Trustee Reports and Meetings ................................................ 15

         2.   Quarterly Investment Performance Reports ......................................... 16

         3.   Fund Fact Sheets .......................................................................... 17

         4.   Additional Lines of Communication .................................................. 17

    E.   Insperity's Experience with and Knowledge of Reliance as an Organization
.......................................................................................................... 19

    F.   Insperity Considered Other Candidates to Replace Reliance .............................. 20

Confidential – Pursuant to Protective Order

VIII.   INSPERITY MET, IF NOT EXCEEDED, APPLICABLE STANDARDS FOR MONITORING RELIANCE DURING THE CLASS PERIOD REGARDING THE SPECIFIC ISSUES PLAINTIFFS HAVE RAISED.................................................. 21

    A.   Insperity Reasonably Monitored Reliance's Decision To Establish the Horizon Funds and Add Them to the Plan's Investment Menu........................... 21

        1.   Designing and Establishing the Horizon Funds........................................ 21

            a.   Recent Financial History Warranted Protecting Against Equity Risk.................................................................................... 21

            a.   Insperity Began Monitoring Information about the Potential New Target Date Funds in 2011 .................................................... 22

            b.   Insperity Continued Diligently Monitoring Information about the Potential New Target Date Funds in 2012 ................... 24

            c.   Insperity Reasonably Concluded that Reliance Had Sufficient Experience and Expertise to Establish and Manage the Horizon Funds............................................................ 31

            d.   Insperity Reasonably Concluded that Reliance Appropriately Evaluated the Expense Ratios of the Horizon Funds and that Reliance's Fee Was Appropriate ......................... 34

        2.   Insperity Reasonably Monitored Reliance's Performance as Trustee and Investment Manager for the Horizon Funds. .................................... 38

            a.   Insperity Monitored the Performance of the Horizon Funds ........ 39

            b.   Insperity Monitored Reliance's Use of F-Squared as Tactical Advisor to the Horizon Funds....................................................... 40

    B.   Insperity Reasonably Monitored Reliance's Conduct in Selecting and Periodically Replacing Other Investment Options ............................................... 41

IX.   CONCLUSION............................................................................................................ 44

Confidential – Pursuant to Protective Order

**Exhibits**

Exhibit A – List of Materials Considered

Exhibit B – Qualifications

Exhibit C – Chart of Quarterly Performance Reports

Exhibit D – 2010 Annual Trustee Report (NSP-000011035)

Exhibit E – 2011 Annual Trustee Report (NSP-000011036)

Exhibit F – 2012 Annual Trustee Report (NSP-000011037)

Exhibit G – 2013 Annual Trustee Report (NSP-000011038)

Exhibit H – 2014 Annual Trustee Report (NSP-000011039)

Exhibit I – 2015 Annual Trustee Report (NSP-000011040)

Exhibit J – 2016 Annual Trustee Report (NSP-000011041)

Exhibit K – 2017 Annual Trustee Report (NSP-000011042 to NSP-000011044)

Confidential – Pursuant to Protective Order

## I.     <u>INTRODUCTION</u>

I have been retained as an expert witness regarding *Pledger v. Reliance Trust Company, et al,* in the U.S. District Court for the Northern District of Georgia.  This report sets forth my analyses and opinions concerning the reasonableness of the practices that Insperity Holdings, Inc. ("Insperity") employed when monitoring the performance of Reliance Trust Company ("Reliance"), as the sole discretionary trustee and investment manager of the Insperity 401(k) Plan (the "Plan") from December 22, 2009 until September 30, 2017 (the "Class Period").

This report uses the following definitions and terms:

- "Insperity" — means Insperity Holdings, Inc., the named fiduciary of the Plan under Section 402(a) of ERISA, and a subsidiary of Insperity, Inc.  As discussed more fully below, Insperity performed its role as the Plan's named fiduciary primarily through its three Directors.   However, the Directors of Insperity were assisted by other employees of Insperity, Inc.'s subsidiaries in monitoring Reliance's performance as discretionary trustee to the Plan.   For this reason, references to "Insperity" herein include the Directors of Insperity and other employees of Insperity, Inc.'s subsidiaries who assisted the Directors of Insperity in that regard.

- The "Plan" — means the Insperity 401(k) Plan.

- "Reliance" — means Reliance Trust Company, the Plan's discretionary trustee and investment manager.

- "Applicable Standards" — means reasonable functional standards and practices for ERISA named fiduciaries (under Section 402 of ERISA) when monitoring a discretionary fiduciary to which they have delegated day to day investment authority and discretion, such as a trustee or investment manager.

- "Monitoring Fiduciaries" or "Monitoring Fiduciary" — means the individuals or entity with authority, responsibility and discretion to delegate investment authority and discretion to an ERISA Section 3(38) investment manager or discretionary trustee, and who then retain residual duties to monitor the performance of that delegate.  The Monitoring Fiduciary here was Insperity, as named fiduciary of the Plan under Section 402(a) of ERISA, acting through the three Directors and assisted by employees of Insperity, Inc.'s other subsidiaries in performing this function.

- The "Class Period" — means the period from December 22, 2009, through September 30, 2017.

- The "Horizon Funds" — mean the target date funds that Reliance designed, established and managed for the Plan and that, in or about November 2012, replaced the target date funds that J.P. Morgan had previously managed for the Plan.

Confidential – Pursuant to Protective Order

## II.    SCOPE OF REPORT

This Report examines:

    A.  Whether, under then-prevailing circumstances, Insperity met Applicable Standards for monitoring Reliance during the Class Period.

    B.  More specifically, under then-prevailing circumstances, whether Insperity met Applicable Standards for monitoring Reliance during the Class Period regarding the key issues Plaintiffs have raised:

        1.  Reliance's decision to establish the Horizon Funds and add them to the Plan's investment menu;

        2.  Reliance's subsequent performance as investment manager for the Horizon Funds; and

        3.  Reliance's conduct in selecting, monitoring and periodically replacing the Plan's other investment options (including mutual funds and collective trusts) with, among other features, expense ratios that included a component for revenue sharing.

This Report contains my opinions on the issues set forth above, along with an explanation of the grounds for those opinions.[1]  A list of materials that I reviewed, considered and relied upon in forming my opinions is attached as Exhibit A.

## III.    BACKGROUND

My resume, describing my qualifications as an expert, is attached as Exhibit B.

I have previously testified as an expert witness in several matters. These include:

- Perez v. Bruister, 54 F. Supp.3d 629 (S.D. Miss. 2014) (trial), aff'd, 823 F.3d 250 (5th Cir. 2016)

- Spear v. Fenkell, Case No. 2:13-cv-02391-RAL (E.D. Pa.) (deposition 2017)

- Fish v. Great Banc Trust, Case No. 09-CV-1668, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016) (deposition 2016)

---

[1]    I have not formed and am not expressing an opinion on: (1) the reasonableness of the Plan's administrative expenses or the method of allocating costs among plan participants; (2) the appropriateness of the Monitoring Fiduciaries selecting Insperity Retirement Services as the Plan's recordkeeper; or (3) whether, as trustee or investment manager, Reliance met industry standards for investment due diligence and when managing the Plan's revenue sharing account.  I am not testifying to legal opinions or conclusions.

Confidential – Pursuant to Protective Order

- <u>Henderson, et al. v. BNY Mellon,</u> Case No. 1:15-cv-10599-PBS (D. Mass.) (deposition 2017)

My company, Prudent Expert, LLC, is being compensated for my services at the rate of $675 per hour, after a recent annual inflation adjustment. That compensation is in no way contingent on the nature of my opinions or the outcome of this matter.

In addition to the materials cited in Exhibit A, my opinions are based on my many years of experience as an investment professional, an independent fiduciary and a practicing attorney concentrating in fiduciary investment decisions. The bulk of my experience concerns investments regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), though I also have dealt extensively with standards and practices for investing by or on behalf of other types of institutional and high net worth investors, such as personal trusts, public pension funds (regulated under state and local law), foundations, endowments and sovereign wealth funds of foreign countries. Most of my career has revolved around providing investment advice to Monitoring Fiduciaries (such as investment committees, boards of trustees and other decision-makers), plus central involvement in my prior firm's functions as an "independent fiduciary," investment manager under Section 3(38) of ERISA and/or named fiduciary under Section 402 of ERISA. This includes extensive experience with searching for and selecting investment firms and investment vehicles (such as mutual funds and trusts) as a fiduciary, as well as acting as a Monitoring Fiduciary and periodically replacing such firms and vehicles for a variety of ERISA plans, including many 401(k) plans. My experience also includes advice and analysis on governance regarding fund investment programs, including 401(k) plans, defined benefit plans and sovereign wealth funds.

## IV.   <u>SOURCES AND GENERAL NATURE OF APPLICABLE STANDARDS FOR MONITORING FIDUCIARIES</u>

My opinions of what constitute "Applicable Standards" for Monitoring Fiduciaries are based on several sources:

- My extensive experience with my own firm,[2] responsible as a fiduciary for advice and decisions on selecting and monitoring investment managers, trustees and investment funds for a wide range of clients (including many 401(k) plans), across a wide range of asset classes, subclasses and strategies. My experience in that regard includes acting

---

[2]   In 1986, I helped establish and develop the predecessor to my firm, then owned by the investment bank and broker dealer, Bear, Stearns & Co. and named Bear Stearns Fiduciary Services, Inc. In 1996, my business partner and I purchased 100% of the firm from Bear Stearns and renamed it Independent Fiduciary Services, Inc. ("IFS"). I served as the firm's President, one of two owners and one of three members of our Executive Committee. We later added several other senior colleagues as minority shareholders and in 2011, sold all the assets of IFS to the publicly-traded company, Arthur J. Gallagher. The firm then operated under the name Gallagher Fiduciary Advisors, LLC. ("Gallagher"). At that point, I remained President of our two former offices in Washington, D.C. and Newark, New Jersey and served as one of three members of the Executive Committee that operated and guided the firm, until I retired from Gallagher in 2015. *See* Ex. B.

Confidential – Pursuant to Protective Order

as team leader on assignments where my firm was itself the Monitoring Fiduciary as either a named fiduciary under Section 402(a) of ERISA, an investment manager under Section 3(38) of ERISA or an "outsourced chief investment officer" ("OCIO") or "independent fiduciary."

- My extensive experience with my firm handling assignments where we advised or critiqued Monitoring Fiduciaries or plan sponsors, as an investment consultant and "investment advice fiduciary" under Section 3(21)(A) of ERISA, concerning selection and monitoring of investment funds and managers, as well as governance and operation of their investment programs.  In those situations, the Monitoring Fiduciaries were typically not investment experts themselves and, instead, delegated or allocated investment authority to others who were such experts.

- My extensive experience observing the processes, practices and standards other fiduciaries and investment consultants employ in selecting and monitoring investment managers, trustees and investment funds.

- My extensive experience studying and discussing with lay fiduciaries and plan sponsors as well as other investment professionals the extensive literature and analyses concerning various ways of selecting and monitoring investment managers, trustees and investment funds and governance structures for such tasks.

- My professional familiarity with functional fiduciary standards and practices as they have developed under various bodies of law, such as ERISA, including applicable regulatory provisions, case law and guiding principles.

In my opinion, Applicable Standards for a Monitoring Fiduciary overseeing a discretionary trustee (or investment manager it has appointed) revolve around reviewing and understanding the processes and lines of analysis of the discretionary trustee or investment manager, but not duplicating, overturning or displacing them.[3]  The role of the Monitoring Fiduciary, as I have performed, observed and advised on it, is not to select or regularly evaluate the investment funds of a 401(k) plan—that role is for the trustee/investment manager.  Rather, the role of the Monitoring Fiduciary is simply to reasonably oversee the trustee/investment manager.  The point of this oversight is to determine whether the delegation of authority and discretion to the trustee or investment manager remains reasonable.

---

[3]     Under ERISA, a plan's named fiduciaries under Section 402(a) are authorized to delegate discretionary investment management authority to either a discretionary trustee (*see* Sections 403(a) and 405(c)) or an investment manager (*see* Sections 3(38) and 402(c)).  This report refers to both "discretionary trustees" and "investment managers" for two reasons.  First, in my experience and opinion, the functional obligation of the Monitoring Fiduciary, as the party that appoints, delegates and monitors, is in practice equivalent, regardless of whether the delegate is a discretionary trustee or investment manager.  Second, this report refers to both discretionary trustees and investment managers because, as discussed more fully below, Reliance was the "discretionary trustee" regarding most of the Plan's investment options but also an "investment manager" regarding the Horizon Funds.

Confidential – Pursuant to Protective Order

In fact, in a 401(k) plan, where the investment options are in the form of pooled vehicles (like mutual funds or collective trusts), the Monitoring Fiduciary is generally two steps removed from day-to-day management of the underlying assets:

1.   Closest to "the ground" is the adviser or asset manager for the vehicle that builds and manages its investment portfolio (a mutual fund's own investment adviser);

2.   Next up the chain is the trustee/ investment manager that selected that vehicle and evaluates its performance on an ongoing basis; and

3.   Above those two levels is the Monitoring Fiduciary that selected the second level trustee/ investment manager.

In short, given this three-level architecture, the practical burdens and hands-on functions of the Monitoring Fiduciary are far less intensive and direct than those of the trustee/ investment manager.  This is true even where the trustee/investment manager develops and adds to a 401(k) plan a fund of funds which pays it fees for administering, selecting and/or periodically rebalancing among the underlying, third party funds.  In that instance, the Monitoring Fiduciary remains in a conflict-free position to monitor the trustee/manager's decisions.  In that position, the Monitoring Fiduciary should consider the reasonableness of the process of the trustee/manager in deciding to add the fund of funds and subsequently, when evaluating the performance of the trustee/manager as the "manager of managers."  However, even in that situation, the practical burdens and hands-on functions of the Monitoring Fiduciary are less intensive and direct than those of the trustee/investment manager, who is responsible for supervising the portfolio of underlying funds and their respective asset managers.

In an arrangement like this — where the Monitoring Fiduciary (Insperity) selects a trustee/investment manager (Reliance) and the latter then selects and evaluates underlying pooled vehicles (such as mutual funds) — the practical duties and functions of the Monitoring Fiduciary essentially consist of receiving and evaluating sufficient information from the trustee/investment manager to enable the Monitoring Fiduciary to reasonably oversee the latter's performance and determine whether to keep it in place.

The specific practices the Monitoring Fiduciary should apply may vary to some extent, depending on the type of investment strategy, assets and other circumstances involved.  But in all cases, the Monitoring Fiduciary's process should be reasonably designed to assess whether the trustee/ investment manager is itself adhering to a sufficient process, with sufficient resources and objectivity.

## V.   PLAINTIFFS' ALLEGATIONS

Plaintiffs acknowledge that, pursuant to Section 10.3 of the Plan, Insperity "delegated its fiduciary responsibility to hold, manage and control the assets of the Plan" to Reliance, including responsibility for the "selection, retention and monitoring of the Plan investment options."[4]   As Plaintiffs concede throughout their Amended Complaint, *Reliance* is the fiduciary responsible for

---

[4]   Amended Complaint ("Am. Comp.") ¶ 23; *see also* ¶ 199.

Confidential – Pursuant to Protective Order

the *selection*, *retention* and *monitoring* of the investment options made available to Plan participants.[5]

Based on my review of the Amended Complaint, I understand that Plaintiffs allege that Reliance failed to act reasonably in selecting the Plan's investment options on several grounds.

- Reliance allegedly selected Horizon Funds that had no performance history — "wholly contrary to the most basic duties."[6]

- The Horizon Funds allegedly carried excessive expense ratios, totaling 53 basis points ("bps"), including 25 for revenue sharing, 10 for acquired fund fees and "up to 18 bps" for investment management.[7]

- The subsequent investment performance of the Horizon Funds was allegedly inferior to several other target date series available in the market, supposedly helping to demonstrate the alleged fiduciary breaches.[8]

- The Plan's other investment options also allegedly charged unduly high fees, when compared to several reference points:

  o share classes of the same funds;[9]

  o other, supposedly comparable funds available from firms such as Vanguard;[10]

  o separately managed accounts;[11] and

  o collective trusts.[12]

Recognizing that Insperity delegated its fiduciary responsibility for selection and retention of the Plan's investment options to Reliance, in Count V, Plaintiffs allege that Insperity failed to adequately "monitor" Reliance "to ensure that any delegated tasks were being performed prudently and loyally."[13]  Specifically, Plaintiffs allege that Insperity failed to adequately "monitor" Reliance in performing its functions as discretionary trustee on several grounds:

- failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan allegedly suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

---

[5]   *See, e.g.,* Am. Compl.¶¶ 2, 18, 35, 57, 58, 60, 62, 91, 100.
[6]   Am. Compl. ¶ 63.
[7]   Am. Compl. ¶ 68.
[8]   Am. Compl. ¶¶ 72-73, 172.
[9]   Am. Compl. ¶ 96.
[10]   Am. Compl. ¶ 104.
[11]   Am. Compl. ¶ 112.
[12]   Am. Compl. ¶ 121.
[13]   Am. Compl. ¶ 201.

Confidential – Pursuant to Protective Order

- failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

- failing to ensure that the monitored fiduciaries, including Reliance, considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's proprietary Reliance funds and other investments; and

- failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, and options that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.[14]

As explained below, in my opinion, each of these allegations is unfounded and without merit.

## VI.   EXECUTIVE SUMMARY OF OPINIONS

In my opinion, from the functional standpoint of a Monitoring Fiduciary (and without expressing opinions as a matter of law):

> **A.      Under then-prevailing circumstances, Insperity met, if not exceeded, Applicable Standards for monitoring Reliance during the Class Period, by performing its functions within a well-structured framework of policies, practices and extensive, continuing channels of communication.**

Pursuant to the Plan and Trust Agreement, Insperity's role as Monitoring Fiduciary was not to duplicate Reliance's role as trustee and investment manager, but only reasonably to monitor Reliance. Insperity's role was on the third level of the Plan's investment program. First — "closest to the ground" — was the investment adviser for each mutual fund, directly responsible for managing its portfolio of securities. Second was Reliance, which selected and evaluated each fund. Third — furthest removed from day to day asset management — was Insperity, responsible only for monitoring Reliance. The practical burdens and hands-on functions of Insperity as Monitoring Fiduciary were less intensive and less direct than those at the two preceding levels.

The Plan's Investment Policy Statement ("IPS") provided Insperity an initial element of the framework for monitoring Reliance, including detailed criteria and processes Reliance applied in the selection and ongoing evaluation of the Plan's investment funds. Consistent with the IPS, Insperity received extensive, detailed information about Reliance's process for selecting and subsequently evaluating funds — including target date funds.

Insperity performed its monitoring function through three Directors of Insperity, supported by several employees of Insperity, Inc.'s subsidiaries, including well-qualified ERISA attorneys and an experienced retirement professional. This combined team received detailed, frequent information and analysis from Reliance in the form of Annual Trustee Reports ("Annual Reports")

---

[14] Am. Compl. ¶ 202.

Confidential – Pursuant to Protective Order

and Annual Trustee Meetings ("Annual Meetings"), quarterly Investment Performance Reports ("Investment Performance Reports"), fund fact sheets, and several additional ongoing lines of communication such as e-mails, phone calls, memoranda and other periodic meetings. Insperity diligently and carefully probed and questioned Reliance and repeatedly sought additional explanation or detail about Reliance's processes and criteria for selecting and evaluating investment funds, including the Horizon Funds. Insperity also kept informed about Reliance as an organization and considered other candidates as possible replacements for Reliance.

In my opinion, the record demonstrates that Insperity met, if not exceeded, Applicable Standards for monitoring Reliance during the Class Period.

> **B.**   **More specifically, under then-prevailing circumstances, Insperity met, if not exceeded, Applicable Standards for monitoring Reliance during the Class Period with respect to the key issues Plaintiffs have raised.**

*First,* Insperity reasonably monitored Reliance's decision to establish the Horizon Funds. In the wake of the 2008 Financial Crisis, Reliance and Insperity — like many other investors — considered the risk of another market sell-off and ways to potentially protect the Plan's participants. Insperity began monitoring Reliance's analysis of whether and how to establish a series of target date funds in 2011 and continued monitoring this effort through late 2012, when those funds were finally implemented in the Plan. Insperity became informed regarding the fact that Reliance had considered other possible firms and vehicles for providing these target date funds, as well as extensive technical investment and other details regarding Reliance's analysis, including, *e.g.,* fees and expenses, ways to reduce equity risk, the strategic asset allocation or glidepath, use of active vs. passive management, collective trusts vs. mutual funds and more. Insperity insisted on and studied several rounds of detailed memoranda from Reliance to explain its process and deliberations in developing and deciding on the nature and terms of what ultimately became the "Horizon Funds."

Insperity reasonably concluded that Reliance had sufficient experience and expertise to establish and manage the Horizon Funds and learned the relevant aspects of their performance history. Insperity was informed about: the nature of the underlying funds comprising each Horizon Fund (all were third party funds; none was managed by or proprietary to Reliance); Reliance's experience and process for developing the glidepath/strategic asset allocation and rebalancing its components over time; and the equity de-risking program, including the reported performance record of the advisor Reliance selected to assist it in that regard, F-Squared.

Plaintiffs allege the Horizon Funds charged an unduly high expense ratio and that the fee to Reliance was high as well. However, Insperity reasonably concluded that Reliance appropriately evaluated that expense ratio and that Reliance's own fee was appropriate as well. Each fund's overall expense ratio included a component for "revenue sharing," which effectively were payments from the mutual funds to defray Plan expenses that participants would otherwise directly bear in "hard dollars." Reliance carefully accounted for such revenue sharing payments and Insperity monitored Reliance's accounting and its evaluation of expense ratios, both before and after applying the revenue sharing payments. Plaintiffs also allege that Reliance received an "investment management fee" of 18 basis points from the Horizon Funds, but that is incorrect for

Confidential – Pursuant to Protective Order

several reasons explained below, including the fact that there was no such "investment management fee."

*Second,* after the Horizon Funds were selected by Reliance and implemented, Insperity reasonably monitored Reliance's performance as trustee/investment manager for those funds. Insperity received and carefully considered extensive analysis and information about the performance of the Horizon Funds and Reliance's ongoing management of them, including performance attribution reports and the role of F-Squared.

*Third,* Insperity reasonably monitored Reliance's selection and replacement of the Plan's other investment options. Plaintiffs claim the expense ratios of those funds were excessive, but ignore (again) the fact that a portion was used to defray costs that participants would otherwise directly bear. Considering only the "gross" expense ratio is misleading; proper analysis considers the gross, then the revenue sharing component; and finally, the net cost. Plaintiffs' other comparisons of the Plan's investment funds relative to other funds across the marketplace are also flawed for a variety of reasons explained more fully below.

In my opinion, the record demonstrates that Insperity met, if not exceeded, Applicable Standards for monitoring Reliance during the Class Period with respect to the key issues Plaintiffs have raised.

## VII.   INSPERITY MET, IF NOT EXCEEDED, APPLICABLE STANDARDS FOR MONITORING RELIANCE DURING THE CLASS PERIOD, BY PERFORMING ITS FUNCTIONS WITHIN A WELL-STRUCTURED FRAMEWORK OF POLICIES, PRACTICES AND CHANNELS OF COMMUNICATION

The record is replete with documents that memorialize Insperity's extensive involvement with and monitoring of innumerable aspects of the Plan.[15] Consistent with Applicable Standards, the documents laying out the Plan's investment program demonstrate that while Reliance was responsible for investing the Plan's assets and reporting to Insperity, Insperity was responsible only for monitoring Reliance. The record also demonstrates that Insperity performed its monitoring functions within a well-structured framework of policies, practices and channels of communication.

### A.   Under the Governing Plan Documents, Insperity's Role Was Only To Monitor Reliance

The Plan and Trust Agreement, as governing documents, set forth the relative roles and functions of the parties.

Insperity is the plan sponsor, administrator and a named fiduciary of the Plan.[16] Pursuant to Section 405 of ERISA, 29 U.S.C. § 1105(c), and Section 10.3 of the Plan, Insperity "may delegate,

---

[15]    This Report cites only representative samples of relevant documents and does not attempt an exhaustive listing.

[16]    *See* the January 1, 2014 Plan document (the "Plan") (NSP-000010901) at § 2.4 (defining the "Administrator" as the "Company"); § 2.12 (defining the "Company" as "Insperity Holdings, Inc."); and § 10.1 (noting the Administrator is a fiduciary).

Confidential – Pursuant to Protective Order

by written instrument, all or any part of its responsibilities under the Plan."[17]   Pursuant to the Trust Agreement, Insperity "delegated its fiduciary responsibility to hold, manage and control the assets of the Plan" to Reliance, including responsibility for the "selection, retention and monitoring of the Plan investment options."[18]   In that role, Reliance, as Trustee, has all authority and responsibility for management and control of the Trust Fund.[19]   By delegating these duties to Reliance, Insperity no longer retained any fiduciary responsibility for these functions, as the Plan explicitly prohibits any such fiduciary responsibility to be "shared" by more than one fiduciary.[20]

Consistent with these provisions of the Trust Agreement, the Summary Plan Description ("SPD") provided to participants clearly states that Reliance "selects" all investment options.[21]

In my opinion, pursuant to the Plan and Trust Agreement, Insperity's role as Monitoring Fiduciary was not to duplicate Reliance's role as trustee and investment manager, but only reasonably to monitor Reliance.

### B.    Insperity's Well-Structured Framework for Monitoring Reliance

Insperity performed its role as the Plan's named fiduciary through three Directors of Insperity — Richard Rawson (President, Insperity, Inc.); Daniel Herink (Senior Vice President of Legal, General Counsel and Secretary, Insperity, Inc.); and Paul Sarvadi (Chairman and CEO, Insperity, Inc.).[22]   In 2015, Jim Allison (Senior Vice President, Insperity, Inc.) replaced Mr. Sarvadi as a director of Insperity and then assumed Mr. Sarvadi's role with respect to the Plan.[23]

The Directors of Insperity were assisted by other employees of Insperity, Inc.'s subsidiaries in monitoring Reliance's performance as discretionary trustee to the Plan.   Mr. Rawson generally took the lead in monitoring Reliance's performance on investment matters, with assistance from Mr. John Stanton (Managing Director of Insperity Retirement Services, L.P.) and his leadership

---

[17]    *See* Plan (NSP-000010901) at § 10.3; *see also* Am. Compl. ¶ 23.

[18]    Am. Compl. ¶ 23; Trust Agreement (the "Trust Agreement") (NSP-000010904) at § 3.2 ("Trustee shall perform discretionary investment services for the Plan.  Such services shall include the following: (a) researching, selecting, monitoring and replacing Investment Funds; and (b) providing quarterly investment performance analyses and reports to the Plan Sponsor.").

[19]    *See* Trust Agreement at § 4.1(a) ("The Trustee shall serve as discretionary trustee and have all authority and responsibility for the management and control of the Trust Fund.").  In addition, the Trust Agreement states that the Trustee is obligated to hold, manage and control all contributions.  Trust Agreement at §§ 3.3, 3.5(b).

[20]    *See* Plan § 10.4, at p. 49.

[21]    *See* Summary Plan Description (NSP-000010902) at Q&A. No. 28.  Similarly, page 5 of the "Plan Highlights" Booklet ("Plan Highlights" Booklet) (NSP-000010903) states that the Horizon Funds are managed by Reliance.

[22]    Deposition of Daniel Herink ("Herink Dep."), at pp. 37:22-42:5;  Deposition of Richard Rawson ("Rawson Dep."), at pp. 23:3-24:21; Deposition of John Stanton ("Stanton Dep."), at pp. 71:3-22.

[23]    Herink Dep., at p. 38:3-23.

Confidential – Pursuant to Protective Order

team.[24]   Mr. Stanton and his leadership team met with Mr. Rawson frequently to discuss, among other things, the Plan's investments.[25]   If Reliance changed any investment options, Mr. Stanton would discuss such changes with Mr. Rawson.[26]   Based on their review of the quarterly Investment Performance Reports from Reliance, Mr. Stanton and his team completed their own analysis of investment performance relative to peers and benchmarks, expense ratios relative to peer groups, Morningstar ratings and amounts available for expense reimbursement and submitted that analysis to Mr. Rawson.[27]

Mr. Herink generally took the lead in monitoring Reliance's performance with respect to any legal matters, and was assisted by two well-qualified lawyers within his department — Dan Pollina (Managing Counsel, Insperity, Inc.) and Doug Sivula (Assistant General Counsel, Insperity, Inc.).[28]   Mr. Herink also kept apprised of Plan investments and monitored Reliance through the Annual Meetings with Reliance as well as periodic updates from others in the company, such as Messrs. Rawson, Pollina, Stanton and Sivula.[29]

During relevant times when each was a Director of Insperity, Messrs. Sarvadi and Allison kept apprised of Plan investments and monitored Reliance through the Annual Meetings with Reliance and updates as needed from Messrs. Rawson and/or Herink.[30]

In my opinion, the fact that the Directors of Insperity enlisted qualified employees to assist with monitoring Reliance was both appropriate and reasonable.

---

[24]   Herink Dep., at pp 80:13-85:1, 96:14-97:18; Stanton Dep., at pp 66:23-70:1, 78:19-81:18, 114:22-115:22.  Mr. Stanton reported to Neal Shifman when Shifman joined the firm in 2013 and Mr. Shifman reported to Mr. Rawson.  However, even after 2013, Mr. Stanton sometimes communicated directly with Mr. Rawson, both orally and by e-mail.  Stanton Dep., at pp. 73:5-77:5.

[25]   For examples of meetings between Mr. Rawson and Mr. Stanton, *see, e.g.*, NSP-000020168, NSP-000020205-06, NSP-000020228, NSP-000020303, NSP-000020312, NSP-000020345, NSP-000020366, NSP-000020398, NSP-000020399, NSP-000020408, NSP-000020409, NSP-000020420, NSP-000020454, NSP-000020459, NSP-000020466, NSP-000020494, NSP-000020499, NSP-000020507, NSP-000020538, NSP-000020539, NSP-000020548, NSP-000020551, NSP-000095414, NSP-000020604, NSP-000020607, NSP-000020609, NSP-000036366, NSP-000036377, NSP-000036378-79, NSP-000036383, NSP-000036421.

[26]   Stanton Dep., at pp 80:24-81:24, 114:22-115:22, 119:6-122:9.

[27]   Stanton Dep., at pp. 116:14-120:22.

[28]   Herink Dep., at pp. 23:14-25:23, 95:15-97:18.

[29]   Herink Dep., at pp 27:11-29:22, 56:24-58:20, 118:18-131:8, 201:1-202:19.

[30]   Herink Dep. at pp. 82:3-6, 128:11-14, 193:20-23.

Confidential – Pursuant to Protective Order

C.    **Reliance's Documented Processes for Selecting and Monitoring Investment Funds**

1.    **The Investment Policy Statement Provided an Initial Framework**

The purpose of an Investment Policy Statement ("IPS") is typically to set forth the relative roles and responsibilities of the parties, identify the plan's investment objectives, and articulate permitted and impermissible investments and strategies.  Here, as with the Plan and Trust Agreement, the Plan's IPS stressed that investment responsibility was assigned to Reliance, including responsibility to determine the categories of the Plan's investment options (*e.g.,* large cap value, short duration fixed income) and to select investment vehicles for each such category.[31]

The IPS declares:

> *The Plan Administrator has appointed Reliance Trust Company as the independent discretionary trustee who will manage the overall investment process.  The Trustee will be responsible for ensuring that a disciplined investment process is established and maintained…"*[32]

The IPS goes on to specify a great many aspects of the overall investment program, including identifying numerous qualitative and quantitative criteria for Reliance's investment due diligence when selecting investment funds in general, and target date funds and QDIAs in particular; quarterly monitoring of investment options; a "watch list" process concerning investment vehicles under special scrutiny and annual review of expense ratios, peer group comparisons and revenue sharing, among other factors.[33]  The IPS states that the target date funds constitute the Plan's "qualified default investment alternative," as specified in U.S. Department of Labor regulations.[34]

In my opinion, the IPS here provided a well-documented framework for Reliance to select and monitor investment funds and for Insperity to perform its role as Monitoring Fiduciary.

2.    **Reliance's Processes for Selecting and Monitoring Funds**

Consistent with the IPS but going far beyond it, Insperity received extensive documentation and information about Reliance's process for selecting and subsequently evaluating investment options.  Nicholas Cotter (Reliance) testified that he typically explained Reliance's process for selecting and monitoring funds, including both quantitative and qualitative processes and monitoring criteria to Insperity at the Annual Meetings.[35]  For example, the March 2010 Trustee

---

[31]     There were three applicable versions of the IPS during the Class Period.  The November 2008 IPS (NSP-000010925), the March 2010 IPS (NSP-000010926), and the November 2012 IPS (NSP-000010927).

[32]     *See* March 2010 IPS (NSP-000010926) at p. 8; *see also* November 2008 IPS (NSP-000010925) at p. 8; November 2012 IPS (NSP-000010927) at p. 8.

[33]     *See generally,* November 2008 IPS (NSP-000010925); March 2010 IPS (NSP-000010926); the November 2012 IPS (NSP-000010927).

[34]     *Id.*

[35]     Deposition of Nick Cotter ("Cotter Dep.") at pp 162:14-164:2.

Confidential – Pursuant to Protective Order

Report sets forth the "Manager Selection Process" and "Monitoring Process."[36]  Through these documents and presentations, Insperity learned in detail the combination of quantitative, fundamental and qualitative factors that Reliance used when selecting investment funds.  These included:

- *Quantitative factors*: use of software and research from Zephyr and Morningstar; peer group rankings; batting average compared to the applicable index benchmark; beta; and downside capture;[37]

- *Fundamental factors*:  style, based on both holdings and returns analysis; performance during bull and bear markets; portfolio composition; historical investment decisions; fees and expenses; changing assets under management in the respective investment discipline;

- *Qualitative factors*: access to each fund's portfolio manager(s); organizational matters such as the firm's culture, regulatory issues, compensation incentives and experience and stability of the investment team; the strategy's philosophy and process; the team's investment outlook.

The same documents also provided Insperity information regarding the criteria Reliance applied in its ongoing evaluation of funds:

- Performance against peers;

- Risk-adjusted returns;[38]

- Changes in or stability of the investment professionals who managed the strategy;

- Changes in the assets under management in the strategy;

- Deviations from the fund's expected style or strategy;

---

[36]    *See* March 2010 Trustee Report (NSP-000011035), at pp. 18-19; *see also*, Reliance "Investment Manager Screening and Monitoring Process" (NSP-000012666).

[37]    Zephyr is a widely-used analytical system for evaluating risk and classifying investments, among other things.  Morningstar is a widely-used research platform concerning mutual funds. "Batting average" refers to the percentage of times a given investment account outperforms the applicable market index benchmark.  "Beta" is a statistical measure of systematic risk, i.e., the extent to which a portfolio tends to move in tandem with an applicable market index.  "Downside capture" measures the extent to which a portfolio loses money in an adverse market, compared to the applicable benchmark.  The foregoing statements, as well as footnote 38, are based on my knowledge and experience evaluating and monitoring investment accounts and institutional investment portfolios.

[38]    Risk-adjusted returns combine in a single statistic both the nominal return of an investment and its risk, commonly measured by the standard deviation or volatility of those returns over time.

Confidential – Pursuant to Protective Order

- Fees and expenses;

- Other extraordinary events; and

- The extent to which Reliance continues having confidence in the manager.

In my opinion, these are all relevant and appropriate criteria for selecting and thereafter evaluating investment funds, consistent with Applicable Standards.

Insperity further learned information about Reliance's process for selecting target date funds in particular. For instance, the "Reliance Target Date Search" presentation dated February 2010[39] mentioned additional criteria when considering target date fund candidates, including,

- The strength of the overall fund family;

- Quality of underlying funds, including long-term risk adjusted performance, performance consistency and manager tenure;

- The fund's "glidepath" methodology — target "to" or target "through";[40]

- Diversification;

- Expenses; and

- Strategy, including whether tactical management is allowed and if so, how qualified the managers are.

Again, in my opinion, these are all relevant and appropriate criteria for selecting and thereafter evaluating target date funds, consistent with Applicable Standards.

The information and framework fully covered Reliance's investment process for both the wide range of investment options (and for target date funds in particular), including whether, why and how to replace the historic "off the shelf" target date funds with the Horizon Funds managed by Reliance. And, as discussed more fully below, Insperity then monitored Reliance's investment processes within that well-documented framework.

---

[39]     *See* "Reliance Target-Date Search" presentation dated February 2010 (NSP-000021007), at p. 2.

[40]     The formula for adjusting a target-date fund's overall strategic asset allocation and especially decreasing its equity exposure as the participant approaches the target-date (e.g., retirement) is specified by the "glidepath" the fund's investment adviser adopts. One critical factor shaping the glidepath is whether to trim equity risk only up to the retirement date ("to") or to continuing through it, into later years ("through"). In its May 2014 whitepaper, "Reexamining 'To Versus Through': New Research into an Old Debate," the premier investment advisory firm Blackrock explains how a glidepath to retirement is more conservative, more risk-averse and more sensible than a glidepath running through retirement. *See* Blackrock.com/investing/literature/…/to versus-through-whitepaper.pdf.

Confidential – Pursuant to Protective Order

### D.    Channels of Ongoing Communication

Insperity performed its monitoring function within the framework of several continuing channels of communication from Reliance.  Insperity received from Reliance and extensively reviewed an enormous amount of information about the latter's performance as discretionary trustee/investment manager, including detailed, well-drawn annual investment performance reports, quarterly investment performance reports and numerous other communications between the dates of the various formal reports, as explained more fully below.  All this reporting, meeting and other communication occurred within the framework of and consistent with the IPS, which articulated the investment roles and responsibilities of the parties.  In essence, while Reliance handled the underlying investment duties and activities, Insperity's role was simply to review and eventually understand the reports from and performance of Reliance as discretionary trustee/investment manager.

### 1.    Annual Trustee Reports and Meetings

The Annual Trustee Reports ("Annual Reports") were presented by Reliance at an in-person meeting ("Annual Meeting"), typically in February or March each year.[41]  These Annual Reports provided Insperity with extensive and relevant detail not only about Reliance's process for selecting investment options (including the Horizon Funds), but also Reliance's process for evaluating investment options on an ongoing basis and periodically replacing them, as appropriate.[42]  The Annual Reports were extensive, typically providing:

- an overview of the financial markets and economy;

- investment returns for each fund on the Plan's investment platform (including the target date funds), compared to benchmarks and over various time periods (*e.g.,* trailing 10, 5, 3, 1 and year to date figures, plus since inception);

- each fund's style, ticker symbol and ranking relative to peers;

- various metrics dealing with risk (such as standard deviation of returns, beta, upside and downside capture, Sharpe ratio, alpha, information ratio);

- each fund on the "Watch List;" and

- upcoming changes to the fund line-up.

These Annual Reports also provided a detailed review of the revenue sharing arrangements, including revenue received compared to expenses they offset, by year, broken down into components, fund expense ratios, gross and net expenses and other detail.

---

[41]    *See* Exhibits D to K, March 2010 - March 2017 Annual Trustee Reports (NSP-000011035-11044).

[42]    *Id.*

Confidential – Pursuant to Protective Order

The record reflects that Messrs. Rawson, Sarvadi, Herink and Allison were present and participated in these Annual Meetings during the Class Period.[43]   In addition, Messrs. Stanton, Pollina and Sivula regularly attended these Annual Meetings as well, to assist the Directors of Insperity with their duty to monitor.[44]

Significantly, Insperity was not just a passive recipient of these Annual Reports at the Annual Meetings.   To the contrary, the record indicates active participation in the Annual Meetings[45] and significant follow up thereafter.[46]

## 2.      Quarterly Investment Performance Reports

In addition to Annual Reports and Meetings, and consistent with Section 3.2 of the Trust Agreement, Reliance sent quarterly investment performance reports ("Investment Performance Reports") for each quarter throughout the Class Period.[47]  These quarterly Investment Performance Reports provided detailed investment returns for each investment option in the Plan (including the Horizon Funds), for the year to date, the quarter and trailing periods of 1, 3, 5 and 10 years, plus since inception.  These Investment Performance Reports also compared each return for each fund and each period against a relevant market benchmark. The Investment Performance Reports classified each fund by its investment style or category, reported its ticker symbol and explained that Reliance used the Zephyr software system to compile each Investment Performance Report.

The record reflects that Insperity not only received these quarterly Investment Performance Reports, but also probed and questioned them.  In particular, John Stanton reviewed the quarterly Investment Performance Reports from 2009 through 2016,[48] kept detailed notes on fund performance patterns,[49] and pressed Reliance for additional information/answers when the

---

[43]      Herink Dep. at pp. 80:5-82:22, 125:15-126:3, 193:17-23.

[44]      Herink Dep. at pp. 202:3-19; Stanton Dep. pp 67:1-6, 67:22-69:19.

[45]      *See e.g.,* RTCPLEDGER00034346 (Meeting minutes from March 23, 2015 Annual Meeting); NSP000021317 (John Stanton notes on agenda for March 23, 2015 Annual Meeting); NSP-000076148 (Dan Pollina notes from March 29, 2011 Annual Meeting); NSP-000096030-96041 (Dan Pollina notes from March 14, 2012 Annual Meeting); NSP-000075955-75956 (Dan Pollina notes from March 3, 2014 Annual Meeting); NSP-000071815-71817 ( Doug Sivula notes from March 23, 2015 Annual Meeting); NSP-000076010-76012 (Dan Pollina notes from March 23, 2015 Annual Meeting).

[46]      *See e.g.,* NSP-000038521 (June 17, 2015 e-mail from Neil Shifman to Trey Carter following up on March 23, 2015 Annual Meeting).

[47]      *See* Exhibit C ("Ex. C").

[48]      Herink Dep. 78:21-83:25, 119:11-119:25; Stanton Dep: 116:25-118:18, 161:14-165:17.

[49]      *See e.g.,* NSP-000020627 (Fund Performance 2008-2014 with John Stanton notes); NSP-000020645 (Investment Performance Summary with John Stanton notes); NSP-000035506 (Investment Performance Summary with John Stanton notes).

Confidential – Pursuant to Protective Order

investment results on these Investment Performance Reports were disappointing.[50]  In addition, Mr. Stanton reported to Mr. Rawson on these Investment Performance Reports when appropriate.[51]

### 3.    Fund Fact Sheets

Reliance also provided Insperity with further information about each fund by way of the many fund fact sheets ("Fund Fact Sheets").[52]  The Fund Fact Sheets provided extensive detail about each fund, including, for instance, its asset allocation, the benchmark, investment objectives, its underlying component funds, expense ratio, turnover ratio, risks, glidepath and other data.[53]  Once again, Insperity was not just a passive recipient of these Fund Fact Sheets; to the contrary, Insperity reviewed, questioned and commented on drafts of these documents before Reliance finalized them.[54]

### 4.    Additional Lines of Communication

The record reflects numerous other meetings, conferences, e-mails and telephone calls between Insperity and Reliance throughout the Class Period.

*First,* separate from the Annual Meetings, Insperity regularly met with Reliance in person – either in Houston, Texas or Atlanta, Georgia.[55]  At these meetings, representatives from the two parties discussed a wide range of topics, including, but not limited to:

---

[50]    *See e.g.,* NSP-000020632 (March 17, 2015 e-mail from John Stanton to Trey Carter); NSP-000012508 (August 5, 2014 e-mail from John Stanton to Nick Cotter); NSP-000018356 (November 9, 2010 e-mail from John Stanton to Nick Cotter); *see also* NSP-000068650 (March 15, 2012 e-mail from Doug Sivula to John Stanton); NSP-000017734 (March 1, 2013 email from Nick Cotter to Dan Pollina).

[51]    Stanton Dep. at pp 116:14-122:9.

[52]    For an example of such Fund Fact Sheets, *see, e.g.,* NSP-000042807-42819 (email with fund fact sheet attachments); NSP-000012542-12555 (same); NSP-000094093- NSP-000094101 (same); NSP-000067511-NSP-000067513 (same); NSP-000042807-NSP-000042819 (same); NSP-000068701- NSP-000068708 (same); NSP-000041890-41891 (same); NSP-000077561-0001-NSP-000077561-0032 (various fund fact sheets); NSP-000077643-0001-0189 (same); NSP-000078106 (same); NSP-000031492-31495 (same); NSP-000071797-71807 (same); NSP-000072810-72811 (same).

[53]    *Id.*

[54]    *See, e.g.,* NSP-000015618 (June 14, 2012 e-mail chain ending with Karen Drury to Wade Fox).

[55]    *See, e.g.,* NSP-000041213 (August 10, 2010 meeting in Houston, Texas); NSP-000018087 (April 7-8, 2011 meeting in Houston, Texas with Lance Studdard and Kent Buckles); NSP-000012455 (September 19, 2012 meeting in Houston, Texas with Kent Buckles); NSP-000055744 and NSP-000055898 (April 30, 2013 meeting with Bill Harlow, Kent Buckles, Mark Teichner, Neil Shifman and Richard Rawson in Houston, Texas regarding investment options in the Plan); NSP-000012816 (June 3, 2013 meeting with Kent Buckles in Houston, Texas to discuss adding stable value fund to the Plan); NSP-000020685 (July 25, 2013 meeting in Atlanta, Georgia regarding a wide range of topics including, e.g., revenue sharing, F-Squared, fiduciary

Confidential – Pursuant to Protective Order

- Reliance as an organization, including its history, employees, current strategies;

- Current fiduciary and legal developments;

- Various investment options in the Plan;

- Funds on the "watch list";

- Potential fund and share class changes; and

- Revenue sharing account.

The record reflects that Insperity kept and circulated detailed notes regarding these meetings,[56] and was active in considering and pursuing follow up action items after these meetings.[57] Reliance's notes confirm Insperity's active involvement in these meetings.[58]

*Second,* the record reflects extensive communication between Insperity and Reliance on a wide range of issues.[59] These communications included discussion regarding the plan's investment

---

developments from the Labor Department, the Stable Value Fund, the Investment Policy Statement, performance of several investment options and other matters); NSP-00070357; NSP-000020436, NSP-000020747, NSP-000031847 (November 12-14, 2013 meeting in Houston, Texas with Kent Buckles, Nick Cotter and Lance Studdard concerning share classes, QDIA, MetLife Stable Value fund, defensive strategy of the Horizon Funds, investment performance across the Plan's investment options and more); NSP-000018471, NSP-000021201, NSP-000044284 (January 15, 2014 meeting in Atlanta, Georgia); NSP-000066539, NSP-000055556 (April 29, 2014 meeting with Kent Buckles, Tony Guthrie and Bill Harlow in Houston, Texas); NSP-000019178, NSP-000021267 (August 7, 2014 meeting in Atlanta, Georgia regarding a wide range of topics including investment performance, funds on the watch list and upcoming fund changes); NSP-000031819 (November 13, 2014 meeting in Houston, Texas); NSP-000037878, NSP-000020274 (February 5, 2015 meeting with Trey Carter in Houston, Texas regarding a range of topics including Reliance Trust roles and responsibilities, F-Squared, and proposed fund changes).

[56]   *See, e.g.,* NSP-000096461 (Karen Drury notes); NSP-000070275 (Doug Sivula notes); NSP-000020436 (John Stanton notes); NSP-000035882 (Karen Drury notes); NSP-000096088 (Sivula notes); NSP-000035824 (Karen Drury notes);  NSP-000031833 (Heidi Lapham notes); NSP-000032169) (Karen Drury notes); NSP-000020275 (John Stanton notes).

[57]   *See, e.g.,* NSP-000041820 (February 20, 2015 e-mail chain from Trey Carter to John Stanton and others).

[58]   *See, e.g.,* RTCPLEDGER93162 (Trey Carter notes from February 5, 2015 meeting).

[59]   *See, e.g.,* NSP-000038068 (April 26, 2013 e-mail from John Stanton to Neil Shifman explaining the relationship with Reliance representatives and frequency of communications); Herink Dep. at pp. 56:9-57:21.   Representatives from Reliance and Retirement Services also participated in monthly conference calls to discuss operational issues in recordkeeping the Plan. *See, e.g.,* NSP-000037862-37863 (November 16, 2010 e-mail from Medlin to Studdard); NSP-000015297;  NSP-000037864;  NSP-000016746;  NSP-000037866;  NSP-000016575;  NSP-

Confidential – Pursuant to Protective Order

options and reducing expenses for participants.[60]   Reliance periodically reiterated its criteria and process for evaluating and replacing investment funds,[61] and kept Insperity apprised of upcoming changes to the fund line-up.[62]

*Third,* the record reflects that Insperity devoted substantial energy and attention to its ongoing role as Monitoring Fiduciary.  As explained earlier and as further demonstrated below, Insperity didn't simply receive annual reports, quarterly reports and fund fact sheets.  Rather, in between these reports, Insperity actively monitored developments across the investment menu, including but extending far beyond the Horizon Funds.[63]

*Fourth,* the record reflects that Insperity probed Reliance for further information and analysis when confronted with particular participant concerns. Insperity took seriously the concerns participants expressed, carefully considered them and forwarded them to Reliance to provide responsive answers.[64]   By providing Reliance this sort of input from the "ground up," Insperity not only monitored Reliance but also actively supplemented its practical understanding of the Plan, its participants and their concerns.

### E.     Insperity's Experience with and Knowledge of Reliance as an Organization

The record demonstrates that Insperity monitored and kept informed not only about Reliance's investment procedures and performance, but also about Reliance as an organization.

---

000016762; NSP-000016682; NSP-000055226; NSP-000035953.   From time to time, these conference calls also reflect discussion about investment performance and fund changes.

[60]     *See, e.g.*, Herink Dep. at pp. 215:10-216:6.

[61]     *See, e.g.,* NSP-000045972-73 (Sept 28, 2015 e-mail from Jay Mullins to Nick Cotter).

[62]     *See, e.g.,* NSP-000038726 (Jan. 2, 2014 e-mail from Nick Cotter to John Stanton); NSP-000068911 (Oct. 16, 2013 e-mail from Veronica Medlin to Doug Sivula); NSP-000015288 (November 5, 2013 email from Veronica Medlin to Stephanie Smith).

[63]     *See, e.g.,* NSP-000018356 (November 9, 2010 e-mail from John Stanton to Nick Cotter questioning the performance of the Davis New York Venture Fund); NSP-000016066 (August 22, 2011 email from Nick Cotter to Katherine Red regarding Insperity relaying a suggestion for Reliance to consider more index funds); NSP-000014668 (Feb. 6, 2012 e-mail from Karen Drury to Nick Cotter regarding Goldman Sachs Mid-Cap Value Fund); NSP- 000017734 (March 5, 2013 e-mail from Nick Cotter to Dan Pollina regarding Pollina's concerns about that same Goldman Sachs Fund and attaching several pages about active vs. passive management, performance in bull vs bear markets and the cyclicality of performance); NSP-000055744 (reflecting Insperity monitoring and questioning Reliance on a wide range of subjects such as the Stable Value Fund, fee disclosures and other matters); NSP- 000043685 (Sept. 23, 2013 e-mail from Nick Cotter to John Stanton regarding Columbia Strategic Income Fund and Reliance's process for evaluating possible replacements for incumbent funds); NSP-000041879 (Oct. 3, 2013 e-mail from John Stanton to Kent Buckles regarding stable value fund); NSP-000012522 (Nov. 12, 2014 e-mail from John Stanton to Katherine Red regarding PIMOC).

[64]     *See, e.g.,* NSP-000048468, NSP-000048537; Herink Dep. at pp. 206:20-207:10; Rawson Dep. at pp. 83:7-11.

Confidential – Pursuant to Protective Order

Insperity first selected Reliance as discretionary trustee in 2003 and thus, by the beginning of the Class Period, had long experience with Reliance.  However, face-to-face meetings between upper management of the two companies continued through the Class Period.[65]

Insperity also kept abreast of organizational developments at Reliance, including, for instance, the impact of key employee departures and the acquisition of Reliance by FIS.[66]  Insperity's review of FIS was not a one-time shot; rather, it continued well after the acquisition occurred.[67]

### F.     Insperity Considered Other Candidates to Replace Reliance

Well before this litigation began, Insperity considered other candidates for the role of trustee and investment manager, rather than simply passively keeping Reliance in those roles.  Insperity began the process of conducing a formal search for a possible replacement in 2014.[68]  With assistance from a third party consultant (Sageview), an internal team led the process with extensive help from the legal department.[69]  A comprehensive Request for Proposal ("RFP") was issued to 13 interested candidates (including Reliance) in 2015.  Insperity received seven written proposals, including one from Reliance.[70] As set forth in a report to the Directors of Insperity in December 2016, during the evaluation of finalists, Insperity was named in this very class action lawsuit.[71] The Directors of Insperity concluded that Reliance should remain in place as discretionary trustee while the search continued.  After a pause, the RFP was reinstituted in 2017 with a new consultant (Curcio Webb), and is currently still in process.[72]

In sum, Insperity kept apprised of the investment functions of Reliance and the Plan's investment program through an extensive network of information and effort including Annual Reports, Annual Meetings and quarterly Investment Performance Reports, fund fact sheets, frequent ongoing communication in-between formal meetings, questioning and probing Reliance and comparing

---

[65]     *See, e.g.,* NSP-000060036 (Feb. 20, 2010 e-mail scheduling a meeting between Harlow, Guthrie and Rawson); NSP-000060033 (October 2011 meeting with Harlow, Guthrie and Rawson); NSP-000066539, NSP-000055556 (April 29, 2014 meeting with Kent Buckles, Tony Guthrie and Bill Harlow in Houston, Texas); NSP-000055524 (August 27, 2014 meeting with Harlow and Rawson).

[66]     *See, e.g.,* NSP-000021314 (Stanton and Shifman trip to visit FIS in Milwaukee, Wisconsin to understand FIS business); NSP-000095386 (April 29, 2014 e-mail from Dan Pollina to Doug Sivula); NSP-000067641 (June 19, 2014 e-mail from John Stanton to Doug Sivula).

[67]     NSP-000011040 (March 2015 Annual Trustee Report) at pp. 1-2; NSP-000021220-249 (April 2015 FIS Corporate Overview); NSP-000011041 (Mary 11, 2016 Insperity Annual Trustee Meeting including "FIS/Reliance Update").

[68]     NSP-000048605, 000048607, 000048608 (December 11, 2014 e-mail from John Stanton looking for trustee search consultant and responses); NSP-000048604 (e-mail from Curcio Webb to John Stanton regarding potential trustee search).

[69]     NSP-000011110 to NSP-000011253 (2015 RFP materials); Stanton Dep. at pp. 84:13-87:3; 298:1-299:19.

[70]     NSP-000036535 (2016 Report to Insperity Board of Directors).

[71]     *Id.*

[72]     NSP-000011460-11480; Rawson Dep. at pp. 222:12-224:21; Stanton Dep. at pp. 298:16-301:11.

Confidential – Pursuant to Protective Order

Reliance to other potential candidates.  Through this combination of information and efforts, Insperity not only met but **exceeded** Applicable Standards for monitoring Reliance as trustee/investment manager.

## VIII.  INSPERITY MET, IF NOT EXCEEDED, APPLICABLE STANDARDS FOR MONITORING RELIANCE DURING THE CLASS PERIOD REGARDING THE SPECIFIC ISSUES PLAINTIFFS HAVE RAISED

### A.     Insperity Reasonably Monitored Reliance's Decision To Establish the Horizon Funds and Add Them to the Plan's Investment Menu

The record demonstrates that Insperity extensively considered, probed and learned detailed information about the target date funds considered, and eventually selected by Reliance, to replace the J.P. Morgan target date funds.  This monitoring process began in 2011, and continued up to the eventual launch of the target date funds known as the "Horizon Funds" in the Plan in November 2012.  In my opinion, the record demonstrates that Insperity not only reasonably—but extensively — monitored Reliance's decision to establish the Horizon Funds and add them to the Plan's investment menu.  As detailed below, support for this conclusion includes recent (as of 2012) experience with equity market volatility, the history and cost of the J.P. Morgan target date funds, Insperity's extensive pursuit and evaluation of information from Reliance in 2011 and 2012, detailed reporting from Reliance about the nature of the Horizon Funds and reasons for installing them, the low expense ratio of the Horizon Funds, the modest amount of Reliance's fee, and information regarding F-Squared and how the tactical overlay worked.

#### 1.     Designing and Establishing the Horizon Funds

##### a.     Recent Financial History Warranted Protecting Against Equity Risk

As of 2011 and 2012, when Reliance began designing and eventually implemented the target date funds (known as the "Horizon Funds"), fiduciaries of and participants in 401(k) plans nationally still suffered recent, disturbing memories of how dramatically equity markets may collapse.  First was the dot-com bubble at the turn of the century, when the S&P Stock Index dropped 37.5% from March 2000 until October 2002 (even after reinvesting dividends), and second was the financial crisis from October 2007 until March 2009, when the S&P Stock Index dropped over 50% (the "2008 Financial Crisis").[73]  In my experience, in the wake of these historic declines, many fiduciaries of various types of ERISA plans — including 401(k) plans — considered and implemented a variety of strategies designed to dampen equity volatility.[74]  These included equity index options, hedge funds and hedge fund of funds, tactical asset allocation strategies and so-called "alternative assets," such as commodities, global fixed income (including emerging market bonds), real estate, currencies and other assets expected to perform differently — and to cushion

---

[73]     *See* dqydj.com/sp-500-return-calculator.  In the wake of these meltdowns, many observers joked that their 401(k) plans had turned into 201(k) plans.

[74]     The record reflects that after the 2008 Financial Crisis, Reliance and Insperity considered the potential for another equity market sell-off and the adverse impact that would have on target-date investors.  Cotter Dep. at pp. 77:20-85:18.

Confidential – Pursuant to Protective Order

participant account balances — from the performance of equity securities in negative equity markets.  After the 2008 Financial Crisis, hedging or "de-risking" strategies were especially understandable in the context of a participant-directed 401(k) plan, where the investment risk falls on the participant (in contrast to a defined benefit plan, where the risk falls essentially on the employer). [75]

### a.    Insperity Began Monitoring Information about the Potential New Target Date Funds in 2011

As early as June 2011, Insperity received notice from Reliance that it was considering a possible shift to a new target date fund series, including an equity de-risking strategy.  Specifically, on June 24, 2011, Bill Harlow (Reliance) e-mailed John Stanton regarding the prospect of establishing a new series of target date funds as QDIAs[76] for the Plan and the many potential advantages of doing so, relative to the J.P. Morgan target date funds.  Mr. Harlow suggested building this new target date fund with low-cost, passive funds; using Reliance  to select, combine and oversee the component, underlying funds; and thus, significantly reducing the expense ratio from what participants paid for the J.P. Morgan target date funds.[77]  Mr. Harlow's e-mail also attached background, educational materials, explaining to Insperity key concepts involved in developing these funds, such as risk-based allocation compared to target date allocation; the distinction between a glidepath based on a target-to methodology compared to a target-through approach; glidepath designs with varying degrees and schedules for decreasing equity exposure over time; eligibility as a QDIA; rebalancing; and possible components for constructing each target date fund, using specified Vanguard passive equity and fixed income funds.  The materials also showed a potential allocation to asset classes and subclasses for several sample funds, the expense ratio of each component and their weighted average.[78]

In early August 2011, Reliance presented these ideas in more detail.[79]  The record demonstrates that Reliance provided Insperity with information on a range of relevant issues, including details, pros and cons of the new target date funds from MetLife and Reliance; the relative cost savings of the various potential approaches (existing J.P. Morgan target date funds vs. the proposed MetLife funds vs. the combination of underlying third party funds Reliance proposed to assemble and manage); use of mutual funds vs. separate accounts vs. collective trusts; active vs. passive

---

[75]    The "Plan Highlights" Booklet (NSP-000010903) warns Plan participants that they bear the investment risk. (". . . the funds' returns will fluctuate.  The funds are subject to the risks associated with the stock and bond    markets, any of which could cause an investor to lose money.  An investment in the funds is not guaranteed.  An investor may experience losses . . . there is no guarantee the funds will provide adequate income at or after the target year.")

[76]    As a matter of policy, a QDIA should be diversified to minimize the risk of large losses, designed to provide a level of capital preservation and becoming more conservative with the participant's increasing age.  *See* 29 CFR 2550.404c and Profit Sharing/401(k) Council of America's white paper, "DOL Issues Final QDIA Guidance," Oct. 26, 2007.

[77]    NSP-000041113.

[78]    NSP-000041114.

[79]    *See, e.g.,* NSP-000038579 (Aug. 9, 2011 e-mail from Lance Studdard to John Stanton and attached agenda); NSP-000096062 (Dan Pollina meeting notes); NSP-000039904 (invitation from Lance Studdard for Aug. 9 meeting).

Confidential – Pursuant to Protective Order

management for the components of each target date fund; use of an equity risk overlay; and the reasonableness of the compensation to Reliance, in light of the legal requirements of the ERISA prohibited transaction exemption, Section 408(b)(8).  Insperity clearly recognized the importance of Reliance carefully structuring these new target date funds to avoid any ERISA prohibited transaction issues and the importance of considering whether a provider other than Reliance would provide participants a better product.[80]

Later that same month, Reliance presented more information about these possible new target date funds to a larger group of representatives from Insperity.  According to the materials Reliance prepared for that meeting, the purpose and focus of the discussion was to find ways to reduce expenses for plan participants, provide a custom approach for target date funds, consider possible alternatives to the existing, actively managed J.P. Morgan target date funds and get impressions and feedback from Insperity.[81]  The materials compared possible approaches offered by J.P. Morgan, MetLife and Reliance. Handwritten notes from in-house counsel Dan Pollina reflect discussion on many detailed aspects of Reliance's presentation regarding its potentially replacing the existing J.P. Morgan target date funds,[82] including:

- The reasonableness of Reliance's proposed fee vs. market pricing;

- Components of the overall expense ratio;

- "To" vs. "through" glidepaths;

- The extent of Reliance's experience and business with collective trusts;

- How the proposals of Reliance, J.P. Morgan and MetLife compared;

- The possibility of using an equity hedge and how it might work;

- Active vs. passive management; and

- The track record of Reliance with managing funds with multiple asset classes and the track record of the underlying funds composing the target date fund.

Other record evidence[83] reflects that in its monitoring role Insperity also considered:

---

[80]    NSP-000041928 (August 12, 2011 e-mail from John Stanton to Richard Rawson).
[81]    NSP-000020825.
[82]    NSP-000071574.
[83]    See NSP-000071577-78 (Sept. 12, 2011 Dan Pollina notes regarding Schwab proposal); NSP-000071579-80 (Pollina notes regarding the target date fund program that URS adopted, primarily using Blackrock funds); NSP-000071581 (Pollina notes regarding investment firm Mesirow); NSP-000071583-84 (Pollina notes regarding rigorous process to prevent self-dealing); NSP-000071585-86 (Pollina notes regarding compliance with ERISA's prohibited transaction exemption and daily valuation); NSP-000036148 (Jan. 31, 2012 Pollina notes regarding volatility component, potential retirement dates to use for target date fund fact sheets and an attached "RTC

Confidential – Pursuant to Protective Order

- Tactical vs. strategic asset allocation, including one particular line of analysis often used in that regard (so-called "Monte Carlo" simulation);

- Information from Charles Schwab and how its products compared to other options being considered by Reliance and discussed with Insperity, including in terms of Schwab's fiduciary status, fees, share classes, disclosure documents, experience and other factors;

- Whether and how to include revenue sharing and whether, instead, to utilize "flat" fee arrangements;

- "Off the shelf" vs. customized target date funds;

- Funds offered by various mutual fund companies including Blackrock, Vanguard, T. Rowe Price and Fidelity;

- Establishing a rigorous process to prevent self-dealing;

- Participant disclosures;

- Daily valuation;

- Whether to design the target date funds in increments of 5 year differences in target retirement dates or 10-year differences;

- Back-testing the equity hedge Reliance eventually adopted compared to the hedge MetLife proposed; and

- Whether to use both "risk-based" and "target date" or just "target date" funds.

### b.   Insperity Continued Diligently Monitoring Information about the Potential New Target Date Funds in 2012

Continuing into 2012, Insperity continued its evaluation of and questioning Reliance about a wide range of subjects concerning the proposed new target date funds, which eventually became known as the "Horizon Funds." One aspect of Insperity's work revolved around numerous legal issues concerning the proposed Horizon Funds, some of which relate to my opinions.

(i)   The Schiff Hardin Memorandum

---

Target-date Fund(s) Project Outline," itemizing numerous detailed issues to address and resolve); NSP-000070064 (Sept. 12, 2011 e-mail from Chiera of Schwab to Dan Pollina transmitting Schwab's extensive proposal); NSP-000041681 (Sept. 26, 2011 e-mail from Stanton to Harlow regarding reasons for using an equity hedge against market volatility); NSP-000041274 (February 2, 2012 e-mail from Stanton to Rawson regarding back-tested results of Reliance equity hedge vs. MetLife's and whether to use risk-based funds and target-date funds, among other issues).

Confidential – Pursuant to Protective Order

In January 2012, Reliance sent Insperity a legal opinion memorandum from Schiff Hardin dated December 8, 2011 (the "Schiff Hardin Memorandum").[84] The Schiff Hardin Memorandum squarely addressed whether ERISA's prohibited transaction rules permitted Reliance to: "(1) establish and maintain a collective trust for which Reliance would serve as trustee, (2) in the exercise of its discretion as trustee of the [Plan] invest assets of the Plan in the collective trust, and (3) receive trustee fees from both the collective trust fund and the Plan."[85] The Schiff Hardin Memorandum concluded that under the Section 408(b)(8) exemption, Reliance could serve as discretionary trustee of the Plan and charge it a reasonable fee for its trustee services to the Plan, while also causing the Plan to invest in a Reliance collective trust fund and receiving a reasonable administration fee for that collective trust fund.[86]

> (ii)   Insperity's Repeated Insistence on Detailed Explanations from Reliance

Another chain of communications forcefully documents Insperity's thorough and rigorous requests for sufficient information to understand the nature and reasonableness of Reliance's due diligence in establishing the Horizon Funds and the details of its proposed fees and expenses. As detailed below, these documents demonstrate that Insperity repeatedly and diligently insisted on collecting detailed, accurate information from Reliance about the proposed Horizon Funds and carefully examined what Reliance supplied.

The process began when Dan Pollina asked John Stanton to request further information from Lance Studdard (Reliance) on the details on Reliance's due diligence process, given that Reliance was offering one of the target date funds under consideration.[87]

*February 9, 2012 Due Diligence Memorandum ("Original Memorandum")*

On February 9, 2012, Reliance sent John Stanton a memorandum in response to Insperity's questions (the "Original Memorandum").[88] For purposes of my opinion, the most significant aspect of that Original Memorandum concerned Insperity's request for details on Reliance's due diligence to identify the possible collective investment trust ("CCT" or "CIT") options, including the methodology used to select among the various investment provider candidates and the support for Reliance using internal resources rather than a third party to conduct this evaluation. In its request for information, Insperity had stated:

> *We feel this documentation is especially important considering the appearance of a conflict of interest when Reliance is offering one of the CCT investments under consideration.*[89]

---

[84]   NSP-000065696-65968 (email from Lance Studdard to Dan Pollina containing Schiff Hardin Memorandum as attachment).
[85]   *Id.*
[86]   *Id.*
[87]   NSP-000066983.
[88]   NSP-000068673.
[89]   NSP-000068673.

-25-

Confidential – Pursuant to Protective Order

Reliance's Original Memorandum responded to that first request in some detail. The Original Memorandum explained Reliance's asset allocation process, the design of its target date portfolios, its tactical overlay, its process for manager selection and monitoring, its watch list criteria, use of passive funds, cost and Reliance's employing a third party adviser to assist with the volatility hedge.[90]

After reading the Original Memorandum, Doug Sivula responded to Mr. Studdard on March 2, 2012 indicating that Insperity still had additional questions.[91] This March 2, 2012 e-mail asked Reliance for detailed responses concerning two key points. The first is worth quoting because it underscores Insperity's diligence regarding the establishment and design of the Horizon Funds and the role of Reliance in those regards:

> *The essence of the first question is regarding the decision-making process that Reliance undertook in choosing the new investments. The explanation of the five new CCTs and how they will be managed was good information, and we would like more details regarding Reliance's decision-making process. How was the final decision made, including a description of the steps undertaken during the process? What other funds/CCTs/providers did Reliance consider, and how do the chosen Reliance CCTs compare to other funds/CCTs available in the marketplace? What were the factors considered in choosing the Reliance CCTs, and what factors resulted in the final decision? Why did Reliance make the decision itself rather than using an independent third party, and what was the rationale for doing so? This additional information focusing the due diligence process would be most helpful.*[92]

The second point was Insperity's request for "some additional information to help Insperity to understand how the CCT fees and expenses will be handled and to prepare for its own disclosure obligations. How will expenses be calculated and then allocated in the CCT context?"[93]

*March 6, 2012 Due Diligence Memorandum ("Updated Memorandum")*

In response to Mr. Sivula's March 2, 2012 e-mail request, on March 6, 2012 Mr. Studdard sent an updated version of the memo to respond more satisfactorily to Insperity's remaining questions (the Updated Memorandum").[94] This Updated Memorandum explained Reliance's process for selecting the equity overlay adviser, consistent with the selection process outlined in the prior letter, and explained that particular emphasis was given to long-term historical returns, performance in up and down markets and cost.[95] It explained how Reliance engaged in multiple interviews with the chosen adviser, both by telephone and in person, over the course of a year and also cited its experience with the firm.[96]

---

90  NSP-000068673-75.
91  NSP-000013003.
92  *Id.*
93  *Id.*
94  NSP-000068663.
95  *Id.*
96  *Id.*

-26-

Confidential – Pursuant to Protective Order

*March 14, 2012 Annual Trustee Meeting*

On March 14, 2012, Reliance presented the Annual Report at the 2012 Annual Meeting which included, among other things, a discussion about replacing the J.P. Morgan target date funds and the addition of collective trusts in the Plan.[97]  Reliance explained that it planned to remove the target date funds managed by J.P. Morgan in order to reduce costs to participants and enhance risk management.[98]  Rather than buying a target date fund "off the shelf," Reliance informed Insperity that it intended to construct a custom series of target date funds, which would be more conservative, less expensive and have more control over equity risk.  Reliance shaped the funds as "target to," not "target through," meaning that the controlling date for trimming equity exposure would be the participant's expected retirement date, not later.  By using collective trusts (as opposed to mutual funds), Reliance would be able to offer lower cost funds than the J.P. Morgan and Fidelity target date funds which had previously been offered in the Plan.  And by adding a tactical de-risking strategy Reliance hoped to "reduce equity exposure during down markets while participating in up markets."[99]

The 2012 Annual Report provided Insperity with extensive details regarding the proposed Horizon Funds.  These included:

- the anticipated asset allocation for each target date and associated glide path;[100]

- the equity de-risking model, including its objective and key inputs, such as price of stocks by sector, volatility of those prices and changes in such volatility, as well as the results or "output" of the model;[101]

- historic allocations to different equity sectors, going back to April 2001;[102]

- an explanation of risk metrics (such as maximum drawdown, standard deviation, upside/downside capture ratio and asymmetry) and back-testing the comparative performance of a sample J.P. Morgan target date funds vs. that target date funds enhanced with the equity de-risking strategy;[103]

- a summary of the reasons for and results of shifting to the Horizon Funds, namely, lower cost (reducing the expense ratio from 88 bps to 52 or 53 bps), enhancing the conservatism of the target date funds, consistent with QDIA regulations, better risk management for a "smoother ride and better outcomes for participants," and more

---

[97]   *See* NSP-000011037 (March 2012 Trustee Report), at p. 36.
[98]   *Id.* at p. 36.
[99]   *Id.*
[100]  *Id.* at p. 49.
[101]  *Id.* at p. 50.
[102]  *Id.* at p. 51.
[103]  *Id.* at p. 53. The conclusions of the back-testing were that de-risking reduced the maximum drawdown of the J.P. Morgan sample by 64%; materially reduced its volatility; outperformed the sample by an average of 6.1% per year over the trailing 5 year period; and produced a more favorable ratio of upside capture vs. downside capture.

Confidential – Pursuant to Protective Order

downside protection in bear markets, particularly important for participants nearing retirement.[104]

The Horizon Funds consisted primarily of passive rather than active investment vehicles, combined into the framework of a collective trust. *See* Subsection (d), below. For several reasons collective trusts are typically less costly than mutual funds and the Horizon Funds were significantly less expensive for participants than the prior J.P. Morgan target date funds, which consisted of largely actively managed mutual funds. In my experience, passive strategies likewise tend to be less expensive than corresponding active strategies and may outperform the active strategy, especially in more efficient asset classes and subclasses, such as large cap, domestic equities.

*March 19, 2012 Due Diligence Memorandum ("Second Update Memorandum")*

After the March 14, 2012 Annual Meeting, representatives from Reliance and Insperity participated in a conference call on March 15, 2012 to discuss "outstanding issues on the CITs."[105] Despite the information provided at the Annual Meeting, and the further detail and scope of the Updated Memorandum, Insperity sought even more information, which resulted in another, "second set of revisions" to the Memorandum (the "Second Update Memorandum.")[106]

In that Second Update Memorandum, Reliance explained that it conducted a thorough search of potential target date replacements currently available in the marketplace, and considered numerous factors, including active and passive strategies, both mutual funds and collective trusts, the total expenses of each strategy (net of offsetting revenue sharing reimbursed to the Plan), varying asset allocations and glidepaths, long-term risk adjusted returns, depth and breadth of the various management teams, the governance policies of the different organizations, their investment philosophies and their risk management processes. Reliance explained that none of the candidates offered a sufficient risk-management process, coupled with low expenses, and that therefore the most efficient approach was for Reliance to create and manage a series of target date collective investment trusts.[107]

*March 30, 2012 Due Diligence Memorandum ("Third Update Memorandum")*

Further demonstrating its due diligence, after studying the "Second Update," Insperity insisted on a third update, resulting in a March 30, 2012 "Third Update" version of the memorandum (the "Third Update Memorandum").[108] This Third Update Memorandum explained that, as part of its due diligence, Reliance considered the fee structures of other asset allocation funds using collective trusts. One structure had two general components — a fee attributable to investment managers and another fee for trustee or other operational services. The other structure applied a single fee covering both services. With the single fee structure, the collective trust fees were typically approximately 20 basis points. The J.P. Morgan collective trust, for instance, was 24 bps

---

[104]   *Id*. at p. 54.
[105]   NSP-000068650; NSP-000040862.
[106]   NSP-000040862.
[107]   *Id.*
[108]   NSP-000068625.

Confidential – Pursuant to Protective Order

for fund management, audit and trustee services.  The Third Update Memorandum stated that Reliance would charge a fee of 10 bps for trustee, audit and operational services, and would waive its fee for investment management of the trust.[109]  Finally, the Third Update Memorandum stated that Reliance – as a fiduciary to the trusts and the Plan – had determined that both its fee and the fee to the third party adviser were reasonable.[110]

In short, by the end of March 2012, Insperity had insisted upon and collected extensive information through four rounds of memoranda and the March 2012 Annual Meeting, examined Reliance's process for establishing, designing and managing the Horizon Funds, and extensively explored numerous practical, investment, legal and other issues regarding those funds.  But even all that was far from the end of Insperity's probing and evaluation.

Insperity's legal counsel remained deeply involved thereafter regarding various tax, reporting and other regulatory issues, including whether the collective trusts required an IRS determination letter before launching, whether employers other than Insperity were necessary for the trust to qualify as a valid collective trust, the exact reporting status of the trust, the formal name for the trusts and the structure of the series of funds within the larger trust.[111]  Responding to Insperity's request for information, Reliance provided Insperity the document and attachment entitled "Collective Fund Overview," July 2012.[112]  Those documents provided Insperity diagrams of the organization and governance structure of Reliance (as it related to the Horizon Funds) and of the collective trust, including "Series Six" and related governing documents, with a copy of the Amended and Restated Declaration of Trust of the "Trust Advisors Portfolio" included.

(iii)   Insperity Collected and Evaluated Even More Investment<br>and Operational Information about the Horizon Funds

Insperity also continued probing and learning more about numerous operational, practical and investment aspects of the Horizon Funds, including fine points regarding disclosure to participants.

In June 2012, Insperity considered proposed disclosure documents concerning the upcoming Horizon Funds, including sample "Fund Fact Sheets" and "Offering Statements" for the upcoming funds.[113]   In response to questions along those lines, Reliance responded in writing on July 31, 2012.[114]  These responses, along with many other communications, addressed many aspects of the Horizon Funds, including, e.g., expense ratios, structure and philosophy behind the funds, their

---

[109]   *Id.* at pp. 3-4; NSP-000068627.

[110]   NSP-000068628.

[111]   *See* NSP-000069193 (June 15, 2012 chain of e-mails including from John Stanton to Karen Drury); NSP-000013247 (July 6 2012 chain of e-mails including from Kent Buckles to Veronica Medlin); NSP-000041088 (July 11, 2012 chain of e-mails including from Karen Drury to John Stanton); NSP-000012976 (July 17, 2012 chain of e-mails including from Doug Sivula to Kent Buckles).

[112]   NSP-000013205.

[113]   *See, e.g.* NSP-000045106 (June 8, 2012 e-mail from Karen Drury to Katherine Red, et al, with attached samples).

[114]   *See* NSP-000038795 (August 2, 2012 e-mail chain from Karen Drury to Kim Thurman, and attached written responses).

Confidential – Pursuant to Protective Order

glidepaths, composition of the underlying investment components for each target date fund, passive vs. active asset management, definition of collective investment trust, reasons for introducing the funds to replace the prior J.P. Morgan target date funds, explanation of the 25 basis point service fee, explanation of Reliance Trust Company as an organization, how collective trusts differ from mutual funds, and how the proposed Horizon Funds would differ from typical target date funds (explaining the modest expense ratios and equity de-risking). In addition, Insperity learned the results of back-testing the Horizon Funds, using F-Squared's overlay, compared to the results with the J.P. Morgan target date funds.[115]

Thereafter, Insperity asked Reliance to train Insperity's employees by exploring similar questions and educating them on the answers.[116] After extensive back and forth with Insperity, Reliance led a training session on this upcoming fund change.[117]

By letter dated August 13, 2012, Reliance formally notified Insperity of Reliance's intention to replace the various J.P. Morgan target date funds with the Horizon Funds.[118] Thereafter, Insperity sought, learned and questioned the expected benchmarks for evaluating the Horizon Funds.[119] Insperity dug into nitty gritty operational and practical details, such as CUSIP numbers for the Horizon Funds, exact percentage asset allocation figures, consistency between the precise expense ratios of the different Horizon Funds and fact sheets from Newkirk, and consistency between benchmarks stated in the IPS and those in the investment performance reports.[120] Insperity also noted that the Horizon Funds lacked an investment performance history per se; that although back-tested results were available, it would be inappropriate for participants to rely on them; and instead, participants would want to know "how the [underlying] funds that make up the collective trust have performed in the past."[121] Insperity also remained involved in refining and adjusting the Plan's IPS.[122]

In sum, the record reflects that Insperity extensively monitored Reliance as it made the decision to replace the J.P. Morgan target date funds with the Horizon Funds. In my opinion, Insperity not

---

[115]   March 2012 Trustee Report (NSP-000011037), at p. 53. Eventually, this data was questioned by Reliance in the wake of the SEC investigation of F-Squared, and F-Squared supplied Reliance with new data that confirmed Reliance's original decisions to add these funds and use F-Squared for risk management. NSP-000068896 (May 15, 2014 e-mail from Stanton to Shifman); RTCPLEDGER141220.

[116]   NSP-000041086 (August 24, 2012 e-mail from Katherine Red to John Stanton and from Katherine Red to Lance Studdard).

[117]   "Overview of Upcoming Fund Changes in the Insperity 401(k) Plan," September 19, 2012 (NSP-000047103)

[118]   NSP-000014159.

[119]   NSP-000051160 (August 27, 2012 e-mail from Karen Drury to John Stanton); NSP-000015076 (August 28, 2012 e-mail from Nick Cotter to Karen Drury); NSP-000069071 (October 24, 2012 e-mail from Doug Sivula to Katherine Red); NSP-000069105 (October 22, 2012 e-mail from Doug Sivula to Lance Studdard).

[120]   NSP-000018034 (October 26, 2012 e-mail from Karen Drury to John Stanton); NSP-000012461 (November 12, 2012 e-mail to Nick Cotter to Doug Sivula).

[121]   NSP-000068480 (August 20, 2012 e-mail from John Stanton to Katherine Red, et al).

[122]   NSP-000013292 (August 20, 2012 e-mail from Nick Cotter to Doug Sivula).

Confidential – Pursuant to Protective Order

only met Applicable Standards for Monitoring Fiduciaries in evaluating the Horizon Funds but was especially scrupulous and diligent in collecting, questioning and evaluating information in that regard.

### c.   Insperity Reasonably Concluded that Reliance Had Sufficient Experience and Expertise to Establish and Manage the Horizon Funds.

Plaintiffs allege that Reliance selected Horizon Funds that had no performance history, "wholly contrary to the most basic duties."[123]   Plaintiffs then cite this supposed fact as grounds for establishing that Defendants breached their fiduciary duties.[124]  However, neither claim is correct. Properly understood from an investment perspective, in relevant respects, the Horizon Funds did have a performance history that Reliance and Insperity considered.

To understand this, it is necessary to identify three aspects of how the Horizon Funds were constructed and managed:

1.  The nature and history of each of the components that comprised Horizon Funds, *i.e.,* primarily the underlying passive collective trust funds.

2.  The process Reliance used to design a strategic asset allocation using these component funds and periodically to rebalance among them.

3.  The process of applying an equity de-risking strategy, including the investment advisory firm that Reliance engaged for that strategy (F-Squared) and its own reported history and performance.

First, the components of the Horizon Funds were mostly passive vehicles and included the following:

- BNY Mellon Broad Market Index Fund;

- BNY Mellon 1-3 Govt/Credit Index Fund;

- BNY Mellon Aggregate Bond Index Fund;

- BNY Mellon TIPS Index Fund;

- American Funds High Income Trust R6;

- BNY Mellon ACWI/ex-U.S. Index Fund;

- DFA Commodity Strategy; and

---

[123]    Am. Compl. ¶ 63.
[124]    Am. Compl. ¶ 172.

Confidential – Pursuant to Protective Order

- BNY Mellon EB DL U.S. REIT Index Fund.[125]

Most of these components were passive funds and as of November 2012, many enjoyed a substantial historic track record.  The passive funds were managed by Bank of New York Mellon – one of the most experienced and proficient passive managers in the country, so by definition their actual returns were designed essentially to mirror those of each applicable market index benchmark.  In its final form as amended November 2012, the IPS stated that in the case of asset allocation funds in a fund of funds structure (like the Horizon Funds), the general requirement of a three-year track record, "may be relaxed as long as the majority of the underlying funds have at least a three year track record or are passive index strategies."[126]

The record indicates that Insperity recognized the distinction between the absence of a performance history for the newly-established Horizon Funds versus the substantial history for the components that comprised those funds.  Notes from Dan Pollina indicate that this issue was discussed, specifically, that the "history of performance [for the Horizon Funds] or lack thereof could be an issue" but that "there is a history of underlying funds" and that "Bill says thinks they could put together respective performance information at requisite level." [127]

The March 2012 Annual Report further demonstrates that Insperity recognized the distinction between the track record of the target date fund *per se* as distinguished from the track record of the underlying passive or active components.  The Plan's IPS was amended to adjust the criteria for selecting and benchmarking target date funds.[128]  This was to make clear that a three-year track record was unnecessary when selecting a multi-asset class fund (like the Horizon Funds), as long as the underlying component funds had a three-year history or were passive funds.[129]

The second aspect of how the Horizon Funds were constructed and managed was Reliance's process for developing the strategic asset allocation (glide path) for each Fund and rebalancing among the components, as their respective market values fluctuated over time, relative to that strategic asset allocation/glidepath.  Reliance came to these tasks with experience and expertise with developing strategic asset allocations and managing risk-based funds across multiple asset classes.[130] As is conventional in the industry, the strategic allocation for each of the Horizon Funds was designed by Reliance in light of the expected retirement date of the participants investing in it, *e.g.,* target date fund 2020, 2030, 2040, etc.  The strategy called for declining levels of equity securities as each respective retirement target date approached, i.e., increasingly conservative and low volatility investments, such as fixed income and cash, and conversely, the more distant the expected retirement date, the more exposure to equity.[131]   For instance, the strategic asset

---

[125]     *See* NSP-000048345-0001 (Fact Sheet for Insperity 2020 Fund).
[126]     NSP-10927 at p. 10, Item No. 5.
[127]     *See* NSP-000071575 (August 31, 2011 notes of Dan Pollina).
[128]     NSP-000011037, at pg. 32; Cotter Dep. at pp. 168:14-170:19.
[129]     Cotter Dep., at pp. 169:9-171:8.
[130]     Deposition of Mark Teichner ("Teichner Dep.") at pp 79:19-83:2; Cotter Dep, at pp. 29:18-32:16.
[131]     Broadly put, equity securities tend to vary in value over time far more than fixed income securities, although they are also expected on average, over long periods, to earn higher rates of return.  Investment professionals commonly refer to the variability of values and returns as risk,

Confidential – Pursuant to Protective Order

allocation for the 2020 Horizon Fund was 64% equity/36% fixed income, and within equities, roughly 35% U.S., 19% international, 6% real estate and 3% commodities.[132]  The fixed income class was divided into short term bonds at roughly 11%, intermediate bonds at 18%, U.S. Treasury inflation protected securities ("TIPS") at 4% and high yield bonds at another 4%.  In order to maintain the portfolio at that set of targets, Reliance was responsible for periodically trimming or adding to these asset classes and subclasses throughout fluctuating market conditions and values, *i.e.,* it was responsible for "rebalancing."  This type of rebalancing is a standard and core function for a wide range of investment fiduciaries and consultants.  In fact, Reliance had considerable experience with this, through its years of experience as trustee for various investment funds with exposure across multiple asset classes [133]

The third aspect of how the Horizon Funds were constructed and managed was the role of F-Squared.  Because Reliance lacked experience with itself running a de-risking strategy, it decided to engage specialty investment adviser F-Squared to assist.  In March 2012, Reliance reported and Insperity learned the basics of the F-Squared tactical equity de-risking program, including its key inputs, and considered the program's historic allocations on a monthly basis from April 2001 until December 2011, based on information from Morningstar, F-Squared and Reliance.[134]  Insperity also learned the very favorable results of back-testing the Horizon Funds, using F-Squared's strategy and reported performance history, compared to the results with the J.P. Morgan target date funds.  That same month, through the "Second Update" of Reliance's due diligence memorandum, Insperity learned that Reliance had evaluated F-Squared's reported investment history, including its returns in both up and down markets.[135]  By 2012, Reliance had a number of years of "live" experience with F-Squared, including periods of adverse equity markets and the recovery, which gave it confidence in F-Squared.[136]

In short, contrary to Plaintiffs' allegations, the Horizon Funds had a substantial performance history on three different levels and Insperity considered them all — the underlying component funds, Reliance's experience with rebalancing relative to a strategic asset allocation and F-Squared's reported history with equity de-risking.

---

measured in terms of standard deviation.  The standard deviation of large capitalization equity securities in the U.S. is commonly estimated at approximately 15-18%, whereas the standard deviation of investment quality, medium duration bonds is approximately 5%.

[132]    *See* NSP-000011037 (March 2012 Trustee Report), at p. 49.  For these purposes, both real estate and commodities were deemed part of the "equity" allocation.  Unlike fixed income investments, equity securities, real estate and commodities are broadly considered "growth-oriented" assets, expected to increase in value during periods of economic growth, including inflation.  However, the performance of real estate and commodities does not entirely correlate to that of equity securities, thus helping to diversify a portfolio.

[133]    Teichner Dep. at pp 79:19-83:2; Herink Dep, at pp 252:25-253:8, 254:8-15; Reliance Manager Due Diligence Minutes, June 15, 2012 and June 27, 2013, (RTCPLEDGER23652, 23666); NSP-000068625 (Third Updated Memorandum), at p. 2 (NSP-000068626).

[134]    *See* NSP-000011037 (March 2012 Trustee Report), at pp. 50-51.

[135]    NSP-000068633.

[136]    Teichner Dep., at pp. 181:15-182:24, 229:4-232:25, 242:24-244:6.

-33-

Confidential – Pursuant to Protective Order

> **d.** **Insperity Reasonably Concluded that Reliance Appropriately Evaluated the Expense Ratios of the Horizon Funds and that Reliance's Fee Was Appropriate**

Plaintiffs allege that the Horizon Funds carried excessive expense ratios, totaling 53 bps, including 25 for revenue sharing, 10 for acquired fund fees and "up to 18 bps" for investment management.[137] However, this allegation is unfounded, because Plaintiffs incorrectly treat the economic impact of revenue sharing and incorrectly characterize Reliance's fees.

> ➢ *Revenue Sharing*

Revenue sharing may be considered one form of what industry practitioners broadly call "soft dollar" arrangements in contrast with "hard dollars." Soft dollar arrangements enable a plan indirectly to pay reasonable plan expenses to a service provider by way of bundled payments to some other provider who splits off or "recaptures" part of that bundled amount to pay the first provider. Soft dollar payments are commonly made through securities brokerage, where the plan pays, say, 5 cents a share to a broker for executing an equity trade and the broker remits, say, 2 cents to a commission recapture agent, who (on the plan's behalf) then pays that recaptured amount to some other provider which the plan owes. The 2 cents is said to be "directed" or "recaptured" for the economic benefit of the plan or its participants. The net to the executing broker is 3 cents and through commission recapture, the plan has indirectly also satisfied its obligation to the other provider. Thus, focusing only on the gross amount of 5 cents and on that basis concluding the Plan paid that full amount for brokerage is incomplete and incorrect.

In the context of a 401(k) plan, as here, when the plan participant invests in a given mutual fund on the plan's investment menu, part of the fund's total, gross expense ratio may include a component available for payment to another service provider, for instance, for participant recordkeeping. Where, as here,[138] the participant is ultimately responsible for bearing the cost of both the mutual fund investment and recordkeeping, paying the expense ratio effectively covers both obligations at once.[139]

---

[137]    Am. Compl. ¶ 172.

[138]    *See* Plan at § 7.4 ("Plan Expenses. Expenses of administering this Plan, including, but not limited to, the fees and expenses of the Trustee, the Administrator, and the investment managers shall be paid from the Trust under the Plan unless such expenses are paid by a Company Affiliate or Covered Entity. Brokerage fees, transfer taxes and other expenses incident to the purchase or sale of securities by the Trustee shall be deemed to be part of the cost of such securities, or deducted in computing the proceeds therefrom, as the case may be. Taxes, if any, on any assets held or income received by the Trustee shall be charged appropriately against the accounts of Participants as the Administrator shall determine. Applicable loan, withdrawal, distribution, transactional and such other similar fees and expenses shall be charged appropriately against the accounts of Participants.")

[139]    Am. Compl. ¶ 49-50.

Confidential – Pursuant to Protective Order

Purely as a matter of economics, the impact on participants should be equivalent whether the recordkeeping expenses are paid in unbundled hard dollars or through bundled soft dollars, *i.e.,* through revenue sharing.[140]  To illustrate, assume the two following arrangements:

> (1) Reliance installs a mutual fund with a gross expense ratio of, say, 100 basis points, including a revenue sharing (or "recaptured") component of, say, 25 bps and uses all of the latter to reimburse Insperity Retirement Services ("RS"), for appropriate recordkeeping and administrative expenses.  Further assume the total participant assets in this mutual fund average, say, $50 million over the course of a year, so the 25 bps amounts to a payment of $125,000 to the revenue sharing account out of which Insperity RS is reimbursed some of its expenses.

> (2) Reliance installs a mutual fund with a gross expense ratio of 75 bps, without any revenue sharing component and charges participants a hard dollar cost of $125,000 to cover the reimbursable expenses of RS.

From the economic perspective of plan participants, these two arrangements are equivalent.

Now turn from that simplified hypothetical example to the actual facts.  Page 42 of the March 2011 Trustee Report illustrates the situation here.[141]  For the year ended December 31, 2010, that Exhibit shows that total Plan expenses for recordkeeping and trustees services came to $3,699,656, consisting of recordkeeping expenses of $3,006,491 and trustee expense of $693,165.  This total of nearly $3.7 million in expense amounted to 33 bps, relative to the Plan's weighted asset value of just over $1.1 billion.  Now turn to the investment portion of the equation—first mutual fund costs and then "recapture" of a portion of those costs (i.e., the revenue sharing payments).  The estimated total in fund expense ratio payments came to over $10.7 million and that equated to 97 bps, as shown on page 42 of Exhibit E.  However, a major portion of that – $4,520,826 – was recaptured for purposes of defraying other expenses.  That $4.5 million of recapture money amounted to 41 bps.   Page 42 of Exhibit E lays out the math like this:

> The total of expenses for recordkeeping, trustee services and mutual fund expense ratios comes to $14,408,951 and subtracting the recaptured revenue of $4,520,826, leaves a net expense of $9,888,125, as shown on the bottom of the page.

---

[140]     From the fiduciary's perspective, the soft dollar or revenue sharing arrangement may be more burdensome than simply making explicit, direct hard dollar payments to each of the providers, because properly managing revenue sharing requires maintaining detailed accounts of how much is paid, to whom, for what, compared to a reasonable hard dollar equivalent, including how much is "recaptured" or redirected to defray other expenses.  But here, Reliance maintained such accounts and advised Insperity of them, including keeping track of any amounts of revenue sharing in excess of the required trustee fees and recordkeeping expense reimbursements (i.e., credits applicable to the next quarter's fees and expenses).  *See* NSP-000011035-11042 (Annual Trustee Reports).

[141]     *See* Ex. E (NSP-000011036) at p. 42.

Confidential – Pursuant to Protective Order

Another way to lay out the math — functionally equivalent to what page 42 of Exhibit E shows – is to apply the revenue sharing strictly against the gross mutual fund expense ratio.  If the recaptured amount is netted against the 97 bps in gross expense ratio payments, the net expense ratio comes to only 56 bps ($6,188,379).  Either way, the economic impact on the Plan and its participants and beneficiaries is equivalent: the revenue sharing is recaptured and applied to reduce expenses they would otherwise bear.

Insperity expressly recognized this:

> *Since we do not keep any of the revenue sharing, there is no benefit to us to offer higher cost funds to generate more revenue sharing.  The downside to low cost funds is a possible direct expense allocation to participants.  Either way, the cost of the plan to participants is 'less than the cost to operate it' because we can only offset fiduciary costs associated with operating the plan.  Whether that cost is paid by revenue sharing from higher cost funds or by direct expense to participant accounts, the cost to the participant is the same.*[142]

In short, while Plaintiffs argue that the expense ratios of the funds Reliance selected were excessive, they ignore the true economics of the arrangement from the perspective of Plan participants.

Insperity did not blindly or passively acquiesce in the revenue sharing arrangements; to the contrary, Insperity was very active in evaluating and monitoring the arrangements, including the level of the expense ratios with and without revenue sharing and alternative ways to structure the arrangements. Insperity monitored data comparing the expense ratios on the Plan's overall menu of options, as well as for the Horizon Funds and their underlying component funds, relative to industry averages and high and low percentiles for institutional share class mutual funds, without revenue sharing, collective investment trusts and no-load investor share class mutual funds.[143] Notably, the expense ratios on the component funds were all lower than even the 25th percentile for each category and often lower than even the 10th percentile (lower percentile meant lower expenses).[144] Insperity also monitored and considered Reliance's analysis of shifting to share classes for certain mutual funds across the Plan's platform with lower expense ratios.[145]

Insperity expressly considered the pros and cons of using only institutional class mutual funds (without revenue sharing) vs. funds with revenue sharing and decided "to continue to balance the need for funds that pay revenue sharing as a means of fairly charging plan participants for recordkeeping and other services."[146]  Shortly thereafter, Reliance considered possibly equalizing

---

[142]    *See, e.g.* NSP-000058281 (December 27, 2012 e-mail from Veronica Medlin to Mark Ashby).

[143]    *See, e.g.* NSP-000018131 (August 24, 2010 e-mail chain ending with Heidi Lapham to John Stanton); NSP-000011041 at pp. 54-55 (May 11, 2016 Annual Trustee Meeting presentation).

[144]    NSP-000011041 at pp. 60-61.

[145]    *Id.* at p. 55.

[146]    NSP- 000065411 ("We use any asset-based revenue to offset the cost of running the plan." Selecting funds without that revenue "would then cause us to charge expenses to plan participants."); NSP-000020690 (July 25, 2013 meeting between Insperity and Reliance).

Confidential – Pursuant to Protective Order

revenue sharing payments across nearly all funds.[147]  The parties continued to analyze and discuss the prospect of an equalized revenue sharing arrangement, with only one mutual fund at a different rate, and projected several different outcomes with the new arrangement.[148]  Insperity and Reliance not only kept track of the amount of revenue sharing; they also followed and discussed legal literature and trends that regulated that issue.[149]

When the revenue sharing generated by existing funds on the Plan's investment menu was more than sufficient to defray Plan expenses, Insperity closely monitored Reliance's decisions to shift to lower cost funds, with less or no revenue sharing.[150]

> ➢ *The Trustee's Fee*

Plaintiffs further attack the expense ratios of the Horizon Funds on the ground that unlike J.P. Morgan, Vanguard and T. Rowe Price on their respective target date funds, Reliance charged a so-called "investment management fee" of "up to 18 bps."[151]  This is wrong for at least three reasons.

*First,* the fee Reliance received from the Horizon Funds was not for "investment management" or "asset management" of the Horizon Funds.  Reliance expressly waived any "investment management" fee for the Horizon Funds.  Rather, Rather, Reliance received only an "administration fee" of 8 bps for the services it performed just for Horizon Funds.[152]

*Second,* Plaintiffs don't mention that the underlying components of the target date funds of the other firms include—or entirely consist of—their own proprietary funds.  For instance, all the components of the Rowe Price 2020 target date funds are Rowe Price funds.[153]  By contrast, none of the components of the Horizon Funds that Reliance assembled and managed included any Reliance proprietary fund.  Unlike the other firms that collect compensation for managing their respective target date funds through the fees of the underlying component funds, Reliance received compensation solely through the explicit all-in administration fee at the "top" level.

*Third*, attacking Reliance's supposed investment management fee for the Horizon Funds is a red herring; the truly significant point is that the *total* expense ratio was *lower* than the total ratio for the J.P. Morgan target date funds that Reliance replaced.  As the Annual Report of March 2012 showed, selection of the Horizon Funds trimmed the total expense ratio to approximately 53 bps,

---

147    NSP-000038296; NSP-000075961-69; March 2014 Trustees Report (NSP-000011039) at pp. 34, 36-38.

148    March 2014 Trustee Report (NSP-000011039) at p. 34; NSP-000008786 (March 21, 2014 e-mail from Doug Sivula to John Stanton); NSP-000095412 (April 7, 2014 Agenda).

149    *See, e.g.*  NSP-000066547-48 (March 19 2015 e-mail from Kent Buckles to John Stanton and prior e-mails).

150    *See, e.g.* NSP-000018492 (July 5, 2012 e-mail from Karen Drury to John Stanton); NSP-000051702 (November 3, 2012 e-mail from John Stanton to Marcia Gady and Marcia Gady's preceding message); NSP-000058281 (December 27, 2012 e-mail from Veronica Medlin to Mark Ashby).

151    Am. Compl. ¶69.

152    RTCPLEDGER00431582.

153    *See, e.g.,* https://www3.troweprice.com/fb2/fbkweb/snapshot.do?ticker=TRRBX.

Confidential – Pursuant to Protective Order

down sharply from the 88 bps that the J.P. Morgan target date fund charged.  Furthermore, as Reliance reported to Insperity, the total expense ratio on the Horizon Funds was well below other comparable tactical target date funds structured as collective trusts.[154]  Plaintiffs can hardly attack Insperity for monitoring a conversion to Horizon Funds that were reasonably designed to mitigate equity risk and dramatically reduce expenses, compared both to the predecessor target date funds from J.P. Morgan and other comparable target date funds across the wider marketplace.

> **2.    Insperity Reasonably Monitored Reliance's Performance as Trustee and Investment Manager for the Horizon Funds.**

The record demonstrates that Insperity reasonably performed its ongoing monitoring function by receiving and reviewing extensive information about Reliance's continuing management and evaluation of the Horizon Funds.  Insperity performed its ongoing monitoring role within the framework of policies, practices and information flows discussed above, and by continuing to apply considerable staff resources.  Insperity's ongoing monitoring of Reliance's functions concerning the Horizon Funds included the following factors, some mentioned earlier and some detailed below:

- The fact that Reliance itself didn't manage separately managed portfolios of securities; *i.e.,* Reliance merely selected mutual funds (registered investment companies) or collective trusts, which, in turn, held such portfolios and were managed by other, underlying investment management firms, as previously explained;

- The  senior and mid-level staff that Insperity devoted to monitoring Reliance and overseeing the 401(k) Plan;

- The content and quality of the Annual Reports that Insperity received from Reliance and reviewed.  (Section VII.D.1 discussed these Annual Reports primarily as they concerned Reliance's process for selecting funds.  This Section discusses these Annual Reports primarily as they concern Reliance's ongoing evaluation of funds);

- The content and quality of the quarterly Investment Performance Reports Insperity received from Reliance;

- The Fund Fact Sheets for each investment option that Insperity reviewed;

- The nature and extent to which Insperity and its staff reviewed, questioned, independently critiqued and came to understand Reliance's analysis and reporting;

- Meetings between Insperity and Reliance in addition to the Annual Meetings; and

- Other communications between Insperity and Reliance.

---

[154]    Addendum to the May 11, 2016 Trustee's Report (NSP-000011041) at p. 63 (p. 5 of the Addendum).

Confidential – Pursuant to Protective Order

a.    **Insperity Monitored the Performance of the Horizon Funds**

In addition to the overall review of quarterly Investment Performance Reports and Annual Reports from Reliance regarding all investment options, Insperity also remained further updated about the Horizon Funds.

After the first full year of experience with the Horizon Funds, Insperity received and considered details regarding those funds, their performance and Reliance's evaluation of them.  At the March 2014 Annual Meeting, Reliance provided Insperity not only the returns of the Horizon Funds but also what is known as "performance attribution."[155] This is an analysis of the causes of an account's investment performance, compared to relevant benchmarks.  The March 2014 Annual Report showed the return of each Horizon Fund, the comparative return of a target date benchmark, the difference in actual returns vs. the benchmark by asset class and subclass, and the impact of that difference on the whole portfolio, after considering the proportion of the total portfolio invested in such class or subclass.[156]  That same page explained which asset classes contributed to positive performance (Reliance underweighted intermediate term bonds and with the broad bond market down over 2% in 2013, that helped protect the portfolio), and which detracted from performance (underweighting U.S. equities and overweighting hedging assets like real estate and commodities, while the stock market skyrocketed).

Similarly, at the March 2015 Annual Report and Meeting, Reliance reported the returns of the Horizon Funds against relevant benchmarks, explained that the disappointing performance resulted from "equity de-risking" and stated that Reliance not only continued reviewing F-Squared, but had placed it on the watch list and intended to remove it.[157]

In April 2015, Insperity received an extensive update of the glidepath for those funds, the process and criteria for selecting the underlying component funds, Reliance's process for monitoring them and other details.[158]  On September 18, 2015, Insperity received a detailed e-mail from Trey Carter (Reliance) about possibly shifting from BNY Mellon index funds to Blackrock collective investment trusts, for the Horizon Funds, and adding securities lending.[159]   At the May 11, 2016 Annual Trustee Meeting, Reliance updated Insperity on its replacement of F-Squared with Allianz, after favorably evaluating its Dynamic Multi-asset Plus process and track record.[160]   And, more recently, Reliance considered and Insperity monitored the possibility and eventual replacement of the Horizon Funds with the American Funds target date series.[161]

With the benefit of hindsight, Plaintiffs suggest that the fact that the Horizon Funds lagged the investment returns of other target date funds available in the marketplace, somehow suggests that

---

[155]    NSP-000011039 at p. 43.
[156]    NSP-000011039 at p. 43.
[157]    NSP-000011040 at pp. 28, 31.
[158]    NSP-000038729-30 (April 2, 2015 e-mail from Nick Cotter to John Stanton).
[159]    NSP-000042511-12; NSP-000047706 (October 7, 2015 e-mail from Trey Carter to John Stanton).
[160]    NSP-000011041 at pp. 35-36.
[161]    January 25, 2017 Investment Update (NSP-000036197) at pp. 25-28; March 2017 Annual Trustee Report (NSP-000011042).

Confidential – Pursuant to Protective Order

Defendants failed to reasonably consider whether to install those Horizon Funds in the first place.[162]  This suggestion is unfounded.  For present purposes, the question is not whether the absolute returns of the Horizon Funds lagged the other funds.[163]  Rather, the question here is whether, under the circumstances then-prevailing, Insperity reasonably monitored *Reliance*, when Reliance made the decision to establish and install the Horizon Funds in the Plan, and Reliance made the decision to maintain the Horizon Funds as an investment option in the Plan during the Class Period.  As demonstrated earlier, the record indicates that Insperity received and considered extensive information about Reliance's decisions throughout the Class Period, thereby meeting, if not exceeding, Applicable Standards for a Monitoring Fiduciary.

> **b.** **Insperity Monitored Reliance's Use of F-Squared as Tactical Advisor to the Horizon Funds**

Well into 2014, Reliance continued reviewing F-Squared, and Insperity continued to monitor Reliance's decision to select and maintain F-Squared as an advisor to the Horizon Funds. Specifically,

- Insperity met with representatives from F-Squared Investments (including its CEO, Howard Present) in June 2013[164] and again and in November 2014.[165]

- Insperity received periodic reports from Reliance about F-Squared's program, and its recommendations to reduce equity exposure due to market volatility.[166]

---

[162]     Am. Compl. ¶69.

[163]     Plaintiffs do not address other after the fact measures of performance, such as risk-adjusted returns and correlations of return across different investment options.  Nor do Plaintiffs acknowledge that over the time period the Horizon Funds were in place with the F-Squared strategy, the equity market avoided any major downtown—precisely the type of environment the overlay was designed to cushion.  The home owner who buys property insurance isn't considered imprudent just because, in retrospect, his house avoided a major calamity.

[164]     NSP-000055733 (May 30, 2013 e-mail from John Stanton to Richard Rawson); NSP-000023681 and NSP-000055734 (June 3, 2013 presentation materials).  These June 2013 meeting materials reviewed F-Squared as an organization, its role with the equity de-risking program for the Horizon Funds, the nature of that program, its reported performance results and the advantage to participants of the program.

[165]     NSP-000020297-98 (November 13, 2014 e-mail from John Stanton to Neil Shifman); NSP-000031851 (presentation titled "Insperity Horizon Funds: The Value Proposition," explaining the importance of protecting against stock market losses); NSP-000047408-47412 (Doug Sivula notes); NSP-000031833 (Heidi Lapham notes); NSP-000032169 (Karen Drury notes).

[166]     NSP-000018459 (March 16, 2015 e-mail from Colin Wood to John Stanton and attached materials from F-Squared, entitled "Flash Commentary, March 4, 2015," and "The Alpha Sector Value Proposition,"); NSP-000018460; NSP-000019637 (October 20, 2014 e-mail from Peter May to Katherine Red).

Confidential – Pursuant to Protective Order

- Insperity kept track of further news developments about the SEC investigation into F-Squared even before and without notifications from Reliance.[167]

In short, Insperity repeatedly and proactively monitored Reliance's decision to maintain F-Squared as an advisor to the Horizon Funds throughout the relevant portion of the Class Period.

### B.   Insperity Reasonably Monitored Reliance's Conduct in Selecting and Periodically Replacing Other Investment Options

Plaintiffs claim that the Plan's other investment options (besides the Horizon Funds) imposed unreasonably high fees and expenses.[168]   However this argument fails for several reasons.

*First,* Plaintiffs routinely use misleading numbers.  In the chart depicted at Paragraph 96 of the Amended Complaint, for instance, Plaintiffs cite the gross expense ratio of each mutual fund in the Plan's line-up and then conclude that those figures exceed the expenses of lower-priced shares of the same mutual funds.  However, the more correct ratio is the net figure, after the credit for revenue sharing.  Assuming an average of 40 bps in revenue sharing,[169] the more correct figures would each be that much lower.   For instance, whereas Plaintiffs' chart cites the gross expense ratio of 117 bps for the Allianz NFJ Small Cap Value Fund and compares that to the 77 bps ratio for "the identical lower cost fund [share class] fee," the net expense ratio for Insperity Plan participants (assuming the average credit for revenue sharing) was that same 77 bps.  Continuing alphabetically down the list on Plaintiffs' chart, the 97 bps expense ratio for the Allianz GI High Yield Bond Fund would be 57 bps, net of the revenue sharing and that is *less than* the "identical lower cost fund fee" of 64 bps.  In fact, for most of the funds Plaintiffs list, the net expense ratio (after the revenue sharing credit) was likewise lower than the lower cost fund fee cited on their chart.

The Annual Reports to Insperity correctly and with extensive detail showed the Plan's expenses, the amount of revenue sharing used to defray them, any credits remaining to cover future Plan expenses and the net economic impact on participants.[170]   Thus, in my opinion, given its role as Monitoring Fiduciary, Insperity reasonably monitored the net fees and expenses for participants.

*Second,* Plaintiffs argue that the Plan's investment options were more costly than comparable funds offered by Vanguard.[171]  This comparison also is flawed.   Many Vanguard funds are passively managed, unlike the actively managed funds in the Plan.  In my opinion, a mix of active

---

[167]     *See, e.g.* NSP-000019733 (e-mail from John Stanton to Kent Buckles); NSP-000068896 (May 13, 2014 e-mail from Kent Buckles to John Stanton with May 9 letter from F-Squared to "valued clients and business partners."); NSP-000019723 (August 27, 2014 e-mail from Kent Buckles to Neil Shifman and John Stanton); NSP-000068897 (May 9, 2014 letter from Howard Present of F-Squared); NSP-000066547 (December 22, 2014 e-mail from John Stanton to Neil Shifman);  NSP-000066547 (March 20, 2015 e-mail from John Stanton to Dan Pollina noting that Reliance called to tell Insperity it was terminating F-Squared).

[168]     Am. Compl. ¶¶ 92-137.

[169]     *See, e.g.* NSP-000011037 (March 2012 Trustee Report) at p. 46.

[170]     *See* Exs. D-K.

[171]     Am. Compl. ¶ 104.

Confidential – Pursuant to Protective Order

and passive investment options is desirable in a 401(k) plan, because structurally speaking, they embody different types of investment risk.   From an investment perspective — considering both expected risk and expected return — simply comparing them as entirely "apples to apples" or entirely fungible is thus misleading.   The bottom line is that the Plan offered participants both passive (e.g., the BNY Mellon S&P 500 Index, plus the components of the Horizon Funds were mostly index funds) and active strategies and that combination is, in my opinion, a reasonable (even desirable) structure.   Also, when citing the Vanguard expense ratios, Plaintiffs once again reference the Plan's gross expense ratios before the credit for revenue sharing.

*Third,* some of the funds that Plaintiffs cite as representing "the same investment style" as the Plan's respective options are actually not "the same."   To take just one example — starting alphabetically with the first fund listed — the Allianz NJF Small Cap Value Fund is considerably less risky than the Vanguard Explorer Value Fund based on the key metric of forward price earnings ratio.   Based on recent Morningstar data, the Allianz NJF P/E was only about 16 whereas the Vanguard P/E was substantially more — almost 22.   As the different P/Es suggest, the equity classifications of the two funds were different and the applicable market benchmarks were different as well.   Whereas Morningstar classifies the Allianz NJF Fund as small cap value, with the Russell 2000 Value Index as its benchmark, the Vanguard Explorer Fund is classified as small blend (a mix of value and growth) with a benchmark of the core (not value) Russell 2000 Index. These features are often related: more growth would be expected to mean a higher P/E and a higher degree of risk.

*Fourth,* Plaintiffs contend that Defendants failed to act reasonably by not considering separately managed accounts instead of pooled vehicles, because the former typically entail lower investment management fees.[172]   Once again, Plaintiffs begin with the artificially high gross expense ratios of the Plan's options, before revenue sharing.   Next, they assume, based on a U.S. Department of Labor study that's nearly 20 years old, that separate account fees are only a quarter of the expense ratios of retail mutual funds.[173]   In my experience, this is no hard and fast rule.   In fact, the actual investment management fees on a separate account vary, depending on many factors, including the asset value of the account, the specific investment discipline, other relationships among the parties, custody arrangements and possible refinements to the separate account investment management agreement and guidelines.   Moreover, the comparison of separate account fees to mutual fund fees doesn't begin to consider whether the latter figure is before or after a credit for revenue sharing.

Plaintiffs' own Amended Complaint contradicts this supposed "one quarter" standard.   For example, the Plan's expense ratio for Dodge & Cox was 52 bps and under the one quarter "rule," it would be a meager 13 bps.   However, Paragraph 116 of the Amended Complaint states that the published separate account pricing schedule for Dodge & Cox is 44 bps.

---

[172]     Am. Compl. ¶ 112.
[173]     On an unnumbered page, at Section 2.4.1, the report commissioned by the Department of Labor cited the investment consulting firm Rogers Casey as the source for this estimate.   However, how that firm arrived at that figure and its basis for doing so were not explained.   "Final Report: Study of 401(k) Plan Fees and Expenses, April 13, 1998."

Confidential – Pursuant to Protective Order

The general proposition of using separate accounts in this Plan to replace the pooled vehicles actually used presents several practical issues. I believe that unless and until these are satisfactorily resolved, comparing fees on pooled vehicles to those of separate accounts largely remains an exercise in theory, unproven as realistic in practice. With separate accounts rather than self-contained mutual funds and collective trusts, the Plan would likely confront numerous additional issues and need to arrange to perform and pay for numerous additional functions, including, for instance:

- Developing and adopting customized investment manager guidelines for each separate account;

- Establishing and monitoring custody arrangements, to hold and maintain asset listings, transaction reports and other information regarding all assets and investment activity;

- Subcustody for foreign assets;

- Providing participants daily valuation of all accounts;

- Whether and on what terms to engage in securities lending, subject to what controls;

- Selecting a short term investment fund and determining how much of each account to permit in it;

- Evaluating the investment process, strategy and reported investment performance history for each candidate for a separate account, as distinct from the performance of the firm's pooled vehicle;

- Computing investment returns, risk metrics and other data for each separate account;

- Preparing and monitoring performance measurement and evaluation reports for each separate account;

- Monitoring adherence to the customized investment guidelines, to assure the composition and characteristics of each separate account are in compliance;

- Additional financial audit work;

- Additional legal work to prepare and periodically amend investment management agreements and resolve additional legal issues associated with separate accounts. For instance, I understand that under ERISA, it is unclear whether Reliance as an investment manager and/or trustee would be authorized to delegate authority to another Section 3(38) investment manager, unless Reliance was also a co-named fiduciary under Section 402(a);

- Evaluating, structuring and monitoring the brokerage and trading practices of each separate account manager, including appropriate use of soft dollars and the relationship between trading for the separate account vs. trading for the mutual fund or collective trust. The

Confidential – Pursuant to Protective Order

latter issues include, for instance, equitable allocation of trading opportunities (especially in less liquid asset subclasses) and equitable sequencing of trade execution; and

- Arranging for and monitoring the proxy voting practices for each equity account.

Plaintiffs do not address who would perform these functions, whether these issues can be satisfactorily resolved or how much administrative complexity and cost they would have added to the overall investment program. In my opinion, it is difficult to conclude in actual practice whether separate accounts would be feasible and preferable to pooled vehicles, unless and until each of these matters is resolved, account by account. By the same token, in my opinion, comparing the fees on pooled vehicles vs. separate accounts remain largely hypothetical unless and until these issues are satisfactorily resolved, account by account. As far as I know the record, Plaintiffs have not even attempted to address, much less resolve, these issues.

## IX.   **CONCLUSION**

Based on the record cited above and the foregoing analysis, my opinions are two-fold:

First, under then-prevailing circumstances, Insperity, met if not exceeded, Applicable Standards for monitoring Reliance during the Class Period by performing its functions within a well-structured framework of policies, practices and extensive, continuing channels of information.

Second and more specifically, under then-prevailing circumstances, Insperity met, if not exceeded, Applicable Standards for monitoring Reliance during the Class Period with respect to the key issues Plaintiffs have raised, namely Reliance's:

- decision to establish the Horizon Funds and add them to the Plan's investment menu;

- subsequent performance as investment manager for the Horizon Funds; and

- conduct in selecting and periodically replacing the Plan's investment options (including mutual funds and collective trusts) with, among other features, expense ratios that included a component for revenue sharing.

Confidential – Pursuant to Protective Order

Respectfully submitted,

*Samuel Halp*

Samuel W. Halpern

Prudent Expert, LLC

3/1/18

March 1, 2018